RECORD NO. 15-1063

In The

# United States Court of Appeals
### For The Fourth Circuit

**SEVERN PEANUT CO., INC.; MEHERRIN AGRICULTURE & CHEMICAL CO.; TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,**

*Plaintiffs – Appellants*,

**v.**

**INDUSTRIAL FUMIGANT CO.; ROLLINS INC.,**

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT ELIZABETH CITY**

————————

**BRIEF OF APPELLANTS**

————————

James L. Warren, III
Alexandra Markov
D. Scott Murray
CARROLL WARREN & PARKER PLLC
Post Office Box 1005
Jackson, Mississippi  39215
(601) 592-1010

Jay M. Goldstein
Hunter C. Quick
Howard M. Widis
QUICK, WIDIS & NALIBOTSKY, PLLC
2115 Rexford Road, Suite 100
Charlotte, North Carolina  28211
(704) 364-2500

*Counsel for Appellants*

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  15-1063      Caption:   Severn Peanut Co., Inc. et al. v. Industrial Fumigant Co. et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Meherrin Agriculture & Chemical Co.
(name of party/amicus)

_____

 who is _____an appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐ YES ☑ NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☑YES ☐NO
    If yes, identify entity and nature of interest:

    Travelers Property Casualty Co. of America; Subrogated Interest

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ James Warren III                     Date: 1/27/2015

Counsel for: Appellants

# CERTIFICATE OF SERVICE
************************

I certify that on 1/27/2015 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Steven B. Epstein, Esq.
POYNER SPRUILL LLP
301 Fayetteville Street, Suite 1900
Raleigh, NC 27601

Timothy W. Wilson
POYNER SPRUILL LLP
130 South Franklin Street
Rocky Mount, NC 27802-0353

VIA U.S. MAIL

William J. Conroy, Esq.
CAMPBELL TRIAL LAWYERS
1205 Westlakes Drive, Suite 330
Berwyn, PA  19312

s/ James Warren III                     January 27, 2015
      (signature)                             (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1063__          Caption: __Severn Peanut Co., Inc. et al. v. Industrial Fumigant Co. et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

Severn Peanut Co., Inc.
_____
(name of party/amicus)

_____

 who is _____an appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                            ☑ YES ☐ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
         Meherrin Agriculture & Chemical Co.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                         ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☑YES ☐NO
If yes, identify entity and nature of interest:

Travelers Property Casualty Co. of America, Subrogated Interest

5.    Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/ James Warren III                      Date:        1/27/2015

Counsel for: Appellants

# CERTIFICATE OF SERVICE
**************************

I certify that on        1/27/2015        the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Steven B. Epstein, Esq.
POYNER SPRUILL LLP
301 Fayetteville Street, Suite 1900
Raleigh, NC 27601

Timothy W. Wilson
POYNER SPRUILL LLP
130 South Franklin Street
Rocky Mount, NC 27802-0353

VIA U.S. MAIL

William J. Conroy, Esq.
CAMPBELL TRIAL LAWYERS
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312

s/ James Warren III                              January 27, 2015
     (signature)                                        (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-1063__        Caption: __Severn Peanut Co., Inc. et al. v. Industrial Fumigant Co. et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Travelers Property Casualty Company of America ("Travelers")__
(name of party/amicus)

_____

 who is _____an appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                      ☑ YES ☐ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
        Travelers is 100% owned by The Phoenix Insurance Company, which is 100% owned by The Travelers Indemnity Company, which is 100% owned by Travelers Insurance Group Holdings, Inc. which is 100% owned by Travelers Property Casualty Corp., which is 100% owned by The Travelers Companies, Inc. The Travelers Companies, Inc. is the only publicly held company.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: __s/ James Warren III_____    Date: _____1/27/2015_____

Counsel for: _Appellants_____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____1/27/2015_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Steven B. Epstein, Esq.
POYNER SPRUILL LLP
301 Fayetteville Street, Suite 1900
Raleigh, NC 27601

Timothy W. Wilson
POYNER SPRUILL LLP
130 South Franklin Street
Rocky Mount, NC 27802-0353

VIA U.S. MAIL

William J. Conroy, Esq.
CAMPBELL TRIAL LAWYERS
1205 Westlakes Drive, Suite 330
Berwyn, PA  19312

_s/ James Warren III_____                  _____January 27, 2015_____
(signature)                                              (date)

- 2 -

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE ................................................................ 2

    A.    Underlying Facts - The Fire and Explosion at Severn's Dome ........... 3

    B.    Procedural History Preceding the Erroneous Grant of Summary Judgment ............................................................................................ 9

SUMMARY OF THE ARGUMENT ..................................................... 16

ARGUMENT ......................................................................................... 19

    A.    Standard of Review ......................................................................... 19

    B.    The District Court Erred by Relying Solely on Post-Ignition Conduct to Support a Finding of Contributory Negligence ............... 20

    C.    The District Court Erred by *Sua Sponte* Granting Summary Judgment in the Face of Overwhelming Evidence Of Fact Issues .............................................................................................. 23

        1.    Disputed Facts Concerning the Removal of Peanuts ............... 24

        2.    Disputed Facts Concerning the Use of Foam ........................... 27

        3.    Disputed Facts Concerning the Use of Liquid CO2 ................. 29

        4.    Disputed Facts Concerning Whether Severn Followed Advice from Williams ............................................................. 30

i

D.    The District Court Erred by Granting Summary Judgment as to the Breach of Contract Claim ........................................................... 31

    1.    The PAA's Exculpatory Language Is Unenforceable as a Matter of Public Policy ............................................................ 31

    2.    The PAA Must Be Construed Against IFC/Rollins ................. 38

        (i)    Enforcement of the PAA as Interpreted by the District Court Would Be Unconscionable ...................... 38

        (ii)    Alternatively, The PAA Is Ambiguous and a Jury Should Interpret its Provisions ........................................ 40

CONCLUSION ................................................................................................ 41

REQUEST FOR ORAL ARGUMENT .................................................................. 42

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*1899 Holdings, LLC v. 1899, LLC,*
    568 F. App'x 219, 225 (4th Cir. 2014)........................................................30

*Alcoa S.S. Co. v. Charles Ferran & Co.,*
    383 F.2d 46 (5th Cir. 1967) ........................................................23

*Alston v. Monk,*
    373 S.E.2d 463 (N.C. Ct. App. 1988)........................................37

*Andrews v. Carr,*
    521 S.E.2d 269 (N.C. Ct. App. 1999)........................................20

*Brockwell v. Lake Gaston Sales & Serv.,*
    412 S.E.2d 104 (N.C. Ct. App. 1992)........................................37

*Cole v. Cole,*
    633 F.2d 1083 (4th Cir. 1980) ..................................................19

*Commscope Credit Union v. Butler & Burke, LLP,*
    764 S.E.2d 642 (N.C. Ct. App. 2014)........................................41

*Crider v. Jones Island Club, Inc.,*
    554 S.E.2d 863 (N.C. Ct. App. 2001)........................................41

*Dippold v. Cathlamet Timber Co.,*
    225 P. 202 (Or. 1924). ..............................................................22

*Evans v. Techs. Applications & Serv. Co.,*
    80 F.3d 954 (4th Cir. 1996) ......................................................19

*Fitzgerald v. Penthouse, Int'l, Ltd.,*
    639 F.2d 1076 (4th Cir. 1981) ..........................................19, 23

*Fortson v. McClellan*,
       508 S.E.2d 549 (N.C. Ct. App. 1998)........................................35, 37

*Freeman v. Dal-Tile Corp.*,
       750 F.3d 413 (4th Cir. 2014) ...............................................19

*Gore v. George J. Ball, Inc.*,
       182 S.E.2d 389 (N.C. 1971) .........................................35, 37, 39

*Hummer v. Pulley, Watson, King & Lischer, P.A.*,
       536 S.E.2d 349 (N.C. Ct. App. 2000)........................................20

*Hyatt v. Mini Storage on the Green*,
       763 S.E.2d 166 (N.C. Ct. App. 2014)........................................36

*In re Brokers, Inc.*,
       407 B.R. 693 (Bankr. M.D.N.C. 2009) .......................................31

*Jones v. Rallos*,
       890 N.E.2d 1190 (Ill. App. Ct. 2008*)*.......................................23

*J.M. Smith Corp. v. Matthews*,
       474 S.E.2d 798 (N.C. Ct. App. 1996)........................................21

*Little v. Rose*,
       208 S.E.2d 666 (N.C. 1974) ...............................................31

*Mais v. Allianz Life Ins. Co. of N. Am.*,
       34 F. Supp. 3d 754 (W.D. Mich. 2014).......................................22

*McMurray v. U.S.*,
       551 F. App'x 651 (4th Cir. 2014).....................................35, 36, 38

*Miller v. Miller*,
       160 S.E.2d 65 (N.C. 1968) ................................................22

*Parker v. Montgomery*,
       529 So. 2d 1145 (Fla. Dist. Ct. App. 1988).................................22

*Root v. Allstate Ins. Co.*,
    158 S.E.2d 829 (N.C. 1968) ...................................................................38, 40

*Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*,
    658 S.E.2d 918 (N.C. 2008) ........................................................................41

*Smith v. Childs*,
    437 S.E.2d 500 (N.C. Ct. App. 1993)........................................................21

*Southport Transit Co. v. Avondale Marine Ways, Inc.*,
    234 F.2d 947 (5th Cir. 1956) ................................................................22, 23

*Stan D. Bowles Distrib. Co. v. Pabst Brewing Co.*,
    317 S.E.2d 684 (N.C. Ct. App. 1984).................................................... 38-39

*Strawbridge v. Sugar Mountain Resort, Inc.*,
    320 F. Supp. 2d 425 (W.D.N.C. 2004)............................................ 34-35, 37

*Tatham v. Hoke*,
    469 F. Supp. 914 (W.D.N.C. 1979)...........................................................38

*Trillium Ridge Condo. Ass'n, Inc. v. Trillium Links & Village, LLC*,
    764 S.E.2d 203 (N.C. Ct. App. 2014)........................................................21

*Universal Am. Barge Corp. v. J-Chem., Inc.*,
    946 F.2d 1131 (5th Cir. 1991) ...................................................................37

*Walter v. Wal-Mart Stores, Inc.*,
    748 A.2d 961 (Me. 2000) ...........................................................................22

*Watson v. Storie*,
    300 S.E.2d 55 (N.C. Ct. App. 1983)..........................................................21

*Williams v. Jader Fuel Co.*,
    944 F.2d 1388 (7th Cir. 1991) ...................................................................22

## STATUTES

7 U.S.C. §§ 136, *et seq.*..................................................................................37

7 U.S.C. § 136j(2)(g) ....................................................................................36

28 U.S.C. § 1291 ..............................................................................................1

28 U.S.C. § 1332 ..............................................................................................1

N.C. GEN. STAT. §§ 143-434 *et seq.* ............................................................37

N.C. GEN. STAT. § 143-435 ...........................................................................36

N.C. GEN. STAT. § 143-443(b)(3)...................................................................36

## RULES

Fed. R. App. P. 3 ..............................................................................................1

Fed. R. Civ. P. 56 ..........................................................................................19

## OTHER AUTHORITIES

22 Am. Jur. 2d § 31 (1965)...........................................................................22

BLACK'S LAW DICTIONARY (8th ed. 2004) ..................................................35

*EPA Announces New Restrictions on Pesticide Phosphine Fumigants to Reduce Risks to Children New Labels Aim to Reduce Accidental Poisonings,* 2010 WL 1359682 (Apr. 7, 2010) ........................................................37

*EPA and Enterprise, Alabama Police Department Investigate Alleged Misuse of Pesticide,* 2002 WL 32574766 (Jan. 23, 2002) ........................37

## JURISDICTIONAL STATEMENT

Suit was filed in the Eastern District of North Carolina, Northern Division ("District Court").  Subject matter jurisdiction existed in the District Court pursuant to 28 U.S.C. § 1332 because there was complete diversity between the Plaintiffs and Defendants and the amount in controversy exceeded $75,000, exclusive of costs and interest.  No party challenged jurisdiction.

This Court possesses jurisdiction pursuant to 28 U.S.C. § 1291 because the District Court entered a final Order and Judgment disposing of all claims by summary judgment on December 22, 2014.  (JA 1672-76, 1677).  Appellants filed a timely Notice of Appeal on January 15, 2015.  *See*  FED. R. APP. P. 3; *see also* Notice of Appeal.  (JA 1678-80).

## STATEMENT OF THE ISSUES

1)     Whether the District Court erred by granting summary judgment based on contributory negligence when all the alleged acts or omissions of the Plaintiff forming the basis for the ruling occurred *after* the subject fire and when the Court acknowledged that "there is a serious question of material fact as to the cause of the fire."

2)     Alternatively, if post-fire conduct can be considered as contributory negligence, whether the District Court erred by granting summary judgment despite overwhelming evidence of fact issues regarding the fire suppression

activities, including multiple admissions by Defendants The Industrial Fumigant Co. ("IFC") and Rollins, Inc. ("Rollins") (collectively "IFC/Rollins") that issues of alleged contributory negligence were for the jury?

3)    Whether the District Court erred by granting partial summary judgment dismissing the breach of contract claim pursuant to contractual liability limitations that are void as against public policy or ambiguous?

## STATEMENT OF THE CASE

This action stems from a fire and explosion that destroyed a large peanut storage dome ("Dome") and approximately 20 million pounds of farmers stock peanuts. (JA 38-40, 1177). The Dome was 192 feet in diameter, 96 feet in height and contained a temperature monitoring system. (JA 458, 915-18, 1167, 1176-77). The fire and explosion were caused by IFC/Rollins's negligent application of a dangerous pesticide, aluminum phosphide. (JA 39-40). Severn Peanut Co., Inc. ("Severn") and its parent company Meherrin Agriculture & Chemical Co. ("Meherrin") suffered extensive property damage and business losses as a result of the fire and explosion. (JA 458-66, 1404). Their insurer, Travelers Property Casualty Company of America ("Travelers"), paid them $19,242,381.79 as a result of these losses. (JA 37, 40).

**A.    Underlying Facts - The Fire and Explosion at Severn's Dome**

Severn has been in the peanut industry since 1946 and was founded by the grandfather of Severn's current Vice President, R.P. Watson.  (JA 458, 772, 1214). Severn owns and operates several peanut production and storage facilities, including the Dome.  (JA 36, 38).  The Dome was Severn's largest storage facility and was located in Severn, North Carolina.  (JA 38, 898).  It was used to store farmers stock peanuts.  (JA 1216-17).  Severn had hired IFC/Rollins in the past to apply pesticides to ensure that any potential pest infestation was thwarted.  (JA 768, 800-01, 1172-75, 1178).

In April 2009, Severn entered into a Pesticide Application Agreement ("PAA") that obligated IFC/Rollins to fumigate the Dome with phosphine gas.  (JA 38, 46).  The PAA is a two-page form contract prepared by IFC/Rollins.  (JA 46-47).  There is no evidence that the terms of the PAA, particularly the exculpatory language, were negotiated.  The PAA includes two contradictory provisions, one that addresses a broad waiver of consequential damages, and one that contemplates liability for damages up to the amount of IFC/Rollins's insurance coverage.  (JA 46-47). The PAA, read as a whole, attempts to insulate IFC/Rollins from all liability to the client, Severn.  (JA 46-47).

IFC/Rollins chose to use Fumitoxin tablets to fumigate the Dome.  (JA 1308, 1312).  Fumitoxin is a brand of aluminum phosphide and comes in either tablet or

pellet form.  (JA 1267, 1308, 1312).  The Fumitoxin tablets will react with the moisture in the air to produce phosphine gas–a highly toxic gas that is supposed to kill the target pests.  (JA 38, 1282, 1286). Phosphine gas is not only highly toxic, but is also highly reactive and potentially explosive.  (JA 38, 1282).  As a result, the use of aluminum phosphide is restricted and highly regulated by both federal (the Federal Insecticide, Fungicide and Rodenticide Act) and North Carolina (the North Carolina Pesticide Law of 1971) statutes.  (JA 38-43, 1282, 1395, 1397).  Phosphine gas fumigations can be performed only by trained and certified applicators such as IFC/Rollins.  (JA 39).  It is contrary to both the product label and the law to apply aluminum phosphide in a manner that results in piling of tablets.  (JA 105-07, 1218, 1269, 1282, 1287-88, 1311-15, 1392, 1395, 1587, 1589-90, 1604); (JA 1582) ("It is a violation of Federal Law to use this product in a manner inconsistent with its labeling.").

On August 4, 2009,[1] IFC/Rollins dumped approximately 49,000 tablets of Fumitoxin into the Dome from a single access hatch that measured approximately 15 inches by 41 inches.  (JA 39, 1215-16, 1229, 1283, 1285-87). This application process was negligent because it resulted in piles of tablets.  (JA 1285-90, 1313-16).  Such an application is not only negligent, but is in violation of the law.  (JA 41-43, 1285-90, 1308-09, 1313, 1395).

---

[1] All dates are 2009 unless stated otherwise.

After IFC/Rollins dumped the 49,000 tablets on top of the peanuts, the Dome was sealed. (JA 39, 1213, 1228, 1313). Severn was not involved in the application process. (JA 1283-89, 1322-24). At the time of the application, the Dome contained approximately 20,000,000 pounds of peanuts. (JA 476, 483).

The fire inside the Dome began on or before August 10. (JA 1182, 1228, 1230, 1550).[2] Severn first became aware of the fire when one of its employees observed smoke escaping the Dome on August 11. (JA 178-81, 1182, 1550). Severn immediately notified the local fire department, the County Emergency Management team, IFC/Rollins, and others. (JA 181, 1182, 1213, 1550). As soon as the proper notifications were made, Severn began soliciting opinions from firefighting companies concerning how to fight the fire and whether the peanuts in the Dome could be salvaged. (JA 285-87, 336-37, 1183-85, 1187).

On August 12, the Environmental Protection Agency ("EPA") arrived due to the potential for toxic gas harming the surrounding community and the potential environmental harm from the fire and fire suppression efforts. (JA 462, 1463, 1545-46). No individual or entity involved had ever experienced a fire of this nature. (JA 505-06, 1183-86, 1337-38, 1547).

---

[2] As of August 11, some of the thermocouples inside the Dome were damaged and the temperature readings confirmed there was a fire burning inside the Dome (sensor 16 had been indicating a temperature of 230° F since December 2008, as it was faulty or damaged). (JA 748-54, 1226). Additionally, there was evidence that as of August 14, temperatures inside the Dome could have been fluctuating between 1000° and 1600° F. (JA 1226).

On August 14, Robert Cottam, Vice President of Piedmont Risk Management ("Piedmont"), arrived at the scene as the representative of Rollins, the parent company of IFC.  (JA 446, 462, 1029-30, 1183-84, 1485-86, 1494, 1540).[3]  IFC/Rollins confirmed that it was assuming responsibility for suppressing the fire.  (JA 274, 277, 288, 291-96, 394, 462, 1398).  Shortly after Piedmont arrived on site, "Piedmont/Rollins" contracted with Williams Fire & Hazard Control, Inc. ("Williams") to take charge of fire suppression efforts and suppress the fire using dry ice.  (JA 1327-29, 1463, 1466-70, 1503, 1540).  Piedmont retained Williams despite the fact that Williams had no experience with fires involving phosphine gas and its lead firefighter, Chauncey Naylor, had no experience fighting a fire involving peanuts or a fire inside a structure similar to the Dome.  (JA 505-06); (JA 1509) (Dwight Williams stating that he was not "overly familiar with this phosphide [sic] gas").

Severn and Travelers ceased efforts to retain a separate consultant when they were informed by Piedmont and IFC/Rollins that Piedmont, on behalf of IFC/Rollins, would assume responsibility for suppressing the fire.  (JA 299-300, 302-03, 307-08). While Piedmont assumed ultimate responsibility for the fire suppression efforts, Severn continued to consult and coordinate with Williams to

---

[3] Robert's brother, William Cottam (President of Piedmont), was also at the fire scene and involved in planning the fire suppression.  (JA 1327, 1463, 1487-89, 1540).

mitigate the damage to the Dome and the peanuts.  (JA 1029-30, 1125-31, 1505-06, 1508-14).

From August 15-17, Williams assisted in the introduction of dry ice into the Dome and the Dome was subsequently sealed.  (JA 519, 523, 1184, 1540-41, 1551).   The parties on site agreed to apply dry ice after considering other suppression methods, including water, foam, and liquid Carbon Dioxide ("liquid CO2").  (JA 1142-43, 1152-53, 1183-84, 1464, 1486-87).[4]  On August 18, IFC/Rollins, through Piedmont, released Williams from the site and asked them to return around August 24.  (JA 562-64, 1541).

On August 24, representatives of IFC/Rollins, Travelers, Severn, and other involved entities participated in a conference call to discuss the best way forward.  (JA 1496-1501, 1505-06, 1508-14).   Dwight Williams, the principal decision maker for Williams, informed the group that he believed the fire was likely out, but this could not be confirmed until opening and venting the Dome.  (JA 504-05, 1125-26, 1508).  He agreed with Piedmont that time was an ally and that the group had at least ten days before they would need to remove peanuts from the Dome.  (JA 1509-14).  Mr. Williams also discussed foam as a suppression tool, but opined

---

[4]  R.P. Watson testified that he does not recall Chauncey Naylor ever recommending the use of liquid CO2 to Severn.  (JA 1125-28, 1136-38). It is possible that Mr. Naylor may have told IFC/Rollins's agent, Piedmont, that they should use liquid CO2 to suppress the fire and not Severn.  (JA 507-09, 528-29).

that it would not help much at that point. (JA 1509). The call resulted in an agreement to open the Dome. (JA 1511-14).

Williams came back to the site and opened the Dome on August 25. (JA 1214). Williams personnel introduced water to attempt to control the temperature inside the Dome. (JA 593-94). On August 27, the group began to collect sample peanuts through the Dome's side chutes to determine if some of the product was still usable. (JA 125, 128-29, 1193). The removed peanuts were moldy, burned, wet, and/or off color, and emanated a foul odor. (JA 128-29, 1193). The peanuts were likely in this condition due to the fire and the fire suppression efforts. (JA 128-29, 131-32, 1112-15).[5]

The peanuts were taken to JLA in Edenton, North Carolina for testing. (JA 1193). The results indicated that the peanuts had an "offensive smokey [sic] odor" and some of the "raw shelled kernels from each of the sacks were found to have a spongy texture and discolored brown kernels," indicating smoke and water damage. (JA 1193). Additionally, the peanuts had high free fatty acid content and these levels were considered "substandard." (JA 1193). The smoky odor and the

---

[5] The sample peanuts collected from the Dome on August 27 came from right up against the Dome wall. (JA 239-40, 1099-1101). As of August 27, peanuts located near the top, center portion of the peanut pile, underneath the hatch used by IFC/Rollins to dump the 49,000 Fumitoxin tablets into the Dome, would have also been burned or "charred" due to the fire caused by the piling of Fumitoxin tablets. (JA 1226-27).

high free fatty acid content were caused by the fire inside the Dome. Wilbur Parker of JLA was expected to testify about this at trial. (JA 1444).

On August 28, Williams introduced foam due to the continued rise in temperature inside the Dome. (JA 625-27, 1214). The following day an explosion occurred, causing extensive damage to the structural integrity of the Dome. (JA 39, 1214).[6]

On August 31, IFC/Rollins terminated the contract with Williams and advised Severn that it would no longer assume responsibility for the fire suppression effort. (JA 462, 1478-80). After Williams left the job, Severn retained another company, which was already on site providing heavy equipment to Williams, to complete the fire-fighting effort. (JA 133-34, 312-15, 462-64, 654). Ponds were excavated at the site, and peanuts removed from the Dome were dumped into the ponds in order to ensure that they were extinguished. (JA 136-37, 462-65).

## B.    Procedural History Preceding the Erroneous Grant of Summary Judgment

The operative Complaint was filed in January 2012, and included counts for negligence, negligence *per se*, and breach of contract. (JA 36, 41-44). Discovery progressed in the usual course and IFC/Rollins moved for summary judgment in

---

[6] Even before the Dome exploded, there were concerns the Dome could not be used again for peanut storage due to the rancid odor caused by the fire as well as mold and peanut oil residue. (JA 344, 385-86, 444, 450, 1506).

November 2013. (JA 15). IFC/Rollins sought summary judgment on multiple grounds. (JA 1388-89). Neither this motion, nor any other pleading filed by IFC/Rollins below, included a request for summary judgment on the basis of Severn's alleged contributory negligence.

The District Court conducted a hearing concerning IFC/Rollins's Motion for Summary Judgment on March 14, 2014. (JA 1334). During this hearing, counsel for IFC/Rollins stated multiple times that contributory negligence and/or mitigation issues were not before the District Court, but would be decided by the jury. Those statements included:

➢ "[W]e haven't argued that as a matter of law, it was contributorily negligent. We haven't contended contributory negligence as a defense."

➢ "[T]here were complicated [firefighting] efforts going on and it was a mix of people involved, including Plaintiffs and including agents from my client as well as including independent firefighters. So it was a very complicated situation, including the EPA, in fact. . . . And as to whether that constitutes contributory negligence, we believe a jury is going to have to determine that, which is why we did not include that in our Motion for Summary Judgment."

➢ "There would have been thought that [the fire] may put itself out, particularly with the carbon dioxide from the dry ice involved, that it may go away on its own. *This was a type of fire that had never been fought before*."

➢ "[With respect to firefighting efforts,] [e]verybody involved was basically creating a game plan from scratch as to what to do to try to address that situation, to save the peanuts, if possible. And there was a duty clearly by . . . Severn . . . if they were ultimately going to file a lawsuit to mitigate their damages."

(JA 1336-37, 1360-61) (emphasis added).   Counsel for IFC/Rollins even explained why fact issues remained concerning post-fire activities and the preferred methods to address the fire.  (JA 1336-39).

The day after the March 14, 2014 hearing, the District Court signed an Order granting partial summary judgment solely as to the breach of contract claim based on the exclusionary language in the PAA.  (JA 1388, 1398).  In the same Order, the District Court denied IFC/Rollins's Motion for Summary Judgment, finding that neither the economic loss doctrine nor the PAA's damage exclusions bar Appellants' tort claims.  (JA 1393-98).

While IFC/Rollins never moved for summary judgment on contributory negligence, Severn did file its own motion in May 2013 on the grounds that there was no legal basis for a finding of contributory negligence.   (JA 10-11, 71). Consistent with the statements quoted above from the March 14, 2014 hearing, IFC/Rollins argued that summary judgment was inappropriate because "genuine issues of fact remain which preclude the grant of partial summary judgment on Defendants' contributory negligence defense."   (JA 80).   IFC/Rollins argued multiple times in the same response that its contributory negligence defense, which was based primarily on claims that Severn failed to properly store and monitor peanuts in the Dome prior to the fire, should be presented to the jury.  (JA 78-80).

The District Court ultimately denied Severn's Motion for Partial Summary Judgment.  (JA 1207-11).

The District Court conducted a Pretrial Conference in May 2014.  (JA 1403). The requested verdict form submitted by IFC/Rollins just prior to the Pretrial Conference included two questions addressing the alleged negligence of Severn. These questions involved only Severn's peanut storage and monitoring practices – not Severn's actions or inactions **after** the fire was discovered.  (JA 1400).

A Final Pretrial Order approved by a United States Magistrate Judge was entered in June 2014.  (JA 1451).[7]  The list of "Defendants' Factual Contentions" in the Final Pretrial Order included the allegation that "Plaintiffs' claims are barred, in whole or in part, by [Severn's] contributory negligence in the manner in which it *stored or monitored the peanuts* in the storage dome" – not Severn's alleged failure to remove the peanuts and/or follow Chauncey Naylor's recommendations. *Compare* (JA 1407-08) (emphasis added) *with* (JA 1325-26).

---

[7] In the prior drafts of the joint pretrial order and in the Final Pretrial Order, Appellants raised the issue that contributory negligence was not a proper defense in this case.  (JA 1405, 1407).  That issue is not before this Court, and Appellants do not intend to waive it by arguing that fact issues concerning contributory negligence precluded summary judgment in favor of Appellants.

The matter was set for trial on August 25, 2014.  The Order setting a trial date included a nine hour per-side time limit.  (JA 21-22).[8]  After IFC/Rollins filed an interlocutory appeal with this Court, the District Court withdrew the Order and did not reset the trial.  (JA 23).

After entry of the Final Pretrial Order, the parties briefed multiple motions *in limine* filed by Severn. (JA 21-28). While the parties were awaiting a new trial date and rulings on the pending motions *in limine*, the District Court, *sua sponte*, ordered briefing on contributory negligence.  (JA 1606).[9]  The District Court did not inform the parties that it was considering dismissing all claims under North Carolina's pure contributory negligence scheme.  (JA 1606). [10]

---

[8]  In an effort to have the District Court reconsider the 9-hour time limit, IFC/Rollins's counsel submitted a "Declaration" addressing the complex issues in this case.  (JA 1515).  In the Declaration to the District Court, IFC/Rollins's counsel stated that the case "involves highly complex factual and scientific issues" including the "[f]ire-fighting methods and techniques associated with large commodity fires and the degree to which the Severn peanut dome fire could have been alleviated by offloading the peanuts while the fire was a contained, smoldering fire."  (JA 1515, 1518).  As noted in the Declaration, Severn's corporate representative, R.P. Watson, would have testified about the decisions concerning the fire suppression activities.  (JA 1520).

[9]  In response to a *motion in limine* filed by Appellants regarding the mitigation of damages defense, IFC/Rollins admitted that: "Though, there is certainly evidence in the record from which Plaintiffs may contend that they properly exercised their duty to mitigate, that evidence does [not] erase Mr. Naylor's testimony to the contrary," but "creates conflicting evidence which must be resolved by the jury." (JA 1575).

[10]  The parties agreed below that North Carolina law applies.

The Order mandating briefing noted that the District Court had denied Appellants' prior Motion for Summary Judgment as to contributory negligence well before the close of discovery and that IFC/Rollins did not raise the issue in its Motion for Summary Judgment. (JA 1606). The District Court stated that it was ordering additional briefing "in light of not having considered or been briefed on the matter of contributory negligence after the close of discovery . . . ." (JA 1606).

IFC/Rollins filed a Memorandum of Law on October 15, 2014 in response to the District Court's briefing order. (JA 1613). In that filing, IFC/Rollins requested a jury instruction concerning contributory negligence and did not specifically ask the Court to dispose of the remaining tort claims. (JA 1636-38). Appellants responded by arguing that contributory negligence was not a proper defense in this case because: (1) the parties were putting forth two separate alternative cause theories as to what started the fire, *i.e.*, Severn's alleged negligent storage and monitoring practices had nothing to do with the negligent application of Fumitoxin and thus did not combine with IFC/Rollins's negligence to start the fire; and (2)

Severn's alleged failures after the fire was discovered cannot constitute contributory negligence. (JA 1647-58).[11]

On December 22, 2014, the District Court entered an Order granting summary judgment in favor of IFC/Rollins as to all remaining claims based on a finding that "there is no issue of material fact as to plaintiffs' failure to exercise due care in responding to the fire *after it was discovered* and that their failure to do so was a proximate cause of the catastrophic loss of the peanuts and the dome." (JA 1674) (emphasis added). The District Court granted summary judgment despite concluding that "there is a serious question of material fact as to the cause of the fire." (JA 1673).

The District Court cited only the deposition testimony of Williams's lead firefighter, Chauncey Naylor, in support of its case-dispositive ruling. (JA 1674-75).[12] The District Court relied solely on portions of Mr. Naylor's deposition testimony, despite the fact that this testimony is contrary to that of multiple

---

[11] Severn's response brief also directed the District Court to evidence that had already been submitted regarding the contributory negligence defense as well as the issues concerning post-fire activities and argued that the defense of contributory negligence was improper in this action. (JA 1647-49, 1655-58); (JA 1456-58, 1526-29, 1535, 1594-1600, 1641-44). Again, IFC/Rollins had just previously admitted in their response to Appellants' Omnibus Motion in Limine that there were fact issues concerning Severn's post-fire conduct and Chauncey Naylor's testimony. (JA 1569-75).

[12] The District Court also cited one page of the testimony of Severn's corporate designee. (JA 1674). However, the cited testimony related only to the date the fire was discovered. (JA 126).

witnesses and multiple documents created during the events in question, and the fact that even Mr. Naylor himself eventually disagreed with portions of the cited testimony upon further examination.  (JA 517, 529, 569, 703, 706-08, 724-25, 1139-43, 1463-82, 1484-1501, 1505-06, 1508-14).

## SUMMARY OF THE ARGUMENT

As of December 21, 2014, the parties were ready to proceed to trial.  All summary judgment motions had been decided, a Pretrial Conference had been conducted, a Final Pretrial Order had been entered, and a trial date had been set and then withdrawn by the District Court.  The list of fact issues IFC/Rollins presented in the Final Pretrial Order included Severn's alleged contributory negligence relating to Severn's storage and monitoring practices–not post-fire conduct.  IFC/Rollins had argued multiple times, in writing and orally, that contributory negligence was a jury issue and had requested a verdict form that presented the issue to the jury.

On December 22, 2014, the District Court entered its Order deciding as a matter of law that Severn's failure to exercise due care **after** discovering the fire was a proximate cause of the loss.  The District Court reached this conclusion based solely on Chauncey Naylor's disputed testimony that Severn did not follow his fire suppression recommendations and that peanuts should have been removed from the Dome earlier.  The decision was erroneous for multiple reasons.

First, Severn's alleged acts or omissions subsequent to IFC/Rollins negligently setting fire to the peanuts inside the Dome cannot constitute contributory negligence under North Carolina law. The alleged failures can only serve as evidence of Severn's failure to mitigate. As set out below, even that issue is fraught with factual disputes as it was IFC/Rollins, through its retained agents, that directed the fire suppression activities. Mitigation is separate - legally and factually - from contributory negligence and is not a complete bar to recovery in tort.

The District Court ignored overwhelming evidence that Severn acted reasonably after discovering the fire. The crux of the District Court's decision was that Severn waited too long after discovering the fire to remove peanuts, thus increasing the number of peanuts that were damaged, and that Severn ignored the advice of Williams. This ignores scores of contrary evidence, including:

➢ Testimony that Piedmont, on behalf of IFC/Rollins, would be responsible for the fire suppression;

➢ Advice from Dwight Williams and/or Piedmont that time was an ally and that ample time remained before Severn needed to consider removing peanuts;

➢ Testimony that Mr. Williams came up with the idea to use dry ice as the initial suppression method;

➢ The EPA's refusal to allow Severn to open the Dome due to the presence of dangerous phosphine gas;

➢ Evidence that foam and/or water could not be used because their use would have adulterated the peanuts;

➢ Testimony and evidence that peanuts removed from the Dome before the explosion were unusable;

➢ Evidence that the Dome may have been rendered unusable due to the fire even before the catastrophic explosion;

➢ Testimony that there was not enough water in the area to extinguish burning peanuts upon removal;

➢ Evidence concerning the risk of dangerous oil run off had removed peanuts been extinguished with water;

➢ Chauncey Naylor's agreement that Severn's decision to use dry ice was not a bad idea and his testimony that he never told Severn he was concerned with that suppression method;

➢ Mr. Naylor's testimony that Severn followed certain advice from Williams; and

➢ Mr. Naylor's testimony that he could not say that the explosion would not have occurred if the peanuts had been removed sooner.

Even if post-ignition conduct could support a finding of contributory negligence, which is denied, the above evidence alone presented triable fact issues.

Finally, the District Court erred by finding that the internally contradictory and ambiguous language of the PAA precluded recovery for breach of contract. The exculpatory language in the PAA, as interpreted by the District Court, is void as it is against public policy because it attempts to insulate IFC/Rollins from its failure to use reasonable care in applying a highly regulated and dangerous product. The PAA unreasonably limits recovery for the catastrophic loss suffered

18

here, unless IFC/Rollins is required to pay its insurance limits, as contemplated by the PAA.  Further, the District Court failed to construe the ambiguous PAA against IFC/Rollins as required by North Carolina law.

## **ARGUMENT**

### A.    **Standard of Review**

"This court 'reviews the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court and *viewing the facts and inferences drawn from the facts in the light most favorable to the nonmoving party*.'" *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 419-20 (4th Cir. 2014) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)) (emphasis added).  "[O]n a motion for summary judgment, the court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to the party if the inferences are reasonable (however improbable they may be)." *Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir. 1980).  "Summary judgment is inappropriate whenever there exists a genuine issue of material fact, Fed. R. Civ. P. 56, and the district court err[s] . . . by improperly taking it upon itself to resolve the factual issue in the course of ruling on the motion." *Fitzgerald v. Penthouse*, *Int'l*, *Ltd.*, 639 F.2d 1076, 1079 (4th Cir. 1981).

**B.    The District Court Erred by Relying Solely on Post-Ignition Conduct to Support a Finding of Contributory Negligence**

The District Court cited only post-ignition conduct to support its finding that Severn's negligence was a proximate cause of the loss and thus completely barred any recovery in tort.  (JA 1674-76).  The District Court cited only the disputed testimony from Chauncey Naylor that Severn failed to follow certain advice concerning fire suppression methods and that peanuts should have been removed from the Dome sooner.  (JA 1674-76).

Reliance on post-ignition conduct was improper because such conduct is not relevant to contributory negligence under North Carolina law.  If post-ignition conduct is relevant at all, it goes to the issue of whether Severn exercised reasonable care in mitigating its damages.  *See Hummer v. Pulley*, *Watson*, *King & Lischer*, *P.A.*, 536 S.E.2d 349, 354-55 (N.C. Ct. App. 2000) (affirming trial court's decision to grant plaintiff's motion for summary judgment on defense of contributory negligence because the "original injury was caused by defendants' failure to mail the letter requesting review of the superintendent's recommendation that he be dismissed" thus "defendants' argument that [plaintiff] should have petitioned for judicial review thereafter would only have been relevant as to whether he failed to mitigate his damages. . . ."); *Andrews v. Carr*, 521 S.E.2d 269, 273 (N.C. Ct. App. 1999) ("Assuming the post-surgery activities of Plaintiff did contribute to his injuries, they cannot constitute contributory negligence because

these activities occurred *subsequent* to Dr. Carr's negligent treatment.") (emphasis in original); *Watson v. Storie*, 300 S.E.2d 55, 57 (N.C. Ct. App. 1983) ("Clearly, decedent's failure to promptly obtain medical attention for his injuries . . . cannot be a cause of the accident that produced the injuries. . . . [His] failure to go to the doctor or hospital was a proper subject for the jury to consider concerning mitigation of damages, but under the damage issue rather than under the issue of contributory negligence."). Failure to mitigate is not a bar to recovery. *See Trillium Ridge Condo. Ass'n, Inc. v. Trillium Links & Village, LLC*, 764 S.E.2d 203, 208 n.1 (N.C. Ct. App. 2014); *Smith v. Childs*, 437 S.E.2d 500, 507 (N.C. Ct. App. 1993).

In distinguishing contributory negligence from mitigation (also known as the doctrine of avoidable consequences)[13] the North Carolina Supreme Court explained:

> The doctrine of avoidable consequences is to be distinguished from the doctrine of contributory negligence. Generally, they occur-if at all-at different times. *Contributory negligence occurs either before or at the time of the wrongful act or omission of the defendant.* On the other hand, the avoidable consequences generally arise after the wrongful act of the defendant. That is, damages may flow from the wrongful act or omission of the defendant, and if some of these damages could reasonably have been avoided by the plaintiff, then the

---

[13] The doctrine of avoidable consequences is often referred to as the duty to mitigate damages. *See J.M. Smith Corp. v. Matthews*, 474 S.E.2d 798, 802 (N.C. Ct. App. 1996) ("This rule is known as the doctrine of avoidable consequences or the duty to minimize damages. Failure to minimize damages does not bar the remedy; it goes only to the amount of damages recoverable.") (citation omitted).

doctrine of avoidable consequences prevents the avoidable damages from being added to the amount of damages recoverable.

*Miller v. Miller*, 160 S.E.2d 65, 74 (N.C. 1968) (quoting 22 Am. Jur. 2d § 31 (1965)) (emphasis added).

Multiple other courts draw the same distinction:

➢ *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1401 (7th Cir. 1991): "[C]ontributory negligence is negligence of the plaintiff before any damage, or any invasion of his rights, has occurred, which bars all recovery. The rule of avoidable consequences comes into play after a legal wrong has occurred, but while some damages may still be averted, and bars recovery only for such damages."

➢ *Walter v. Wal-Mart Stores, Inc.*, 748 A.2d 961, 969-70 (Me. 2000): "Contributory negligence is generally unreasonable behavior by a plaintiff before or concurrent with the injury imposed by the defendant, whereas the avoidable consequences doctrine is applied to plaintiff's action or inaction after the defendant's negligent act. . . . When the plaintiff commits negligence after the defendant's negligence or fails to take steps to avoid the consequences of the defendant's negligence, the amount of damages may be affected, but not the plaintiff's right of recovery."

➢ *Parker v. Montgomery*, 529 So. 2d 1145, 1147 (Fla. Dist. Ct. App. 1988): "A plaintiff's contributory negligence occurs *either before or at the time of* the wrongful act or omission of the defendant, whereas the plaintiff's fault in failing to mitigate damages generally arises *after* the wrongful act of the defendant."

*See also Mais v. Allianz Life Ins. Co. of N. Am.*, 34 F. Supp. 3d 754, 770 (W.D. Mich. 2014); *Jones v. Rallos*, 890 N.E.2d 1190, 1203 (Ill. App. Ct. 2008*)*; *Dippold v. Cathlamet Timber Co.*, 225 P. 202, 207-09 (Or. 1924).

The Fifth Circuit considered facts similar to those presented here in *Southport Transit Co. v. Avondale Marine Ways, Inc.*, 234 F.2d 947 (5th Cir.

1956).  In that case, a tugboat owner brought a negligence action against a shipyard owner for damages to the boat resulting from a fire started by shipyard employees. *See Southport Transit Co.*, 234 F.2d at 949-51.  The court held that: "[s]o far as the original fire is concerned, there was, of course, no basis for imposing any or all or part of its consequences on the tug owner.  The shipyard . . . was and remains clearly liable for this and all damage proximately caused by this fire." *Id.* at 954. The court further held that "[t]he tug owner's actions subsequent to that related not to liability but to a possible reduction in the award to the extent that its failure to take reasonable steps augmented the loss." *Id.*; *see also Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 49, 53-54 (5th Cir. 1967).

These authorities establish that a plaintiff's conduct after a defendant's actionable negligence or legal wrong cannot be defined as contributory negligence. Here, IFC/Rollins's actionable negligence was the piling of Fumitoxin resulting in a fire on top of 20,000,000 pounds of peanuts inside a gigantic dome containing toxic gas.  The District Court committed reversible error by relying solely on Severn's alleged post-ignition conduct to find contributory negligence.

## C.    The District Court Erred by *Sua Sponte* Granting Summary Judgment in the Face of Overwhelming Evidence of Fact Issues

A district court must not play the role of juror and decide which set of disputed facts is true.  *See Fitzgerald v. Penthouse*, *Int'l*, *Ltd.*, 639 F.2d 1076, 1079 (4th Cir. 1981) (finding that district court erred "by improperly taking it upon itself

23

to resolve the factual issue in the course of ruling on the motion"). The District Court did just that. While, for the reasons stated above, it was improper for the District Court to consider post-ignition conduct in the context of contributory negligence, even if it had been proper, the "facts" cited by the District Court are in dispute and should have been decided by a jury.

### 1. Disputed Facts Concerning the Removal of Peanuts

The first "fact" cited by the District Court is Severn's alleged refusal to allow Williams to remove peanuts from the Dome as quickly as possible. (JA 1675). The implication is that the District Court believed peanuts could have been saved and the Dome would not have been destroyed had the peanuts been removed sooner. The District Court relied solely on the testimony of Chauncey Naylor to reach this conclusion.

The idea that removing the peanuts from the Dome would have lessened the damage is sheer speculation. Mr. Naylor himself admitted that it was "unknown" whether the explosion would have occurred if the peanuts had been removed sooner. (JA 703, 707-08). IFC/Rollins's corporate designee testified that it could not quantify any amount of additional damage caused by the alleged delayed efforts in salvaging the peanuts. (JA 1559-60). Mr. Naylor's boss, Dwight Williams, apparently agreed during the August 24 conference call that time was on their side and that Severn **had at least ten days to remove the peanuts**. (JA 727-

28, 1473-74, 1509, 1511-14). The **explosion occurred within five days** of the conference call. (JA 1672).

As set forth above, there were serious concerns that opening the Dome to remove peanuts could have created a hazardous situation beyond the area surrounding the Dome. (JA 1342, 1463). The EPA arrived on scene the day after the fire was discovered. (JA 1546). Its involvement was required due to the presence of phosphine gas. (JA 461-62, 1545-46).

The day after arriving, the EPA authored a pollution report noting that:

> With so many variables unknown at this time, including phosphine levels, temperature, location of the fire, and oxygen levels, it is difficult to develop a concrete plan as to how to move forward . . . . Although there are people who have experience with peanut fires, and fires caused by the application of aluminum phosphide, the group has been unable to find any reference materials regarding a fire in such a large enclosed dome structure. This is presenting significant challenges regarding how to proceed.

(JA 1547). The Travelers adjuster assigned to the loss testified that the "EPA made that abundantly clear that there was no way that, A, they were to allow us to vent the phosphine gas to get [it] out of there; B, in the suppression process you had to make sure that it was not able to get into the atmosphere to effect people." (JA 284).

In addition to atmospheric safety and environmental concerns, there was nowhere to place millions of pounds of smoldering peanuts during the early stages of suppression efforts and the small town of Severn, North Carolina did not have

the requisite water supply to fight a fire outside of the Dome. (JA 462-65, 522-23, 653-54, 721-22, 1032, 1140-43, 1376-78). When the decision was made to remove peanuts after the explosion, man-made ponds were constructed to hold the peanuts. (JA 462-64). This was necessary because the high oil content of peanuts renders them difficult to extinguish. (JA 136-37).

Had the peanuts been removed before these ponds were built, there may not have been enough water in the area to put the burning peanuts out. (JA 462-64). Even if there had been enough water, the oil runoff from millions of pounds of peanuts could have been disastrous to the local community. (JA 441, 1142-43). These issues placed a cloud over whether the removal of peanuts sooner would have been a feasible or safe course of action.

Finally, while the District Court found that the majority of the peanuts could have been saved if removed sooner, this was based solely on Mr. Naylor's testimony that 2,000 pounds of peanuts removed for sampling on August 27 were "cold and dry." (JA 1675-76). The District Court ignored contrary evidence from multiple sources. R.P. Watson of Severn testified that the peanuts removed for sampling were "moldy, burned, wet, off color" and had an unusual odor. (JA 128-29, 1103-05). Mr. Naylor also admitted that the peanuts smelled odd. (JA 613).

Additionally, the test results generated as a result of the sampling indicated that the peanuts had an "offensive smokey [sic] odor" and that some of the "raw

shelled kernels from each of the sacks were found to have a spongy texture and discolored brown kernels," indicating smoke and water damage. (JA 1193). The tests also revealed free fatty acid levels that rendered the peanuts "substandard." (JA 1193). The reasonable inference is that the high free fatty acid levels in the peanuts were due to the effects of the fire.

Finally, the Court's determination that the "majority" of the peanuts could have been saved is unsupported. (JA 1676). The peanuts in the Dome were worth over $7,000,000. (JA 471, 483). Other than sheer speculation, there is no evidence to support a finding that any specific amount of peanuts could have been saved as a result of an earlier extraction, much less over $3,500,000 in peanuts.

The evidence cited herein, which was ignored by the District Court, is more than sufficient to create triable fact issues concerning whether Severn acted unreasonably in failing to remove peanuts sooner and whether doing so would have saved the Dome or any peanuts. The District Court erroneously played the role of the jury by deciding these factual disputes.

### 2. Disputed Facts Concerning the Use of Foam

The District Court also cited the "fact" that Severn refused to follow Chauncey Naylor's advice to use foam until the day before the explosion. (JA 1675). This finding ignored evidence to the contrary.

While Mr. Naylor may have asked to use foam early on in the process, multiple witnesses testified that the use of dry ice, as opposed to an alternative method, was appropriate.  (JA 1128-29, 1152-53, 1464-65, 1486).  Mr. Naylor admitted that dry ice was a viable alternative and that its use was not a "bad" decision.  (JA 569, 725).  He also recognized that the parties involved did not want to use foam because they were trying to salvage the peanuts.  (JA 528-29, 687).  Additional contrary evidence includes:

➢ R.P. Watson testified that the decision to use dry ice as an initial means to suppress the fire was a group decision that included Piedmont and Williams. (JA 1128-29);

➢ Dwight Williams developed the idea of using dry ice.  (JA 1152-53);

➢ William Cottam of Piedmont testified that Williams was involved in determining that dry ice should be used.  (JA 1464);

➢ Robert Cottam of Piedmont testified that he thought the use of dry ice was Williams's "preferential means to put the fire out."  (JA 1486);

➢ After dry ice was loaded into the Dome from August 15-17, Piedmont released Williams from the Severn facility since "the site was buttoned up" and the plan was to allow the dry ice to sit for a period and extinguish the fire. (JA 1495, 1541); and

➢ Dwight Williams stated during the August 24 conference call (subsequent to the application of dry ice and prior to the application of foam) that the fire was "likely out." (JA 1508).

This evidence from Mr. Naylor, Mr. Naylor's boss, and representatives of the company in charge of suppression efforts created triable fact issues concerning

28

whether the decision to use dry ice instead of foam as the initial suppression method was negligent.  The District Court erred by deciding this fact issue.

### 3.     Disputed Facts Concerning the Use of Liquid CO2

The District Court further relied on the "fact" that Severn refused Mr. Naylor's request for permission to introduce liquid CO2 into the Dome.  (JA 1675).  This contention was also contradicted by evidence from multiple sources that was ignored.  The contradictory evidence includes:

➢ Mr. Naylor did not know if liquid CO2 was readily available in the area. (JA 517);

➢ Mr. Naylor admitted that the "end result is the same" when considering dry ice vs. liquid CO2.  (JA 517);

➢ Mr. Naylor testified that he opined at the time of the events in question that "dry ice would manifest CO2" and that dry ice was a viable option.  (JA 725);

➢ Mr. Naylor may have made the recommendation to use liquid CO2 to Piedmont and not Severn.  (JA 507-09, 528-29, 1125-29, 1136-38); and

➢ Dwight Williams stated during the August 24 conference call that the dry ice treatment created CO2 and that putting CO2 into the Dome would have been "nothing more than the same as dry ice."  (JA 1509).

The District Court erred by deciding whether Severn refused to use liquid CO2 and whether the use of dry ice was a reasonable alternative.[14]

### 4.    Disputed Facts Concerning Whether Severn Followed Advice from Williams

The District Court summarized its finding of contributory negligence by stating that "Mr. Naylor testified that Severn did not follow any of Williams's recommendations as to how to suppress the fire." (JA 1675). This finding ignores Williams's lack of experience fighting fires of this type, but even if it is assumed that Williams gave sound advice, the finding was contradicted by multiple witnesses, including Mr. Naylor himself. Subsequent to the testimony cited by the District Court, Mr. Naylor admitted that Severn followed his recommendation concerning the use of carbon dioxide, but applied it differently than recommended. He testified that Severn "followed the recommendation of producing CO2," but not the recommendation as to how. (JA 724-25). Again, Mr. Naylor had no idea whether liquid CO2 was readily available in the area, never told Severn that the use of dry ice was a bad idea and even told someone, possibly Piedmont, that dry ice

---

[14] The District Court was even informed by counsel for IFC/Rollins why dry ice was used and the complex situation facing everyone involved. (JA 1337-38, 1360). The factual statements of IFC/Rollins's counsel during the March 14, 2014 hearing regarding the post-fire activities were "deliberate, clear, and unambiguous" and therefore should have been treated as binding admissions of IFC/Rollins. *1899 Holdings, LLC v. 1899, LLC*, 568 F. App'x 219, 225 (4th Cir. 2014) (citations omitted).

could be used if liquid $CO_2$ was not available.  (JA 517, 529, 569, 725, 1139-43, 1486),

Moreover, as detailed at length above, Severn followed the advice of Mr. Naylor's boss, Dwight Williams.  Mr. Williams recommended the use of dry ice, did not disagree that time was their ally, and opined that **as of five days prior to the explosion, Severn still had at least ten days to remove the peanuts.**  (JA 1152-53, 1508-11).  There was no basis to support the District Court's finding that Severn failed to follow any advice from Williams.  The District Court erroneously exercised its own judgment to resolve fact issues that should have been left to the jury.[15]

## D.    The District Court Erred by Granting Summary Judgment as to the Breach of Contract Claim

### 1.    The PAA's Exculpatory Language Is Unenforceable as a Matter of Public Policy

The PAA obligated IFC/Rollins to exercise all reasonable efforts to apply Fumitoxin in a manner consistent with the instructions and directions set forth in the labeling of the product as required by the EPA.  (JA 46).  IFC/Rollins breached this obligation.  (JA 43, 1229, 1282-89).

---

[15] IFC/Rollins assured Severn that IFC/Rollins and its agents would be responsible for fire suppression efforts.  This underscores the fact that Severn's post-fire conduct cannot constitute contributory negligence and can only be relevant to loss mitigation issues.  *See In re Brokers*, *Inc.*, 407 B.R. 693, 845 (Bankr. M.D.N.C. 2009 (citing *Little v. Rose*, 208 S.E.2d 666, 669-70 (N.C. 1974)).

IFC/Rollins's breach resulted in more than an ineffective fumigation that did not kill pests. The application of Fumitoxin in a manner contrary to the label and the law resulted in the destruction of Severn's peanuts and Dome. (JA 36-44, 1229, 1272, 1289-90). The fire also caused other losses and expenses, such as debris removal costs and business interruption. (JA 462-65, 483).

The District Court granted summary judgment based on its conclusion that Section 8(h)(ii) of the PAA precludes recovery for consequential damages and that all of Severn's damages were consequential. (JA 1396-97).[16] The District Court further concluded that Severn agreed that damage to its property, product, equipment, downtime, and the loss of business qualified as consequential damages when it signed the PAA. (JA 1396). The relevant PAA provisions are:

7.    THE    INDUSTRIAL    FUMIGANT    COMPANY    ASSUMES
      RESPONSIBILITY FOR THE FOLLOWING:
      a.  IFC agrees to exercise all reasonable and practical efforts to apply
      the pesticides listed in #4 in a manner consistent with instructions,
      procedures, directions, and precautions set forth in the labeling of the
      pesticide as required by EPA.
      b.   Client acknowledges that all warranties, expressed or implied, of
      the goods contained on the labels affixed to the goods, and all terms
      and conditions of such labels are a part of this Agreement. There are
      no terms, conditions, or warranties, expressed or implied, of
      merchantability, fitness for a particular purpose, or otherwise of the
      goods other than or different from those contained on the labels
      affixed to the goods. IFC shall in no event be liable for consequential

---

[16] The District Court dismissed the breach of contract claim without specifically determining whether claims for debris removal costs and/or fire suppression costs, amounting to nearly $8,000,000 in damages, were "consequential" damages and thus specifically excluded by the PAA. *Compare* (JA 1396-97) *with* (JA 483).

damages for breach, if any, of such limited warranties, or resulting from the performance of its services and use of any products pursuant hereto.

***

e.  IFC maintains public liability and property damage insurance with those who are licensed to do business in the state of the facility to be treated.

8.    CLIENT ASSUMES THE FOLLOWING RESPONSIBILITIES:

***

f.  The Client assumes only the risk of Client's failure to follow the aforesaid instructions. Client further agrees to indemnify, defend and hold IFC harmless from all claims, demands, causes of action, losses, damages or expenses whatsoever, including costs and attorney's fees, arising by reasons of the entry of any person or persons or property upon the pesticide treated premises from and after the date and time of the completion of the pesticide application work hereunder if said entry is contrary to the aforesaid instructions. For the purpose of this paragraph and para. (7)(c) above, the pesticide application work hereunder shall be deemed to have been completed when IFC's employees leave Client's premises after completion of the work specified herein, and shall not be deemed to relate to any other services performed for any other reason by IFC thereafter.

g.   Client is to provide a guard service and assume complete responsibility for evacuating all people and animals and keeping all unauthorized people out of the treated areas, adjacent areas, plant facilities and grounds during the time of pesticide application through to completion of aeration.  Client is to remove all items which are not to be exposed to the pesticides during the pesticide application period. IFC assumes responsibility only for releasing the pesticide and aeration of the treated areas.

***

(h)(ii) Charges for services provided under this Agreement are based solely upon the value of the services provided and are not related to the value of Client's premises or the contents therein. The amounts payable by Client are not sufficient to warrant IFC assuming any risk of incidental or consequential damages such as Client's property,

33

product, equipment, downtime, or loss of business. Since it is impractical and extremely difficult to fix actual damages which may arise due to the actions or inaction of IFC or its employees, if, notwithstanding the above provisions, there should arise any liability on the part of IFC, such liability shall be limited to IFC's applicable insurance coverage and/or limits. This sum shall be complete and exclusive and shall be paid and received as liquidated damages and not as a penalty.

\*\*\*

(JA 46-47).

The PAA contains broad exclusionary language concerning liability for "consequential damages" as well as provisions requiring the client, Severn, to be responsible for any liability for harm to persons coming anywhere near the treatment area.  (JA 46-47).  The District Court's interpretation of these provisions allows recovery only for "direct damages."  (JA 1396-97).[17]  Direct damages are not identified by the District Court, and based on its ruling and the broad definition of consequential damages, the stated exception does not allow any recovery.

Given the District Court's interpretation of the PAA, the responsibilities allocated to Severn, including an indemnity agreement, and the fact that the PAA does not limit IFC/Rollins's liability to a specified amount, the relevant provisions should be considered exculpatory in nature and strictly construed against IFC/Rollins. (JA 1397); *Strawbridge v. Sugar Mountain Resort*, *Inc.*, 320 F. Supp.

---

[17] The PAA does not state that it bars recovery based on IFC/Rollins's negligence. (JA 46-47, 1397).  Further, as noted by the District Court, the terms of the PAA do not bar Appellants' tort claims.  (JA 1394-97).

2d 425, 432 (W.D.N.C. 2004) (citation omitted); BLACK'S LAW DICTIONARY 608, 612, 948 (8th ed. 2004) (defining "exculpatory clause," "exemption clause," and "limitation-of-damages clause"); *see also Fortson v. McClellan*, 508 S.E.2d 549, 553 (N.C. Ct. App. 1998) ("The present case involves a complete release from liability, rather than an indemnification or *reasonable limitation on liability*, and so the release must be strictly construed.") (emphasis added).

Exculpatory clauses are unenforceable if "violative of the law or contrary to some rule of public policy . . . ." *McMurray v. U.S.*, 551 F. App'x 651, 653 (4th Cir. 2014). "A provision in a contract which is against public policy will not be enforced." *Gore v. George J. Ball, Inc.*, 182 S.E.2d 389, 395 (N.C. 1971) (collecting cases). Further, agreements "are against public policy when they tend to the violation of a statute." *Id.* (internal quotes omitted) (citations omitted).

The District Court's erroneous dismissal of the breach of contract claim resulted from its failure to apply this binding precedent. (JA 1396-97). The PAA's exculpatory language is unenforceable because it runs counter to both North Carolina and federal statutes and is contrary to North Carolina public policy. *See McMurray*, 551 F. App'x at 656 (finding that release prepared by government relating to operation of car was unenforceable and vacating district court's order granting summary judgment in favor of government).

35

IFC/Rollins's attempt to contractually insulate itself from liability arising out of the improper application of Fumitoxin is inconsistent with the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA") and the North Carolina Pesticide Law of 1971. (JA 1282-83, 1394-97). The exculpatory language in the PAA also undercuts the purpose of these statutes, which is to protect the public from harm. (JA 1395); 7 U.S.C. § 136j(2)(g); N.C. GEN. STAT. §§ 143-435 & 143-443(b)(3); *see also* (JA105-07, 1581); *cf. Hyatt v. Mini Storage on the Green*, 763 S.E.2d 166, 170 (N.C. Ct. App. 2014). Therefore, the exculpatory provisions in the PAA are unenforceable.

The exculpatory language in the PAA also amounts to an impermissible attempt by IFC/Rollins to avoid its duty to exercise reasonable care in applying aluminum phosphide and/or to apply this very dangerous chemical in accordance with the law. *See McMurray*, 551 F. App'x at 654-55. As this Court recognized in *McMurray*, "North Carolina courts have applied the public-policy exception to invalidate exculpatory . . . clauses . . . under widely varying circumstances," including, releases signed in relation to a motorcycle-safety training program, cosmetology school activities, and a boat-repair shop. *Id.* (citations omitted).[18]

---

[18] The public interest in the safe and proper application of aluminum phosphide is at least equal to, if not far greater than, the activities previously deemed by courts to be too important to uphold exculpatory clauses or releases implicating the various public interests at issue. *See McMurray*, 551 F. App'x at 655-56 (invalidating release relating to public interest in safe operation of cars);

The proper application of aluminum phosphide is a matter of important public interest and the method of its application, use, and storage is heavily regulated. (JA 1394-97); *see also* 7 U.S.C. § 136 *et seq.*; N.C. GEN. STAT. § 143-434 *et seq.*; *EPA Announces New Restrictions on Pesticide Phosphine Fumigants to Reduce Risks to Children New Labels Aim to Reduce Accidental Poisonings*, 2010 WL 1359682 (April 7, 2010); *EPA and Enterprise*, *Alabama Police Department Investigate Alleged Misuse of Pesticide*, 2002 WL 32574766 (Jan. 23, 2002).[19] As a result, the exculpatory language in the PAA is unenforceable under

---

*Strawbridge v. Sugar Mountain Resort*, *Inc.*, 320 F. Supp. 2d 425, 433-34 (W.D.N.C. 2004) (finding unenforceable exculpatory language on lift ticket since allowing the defendant to "contract its way out of liability would undercut" North Carolina law on skier safety and would "run counter to the public interest"); *Gore v. George J. Ball*, *Inc.*, 182 S.E.2d 389, 398 (N.C. 1971) (holding that "Limitation of Warranty" provision used by tomato seed supplier was against public policy of North Carolina and therefore unenforceable); *Fortson v. McClellan*, 508 S.E.2d 549, 551-54 (N.C. Ct. App. 1998) (invalidating release signed as condition of participating in motor-cycle training program); *Brockwell v. Lake Gaston Sales & Serv.*, 412 S.E.2d 104, 106 (N.C. Ct. App. 1992) (invalidating exculpatory clause in boat-repair contract); *Alston v. Monk*, 373 S.E.2d 463, 466-67 (N.C. Ct. App. 1988) (invalidating release signed by customer having hair colored by student of cosmetology school since cosmetology involves the "[t]he practice of cosmetology and the education of students in this field may affect the health of the general public").

[19] The dangers of Fumitoxin, *i.e.*, aluminum phosphide, are further explained by Appellants' experts. (JA1217-18, 1267-70, 1282, 1288-89, 1308-10, 1392, 1395). The Fifth Circuit Court of Appeals has also recognized the fire hazard that aluminum phosphide can present when applied improperly. *See Universal Am. Barge Corp. v. J-Chem.*, *Inc.*, 946 F.2d 1131, 1134-35, 1142 (5th Cir. 1991).

North Carolina law as a matter of public policy. *See McMurray*, 551 F. App'x at 654-56.

### 2.    The PAA Must Be Construed Against IFC/Rollins

#### (i)    Enforcement of the PAA as Interpreted by the District Court Would Be Unconscionable

Agreements containing limitations of liability are strictly construed against the party seeking to use the agreement to limit its liability. *See Tatham v. Hoke*, 469 F. Supp. 914, 917 (W.D.N.C. 1979) (citation omitted). Further, ambiguities in a written instrument must "be construed against the party that prepared the instrument." *Root v. Allstate Ins. Co.*, 158 S.E.2d 829, 834 (N.C. 1968) (citations omitted). Here, all ambiguities should be strictly construed against IFC/Rollins because the PAA is a form contract provided by IFC/Rollins to its client, Severn.

If the exculpatory provisions in the PAA are not void as against public policy, recovery should be allowed up to the limits of IFC/Rollins's applicable insurance coverage.[20] This is the only remedy provided by the PAA. (JA 46-47). Any other interpretation would leave Severn with no contractual remedy for IFC/Rollins's breach, which led to approximately $20,000,000 in damages. This would be unconscionable and underscore the one-sided and oppressive nature of the PAA as interpreted by the District Court. *See Stan D. Bowles Distrib. Co. v.*

---

[20] IFC/Rollins has over $25,000,000 in liability insurance coverage for the claims at issue. (JA 1325).

*Pabst Brewing Co.*, 317 S.E.2d 684, 690 (N.C. Ct. App. 1984) (stating that under Uniform Commercial Code "[i]n order to avoid a finding of unconscionability, the contract must provide 'minimum adequate remedies'" and that parties "must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract'") (citations omitted); *see also Gore*, 182 S.E.2d at 398 (finding limitation provision invalid due to North Carolina public policy regarding the proper labeling of seeds and stating that "[t]o permit the supplier of seed to escape all real responsibility for its breach of contract by inserting therein a skeleton warranty . . . would be to leave the farmer without any substantial recourse for his loss").[21]

Like the tomato farmer in *Gore*, Severn has no recourse for the destruction of its peanut crop and Dome if the PAA's exculpatory provisions preclude recovery for IFC/Rollins breaching the contract. *See id.* This provides yet another reason to overturn the District Court's grant of summary judgment.

---

[21] Appellants do not contend that this dispute is governed by the Uniform Commercial Code as the PAA is a contract for the performance of a professional service (eradication of any pests inside the Dome using a restricted use pesticide). It is Appellants' position that IFC/Rollins cannot completely insulate itself from any liability arising out of its failure to apply Fumitoxin in accordance with the law, which resulted in the destruction of Severn's peanuts and Dome as well as the resulting fire suppression costs, debris removal costs and business interruption. Appellants note that the *Gore* decision was a pre-U.C.C. case. 182 S.E.2d at 392.

### (ii)    Alternatively, The PAA Is Ambiguous and a Jury Should Interpret its Provisions

Again, any ambiguities in the PAA must be construed against IFC/Rollins as it prepared the agreement between the parties. *See Root*, 158 S.E.2d at 834 (citations omitted). The PAA contains multiple ambiguities, including the following:

> ➢ It is unclear whether the consequential damages limitation in Section 7(b) applies only to breach of warranty or to consequential damages arising from the breach of IFC/Rollins's contract to perform the requested service as well.

> ➢ While Section 7 includes a limitation of liability for consequential damages, it also assures the customer, Severn, that IFC/Rollins maintains insurance for property damage and public liability.  Then, in Sections 8(f) and 8(g), the PAA not only requires Severn to be responsible for people coming near the treatment area, it also requires Severn to indemnify and hold IFC/Rollins harmless for liability arising from someone entering the "pesticide treated premises."

> ➢ Section 8(f) provides that Severn assumes only the risk of its own failure to follow instructions, yet the District Court's interpretation of the PAA places the risk of property destruction and business losses on Severn.

> ➢ Section 8(h)(ii), which the District Court cited in support of its finding that the PAA excludes consequential damages, is in the customer responsibility portion of the PAA and states that the amount paid to IFC/Rollins is insufficient to warrant IFC/Rollins assuming any risk of consequential damages, but goes on to provide that, "if, notwithstanding the above provisions, there should arise any liability on the part of IFC, such liability shall be limited to IFC's applicable insurance coverage and/or limits."

(JA 46-47, 1396-97).

It makes no sense for the same contract to preclude liability for property damage, as claimed by IFC/Rollins, yet limit liability to the extent of any potential

insurance. The District Court erred by not resolving the aforementioned ambiguities against IFC/Rollins and not holding that the presence of these ambiguities should result in the denial of IFC/Rollins's request for summary judgment. *See Schenkel & Shultz*, *Inc. v. Hermon F. Fox & Assocs.*, *P.C.*, 658 S.E.2d 918, 923 (N.C. 2008); *Commscope Credit Union v. Butler & Burke*, *LLP*, 764 S.E.2d 642, 651-52 (N.C. Ct. App. 2014); *Crider v. Jones Island Club*, *Inc.*, 554 S.E.2d 863, 866-67 (N.C. Ct. App. 2001).

## CONCLUSION

The District Court erred on multiple fronts. First, it found contributory negligence as a matter of law based solely on post-ignition conduct that cannot constitute contributory negligence under North Carolina law. Second, the District Court played the role of the jury by deciding multiple disputed fact issues. Third, the District Court enforced the PAA against Appellants despite the fact that the PAA is void against public policy and ambiguous. For these reasons, Severn, Meherrin, and Travelers ask this Court to reverse the District Court's December 22, 2014 Order and Judgment granting summary judgment as to all remaining issues, and the portion of the District Court's March 17, 2014 Order granting summary judgment in favor of IFC/Rollins as to the breach of contract claim. The matter should be remanded for trial following reversal.

41

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request oral argument. This appeal involves important legal and public policy issues. The District Court granted summary judgment based, in part, on its failure to distinguish between the doctrine of contributory negligence and the doctrine of avoidable consequences. The District Court's decisions allowed IFC/Rollins to escape all liability resulting from the failure to exercise the level of care required when applying a dangerous and heavily regulated pesticide. Oral argument will give the Court an opportunity to question the attorneys concerning the extensive factual record and the unusual procedural background that preceded the District Court's case dispositive rulings.

Respectfully Submitted,

/s/ James L. Warren, III
James L. Warren, III
Alexandra Markov
D. Scott Murray
CARROLL WARREN & PARKER PLLC
Post Office Box 1005
Jackson, Mississippi 39215
(601) 592-1010

Jay M. Goldstein
Hunter C. Quick
Howard M. Widis
QUICK, WIDIS & NALIBOTSKY, PLLC
2115 Rexford Road, Suite 100
Charlotte, North Carolina 28211
(704) 364-2500

*Counsel for Appellants*

# ADDENDUM

# <u>TABLE OF CONTENTS</u>

<u>Addendum Page</u>

*1899 Holdings*, *LLC v. 1899, LLC*,
    568 F. App'x 219, 225 (4th Cir. 2014) ....................................................Add. 1

*McMurray v. U.S.*,
    551 F. App'x 651 (4th Cir. 2014) ........................................................Add. 9

7 U.S.C. § 136j ..........................................................................................Add. 14

N.C. GEN. STAT. § 143-435 ......................................................................Add. 18

N.C. GEN. STAT. § 143-443 ......................................................................Add. 20

BLACK'S LAW DICTIONARY (8th ed. 2004) ...............................................Add. 23

*EPA Announces New Restrictions on Pesticide Phosphine Fumigants to Reduce Risks to Children New Labels Aim to Reduce Accidental Poisonings*, 2010 WL 1359682 (Apr. 7, 2010) ................................................................Add. 27

*EPA and Enterprise, Alabama Police Department Investigate Alleged Misuse of Pesticide*, 2002 WL 32574766 (Jan. 23, 2002) ..............................Add. 28

568 Fed.Appx. 219
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

1899 HOLDINGS, LLC; Stanley Keyser; Keyser
Development Corporation; Keysco Realty
Corporation; Queen Anne Belvedere Revitalization
Limited Partnership; Nineteen/Twenty–One West
Preston, LLC; Imdboss, LLC, Plaintiffs–Appellants,
v.

1899 LIMITED LIABILITY COMPANY; Small
Deal Fund, LP; 1899 Special Member, Llc;
Raleigh Consultants, LLC, Defendants–Appellees.

No. 13–1166.    |    Argued: Jan. 28,
2014.    |    Decided: April 24, 2014.

**Synopsis**
**Background:** Former managing member of limited liability
company (LLC) brought action against investor member,
current managing member, and manager of LLC's
construction project, alleging breach of contract, unjust
enrichment and related claims. Defendants moved to dismiss
for failure to state a claim. The United States District Court
for the District of Maryland, Catherine C. Blake, J., 2013 WL
142303, granted motion. Plaintiff appealed.

**Holdings:** The Court of Appeals, Diaz, Circuit Judge, held
that:

[1] district court properly treated counsel's statement as an
admission;

[2] parol evidence rule applied to bar claims alleging failure
to repay loans; and

[3] removal of plaintiff as managing member did not breach
LLC's operating agreement.

Affirmed.

*220 Appeal from the United States District Court for
the District of Maryland, at Baltimore. Catherine C. Blake,
District Judge. (1:12–cv–00297–CCB).

**Attorneys and Law Firms**

**ARGUED:** Meighan Griffin Burton, Wright, Constable &
Skeen, LLP, Baltimore, Maryland, for Appellants. Paul
S. Caiola, Gallagher Evelius & Jones LLP, Baltimore,
Maryland, for Appellees. **ON BRIEF:** Michael I. Gordon,
Robert Hesselbacher, Wright, Constable & Skeen, LLP,
Baltimore, Maryland, for Appellants. Brian T. Tucker, Steven
G. Metzger, Gallagher Evelius & Jones LLP, Baltimore,
Maryland, for Appellees.

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

**Opinion**

Affirmed by unpublished opinion. Judge DIAZ wrote the
opinion, in which Judge WILKINSON and Judge KEENAN
joined.

Unpublished opinions are not binding precedent in this
circuit.

DIAZ, Circuit Judge:

In this case, we consider whether Appellants, Plaintiffs
below, have adequately alleged claims for breach of contract
and other state-law causes of action against several of their co-
participants in a project to restore and redevelop Baltimore's
Northern District Police Station. Finding that Plaintiffs had
failed to state any viable claims, the district court dismissed
their complaint. For the reasons that follow, we affirm.

I.

A.

In 2001, Stanley Keyser and Wendy Blair formed a
Maryland limited liability company called 1899 LLC (the
"Company"). Initially, 1899 LLC had two *221 members:
Keyser Development Corp., controlled by Keyser, and W.L.
Blair Development LLC, controlled by Blair. Through the
Company, Keyser and Blair planned to purchase Baltimore's

Northern District Police Station and convert it into a commercial development. In doing so, they sought to obtain certain state and federal tax credits available for projects involving the restoration of historic buildings.

The project quickly ran into obstacles. Environmental hazards, among other difficulties, increased development costs beyond what Keyser and Blair had anticipated. To ensure adequate financing in the face of these problems, Keyser, along with several entities controlled by or affiliated with him (collectively, the "Keyser entities"),[1] began contributing funds to 1899 LLC. These investments continued for several years, and by 2008, Keyser and the Keyser entities had contributed at least $3 million.

[1]    These entities included Plaintiffs–Appellants 1899 Holdings, LLC; Keyser Development Corp.; Keysco Realty Corp.; Queen Anne Belvedere Revitalization L.P.; and Nineteen/TwentyOne West Preston, LLC.

In 2005, to secure still additional financing for the project, Keyser negotiated an agreement with John Bowman, Jr., the president of an investment firm called Tax Credit Capital, LLC. Keyser and Bowman eventually agreed that Small Deal Fund L.P.—an entity affiliated with Bowman—would invest $1.9 million in the project in exchange for 99.9% of the operating profits, as well as the tax credits the project would generate. To facilitate this investment, Small Deal and 1899 Holdings, LLC (one of the Keyser entities) executed an Operating Agreement, dated January 31, 2006, through which the two firms became the sole members of 1899 LLC. The two previous members withdrew.

A number of the Operating Agreement's provisions are relevant to this appeal. First, it designated Holdings as "Managing Member" and Small Deal as "Investor Member." In essence, Holdings was responsible for day-to-day management of the project while Small Deal agreed to provide capital. Per the agreement, however, "[i]f the available debt, equity, rental income or other proceeds [were] insufficient" to complete the project, Holdings agreed to "pay such deficiencies." J.A. 152. Relatedly, Holdings warranted that it would "cause the completion of the ... Project substantially in accordance with the plans and specifications ... free and clear of all mechanics', materialmen's or similar liens." *Id.*

The Operating Agreement also specified that any financing Holdings provided to 1899 LLC would "be treated as a Capital Contribution," rather than as a loan. *See id.* This

policy had one exception: Holdings was permitted "to make short term loans to the Company prior to Construction Completion and such loans [would] not be treated as a Capital Contribution" as long as they were repaid within 120 days (or 180 days upon substantial completion of the project). *Id.* at 152–53. At the time they executed the Operating Agreement, Holdings and Small Deal warranted that there were no "loans or advances ... from the Managing Member or its Affiliates to the Company ... outstanding for more than 120 days" (the "Warranty Clause"). *Id.* at 149.

The Operating Agreement gave Small Deal the power to remove Holdings as Managing Member under certain circumstances. Specifically, as relevant here, Small Deal could remove Holdings if it violated (and failed to cure within thirty days) any provision of the Operating **\*222** Agreement, provided that its conduct had a "material adverse effect on the Company or any of its Members." *Id.* at 162. An "uncured violation" of Holdings' duty to "provide funds" would be "*deemed* to have a material adverse effect." *Id.* (emphasis added).

In addition to a standard merger clause, the Operating Agreement included one other relevant provision. "For services rendered in connection with the Company's development," a developer, IMDBOSS, LLC, would receive a "Developer Fee ... in an amount equal to 20% of appropriate development costs." *Id.* at 101, 160. This fee, estimated to be $500,000, would be "deemed earned in its entirety as of the date of Construction Completion." *Id.* at 160. The fee was to be paid "from available debt and equity proceeds of the Company, to the extent such proceeds [were] not required for other Company purposes." *Id.* The Operating Agreement provided that the "remainder" of the fee could be "deferred" at 6% interest, but it was "in all events" to "be [paid] by December 31, 2014."[2] *Id.*

[2]    The Amendment to the Operating Agreement, discussed below, would later change this date to December 31, 2017.

After Holdings and Small Deal executed the Operating Agreement, Holdings and the other Keyser entities contributed additional funding to the project, consistent with Holdings' duty to cover any shortfalls. Nevertheless, the project continued to struggle financially.

On August 12, 2008, allegedly "[a]t the insistence of Small Deal," Holdings executed an agreement on behalf of 1899 LLC with Raleigh Consultants, LLC. *Id.* at 30. Raleigh

Add. 2

agreed to serve as the "day-to-day construction manager" of the project and to "perform cost data processing." *Id.* According to Holdings, after this agreement, it was "effectively removed" from managing the project. *Id.* Specifically, Holdings alleges that it repeatedly requested access to financial records and other information, but Small Deal and Raleigh "refused to respond to those requests." *Id.*

In September 2008, to address the project's ongoing financial difficulties, Holdings and Small Deal executed an Amendment to the Operating Agreement. Among other changes, the Amendment provided that Small Deal and another entity, the Maryland Historic Tax Credit Fund, L.P., would contribute additional capital to the project. Other than with respect to the enumerated changes, however, the Amendment stated that "the Operating Agreement is ratified and confirmed in all respects" (the "Ratification Clause"). *Id.* at 203.

Shortly after Holdings and Small Deal executed the Amendment, Small Deal accused Holdings of breaching its funding obligation under the Operating Agreement. In a letter to Holdings, dated November 13, 2008, Small Deal threatened to remove Holdings as Managing Member, noting the existence of "no fewer than 17 liens and lawsuits directly affecting the Company." *Id.* at 206. In response, Holdings acknowledged that it was "unable to cause the Company to timely pay operating expenses, or payments on the Company's loans." *Id.* at 55. But, citing various forms of alleged misconduct by Small Deal and Raleigh, Holdings denied that Small Deal had authority to remove it as Managing Member. Undeterred, Small Deal formally removed Holdings on December 15.

As provided by the Operating Agreement, 1899 Special Member LLC—an entity **\*223** appointed by Small Deal—automatically replaced Holdings. Special Member acquired Holdings' interest "for an amount equal to the greater of (i) $100 or (ii) [Holdings'] Capital Account balance ... on the date of removal." *Id.* at 163. The Agreement made this sum payable to Holdings "upon the earlier of fifteen years from the date of removal or the sale of all ... of the Company's assets." *Id.*

Sometime after Holdings' removal, 1899 LLC completed the project.

## B.

In December 2011, Holdings, Keyser, the Keyser entities, and IMDBOSS sued 1899 LLC, Small Deal, Special Member, and Raleigh in Maryland state court, asserting law claims. Defendants removed the action Court for the District of Maryland, jurisdiction.

In their amended complaint, Plaintiffs first alleged that, prior to Holdings' removal as Managing Member, Bowman—on behalf of Small Deal—orally "agreed with Stanley Keyser that the outlays that had been made and would be made by [Keyser and the Keyser entities] ... would be considered loans to 1899 LLC and not capital contributions." J.A. 32–33. As loans, the complaint explained, the funds were due immediately upon completion of the project. The complaint alleged that, by failing to repay the loans, 1899 LLC breached the terms of the oral agreement. In the alternative, the complaint sought return of the funds via claims for unjust enrichment.

The amended complaint also alleged that 1899 LLC, Small Deal, and Special Member breached the terms of the Operating Agreement by wrongfully removing Holdings as Managing Member. According to Holding, the removal was not authorized by the Agreement and violated Defendants' fiduciary duties and duty of good faith. Additionally, the complaint alleged that Defendants breached the Operating Agreement by wrongfully withholding IMDBOSS's developer fee. Finally, it requested that Defendants provide "a full accounting of the Project's capital accounts, income, disbursements, distributions and finances." *Id.* at 39.

Defendants filed a motion to dismiss, which the district court granted. *See 1899 Holdings, LLC v. 1899 Ltd. Liab. Co.,* No. CCB–12–297, 2013 WL 142303 (D.Md. Jan. 8, 2013). The court first held that the parol evidence rule barred Plaintiffs' loan claims. According to the court, Plaintiffs' counsel had conceded that the alleged oral agreement to treat the contributions as loans took place prior to execution of the Amendment. Moreover, the court determined that the existence of the loans was inconsistent with the terms of the Operating Agreement, as ratified by the Amendment. Because the parol evidence rule bars evidence of a prior agreement that conflicts with the terms of a written instrument, the court held that the loan-related contract allegations failed to state a plausible claim. Relatedly, the

court dismissed the alternative unjust enrichment claims. It explained that such claims cannot lie where an express contract—here, the Operating Agreement and Amendment—"covers the subject matter of the claim." *Id.* at *4.

Second, with respect to Plaintiffs' claim for an accounting, the district court noted that "a demand for an accounting is generally not an independent cause of action in Maryland, but rather a remedy to another cause of action." *Id.* Having already concluded that the loan claims were not viable, the court determined that the claim for an accounting also failed.

Third, the court held that Holdings had failed to plausibly allege a breach of contract **\*224** based on its removal as Managing Member. Taking judicial notice of state court documents indicating the entry of judgments on liens against the project, the court determined that Holdings had violated its duty "to cause completion of the project free from liens." *Id.* at *5. Accordingly, the court held that "removal of Holdings as Managing Member complied with ... the Operating Agreement." *Id.*

Finally, the court dismissed IMDBOSS's claim for the developer fee without prejudice. The court read the relevant provisions as establishing that the fee was not due until 2017, and thus determined that IMDBOSS's claim for payment was premature.

Plaintiffs timely noted this appeal.

## II.

Plaintiffs argue that the district court erred in dismissing each of the claims in their amended complaint, an issue that we review de novo. *See Cioca v. Rumsfeld,* 720 F.3d 505, 508 (4th Cir.2013). " 'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In assessing the sufficiency of a plaintiff's allegations, the court may "consider documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem'l Hosp.,* 572 F.3d 176, 180 (4th Cir.2009) (internal citation omitted). Additionally, the court "may consider matters of public record such as documents

from prior state court proceedings." *Walker v. Kelly,* 589 F.3d 127, 139 (4th Cir.2009).

In a contract dispute, "the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." *Martin Marietta Corp. v. Int'l Telecomms. Satellite Org.,* 991 F.2d 94, 97 (4th Cir.1992). Under Maryland law, "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris v. Woods,* 353 Md. 425, 727 A.2d 358, 363 (1999).

### A.

We first consider whether the district court erred in dismissing Plaintiffs' loan claims pursuant to the parol evidence rule. Because we have diversity jurisdiction over this case, we apply Maryland's substantive contract law. *See Francis v. Allstate Ins. Co.,* 709 F.3d 362, 369 (4th Cir.2013), *cert. denied,* ––– U.S. ––––, 134 S.Ct. 986, 187 L.Ed.2d 783 (2014) ("A federal court sitting in diversity is required to apply the substantive law of the forum state, including its choice-of-law rules."); *Lab. Corp. of Am. v. Hood,* 395 Md. 608, 911 A.2d 841, 848 (2006) (noting that Maryland courts "generally apply the law of the place where the contract was made").

Under Maryland law, the parol evidence rule "bars the admission of prior or contemporaneous agreements or negotiations to vary or contradict a written contractual term." *Calomiris,* 727 A.2d at 361. Because "a written agreement discharges prior agreements," it "render[s] legally inoperative communications and negotiations leading up to the written contract." *Id.* at 361–62 (internal quotation marks omitted). Plaintiffs argue that the rule does not apply to their loan claims because: (1) the alleged oral agreement to treat their contributions as loans occurred *after* execution of the written Amendment; and (2) the oral agreement is not inconsistent with the **\*225** terms of either the Operating Agreement or the Amendment. We reject both contentions.

### 1.

With respect to the timing issue, Plaintiffs point to language in their amended complaint stating that Small Deal, "on numerous occasions *until the end of 2008,* ... acknowledged, agreed to, and acquiesced in the treatment of the advances as loans." J.A. 33 (emphasis added). Because the Amendment

was executed in September 2008, they argue, the loan agreement is not a "prior" or "contemporaneous" agreement susceptible to the parol evidence rule. *See Calomiris,* 727 A.2d at 361.

 **[1]**    At the hearing on Defendants' motion to dismiss, however, the district court remarked that the conversations relating to the alleged loan agreement took place "sometime in the spring and summer of 2008, after the [Operating Agreement], but prior to the [Amendment]." J.A. 279. In response to this observation, Plaintiffs' counsel stated that the conversations "were certainly after [the Operating Agreement], yes, and before the [Amendment]." *Id.* In its order dismissing Plaintiffs' claims, the district court treated this statement as an admission. In the court's view, Plaintiffs had "concede[d] that the alleged agreement ... preceded the written Amendment." *1899 Holdings,* 2013 WL 142303, at *4.

"[A] lawyer's statements may constitute a binding admission of a party" if the statements are " 'deliberate, clear, and unambiguous.' " *Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty.,* 608 F.3d 183, 190 (4th Cir.2010) (quoting *Meyer v. Berkshire Life Ins. Co.,* 372 F.3d 261, 265 n. 2 (4th Cir.2004)). When the district court treats a statement as an admission, we review that determination only for abuse of discretion. *See Meyer,* 372 F.3d at 264.

On appeal, Plaintiffs contend that their counsel's statement did not carry the significance the district court attributed to it. They argue that "counsel was referring [only] to the *initial* agreement to treat the advances as loans," not any further conversation confirming that agreement. Reply Br. at 26. We find this distinction unpersuasive.

In the colloquy, the court referred to "conversations," in the plural form, indicating it had in mind all of the discussions regarding the loans, not just the initial agreement. In response, counsel neither disputed the court's characterization of the conversations, nor made the distinction on which Plaintiffs now rely. That counsel did not do so is telling: as the court's observation was clearly directed to the issue of whether the parol evidence rule barred Plaintiffs' claims, counsel's failure to mention the distinction likely indicates he had no such distinction in mind. Moreover, counsel himself employed a plural pronoun, and he phrased his statement in definitive terms. *See* J.A. 279 ("*They* [the conversations] were *certainly* ... before the [Amendment]." (emphasis added)).

Accordingly, we find both that the statement was sufficiently clear and that the district court correctly interpreted it. We thus hold that the court's treatment of counsel's statement as an admission was not an abuse of discretion. Because Plaintiffs are bound by the admission on appeal, *see, e.g., In re McNallen,* 62 F.3d 619, 625 (4th Cir.1995), we reject their argument that the loan agreement postdated the written Amendment.

### 2.

Plaintiffs also contend that the alleged loan agreement is consistent with the Operating **\*226** Agreement and Amendment. Because it does not "vary" or "contradict" the terms of the written instruments, they argue, the parol evidence rule does not apply. *See Calomiris,* 727 A.2d at 361.

The district court found that the oral loan agreement was inconsistent with the terms of the writings based on the interaction between two clauses therein: the Warranty Clause in the Operating Agreement and the Ratification Clause in the Amendment. According to the district court, by ratifying the Operating Agreement in the Amendment, Holdings effectively agreed—as of the date of the Amendment—that there were no "outstanding loans or advances" from Holdings to 1899 LLC. *See 1899 Holdings,* 2013 WL 142303, at *3. Holdings' allegation regarding the oral loan agreement, the court held, thus "directly contradicts the plain language of the later written Operating Agreement and its Amendment." *Id.*

Plaintiffs assert that the district court erred by selectively quoting the language of the Warranty Clause. As they point out, the full clause states that "[t]here are no outstanding loans or advances *(excluding,* for this purpose, any loans pursuant to Section 6.11 and *development advances* with respect to the Project) ... which are *outstanding for more than 120 days."* *See* J.A. 149 (emphasis added). Based on this language, Plaintiffs contend that the existence of the loans is in fact consistent with the Warranty Clause in two potential ways: first, if the loans constitute "development advances" (a term that neither the Amendment nor the Operating Agreement defines); and second, if they were outstanding for fewer than 120 days at the time the parties executed the Amendment. [3]

---

[3]        Plaintiffs do not argue that the alleged loans were "loans pursuant to Section 6.11."

**[2]**   Even if the alleged loans are potentially consistent with the Warranty Clause, however, they are nevertheless inconsistent with other provisions of the Operating Agreement. The Operating Agreement explicitly provides that any payments made by Holdings to "acquire and complete ... the project" will "be treated as a Capital Contribution to the Company." [4] *Id.* at 152. The only exception to this rule is for "short-term loans," which avoid classification as capital contributions *only* if they are repaid "within 120 days of being made (or, within 180 days of being made upon substantial completion of construction of the Project)." *See id.* at 152–53. Plaintiffs do not dispute that the contributions in question were for the purpose of funding and completing the project. Nor do they dispute that the contributions were not in fact repaid within even 180 days. Consequently, the Operating Agreement (which the Amendment ratified) unambiguously renders the payments capital contributions. [5]

[4]      Plaintiffs concede that "the amounts advanced by Keyser and his entities were, in substance, monies paid into the Project by Holdings." *See* Appellants' Br. at 38.

[5]      This is no less true of the so-called "Orlo loan," which the amended complaint describes as "a $500,000 loan that Stanley Keyser *personally* obtained from Orlo Holding NY, LLC." J.A. 33 (emphasis added). Although the Amendment notes the existence of the loan, it imposes no express duty on 1899 LLC to repay it. If, as the complaint alleges, Keyser paid the proceeds of the Orlo loan into the project, the Operating Agreement renders that payment a capital contribution.

In any event, the Operating Agreement also contains a merger clause. That clause provides that the "written agreements ... constitute the entire agreement among the parties and supersede any prior agreements or understandings among them." **\*227** *Id.* at 176. Because the Amendment ratified this provision *after* the date of the alleged oral agreement, it leaves no room for treating the payments as loans.

In sum, the oral communications on which Plaintiffs rely contradict the parties' subsequent written agreement. As the parol evidence rule thus bars introduction of those communications as evidence, the district court did not err in dismissing Plaintiffs' loan-related contract claims.

**3.**

From this conclusion, it follows that the district court also correctly dismissed Plaintiffs' unjust enrichment claims. As the district court recognized, Maryland law does not permit a claim for unjust enrichment where an express contract governs. *See Cnty. Comm'rs v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 747 A.2d 600, 607–08 (2000). "This rule," the Maryland Court of Appeals has explained, "holds the contract parties to their agreement and prevents a party who made a bad business decision from asking the court to restore his expectations." *Id.* at 610 (internal quotation marks omitted).

Here, the parties agreed—by way of the Operating Agreement and Amendment—that Plaintiffs' payments to 1899 LLC would be capital contributions rather than loans. That agreement, as the only one that is both "valid and enforceable," thus "precludes recovery in quasi contract [*i.e.,* unjust enrichment] for events arising out of the same subject matter." *See MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 964 (2d Cir.1998) (per curiam) (alteration in original) (internal quotation marks omitted) (quoted in *Cnty. Comm'rs,* 747 A.2d at 607). For this reason, Plaintiffs' unjust enrichment claims fail. [6]

[6]      In *County Commissioners,* the Maryland Court of Appeals recognized a variety of exceptions to the general rule. These include situations involving "evidence of fraud or bad faith," where "there has been a breach ... or a mutual re[s]cission of the contract, when re [s]cission is warranted, or when the express contract does not fully address a subject matter." 747 A.2d at 609. None of the exceptions apply here.

**B.**

Next, we address Holdings' claim for breach of contract based on its removal as Managing Member of 1899 LLC. Holdings makes two arguments for why its removal was not authorized by the Operating Agreement. First, it argues that the Operating Agreement required it only to *complete* the project "free and clear" of liens, such that the existence of liens prior to completion did not violate its obligations. *See* J.A. 152. Second, Holdings argues that even if it did violate the Operating Agreement, that violation might not have had a "material adverse effect on the Company." *See id.* at 162.

**[3]**   Holdings' arguments misapprehend the contractual hook on which its removal was justified. Under the Agreement, it was not the existence of the liens themselves that justified

Holdings' removal, but rather what the liens signified: that Holdings was not meeting its contractual obligation to cover shortfalls in funding. *See id.* at 152 ("If the available ... proceeds are insufficient to ... acquire and complete the rehabilitation of the Project and satisfy all other obligations ... the Managing Member shall be responsible for and obligated to pay such deficiencies...."). To this point, we note that the state court documents in the record (of which we take judicial notice) reveal not merely liens against the project, but actual *judgments* on those liens. Simply put, the existence of such judgments is inconsistent with Holdings having fulfilled its contractual **\*228** duty. [7] In turn, the Operating Agreement provides that Holdings' failure to fulfill its funding obligation is "*deemed* to have a material adverse effect." *Id.* at 162 (emphasis added).

[7]    Holdings' December 11, 2008, letter to Small Deal essentially admitted as much. In the letter, Holdings stated that it was "unable to cause the Company to timely pay operating expenses, or [make] payments on the Company's loans." J.A. 55.

We perceive no ambiguity in the contract language and conclude that Holdings' removal by Small Deal was authorized by the terms of the Operating Agreement. *See id.* (permitting removal of Holdings as Managing Member based on an uncured violation of the Operating Agreement with a material adverse effect on 1899 LLC). Holdings has not pleaded a plausible claim for breach. [8]

[8]    Holdings' vague and conclusory allegations regarding bad faith and violations of fiduciary duties do not alter our conclusion. *See* J.A. 40. We fail to comprehend how Small Deal's decision to exercise a right expressly provided to it by the contract could constitute either bad faith or a breach of fiduciary duty, especially in light of Holdings' own breach. *See, e.g., Big Yank Corp. v. Liberty Mut. Fire Ins. Co.,* 125 F.3d 308, 313 (6th Cir.1997) (noting that "a party's acting according to the express terms of a contract cannot be considered a breach of the duties of good faith and fair dealing" and collecting cases to that effect).

### C.

We next consider IMDBOSS's claim for breach of contract based on Defendants' failure to pay it the development fee. We agree with the district court that this claim is premature.

Under the terms of the Operating Agreement and Amendment, 1899 LLC is to pay IMDBOSS a "developer fee" in an "amount equal to 20% of appropriate development costs." J.A. 200. The terms of the fee's payment are as follows:

> The Developer Fee shall be deemed earned in its entirety as of the date of Construction Completion and otherwise in accordance with the terms of the Development Agreement. The Developer shall be paid such portion of the Developer Fee from available debt and equity proceeds of the Company, to the extent such proceeds are not required for other Company purposes. The remainder of the Developer Fee shall constitute a deferred fee bearing interest at 6% compounded annually, payable ... to the Developer from Cash Flow and/or Net Proceeds[,] ... but in all events the Deferred Developer Fee shall be [paid] by December 31, 2017....

*Id.* at 200–01.

Focusing on this provision's pronouncement that the fee "*shall* be deemed earned in its entirety as of the date of Construction Completion," IMDBOSS asserts that the fee is currently due. *See id.* at 200. Defendants can avoid paying it, IMDBOSS argues, only by demonstrating that "there are not available debt and equity proceeds to pay the fee." Appellants' Br. at 36. As Defendants have not done so, IMDBOSS contends that 1899 LLC's failure to pay constitutes a breach of contract.

We are not persuaded by IMDBOSS's proposed construction. Although the fee was "earned" at the time that construction of the project was completed, it does not follow that the fee simultaneously became due. With respect to *payment* of the fee, the Amendment states only that it "shall be [paid] by December 31, 2017." J.A. 201. Until that date, the contract vests 1899 LLC with discretion to decide that the relevant funds are "required for other Company purposes." *Id.* at 200. While an allegation that the company is withholding payment of the fee in bad faith could perhaps overcome the discretion this clause confers on 1899 LLC, IMDBOSS makes no **\*229** such allegation in the amended complaint. For that matter, the complaint does not even assert that there are "available debt and equity proceeds" to pay the fee. *See id.* Accordingly, we

conclude that IMDBOSS has not adequately alleged that it is yet entitled to the fee. The district court thus did not err in dismissing IMDBOSS's claim without prejudice.

### D.

Finally, we hold that the district court correctly dismissed Plaintiffs' claim for an accounting. "In Maryland, a claim for an accounting is available when one party is under obligation to pay money to another based on facts and records that are known and kept exclusively by the party to whom the obligation is owed, or where there is a fiduciary relationship among the parties." *Polek v. J.P. Morgan Chase Bank, N.A., 424 Md. 333, 36 A.3d 399, 418 (2012)* (internal quotation marks omitted). This case presents neither circumstance.

First, because Plaintiffs have otherwise failed to plead viable claims for breach of contract or unjust enrichment, we discern no basis for concluding that any of the defendants are under a current "obligation to pay money" to any of the plaintiffs. Although Plaintiffs' capital contributions will ultimately be subject to repayment, such repayment is not due until "the earlier of fifteen years from the date of removal or the sale of all or substantially all of the Company's assets," neither of which has yet occurred. J.A. 163.

Second, and for similar reasons, Defendants do not owe Plaintiffs a fiduciary duty. Regardless of whether members of a Maryland LLC generally owe each other fiduciary duties (an issue on which the parties disagree), neither Holdings nor any other plaintiff is currently a member of 1899 LLC. Per the Operating Agreement, Special Member simply owes Holdings a fixed sum of money, payable upon one of the events noted above. *See id.* ("[T]he Special Member or its designee shall automatically ... acquire the Interest of the removed Managing Member for an amount equal to the greater of (i) $100 or (ii) the Capital Account balance of the removed Managing Member on the date of removal."). In other words, the current relationship between Holdings and Special Member is merely that of a creditor and debtor; Holdings has no current relationship with 1899 LLC.

Plaintiffs therefore have not alleged circumstances to support a claim for an accounting. *See Polek, 36 A.3d at 418* (affirming the dismissal of accounting claims on the basis that the contractual relationship between the parties was not fiduciary in nature and any fiduciary relationship that otherwise existed had "expired long ago").

### III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 8

551 Fed.Appx. 651
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

Debra Rose McMURRAY, Plaintiff–Appellant,

v.

UNITED STATES of America, Defendant–Appellee.

No. 13–1129.    |    Argued: Oct.
31, 2013.    |    Decided: Jan. 7, 2014.

**Synopsis**
**Background:** Passenger injured when vehicle being driven by United States Marine Corps recruiter ran a red light and collided with another car brought action under Federal Tort Claims Act (FTCA). Government moved for summary judgment. The United States District Court for the Eastern District of North Carolina, James C. Dever III, Chief District Judge, 2012 WL 6212633, granted motion. Passenger appealed.

**Holding:** The Court of Appeals held that under North Carolina law, public-policy exception rendered liability release unenforceable.

Reversed and remanded.

**\*651** Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville. James C. Dever III, Chief District Judge. (4:12–cv–00086–D).

**Attorneys and Law Firms**

**ARGUED:** Mark A. Sternlicht, Beaver, Holt, Sternlicht & Courie, PA, Fayetteville, North Carolina, for Appellant. Joshua Bryan Royster, Office of the United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas G. Walker, United States Attorney, R.A. Renfer, Jr., Assistant

United States Attorney, Office of the United States Attorney, Raleigh, North Carolina, for Appellee.

Before TRAXLER, Chief Judge, and KING and THACKER, Circuit Judges.

**Opinion**

Vacated and remanded by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Debra Rose McMurray was a passenger in a vehicle being driven by Michael Rumfalo, a recruiter for the United States Marine Corps. McMurray sustained serious injuries when Rumfalo ran a red light and collided with another car, and she subsequently filed suit against the United States under the Federal Tort Claims Act ("FTCA"). The district court granted summary judgment in favor of the United States, and McMurray appeals. We vacate the judgment of the district court and remand for further proceedings.

**\*652 I.**

The Marine Corps occasionally conducts workshops for teachers and other educational professionals at its facility on Parris Island, South Carolina. The workshops give the educators valuable information about the Corps and the opportunity to experience first-hand some elements of basic training.

McMurray, a guidance counselor at a high school near Fayetteville, North Carolina, frequently counsels students who are deciding whether to join the military or which branch of the military would be a good fit. Interested in attending one of the workshops, McMurray contacted Rumfalo, the Marine Corps recruiter she knew from school. Rumfalo told McMurray that a workshop would be held on March 29 through April 2, 2010, and he forwarded her the necessary paperwork to be completed in order to attend. The paperwork included a "Release and Hold Harmless Agreement" (the "Release") that released the government from liability for any injuries arising out of participation in the workshop, including "riding in government-provided transportation (to include

Add. 9

transportation to and from the Educator's Workshop)." J.A. 15.

When Rumfalo came to pick up the paperwork from McMurray, she had not yet completed the Release. She asked Rumfalo if she would be allowed to participate if she did not sign the Release and was told that "everyone has to sign [the Release] to participate." J.A. 18. McMurray also asked Rumfalo if she could drive herself to Raleigh to meet the bus that would take them to Parris Island, rather than being picked up at her house and driven to Raleigh by Rumfalo. The answer to that question was also "no," an answer that "made it clear" to McMurray that she "could not negotiate the terms of [her] participation in the Workshop." J.A. 19. McMurray therefore signed the Release and attended the workshop.

After the workshop, a Marine Corps bus brought the workshop attendees back to Raleigh. Rumfalo was there, waiting to drive McMurray and an attendee from Fayetteville back to their homes. While still in Raleigh, Rumfalo ran a red light and collided with a car that had the right-of-way. McMurray suffered serious injuries, including a traumatic brain injury. McMurray missed work for the remainder of the 2010 school year and through the entire summer as well. Her medical bills and lost wages exceed $48,000.

McMurray thereafter commenced this action under the FTCA. The district court granted summary judgment in favor of the government, concluding that the Release was enforceable under North Carolina law and that it barred McMurray's claims against the government. This appeal followed.

## II.

The FTCA provides a limited waiver of sovereign immunity for torts committed by federal employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). "In other words, a claimant has an FTCA cause of action against the government only if she would also have a cause of action under state law against a private person in like circumstances. Thus, the substantive law of each state establishes the cause of action." *Anderson v. United States,* 669 F.3d 161, 164 (4th Cir.2011) (citation and internal quotation marks omitted).

The act or omission at issue here took place in North Carolina, and the substantive **\*653** law of North Carolina therefore governs McMurray's FTCA claim. The sole issue on appeal is the enforceability of the Release. If North Carolina law would enforce the Release had it been executed in favor of a private person, then we must likewise enforce the Release as barring McMurray's claim. *See id.* ("[S]ubstantive state law establishes—and circumscribes—FTCA causes of action."). When resolving that issue, this court "must rule as the North Carolina courts would, treating decisions of the Supreme Court of North Carolina as binding, and departing from an intermediate court's fully reasoned holding as to state law only if convinced that the state's highest court would not follow that holding." *Iodice v. United States,* 289 F.3d 270, 275 (4th Cir.2002) (internal quotation marks and alteration omitted).

## III.

### A.

Although contracts seeking to release a party from liability for his own negligence "are not favored by the law," such contracts are generally enforceable. *Hall v. Sinclair Refining Co.,* 242 N.C. 707, 89 S.E.2d 396, 397 (1955). Exculpatory clauses or contracts, however, "are void and unenforceable" where the "contractual provisions [are] violative of the law or contrary to some rule of public policy," or where a party to the contract has unequal bargaining power and "must either accept what is offered or forego the advantages of the contractual relation in a situation where it is necessary for him to enter into the contract to obtain something of importance to him which for all practical purposes is not obtainable elsewhere." *Id.* at 398; *see Fortson v. McClellan,* 131 N.C.App. 635, 508 S.E.2d 549, 551 (1998) ("[A]n exculpatory contract will be enforced unless it violates a statute, is gained through inequality of bargaining power, or is contrary to a substantial public interest.").

McMurray contends that each of the exceptions to the general rule of enforceability applies in this case. She argues that the release is unenforceable under the violation-of-statute exception because the Release is inconsistent with North Carolina's red-light statute. *See* N.C. Gen.Stat. § 20–158(b)(2) ("When a traffic signal is emitting a steady red circular light controlling traffic approaching an intersection, an approaching vehicle facing the red light shall come to a stop and shall not enter the intersection...."). She further argues that the Release is unenforceable under the unequal-

Add. 10

bargaining-power exception because the educator's workshop provided information and experience important to her as a guidance counselor that could not be replicated elsewhere and she lacked the ability to negotiate the terms of her attendance. As to the public-policy exception, McMurray contends that operating motor vehicles on public roads is a dangerous and heavily regulated activity. Given the significant public interests at stake, McMurray argues that it would violate public policy to permit drivers to absolve themselves of the duty to exercise reasonable care when driving. We need not consider McMurray's arguments under the violation-of-statute or unequal-bargaining-power exceptions, because we agree that the public-policy exception renders the Release unenforceable.

**B.**

As explained by the Supreme Court of North Carolina, the public-policy exception prohibits a person from contracting to protect himself from "liability for negligence in the performance of a duty of public service, or where a public duty is owed, *or public interest is involved, or where public*
**\*654** *interest requires the performance of a private duty.*"
*Hall,* 89 S.E.2d at 398 (emphasis added; internal quotation marks omitted). We think it clear that an important public interest is involved in this case—the public's interest in safe streets and safe driving.

There can be no dispute that driving on public roads is a dangerous activity, as North Carolina courts have repeatedly recognized. *See Williams v. Henderson,* 230 N.C. 707, 55 S.E.2d 462, 463 (1949) ("A motorist operates his vehicle on the public highways where others are apt to be.... Should he lapse into a state of carelessness or forgetfulness his machine may leave death and destruction in its wake."). Accordingly, in North Carolina, as elsewhere, numerous statutes, regulations, and cases spell out the rules of the road and the duties of a driver. And as the case law makes clear, the point of these rules and regulations is to protect not merely the driver and his passengers, but to protect the safety *of the public:*

> Our motor traffic regulations are not intended merely to protect those who are using the highways. They are designed to protect the life, limb, and property of *any and every person on or about the highway* who may suffer

> injury to his person or damage to his property as a natural and proximate result of the violation thereof.

*Aldridge v. Hasty,* 240 N.C. 353, 82 S.E.2d 331, 337 (1954) (emphasis added); *see also State v. Anderson,* 3 N.C.App. 124, 164 S.E.2d 48, 50 (1968) ("Death on the highway can no longer be considered as a personal and individual tragedy alone. The mounting carnage has long since reached proportions of a public disaster."), *aff'd,* 275 N.C. 168, 166 S.E.2d 49 (1969). We therefore conclude that, under North Carolina law, there is a strong public-safety interest in careful driving and the observance of all traffic-related rules and regulations. Permitting the government to absolve itself of the duty to exercise reasonable care when driving puts members of the public at great risk and is contrary to that strong public interest.

The district court, however, held—and the Government argues on appeal—that the public-policy exception applies only to " 'entities or industries that are heavily regulated.' " J.A. 25 (quoting *Bertotti v. Charlotte Motor Speedway, Inc.,* 893 F.Supp. 565, 569 (W.D.N.C.1995)). In the district court's view, the activity of driving is not heavily regulated (at least where no common carriers are involved), such that the enforcement of the Release would not "contradict a substantial public interest." J.A. 27.

As an initial matter, we question the correctness of the district court's determination that the public-policy exception is limited to cases involving heavily regulated entities or activities. North Carolina courts have applied the public-policy exception to invalidate exculpatory contracts and clauses executed under widely varying circumstances, not all of which can be said to involve heavily regulated entities or activities. *See Fortson,* 508 S.E.2d at 551–52 (invalidating release signed as condition of participation in motorcycle-safety training program); *Alston v. Monk,* 92 N.C.App. 59, 373 S.E.2d 463, 467 (1988) (invalidating release signed by customer having hair colored by student of cosmetology school); *Brockwell v. Lake Gaston Sales & Serv.,* 105 N.C.App. 226, 412 S.E.2d 104, 106 (1992) (invalidating clause in boat-repair contract that purported to relieve mechanic of liability for negligence that led to theft of personal property contained in boat). While the practice of cosmetology may be heavily regulated, teaching motorcycle safety or repairing boats is not, yet the releases in *Fortson* and *Brockwell* **\*655** were still invalidated under the public-policy exception.

Add. 11

In our view, the *Hall* court's formulation of the exception, with its focus on public service, public duty, and public interest, *see Hall,* 89 S.E.2d at 398, makes it clear that the public-policy exception turns not on the level of regulation, but on the presence or absence of a *public interest* in the transaction at issue. The actual application of the exception by the North Carolina courts confirms this view—the courts enforce exculpatory clauses where no public interest is at stake, without regard to whether the entity seeking protection is regulated. *See Gibbs v. Carolina Power & Light Co.,* 265 N.C. 459, 144 S.E.2d 393, 400 (1965) ("Even a public service corporation is protected by an exculpatory clause *when the contract is casual and private and in no way connected with its public service.*" (emphasis added)); *Fortson,* 508 S.E.2d at 553 ("[W]hen [a] public utility engage[s] in non-public activity, freedom of contract principles appl[y], and the public utility's contracts [are] not limited by public policy." (internal quotation marks omitted)); *see also Blaylock Grading Co. v. Smith,* 189 N.C.App. 508, 658 S.E.2d 680, 683 (2008) (enforcing exculpatory clause in land-surveying contract despite regulation of surveying industry because "the limitation on liability in the contract at issue does not implicate the public health or safety"); *Sylva Shops Ltd. P'ship v. Hibbard,* 175 N.C.App. 423, 623 S.E.2d 785, 790, 792 (2006) (enforcing exculpatory clause in commercial lease not because relationship was not heavily regulated, but because exculpatory clause at issue "[did] not create a risk of injury to the public or the rights of third parties" and therefore "[did] not affect the public interest").

Heavy regulation of an activity or entity may well reflect the presence of an important public interest that precludes enforcement of an exculpatory clause. *See Fortson,* 508 S.E.2d at 551 ("An activity falls within the public policy exception when the activity is extensively regulated to protect the public from danger, and it would violate public policy to allow those engaged in such an activity to absolve themselves from the duty to use reasonable care." (internal quotation marks omitted)). Nonetheless, we do not read the relevant North Carolina cases as *requiring* heavy regulation of the activity or entity before the public-policy exception may be invoked. [1]

[1]     In any event, even if heavy regulation were required under North Carolina law, it is apparent that driving on public roads is a heavily regulated activity, with numerous statutes and regulations establishing the requirements for getting and keeping a license to drive

on public roads, and setting out the driver's obligations under various circumstances.

The government also contends driving is not the kind of activity that would justify application of the public-policy exception. We disagree. In our view, the public-safety interest at stake in this case is at least as important as the safety interests involved in motorcycle instruction, *see Fortson,* 508 S.E.2d at 552, or the practice of cosmetology, *see Alston,* 373 S.E.2d at 467, and significantly more important that the public interest in the safeguarding of a boat while under repair, *see Brockwell,* 412 S.E.2d at 106. Moreover, the government's argument in this regard is largely foreclosed by the North Carolina Court of Appeals' decision in *Fortson.*

In *Fortson,* the plaintiff executed a release when signing up for a two-day motorcycle safety program and was injured when the motorcycle she was assigned malfunctioned. The court found the release unenforceable under the public-policy exception. To reach its conclusion, the court focused on the risks associated with **\*656** motorcycle *use* and the public-safety interest "in minimizing the risks associated with motorcycle *use,*" an interest that is "recognized in case law and regulated by statute." *Id.* at 552 (emphasis added). [2] In the court's view, the "*same* interests in public safety" addressed by the cases and statutes involving motorcycle use "are significantly present in motorcycle safety instruction," *id.* at 554 (emphasis added), and the court therefore found the release unenforceable: "Given the hazards to the public associated with motorcycle instruction, and the extensive regulation of motorcycle use, it would violate public policy to allow instructors in a motorcycle safety instruction course, such as the one operated by defendant, to absolve themselves from the duty to use reasonable care." *Id.* at 552.

[2]     As an example of a case recognizing the public interest in minimizing the risks of motorcycle use, the *Fortson* court cited to *State v. Anderson,* 3 N.C.App. 124, 164 S.E.2d 48 (1968), a case which upheld North Carolina's helmet law as valid exercise of police powers because the law bore "a substantial relation to the promotion of *the welfare and safety of the general public* as distinguished from the welfare solely of the individual riders of motorcycles." *Id.* at 50 (emphasis added).

The *Fortson* court's analysis is thus premised on an implicit determination that the public-safety interest in the safe *use* of motorcycles is substantial enough to invalidate a release implicating that interest. If the public interest in the safe use of motorcycles is enough to invalidate a release, then the

Add. 12

public interest in the safe use and operation of cars is likewise enough.

### IV.

As the North Carolina courts have made clear, every driver owes the public the duty to exercise due care when driving on public roads; the failure to exercise due care puts people and property at great risk. *See Aldridge,* 82 S.E.2d at 337; *Williams,* 55 S.E.2d at 463. Careless driving exposes the public, not merely the driver and his passenger, to great danger, and the Release therefore cannot be viewed as a simple private contract that should be enforced according to its terms. *See Blaylock Grading Co.,* 658 S.E.2d at 683; *Sylva Shops,* 623 S.E.2d at 790.

Accordingly, we conclude that, under the circumstances of this case, it would violate public policy to permit the government to "absolve [itself] from the duty to use reasonable care" when driving. *Fortson,* 508 S.E.2d at 552; *cf. Sylva Shops,* 623 S.E.2d at 790 ("Public policy has been defined as the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good."). Because the Release is unenforceable under North Carolina law, we vacate the district court's order granting summary judgment in favor of the government, and we remand for further proceedings on McMurray's FTCA claim.

*VACATED AND REMANDED.*

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 7. Agriculture
        Chapter 6. Insecticides and Environmental Pesticide Control (Refs & Annos)
            Subchapter II. Environmental Pesticide Control (Refs & Annos)

7 U.S.C.A. § 136j

§ 136j. Unlawful acts

Currentness

(a) In general

**(1)** Except as provided by subsection (b) of this section, it shall be unlawful for any person in any State to distribute or sell to any person--

**(A)** any pesticide that is not registered under section 136a of this title or whose registration has been canceled or suspended, except to the extent that distribution or sale otherwise has been authorized by the Administrator under this subchapter;

**(B)** any registered pesticide if any claims made for it as a part of its distribution or sale substantially differ from any claims made for it as a part of the statement required in connection with its registration under section 136a of this title;

**(C)** any registered pesticide the composition of which differs at the time of its distribution or sale from its composition as described in the statement required in connection with its registration under section 136a of this title;

**(D)** any pesticide which has not been colored or discolored pursuant to the provisions of section 136w(c)(5) of this title;

**(E)** any pesticide which is adulterated or misbranded; or

**(F)** any device which is misbranded.

**(2)** It shall be unlawful for any person--

**(A)** to detach, alter, deface, or destroy, in whole or in part, any labeling required under this subchapter;

**(B)** to refuse to--

**(i)** prepare, maintain, or submit any records required by or under section 136c, 136e, 136f, 136i, or 136q of this title;

Add. 14

**(ii)** submit any reports required by or under section 136c, 136d, 136e, 136f, 136i, or 136q of this title; or

**(iii)** allow any entry, inspection, copying of records, or sampling authorized by this subchapter;

**(C)** to give a guaranty or undertaking provided for in subsection (b) of this section which is false in any particular, except that a person who receives and relies upon a guaranty authorized under subsection (b) of this section may give a guaranty to the same effect, which guaranty shall contain, in addition to the person's own name and address, the name and address of the person residing in the United States from whom the person received the guaranty or undertaking;

**(D)** to use for the person's own advantage or to reveal, other than to the Administrator, or officials or employees of the Environmental Protection Agency or other Federal executive agencies, or to the courts, or to physicians, pharmacists, and other qualified persons, needing such information for the performance of their duties, in accordance with such directions as the Administrator may prescribe, any information acquired by authority of this subchapter which is confidential under this subchapter;

**(E)** who is a registrant, wholesaler, dealer, retailer, or other distributor to advertise a product registered under this subchapter for restricted use without giving the classification of the product assigned to it under section 136a of this title;

**(F)** to distribute or sell, or to make available for use, or to use, any registered pesticide classified for restricted use for some or all purposes other than in accordance with section 136a(d) of this title and any regulations thereunder, except that it shall not be unlawful to sell, under regulations issued by the Administrator, a restricted use pesticide to a person who is not a certified applicator for application by a certified applicator;

**(G)** to use any registered pesticide in a manner inconsistent with its labeling;

**(H)** to use any pesticide which is under an experimental use permit contrary to the provisions of such permit;

**(I)** to violate any order issued under section 136k of this title;

**(J)** to violate any suspension order issued under section 136a(c)(2)(B), 136a-1, or 136d of this title;

**(K)** to violate any cancellation order issued under this subchapter or to fail to submit a notice in accordance with section 136d(g) of this title;

**(L)** who is a producer to violate any of the provisions of section 136e of this title;

**(M)** to knowingly falsify all or part of any application for registration, application for experimental use permit, any information submitted to the Administrator pursuant to section 136e of this title, any records required to be maintained pursuant to this subchapter, any report filed under this subchapter, or any information marked as confidential and submitted to the Administrator under any provision of this subchapter;

Add. 15

**(N)** who is a registrant, wholesaler, dealer, retailer, or other distributor to fail to file reports required by this subchapter;

**(O)** to add any substance to, or take any substance from, any pesticide in a manner that may defeat the purpose of this subchapter;

**(P)** to use any pesticide in tests on human beings unless such human beings (i) are fully informed of the nature and purposes of the test and of any physical and mental health consequences which are reasonably foreseeable therefrom, and (ii) freely volunteer to participate in the test;

**(Q)** to falsify all or part of any information relating to the testing of any pesticide (or any ingredient, metabolite, or degradation product thereof), including the nature of any protocol, procedure, substance, organism, or equipment used, observation made, or conclusion or opinion formed, submitted to the Administrator, or that the person knows will be furnished to the Administrator or will become a part of any records required to be maintained by this subchapter;

**(R)** to submit to the Administrator data known to be false in support of a registration; or

**(S)** to violate any regulation issued under section 136a(a) or 136q of this title.

(b) Exemptions

The penalties provided for a violation of paragraph (1) of subsection (a) of this section shall not apply to--

**(1)** any person who establishes a guaranty signed by, and containing the name and address of, the registrant or person residing in the United States from whom the person purchased or received in good faith the pesticide in the same unbroken package, to the effect that the pesticide was lawfully registered at the time of sale and delivery to the person, and that it complies with the other requirements of this subchapter, and in such case the guarantor shall be subject to the penalties which would otherwise attach to the person holding the guaranty under the provisions of this subchapter;

**(2)** any carrier while lawfully shipping, transporting, or delivering for shipment any pesticide or device, if such carrier upon request of any officer or employee duly designated by the Administrator shall permit such officer or employee to copy all of its records concerning such pesticide or device;

**(3)** any public official while engaged in the performance of the official duties of the public official;

**(4)** any person using or possessing any pesticide as provided by an experimental use permit in effect with respect to such pesticide and such use or possession; or

**(5)** any person who ships a substance or mixture of substances being put through tests in which the purpose is only to determine its value for pesticide purposes or to determine its toxicity or other properties and from which the user does not expect to receive any benefit in pest control from its use.

**CREDIT(S)**

(June 25, 1947, c. 125, § 12, as added Oct. 21, 1972, Pub.L. 92-516, § 2, 86 Stat. 989; amended Sept. 30, 1978, Pub.L. 95-396, § 16, 92 Stat. 832; Oct. 25, 1988, Pub.L. 100-532, Title VI, §§ 601(b)(2), 603, Title VIII, § 801(g), (q)(2)(B), 102 Stat. 2677, 2678, 2682, 2683; Dec. 13, 1991, Pub.L. 102-237, Title X, § 1006(a)(7), (b)(3)(L) to (O), 105 Stat. 1895, 1896.)

Notes of Decisions (29)

7 U.S.C.A. § 136j, 7 USCA § 136j
Current through P.L. 113-296 (excluding P.L. 113-235, 113-287, 113-291, and 113-295) approved 12-19-2014

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

N.C.G.S.A. § 143-435

§ 143-435. Preamble

Currentness

(a) The Legislative Research Commission was directed by House Resolution 1392 of the 1969 General Assembly "to study agricultural and other pesticides," and to report its findings and recommendations to the 1971 General Assembly. Pursuant to said Resolution a report was prepared and adopted by the Legislative Research Commission in 1970 concerning pesticides. In this report the Legislative Research Commission made the following findings concerning the use and effects of pesticides and the need for legislation concerning control of pesticide use, of which the General Assembly hereby takes cognizance:

(1) The use of chemical pesticides has developed since the 1940's into a major, new billion-dollar industry. Pesticides have bettered the lot of mankind in many ways and especially have assisted the farmer by their contribution to a stable and inexpensive supply of high quality food, fiber and forest products. The control of insects, fungi and other pests is essential to the public health and welfare and specifically to the prevention of disease, to the production and preservation of food, fiber, and forests and to the protection of other aspects of modern civilization.

(2) The use of pesticides for these important purposes is currently a matter of serious public concern and their use in some instances presents risks to man and the environment which must be weighed against the benefits of those uses in the overall public interest. Evidence is accumulating that extensive use of persistent pesticides poses hazards to health and the environment. Environmental problems resulting from the use, overuse and misapplication of some chemicals, and the disposal of unused chemicals and containers, have grown to the point where contamination of the environment is approaching significant proportions. There is concern among scientists and public health personnel about the long-term chronic effects of pesticide pollution on human health. Contamination by DDT has been shown to be global in extent. Moreover, recent experience in North Carolina and elsewhere has shown that the more toxic but less persistent pesticides cannot safely be substituted for the persistent "hard" pesticides without stringent safeguards.

(3) More extensive observation, study and monitoring of the effectiveness and the use of pesticides and of undesirable side effects on man and on the environment and of their relative importance for the overall public health and welfare are desirable in the public interest.

(4) Continued and strengthened control of the quality of pesticides and the control of labeling claims, direction for use and warnings are necessary for the protection of the purchasing public, including the household consumer, the farmer and other users.

(5) No existing legislation in North Carolina effectively limits or controls the use of pesticides. Misuse and misapplication of pesticides, while effectively controlled by law with respect to structural pest control operators, is not adequately controlled with respect to some other major groups of pesticide applicators. Careless disposal of unused pesticides and

Add. 18

contaminated containers is not controlled by law, and no North Carolina legislation requires that pesticide dealers, who are the principal source of advice for many pesticide users, be qualified to give advice or be held responsible for their advice. These gaps in legal control of pesticides are important and should be remedied.

(b) The purpose of this Article is to regulate in the public interest the use, application, sale, disposal and registration of insecticides, fungicides, herbicides, defoliants, desiccants, plant growth regulators, nematicides, rodenticides, and any other pesticides designated by the North Carolina Pesticide Board. New pesticides are continually being discovered or synthesized which are valuable for the control of insects, fungi, weeds, nematodes, rodents, and for use as defoliants, desiccants, plant regulators and related purposes. However, such pesticides may be ineffective or may seriously injure health, property, or wildlife if not properly used. Pesticides may injure man or animals, either by direct poisoning or by gradual accumulation of poisons in the tissues. Crops or other plants may also be injured by their improper use. The drifting or washing of pesticides into streams or lakes can cause appreciable danger to aquatic life. A pesticide applied for the purpose of killing pests in a crop, which is not itself injured by the pesticide, may drift and injure other crops or nontarget organisms with which it comes in contact. In furtherance of the findings and recommendations of the Legislative Research Commission, it is hereby declared to be the policy of the State of North Carolina that for the protection of the health, safety, and welfare of the people of this State, and for the promotion of a more secure, healthy and safe environment for all the people of the State, the future sale, use and application of pesticides shall be regulated, supervised and controlled by the State in the manner herein provided.

**Credits**
Added by Laws 1971, c. 832, § 1.

N.C.G.S.A. § 143-435, NC ST § 143-435
The statutes and Constitution are current through the end of the 2014 Regular Session of the General Assembly.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

West's North Carolina General Statutes Annotated
Chapter 143. State Departments, Institutions, and Commissions
Article 52. Pesticide Board (Refs & Annos)
Part 2. Regulation of the Use of Pesticides

N.C.G.S.A. § 143-443

§ 143-443. Miscellaneous prohibited acts

Currentness

(a) It shall be unlawful for any person to distribute, sell, or offer for sale within this State or deliver for transportation or transport in intrastate commerce or between points within this State through any point outside this State any of the following:

(1) Any pesticide which has not been registered pursuant to the provisions of G.S. 143-442, or any pesticide if any of the claims made for it or any of the directions for its use differ in substance from the representations made in connection with the registration, or if the composition of a pesticide differs from its composition as represented in connection with its registration: Except that, in the discretion of the Board, a change in the labeling or formula of a pesticide may be made within a registration period without requiring reregistration of the product.

(2) Any pesticide unless it is in the registrant's or the manufacturer's unbroken immediate container, and there is affixed to such container, and to the outside container or wrapper of the retail package, if there be one through which the required information on the immediate container cannot be clearly read, a label bearing:

a. The name and address of the manufacturer, registrant, or person for whom manufactured;

b. The name, brand, or trademark under which said article is sold; and

c. The net weight or measure of the content subject, however, to such reasonable variations as the Board may permit.

(3) Any pesticide which contains any substance or substances in quantities highly toxic to man, determined as provided in G.S. 143-444, unless the label shall bear, in addition to any other matter required by this Part:

a. The skull and crossbones;

b. The word "poison" prominently, in red, on a background of distinctly contrasting color; and

c. A statement of an antidote for the pesticide.

(4) The pesticides commonly known as standard lead arsenate, basic lead arsenate, calcium arsenate, magnesium arsenate, zinc arsenate, zinc arsenite, sodium fluoride, sodium fluosilicate, and barium fluosilicate unless they have been distinctly

colored or discolored as provided by regulations issued in accordance with this Part, or any other white or lightly colored pesticide which the Board, after investigation of and after public hearing on the necessity for such action for the protection of the public health and the feasibility of such coloration or discoloration, shall, by regulation, require to be distinctly colored or discolored; unless it has been so colored or discolored, provided, that the Board may exempt any pesticide to the extent that it is intended for a particular use or uses from the coloring or discoloring required or authorized by this section if the Board determines that such coloring or discoloring for such use or uses is not necessary for the protection of the public health.

(5) Any pesticide which is adulterated or misbranded, (or any device which is misbranded).

(6) Any pesticide in containers violating regulations adopted pursuant to G.S. 143-441. Pesticides found in containers which are unsafe due to damage or defective construction may be seized and impounded.

(b) It shall be unlawful:

(1) For any person to detach, alter, deface, or destroy, in whole or in part, any label or labeling provided for in this Part or regulations promulgated hereunder, or to add any substance to, or take any substance from a pesticide in a manner that may defeat the purpose of this Part;

(2) For any person to use for his own advantage or to reveal, other than to the Board or proper officials or employees of the State or federal government or to the courts of this State in response to a subpoena, or to physicians, or in emergencies to pharmacists and other qualified persons, for use in the preparation of antidotes, any information relative to formulas of products acquired by authority of G.S. 143-442.

(2a) Repealed by Laws 1981, c. 592, § 3.

(3) For any person to use any pesticide in a manner inconsistent with its labeling.

(4) For any person who contracts for the aerial application of a pesticide to permit the application of any pesticide that is designated on its labeling as toxic to bees without first notifying, based on available listings, the owner or operator of any apiary registered under the North Carolina Bee and Honey Act of 1977 that is within a distance designated by the Pesticide Board as necessary and appropriate to prevent damage or injury.

(5) For any person to distribute, sell or offer for sale any restricted use pesticide to any dealer who does not hold a valid North Carolina Pesticide Dealer License.

(6) For any person to assault, resist, impede, intimidate, or interfere with any State employee while that employee is engaged in the performance of his or her duties under this Article.

(7) For any person to apply, for compensation, a pesticide that has not been registered pursuant to G.S. 143-442.

**Credits**

Added by Laws 1971, c. 832, § 1. Amended by Laws 1975, c. 425, § 3; Laws 1979, c. 448, §§ 4, 5; Laws 1981, c. 547; Laws 1981, c. 592, §§ 3, 4; Laws 1987, c. 559, § 8; Laws 1995, c. 445, § 3, eff. July 18, 1995.

Notes of Decisions (3)

N.C.G.S.A. § 143-443, NC ST § 143-443
The statutes and Constitution are current through the end of the 2014 Regular Session of the General Assembly.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 22

# BLACK'S LAW DICTIONARY

EIGHTH EDITION

BRYAN A. GARNER
EDITOR IN CHIEF

*ex contractu*

608

**ex contractu** (eks kən-**trak**-t[y]oo). [Latin "from a contract"] Arising from a contract <action *ex contractu*>. Cf. EX DELICTO.

**exculpate** (ek-skəl-payt *or* ek-skəl-payt), *vb.* To free from blame or accusation. Cf. EXONERATE (1). — **exculpation** (ek-skəl-**pay**-shən), *n.* — **exculpatory** (ek-skəl-pə-tor-ee), *adj.*

**exculpatory clause.** A contractual provision relieving a party from liability resulting from a negligent or wrongful act. ● A will or a trust may contain an exculpatory clause purporting to immunize a fiduciary from a breach of duty; the clause may reduce the degree of care and prudence required of the fiduciary. But courts generally find that if an exculpatory clause in a will or trust seeks to confer absolute immunity, it is void as being against public policy. See EXEMPTION CLAUSE. [Cases: Contracts ⚖114. C.J.S. *Contracts* § 271.]

**exculpatory evidence.** See EVIDENCE.

**exculpatory-no doctrine.** *Criminal law.* The principle that a person cannot be charged with making a false statement for falsely denying guilt in response to an investigator's question. ● This doctrine is based on the Fifth Amendment right against self-incrimination. But the U.S. Supreme Court has overruled this doctrine in federal law. *Brogan v. United States*, 522 U.S. 398, 118 S.Ct. 805 (1998). [Cases: Fraud ⚖68.10(1).]

**ex curia** (eks kyoor-ee-ə). [Latin] Out of court; away from the court.

**excusable,** *adj.* (Of an illegal act or omission) not punishable under the specific circumstances <excusable neglect>.

**excusable assault.** See ASSAULT.

**excusable homicide.** See HOMICIDE.

**excusable neglect.** See NEGLECT.

**excusatio** (ek-skyoo-**zay**-shee-oh), *n.* [Latin] *Roman & civil law.* An excuse or reason that exempts someone from some duty or obligation.

**excusator** (ek-skyoo-**zay**-tər), *n.* **1.** *Hist.* An excuser. **2.** In old German law, a defendant; one who wholly denies the plaintiff's claim.

**excuse** (eks-kyoos), *n.* **1.** A reason that justifies an act or omission or that relieves a person of a duty. **2.** *Criminal law.* A defense that arises because the defendant is not blameworthy for having acted in a way that would otherwise be criminal. ● The following defenses are the traditional excuses: duress, entrapment, infancy, insanity, and involuntary intoxication. — Also termed *legal excuse.* Cf. JUSTIFICATION (2). [Cases: Criminal Law ⚖37–38. C.J.S. *Criminal Law* §§ 49–53, 58.] — **excuse** (ek-skyooz), *vb.* — **excusatory** (ek-skyooz-ə-tor-ee), *adj.*

**excuss** (ek-skəs), *vb.* To seize and detain by law.

**excussio** (ek-skə-s[h]ee-oh), *n.* [Latin] *Roman & civil law.* A diligent prosecution of a remedy against a debtor; the exhausting of a remedy against a principal debtor before resorting to a surety.

**ex-date.** See EX-DIVIDEND DATE.

**ex debito justitiae** (eks **deb**-i-toh jəs-**tish**-ee-ee). [Latin] From or as a debt of justice; in accordance with the requirement of justice; of right; as a matter of right.

**ex debito naturali** (eks **deb**-i-toh nach-ə-**ray**-lɪ). [Law Latin] *Scots law.* Arising from natural obligation. ● The phrase appeared in reference to an obligation that was moral rather than legal.

**ex defectu juris** (eks di-**fek**-t[y]oo **joor**-is). [Law Latin] *Scots law.* From a defect in the right. ● A seller had to warrant a purchaser against an eviction based on a defect in the seller's own right.

**ex defectu natalium** (eks di-**fek**-t[y]oo nə-**tay**-lee-əm). [Law Latin] *Hist.* From defect of parentage. ● Formerly, this phrase appeared in reference to a basis upon which the court rejected the will of a bastard who died without issue.

**ex defectu sanguinis** (eks di-**fek**-t[y]oo **sang**-gwə-nis). [Latin] *Hist.* From failure of blood; for want of issue.

**ex delectu familiae** (eks di-**lek**-t[y]oo fə-**mil**-ee-ee). [Law Latin] *Hist.* From choice of a certain family. ● The phrase appeared in reference to the sovereign's right to bestow honors on those whom he chose.

**ex deliberatione Dominorum Concilii** (eks di-lib-ə-ray-shee-oh-nee dom-ə-nor-əm kən-**sil**-ee-ɪ). [Law Latin] *Hist.* After consideration by the Lords of Council.

> "Formerly all writs which passed the signet were procured by presentation of a bill (or petition) for such writ. The bill was perused and considered by the Lord Ordinary on the Bills, and if he was satisfied, the bill was passed and the writ issued: the latter bearing the words *ex deliberatione Dominorum Concilii* to signify that the bill had been considered. These words are still appended to almost all writs which pass the signet, but they are now only words of style, since the writs are now passed *periculo petentis* without being submitted to the Lords." John Trayner, *Trayner's Latin Maxims* 196–97 (4th ed. 1894).

**ex delicto** (eks də-**lik**-toh), *adj. & adv.* [Latin "from a wrong"] **1.** Arising from a crime or tort <action *ex delicto*>. ● Although *ex delicto* refers most commonly to a tort in modern usage, it referred historically to both torts and crimes. Cf. IN DELICTO; EX CONTRACTU. **2.** *Int'l law. Rare.* As a consequence of a crime or tort <because they were counterfeit, the goods were seized and condemned *ex delicto*>.

**ex delicto trust.** See TRUST.

**ex demissione** (eks də-mish-ee-oh-nee). [Latin "upon the demise"] *Hist.* A phrase forming part of the title of the old action of ejectment. — Abbr. *ex dem.*

**ex directo** (eks di-**rek**-toh). [Latin] Directly; immediately.

**ex distribution.** Without distribution. ● Shares are traded ex distribution when they no longer carry the right to receive a distribution to be made to holders. — Abbr. X; XDIS.

**ex diverso** (eks di-**vər**-soh). [Latin] *Hist.* On the other hand; conversely.

**ex dividend.** Without dividend. ● Shares are traded ex dividend when the seller, not the purchaser, is entitled to the next dividend payment because it will be made before the stock transfer is completed. The first day on which shares are traded ex dividend, the stock price will drop by an amount usu. approximat-

**executory process.** *Civil law.* **1.** A process that can be resorted to either (1) when the right of a creditor arises from an act importing a confession of judgment, and that contains a privilege or mortgage in the creditor's favor, or (2) when the creditor demands the execution of a judgment that has been rendered by a different tribunal. **2.** An accelerated procedure, summary in nature, by which the holder of a mortgage or privilege evidenced by a confession of judgment seeks to effect an ex parte seizure and sale of the subject property. [Cases: Chattel Mortgages ⟷269; Mortgages ⟷499. C.J.S. *Mortgages* §§ 832–833.]

**executory remainder.** See *contingent remainder* under REMAINDER.

**executory sale.** See SALE.

**executory trust.** See TRUST.

**executory unilateral accord.** An offer to enter a contract; OFFER (2).

**executory use.** See *springing use* under USE (4).

**executory warranty.** See WARRANTY (3).

**executress.** See EXECUTRIX.

**executrix** (eg-zek-yə-triks), *n. Archaic.* A female executor. — Abbr. exrx. — Also termed *executress.* Pl. **executrixes** (eg-zek-yə-trik-səz), **executrices** (eg-zek-yə-**trī**-seez). See EXECUTOR.

**exedos** (e-he-thohs), *n.* See EJIDOS.

**exemplar** (eg-zem-plər *or* -plahr), *n.* **1.** An ideal or typical example; a standard specimen <handwriting exemplars>. **2.** Nontestimonial identification evidence, such as fingerprints, voiceprints, and DNA samples. See VOICE EXEMPLAR. [Cases: Criminal Law ⟷404.85; Evidence ⟷197. C.J.S. *Criminal Law* § 853; *Evidence* §§ 800, 802.]

**exemplary,** *adj.* **1.** Serving as an ideal example; commendable <exemplary behavior>. **2.** Serving as a warning or deterrent; admonitory <exemplary damages>.

**exemplary damages.** See *punitive damages* under DAMAGES.

**exemplary substitution.** See SUBSTITUTION (5).

**exemplification,** *n.* An official transcript of a public record, authenticated as a true copy for use as evidence. [Cases: Criminal Law ⟷430; Evidence ⟷338. C.J.S. *Criminal Law* §§ 1025, 1029–1031; *Evidence* §§ 879–880, 893, 895.] — **exemplify,** *vb.*

**exemplificatione** (eg-zem-plə-fə-**kay**-shee-oh-nee). [Latin] A writ granted for the exemplification or transcript of an original record.

**exemplified copy.** See *certified copy* under COPY.

**exempli gratia** (eg-zem-plī gray-shee-ə *or* ek-sem-plee grah-tee-ə). [Latin] For example; for instance. — Abbr. e.g. or (rarely) ex. gr.

**exemplum** (eg-zem-pləm), *n.* [Latin] *Civil law.* A copy; a written authorized copy.

**exempt,** *adj.* Free or released from a duty or liability to which others are held <persons exempt from military service> <property exempt from sequestration>. — **exempt,** *vb.* — **exemptive,** *adj.*

**exempt income.** See INCOME.

**exemption. 1.** Freedom from a duty, liability, or other requirement; an exception. See IMMUNITY; EXCEPTION (2). **2.** A privilege given to a judgment debtor by law, allowing the debtor to retain certain property without liability. [Cases: Exemptions ⟷1; Homestead ⟷1.] **3.** *Tax.* An amount allowed as a deduction from adjusted gross income, used to determine taxable income. Cf. DEDUCTION (2). [Cases: Internal Revenue ⟷3294; Taxation ⟷1031.1, 1048. C.J.S. *Internal Revenue* §§ 330, 335; *Taxation* §§ 1736–1739.]

   **dependency exemption.** A tax exemption granted to an individual taxpayer for each dependent whose gross income is less than the exemption amount and for each child who is younger than 19 or, if a student, younger than 24. [Cases: Internal Revenue ⟷3294; Taxation ⟷1031.1, 1048. C.J.S. *Internal Revenue* §§ 330, 335; *Taxation* §§ 1736–1739.]

   **personal exemption.** An amount allowed as a deduction from an individual taxpayer's adjusted gross income. [Cases: Internal Revenue ⟷3295; Taxation ⟷1031.1, 1048. C.J.S. *Taxation* §§ 1736–1739.]

**exemption clause.** A contractual provision providing that a party will not be liable for damages for which that party would otherwise have ordinarily-been liable. Cf. EXCEPTION CLAUSE; EXCULPATORY CLAUSE; INDEMNITY CLAUSE. [Cases: Contracts ⟷114. C.J.S. *Contracts* § 271.]

   "An exemption clause may take many forms, but all such clauses have one thing in common in that they exempt a party from a liability which he would have borne had it not been for the clause. In some cases an exemption clause merely relieves a party from certain purely contractual obligations, for example, the duties of a seller in a contract of sale regarding the quality and fitness of the goods. In other cases exemption clauses go further and protect the party not merely from contractual liability but even from liability which would otherwise have arisen in tort. For example, a shipping company's ticket may exempt the company from liability to the passenger for any injuries, however caused. Now if the passenger is injured as a result of the negligence of the company's employees, that would, in the normal way, give rise to an action in tort for negligence, quite apart from the contract." P.S. Atiyah, *An Introduction to the Law of Contract* 167 (3d ed. 1981).

**exemption equivalent.** The maximum value of assets that one can transfer to another before incurring a federal gift and estate tax.

**exemption law.** A law describing what property of a debtor cannot be attached by a judgment creditor or trustee in bankruptcy to satisfy a debt. See EXEMPT PROPERTY (1). [Cases: Exemptions ⟷1; Homestead ⟷1.]

**ex empto** (eks emp-toh). [Latin] *Roman & civil law.* Out of purchase; founded on purchase.

**exempt organization.** An organization that is either partially or completely exempt from federal income taxation. See CHARITABLE ORGANIZATION. [Cases: Internal Revenue ⟷4045–4071. C.J.S. *Internal Revenue* §§ 327, 462–474, 670, 798.]

**exempt property. 1.** A debtor's holdings and possessions that, by law, a creditor cannot attach to satisfy a debt. ● All the property that creditors may lawfully reach is known as *nonexempt property.* Many states

**limitation of action**                                          948

*limitation over.* An additional estate created or contemplated in a conveyance, to be enjoyed after the first estate expires or is exhausted. ● An example of language giving rise to a limitation over is "to A for life, remainder to B." [Cases: Deeds ⟐124–134. C.J.S. *Deeds* §§ 245–252, 263–266, 270, 273–276.]

*special limitation.* A restriction that causes an estate to end automatically and revert to the grantor upon the happening of a specified event. See *fee simple determinable* under FEE SIMPLE. [Cases: Deeds ⟐125, 126, 130. C.J.S. *Deeds* §§ 246, 249.]

"[I]f a deed or will uses such words as 'for so long as,' 'while,' 'during,' or 'until' to introduce the circumstances under which an estate may end prior to its running its maximum course, it is generally assumed that a special limitation was intended." Thomas F. Bergin & Paul G. Haskell, *Preface to Estates in Land and Future Interests* 50 (2d ed. 1984).

*supplanting limitation.* A limitation involving a secondary gift that is expressed in a clause following the original gift and that is typically introduced by the words "but if," "and if," or "in case."

**limitation of action.** See LIMITATION (3).

**limitation of assize.** *Hist.* A period prescribed by statute within which a person is required to allege that the person was properly seised of lands sued for under a writ of assize.

**limitation-of-damages clause.** A contractual provision by which the parties agree on a maximum amount of damages recoverable for a future breach of the agreement. Cf. LIQUIDATED-DAMAGES CLAUSE. [Cases: Damages ⟐76. C.J.S. *Damages* §§ 176, 185–187, 194.]

**limitation-of-liability act.** A federal or state law that limits the type of damages that may be recovered, the liability of particular persons or groups, or the time during which an action may be brought. See FEDERAL TORT CLAIMS ACT; *sovereign immunity* under IMMUNITY (1). [Cases: Shipping ⟐203. C.J.S. *Shipping* §§ 471–472, 477–478.]

**limitation-of-remedies clause.** A contractual provision that restricts the remedies available to the parties if a party defaults. ● Under the UCC, such a clause is valid unless it fails of its essential purpose or it unconscionably limits consequential damages. Cf. LIQUIDATED-DAMAGES CLAUSE; PENALTY CLAUSE. [Cases: Contracts ⟐114; Sales ⟐418(6), 426. C.J.S. *Contracts* § 271; *Sales* §§ 281–283, 376, 402.]

**limitation on indebtedness.** See DEBT LIMITATION.

**limitation period.** See LIMITATION (3).

**limitations, statute of.** See STATUTE OF LIMITATIONS.

**limitations period.** 1. LIMITATION (3). 2. STATUTE OF LIMITATIONS.

**limit debate.** *Parliamentary law.* To set a limit on how long debate may continue, or on the number and length of speeches. See DEBATE. Cf. CLOSE DEBATE; EXTEND DEBATE.

**limited administration.** See ADMINISTRATION.

**limited admissibility.** See ADMISSIBILITY.

**limited appeal.** See APPEAL.

**limited appearance.** See *special appearance* under APPEARANCE.

**limited-capacity well.** See WELL.

**limited company.** See COMPANY.

**limited court.** See COURT.

**limited debate.** See DEBATE.

**limited defense.** See *personal defense* under DEFENSE (4).

**limited divorce.** See DIVORCE.

**limited executor.** See EXECUTOR.

**limited fee.** See *base fee* under FEE (2).

**limited guaranty.** See GUARANTY.

**limited interdict.** See INTERDICT (2).

**limited interdiction.** See *partial interdiction* under INTERDICTION (3).

**limited interpretation.** See *restrictive interpretation* under INTERPRETATION.

**limited jurisdiction.** See JURISDICTION.

**limited liability.** See LIABILITY.

**limited-liability company.** See COMPANY.

**limited-liability corporation.** See *limited-liability company* under COMPANY.

**limited-liability partnership.** See PARTNERSHIP.

**limited-market property.** See *special-purpose property* under PROPERTY.

**limited member.** See *nonvoting member* under MEMBER.

**limited monarchy.** See MONARCHY.

**limited owner.** See OWNER.

**limited partner.** See PARTNER.

**limited partnership.** See PARTNERSHIP.

**limited partnership association.** See PARTNERSHIP ASSOCIATION.

**limited-payment life insurance.** See LIFE INSURANCE.

**limited policy.** See INSURANCE POLICY.

**limited-policy insurance.** See INSURANCE.

**limited power of appointment.** See POWER OF APPOINTMENT.

**limited publication.** See PUBLICATION.

**limited public forum.** See *designated public forum* under PUBLIC FORUM.

**limited-purpose marriage.** See MARRIAGE (1).

**limited-purpose public figure.** See PUBLIC FIGURE.

**limited trust.** See TRUST.

**limited veto.** See *qualified veto* under VETO.

**limited voting.** See VOTING.

**limited warranty.** See WARRANTY (2).

**limit of liability.** See LIABILITY LIMIT.

**limit order.** See ORDER (8).

**Lincoln's Inn.** One of the Inns of Court. See INN OF COURT (1).

2010 WL 1359682 (E.P.A.)

Environmental Protection Agency (E.P.A.)

**PRESS RELEASE**

EPA ANNOUNCES NEW RESTRICTIONS ON PESTICIDE PHOSPHINE FUMIGANTS TO
REDUCE RISKS TO CHILDREN NEW LABELS AIM TO REDUCE ACCIDENTAL POISONINGS

April 7, 2010

**WASHINGTON** -- The U.S. Environmental Protection Agency is requiring new restrictions on aluminum and magnesium phosphide products to better protect people, especially children, from dangerous exposures. The new restrictions prohibit all uses of the products around residential areas, increase buffer zones for treatment around non-residential buildings that could be occupied by people or animals, and create more protective product labeling. These actions are part of Administrator Lisa P. Jackson's comprehensive effort to strengthen the agency's chemical management program and assure the safety of chemicals.

"Phosphine fumigants are poisons and must be kept away from where our children live," said Steve Owens, assistant administrator of EPA's Office of Prevention, Pesticides and Toxic Substances. "These new safeguards prohibit the use of these toxic pesticides near homes and impose restrictions to protect our families from exposure to them."

Aluminum and magnesium phosphide fumigants are used primarily to control insects in stored grain and other agricultural commodities. They also are used to control burrowing rodents in outdoor agricultural and other non-domestic areas. The fumigants are restricted to use by specially trained pesticide applicators and in only narrow circumstances.

EPA is expediting approval of the new labels to reduce the potential for accidental poisonings. The primary manufacturer is voluntarily implementing the changes. EPA will apply these changes to all aluminum and magnesium phosphide products.

More information about aluminum and magnesium phosphide: http:// www.epa.gov/oppsrrd1/reregistration/alphosphide/.

2010 WL 1359682 (E.P.A.)

**End of Document**                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 27

2002 WL 32574766 (E.P.A.)

Environmental Protection Agency (E.P.A)

**PRESS RELEASE**

EPA AND ENTERPRISE, ALABAMA POLICE DEPARTMENT
INVESTIGATE ALLEGED MISUSE OF PESTICIDE

January 23, 2002

The United States Environmental Protection Agency (EPA) is cooperating with the Enterprise Police Department to investigate the alleged misuse of a pesticide that May have caused the death of two individuals in their home in Enterprise, Alabama. The pesticide product believed to have been used contains Aluminum Phosphide, which when exposed to air produces deadly phosphine gas. This product May be extremely dangerous if applied without certain safeguards. Pesticides containing Aluminum Phosphide should only be used by persons who have been trained and are licensed or certified for its use. Pesticides containing Aluminum Phosphide cannot be used safely by the general public. If a pesticide containing Aluminum Phosphide is not properly stored or used it May burst into flames. Persons exposed to pesticides containing Aluminum Phosphide May experience nausea, vomiting, chest pain, dizziness, and unconsciousness at very low levels and death at higher concentrations.

Pesticides containing Aluminum Phosphide are used to control insects and rodents in a variety of settings, but are used mainly at facilities where grain and other commodities are transported, processed, and stored. Pesticides containing Aluminum Phosphide come in a variety of forms, but most frequently are found in tablet forms about the size of a dime or pellet forms which are smaller than a dime. These products must not be used to treat indoor residential pest problems.

Pesticides and their use are regulated by state and federal law. Specifically, pesticides are registered or licensed by EPA under the Federal Insecticide, Fungicide and Rodenticide Act. As part of the registration process, EPA establishes directions for the use of each pesticide. Those directions specify how and when the product May be used and are provided to the user on the pesticide label. Use of any pesticide in a manner which is not consistent with the label directions is unlawful. Pesticides which are not in their original container or which do not have labels containing directions for use should never be accepted or used.

Anyone who believes that they are in possession of these pesticide products should immediately notify the Enterprise Police Department at 334-347-2222 or the United States Environmental Protection Agency at 1-800-241-1764.

The following are some of the commercially available pesticide products which contain Aluminum Phosphide and are currently available for sale to persons holding appropriate licences for their use.

(1) Degesch Phostoxin Pellets

(2) Degesch Phostoxin Prepac Rope

(3) Degesch Phostoxin Tablet Prepac

(4) Degesch Phostoxin Tablets-R

(5) Detia Fumex

(6) Fumiphos 60% Aluminum Phosphide Bags

(7) Fumiphos 60% Aluminum Phosphide Tablets

Add. 28

(8) Fumiphos 60% Aluminum Phosphide Pellets

(9) Fumitoxin Bags

(10) Fumitoxin Pellets

(11) Fumitoxin Tablets

(12) Gastoxin Fumigation Pellets

(13) Gastoxin Fumigation Sachets

(14) Gastoxin Fumigation Tablets

(15) Quik-Fume Pellets

(16) Quik-Fume Bags

(17) Quik-Fume Tablets

(18) Tri-Tox 55% Pellets

(19) Tri-Tox 55% Tablets

CONTACT: Carl Terry
(404) 562-8325

2002 WL 32574766 (E.P.A.)

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 29

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*10,314*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>March 24, 2015</u>          <u>/s/ James L. Warren, III</u>

                                       *Counsel for Appellants*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 24th day of March, 2015, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Steven B. Epstein
> Andrew H. Erteschik
> POYNER SPRUILL LLP
> Post Office Box 1801
> Raleigh, North Carolina  27602
> (919) 783-2846

> *Counsel for Appellees*

I further certify that on this 24th day of March, 2015, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ James L. Warren, III
*Counsel for Appellants*
