RECORD NO. 15-1063

In The

# United States Court of Appeals
### For The Fourth Circuit

## SEVERN PEANUT CO., INC.; MEHERRIN AGRICULTURE & CHEMICAL CO.; TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

*Plaintiffs – Appellants*,

**v.**

## INDUSTRIAL FUMIGANT CO.; ROLLINS INC.,

*Defendants – Appellees*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT ELIZABETH CITY

───────────

### REPLY BRIEF OF APPELLANTS

───────────

James L. Warren, III
Alexandra Markov
D. Scott Murray
CARROLL WARREN & PARKER PLLC
Post Office Box 1005
Jackson, Mississippi 39215
(601) 592-1010

*Counsel for Appellants*

Howard M. Widis
WIDIS LAW FIRM, PLLC
3125 Springbank Lane, Suite G
Charlotte, North Carolina 28226
(980) 219-7809

*Counsel for Appellants*

Hunter C. Quick
Jay M. Goldstein
NEXSEN PRUET, PLLC
227 West Trade Street,
Suite 1550
Charlotte, North Carolina 28202
(704) 339-0304

*Counsel for Appellants*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................1

ARGUMENT ...................................................................................2

    I.    THE DISTRICT COURT ERRED BY DISMISSING THE BREACH OF CONTRACT CLAIM ...............................................................2

        A.    IFC/Rollins Ignores the Implications of the Ambiguous Contract it Prepared ................................................2

        B.    IFC/Rollins's Interpretation of the PAA Renders it Unenforceable ...........................................................4

        C.    IFC/Rollins Cannot Avoid Liability Pursuant to an Inconsistent and Ambiguous PAA ..............................6

    II.    THE PAA DOES NOT BAR APPELLANTS' TORT CLAIMS.........................8

        A.    The *Moore* Decision is Inapplicable to Appellants' Tort Claims ..........................................................8

        B.    The PAA Does Not Clearly and Unequivocally Preclude Negligence Claims ......................................9

        C.    Public Policy Prevents IFC/Rollins from Avoiding All Liability ................................................................11

    III.    THE ECONOMIC LOSS RULE DOES NOT BAR PLAINTIFFS' TORT CLAIMS...................................................................11

        A.    The ELR Should Not Apply to Service Contracts....................11

        B.    The "Other Property" Exception Applies to All of Appellants' Claimed Damages ................................18

i

C.    IFC/Rollins Owed Severn a Separate and Independent Duty ........................................................................23

CONCLUSION ......................................................................28

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*2000 Watermark Ass'n, Inc. v. Celotex Corp.*,
  784 F.2d 1183 (4th Cir. 1986) ................................................15, 16

*Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*,
  272 F. Supp. 2d 482 (E.D. Pa. 2003).........................................25

*AIU Ins. Co. v. Omega Flex, Inc.*,
  No. 3:11-cv-00023, 2011 WL 2295270 (W.D. Va. June 9, 2011).........17, 22

*Alston v. Monk*,
  373 S.E.2d 463 (N.C. Ct. App. 1988)..........................................4

*Anderson v. Piedmont Aviation, Inc.*,
  68 F. Supp. 2d 682 (M.D.N.C. 1999) .........................................15

*Atl. Contracting & Material Co., Inc. v. Adcock*,
  588 S.E.2d 36 (N.C. Ct. App. 2003)...........................................10

*Berwind Corp. v. Litton Indus., Inc.*,
  532 F.2d 1 (7th Cir. 1975) ......................................................10

*Binder v. Bank of America Corp.*,
  No. 3:10-CV-770-B, 2010 U.S. Dist. LEXIS 124208
  (N.D. Tex. Nov. 22, 2010).................................................26, 27

*Blaylock Grading Co., LLP v. Smith*,
  658 S.E.2d 680 (N.C. Ct. App. 2008).........................................6, 7

*Cash v. Armco Steel Corp.*,
  462 F. Supp. 272 (N.D. Ga. 1978)............................................10

*Cashwell v. Fayetteville Pepsi-Cola Bottling Co.*,
  93 S.E. 901 (N.C. 1917) .......................................................4, 5

*Cemex, Inc. v. LMS Contracting, Inc.*,
　　2008 WL 4682349 (W.D. Ky. Oct. 21, 2008)..............................27

*Cemex, Inc. v. LMS Contracting, Inc.*,
　　3:06CV-124-H, 2009 U.S. Dist. LEXIS 89052
　　(W.D. Ky. Sept. 28, 2009)........................................................26

*City of Ottawa v. Osmonics, Inc.*,
　　No. 3-10-0431, 2011 WL 10468129 (Ill. App. Ct. May 5, 2011)................10

*City of Wilmington v. N.C. Natural Gas Corp.*,
　　450 S.E.2d 573 (N.C. Ct. App. 1994)..............................................9

*Council v. Dickerson's, Inc.*,
　　64 S.E.2d 551 (N.C. 1951) ........................................................17

*Crop Prod. Servs., Inc. v. Ormond*,
　　No. 4:11-CV-41-D, 2012 WL 147950 (E.D.N.C. Jan. 18, 2012) ...........13, 14

*David v. Hett*,
　　270 P.3d 1102 (Kan. 2011)........................................................17

*Dur v. Western Branch Diesel, Inc.*,
　　240 F. App'x 568 (4th Cir. 2007)................................................21

*Eaton Corp. v. Trane Carolina Plains*,
　　350 F. Supp. 2d 699 (D.S.C. 2004) ..............................................16

*Ellis v. Louisiana-Pacific Corp.*,
　　699 F.3d 778 (4th Cir. 2012) .....................................................15

*Ellis-Don Constr., Inc. v. HKS, Inc.*,
　　353 F. Supp. 2d 603 (M.D.N.C. 2004) ...................................9, 12, 15

*Firemen's Mutual Insurance Co. v. High Point Sprinkler Co.*,
　　146 S.E.2d 53 (N.C. 1966) ........................................................20

*First S. Bank v. Bank of the Ozarks*,
　　542 F. App'x 280 (4th Cir. 2013)..................................................6

iv

*Ford v. All-Dry of the Carolinas, Inc.*,
711 S.E.2d 876 (N.C. Ct. App. Apr. 19, 2011) .............................................19

*Fortson v. McClellan*,
508 S.E.2d 549 (N.C. Ct. App. 1998).......................................................4

*Fussell v. N.C. Farm Bureau Mut. Ins. Co., Inc.*,
695 S.E.2d 437 (N.C. 2010) .......................................................17

*Gore v. George J. Ball, Inc.*,
182 S.E.2d 389 (N.C. 1971) .......................................................7, 8

*Great N. Ins. Co. v. Niro, Inc.*,
No. JFM-08-1765, 2010 WL 4118361 (D. Md. Oct. 15, 2010)...................22

*Ham v. Swift Transp. Co., Inc.*,
694 F. Supp. 2d 915 (W.D. Tenn. 2010) .......................................17

*Hardin v. York Mem'l Park*,
730 S.E.2d 768 (N.C. Ct. App. 2012).......................................17

*Hill v. Carolina Freight Carriers Corp.*,
71 S.E.2d 133 (N.C. 1952) ....................................................... 2-3

*In re Air Bag Prods. Liab. Litig.*,
7 F. Supp. 2d 792 (E.D. La. 1998) .......................................26, 27

*In re New Bern Riverfront Dev., LLC*,
516 B.R. 316 (Bankr. E.D.N.C. 2014) .......................................22

*Indemnity Insurance Co. of North America v. American Eurocopter LLC*,
No. 1:03CV949, 2005 WL 1610653 (M.D.N.C. July 8, 2005)........20, 21, 22

*Ins. Co. of N. Am. v. Cease Elec., Inc.*,
688 N.W.2d 462 (Wis. 2004) .......................................17, 18

*Jones v. Palace Realty Co.*,
226 N.C. 303 (1946) .......................................................3

*Kaltman v. All Am. Pest Control, Inc.*,
    706 S.E.2d 864 (Va. 2011) ............................................................... 25

*Kawamata Farms, Inc. v. United Agri Prods.*,
    948 P.2d 1055 (Haw. 1997) ............................................................. 22

*Land v. Tall House Bldg. Co.*,
    602 S.E.2d 1 (N.C. Ct. App. 2004) ................................................. 12

*Lesiak v. Cent. Valley Ag Coop., Inc.*,
    808 N.W.2d 67 (Neb. 2012) ....................................................... 17, 22

*Lewis v. Ceralvo Holdings, LLC*,
    No. 4:11-CV-00055-JHM, 2012 WL 32607 (W.D. Ky. Jan. 6, 2012) .......... 17

*Lord v. Customized Consulting Specialty, Inc.*,
    643 S.E.2d 28 (N.C. Ct. App. 2007) ............................................... 19

*Louisville Gas & Elec. Co. v. Cont'l Field Sys., Inc.*,
    420 F. Supp. 2d 764 (W.D. Ky. 2005) ............................................ 13

*LRP Hotels of Carolina, LLC v. Westfield Ins. Co.*,
    4:13-CV-94-D, 2014 WL 5581049 (E.D.N.C. Oct. 31, 2014) ............... 13, 14

*McManus v. GMRI, Inc.*,
    No. 3:12-CV-009-DCK, 2012 U.S. Dist. LEXIS 92094
    (W.D.N.C. July 3, 2012) ................................................................ 22

*McMurray v. U.S.*,
    551 F. App'x 651 (4th Cir. 2014) ..................................................... 8

*Miidas Greenhouse, LLC v. Global Horticultural, Inc.*,
    244 P.3d 579 (Ariz. Ct. App. 2010) ................................................ 23

*Miller v. W.H. Bristow, Inc.*,
    739 F. Supp. 1044 (D.S.C. 1990) .................................................... 24

*Moore v. Coachmen Indus., Inc.*,
    499 S.E.2d 772 (N.C. Ct. App. 1998) .................................. 8, 9, 12, 22

*N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*,
    240 S.E.2d 345 (N.C. 1978) ...........................................................12, 19, 20

*Newton v. Standard Fire Ins. Co.*,
    229 S.E.2d 297 (N.C. 1976) ...........................................................14

*Nudelman v. J.A. Booe Building Contractor, Inc.*,
    No. COA02-267, 2003 N.C. App. LEXIS 509
    (N.C. Ct. App. Mar. 4, 2003)...........................................................26

*Oates v. Jag, Inc.*,
    333 S.E.2d 222 (N.C. 1985) ...........................................................25

*Palmetto Linen Service, Inc. v. U.N.X., Inc.*,
    205 F.3d 126 (4th Cir. 2000) ...........................................................16, 25

*Pinnix v. Toomey*,
    87 S.E.2d 893 (N.C. 1955) ...........................................................17

*Riggs v. Orkin, Inc.*,
    No. 7:11-CV-5-D, 2011 WL 2417016 (E.D.N.C. June 13, 2011) ..........12, 14

*Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*,
    658 S.E.2d 918 (N.C. 2008) ...........................................................3

*Smith Craft Real Estate Corp. v. Handex of Conn., Inc.*,
    No. CV03082188S, 2005 WL 1433237
    (Conn. Super. Ct. May 19, 2005) ...........................................................10

*Spencer v. DHI Mortg. Co., Ltd.*,
    642 F. Supp. 2d 1153 (E.D. Cal. 2009) ...........................................................26, 27

*Stan D. Bowles Distrib.Co. v. Pabst Brewing Co.*,
    317 S.E.2d 684 (N.C. Ct. App. 1984)...........................................................3, 6

*Stein v. Asheville City Bd. of Educ.*,
    626 S.E.2d 263 (N.C. 2006) ...........................................................25

*Strawbridge v. Sugar Mountain Resort, Inc.*,
    320 F. Supp. 2d 425 (W.D.N.C. 2004)...........................................................8

*Strum v. Exxon Co., USA,*
　　15 F.3d 327 (4th Cir. 1994) ........................................................14

*Tatham v. Hoke,*
　　469 F. Supp. 914 (W.D.N.C. 1979)................................................3

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.,*
　　110 So. 3d 399 (Fla. 2013) ..........................................................17

*Transco Syndicate #1, Ltd. v. Bollinger Shipyards, Inc.,*
　　1 F. Supp. 2d 608 (E.D. La. 1998) ...............................................22

*Valley Forge Ins. Co. v. Sam's Plumbing, LLC,*
　　207 P.3d 765 (Ariz. Ct. App. 2009) .............................................25

*Vigus v. Milton A. Latta & Sons Dairy Farms, Inc.,*
　　No. COA08-700, 2009 N.C. App. LEXIS 830
　　(N.C. Ct. App. May 19, 2009) .................................................14, 15

*Warfield v. Hicks,*
　　370 S.E.2d 689 (N.C. Ct. App. 1988)...........................................12

*Winkler v. Appalachian Amusement Co.,*
　　79 S.E.2d 185 (N.C. 1953) ...........................................................10

## STATUTES

N.C. Gen. Stat. § 25-2-715.............................................................10

N.C. Gen. Stat. §§ 143-435......................................................5, 7, 8

N.C. Gen. Stat. §§ 143-443(b)(3) .....................................................5

## RULES

Fed. R. Civ. P. 8(a)(3).....................................................................24

# INTRODUCTION

This matter is before the Court as a result of the District Court's erroneous grant of summary judgment in favor of Appellees, The Industrial Fumigant Co. and Rollins, Inc. (collectively "IFC/Rollins"), based on the alleged contributory negligence of Appellant Severn Peanut Co., Inc. ("Severn"). IFC/Rollins concedes in its appellate brief [31] ("Response") that the District Court erred on this point. Response [31], at 1-2. This concession means this Court should reverse and remand the matter for trial.

The remaining issue presented by Appellants – whether the District Court erred by dismissing the contract claim – is not case determinative. While it is Appellants' position that the District Court erred by granting summary judgment as to Appellants breach of contract claim, reversal on that basis is not a prerequisite to a reversal and remand in light of IFC/Rollins's concession.

IFC/Rollins spent the majority of its Response addressing the economic loss rule ("ELR"), an issue the District Court properly decided in favor of Appellants. This Court should not disturb the District Court's ruling that neither North Carolina's ELR nor the damages exclusions in the Pesticide Application Agreement ("PAA") preclude Appellants' tort claims. As set forth below, there is no binding North Carolina authority to support IFC/Rollins's overreaching interpretation of the ELR. Also, to apply the terms of the PAA as argued by

IFC/Rollins would violate North Carolina public policy and cause an unconscionable result.

IFC/Rollins's concession that the District Court erred when it granted summary judgment on the basis of alleged contributory negligence makes this Court's job much easier. The District Court erred; IFC/Rollins concedes the presence of triable fact issues; therefore this Court should remand the matter for trial.[1]

## ARGUMENT

### I. THE DISTRICT COURT ERRED BY DISMISSING THE BREACH OF CONTRACT CLAIM

#### A. IFC/Rollins Ignores the Implications of the Ambiguous Contract it Prepared

IFC/Rollins begins its Response arguing principles of contract construction while ignoring fundamental principles that mandate reversal of the District Court's grant of summary judgment as to Appellants' contract claim. IFC/Rollins seeks to preclude all liability by application of the PAA – this is undisputed. It is also undisputed that IFC/Rollins prepared the ambiguous PAA. Appellants' Brief [25], at 3. As a result of these undisputed facts, the terms of the ambiguous PAA must be construed against IFC/Rollins. *See Hill v. Carolina Freight Carriers Corp.*, 71

---

[1] As argued in the District Court, the defense of contributory negligence is improper in this action and the jury should not be provided a contributory negligence instruction. (JA 1647-58).

S.E.2d 133, 137 (N.C. 1952); *Jones v. Palace Realty Co*., 226 N.C. 303, 305 (1946); *Tatham v. Hoke*, 469 F. Supp. 914, 917-18 (W.D.N.C. 1979). The presence of ambiguities and the construction of the PAA against IFC/Rollins require reversal of summary judgment as to Appellants' contract claim. *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs.*, *P.C.*, 658 S.E.2d 918, 922-23 (N.C. 2008).

As set forth below and in Appellants' brief [25] ("Brief"), IFC/Rollins's interpretation of the PAA and the so-called consequential damages exclusion would preclude any recovery as a result of the unlawful application of Fumitoxin; therefore, it should be construed as exculpatory in nature. Brief [25], at 32-35; Response [31], at 10-11.[2] Such a result is "unconscionable" as it fails to provide any type of remedy. *See Stan D. Bowles Distrib.Co. v. Pabst Brewing Co.*, 317 S.E.2d 684, 690 (N.C. Ct. App. 1984).

Contrary to several of the cases cited in the Response, the terms of the PAA were not the product of negotiations between the parties, but involved a form contract containing exculpatory terms, which were inconspicuous and unreasonably favorable to the drafter.

---

[2] The PAA's expansive "consequential damages" exclusion lists "Client's property, product, equipment, downtime, or loss of business" as purported examples of "consequential damages." (JA 47).

### B.    IFC/Rollins's Interpretation of the PAA Renders it Unenforceable

While IFC/Rollins contends on the one hand that the PAA merely excludes consequential damages, it seeks on the other hand to use the PAA as a shield against all liability based in contract or tort. Brief [25], at 34-35; Response [31], at 10-19. IFC/Rollins's interpretation renders the PAA exculpatory in nature. *See* Brief [25], at 34-35.

IFC/Rollins concedes that when a clause requires a party to release another from all liability, it is exculpatory. Response [31], at 12-13.  It also concedes that exculpatory clauses are void if the released party owed a duty to the public. *Id.* The terms of the PAA do not provide for a "reasonable limitation on liability," but instead, based on IFC/Rollins's interpretation, exclude all recovery. *See Fortson v. McClellan*, 508 S.E.2d 549, 553 (N.C. Ct. App. 1998); Brief [25], at 32-34. These combined concessions render the PAA, as interpreted by IFC/Rollins, unenforceable.

The remaining question is whether IFC/Rollins had a duty to the public.  The answer is a resounding yes.   In *Alston v. Monk*, the North Carolina Court of Appeals held that cosmetologists owed duties to the general public because "cosmetology involves the use of hazardous chemicals which may adversely affect the health of any customer." 373 S.E.2d 463, 466-67 (N.C. Ct. App. 1988). In *Cashwell v. Fayetteville Pepsi-Cola Bottling Co*., the North Carolina Supreme

Court held that a Pepsi bottler owed a duty not to expose the public to danger since soda was "put up in bottles and heavily charged with a dangerous and explosive substance . . . ." 93 S.E. 901, 904 (N.C. 1917).

Fumitoxin, a product that reacts with moisture to produce a highly reactive and toxic gas, is exponentially more hazardous to the general public than hair treatment chemicals or bottled Pepsi. Brief [25], at 36-37. There is no doubt that a Fumitoxin applicator owes duties to the general public. The North Carolina General Assembly has recognized these duties, including the duty to apply pesticides, such as Fumitoxin, in a manner consistent with its labeling, *e.g.*, to not pile tablets. N.C. GEN. STAT. §§ 143-435 & 143-443(b)(3); Brief [25], at 4, 37. Only trained and certified applicators can apply aluminum phosphide products, such as Fumitoxin. (JA 49).

In the words of IFC/Rollins, "exculpatory clauses are not enforceable if the party to be released from all liability has a duty to the public at large." Response [31], at 13. As interpreted by IFC/Rollins, the "consequential damages" exclusion would preclude any recovery resulting from the improper application of Fumitoxin; thus, it is an exculpatory clause. As a result, this Court should reverse the District Court's dismissal of Appellants' breach of contract claim.

## C.    IFC/Rollins Cannot Avoid Liability Pursuant to an Inconsistent and Ambiguous PAA

The PAA is inconsistent and ambiguous.  IFC/Rollins's contention that the PAA excludes all damages, direct and consequential, is contradicted by the inconsistent and ambiguous terms of the PAA. (JA 46-47).  As noted above, the terms of the PAA must be construed against IFC/Rollins due to the presence of ambiguity.

The PAA attempts to exclude recovery for a long list of "consequential" damages, but provides in the next sentence that to the extent liability nonetheless arises, damages are available up to the limits of IFC/Rollins's insurance.  (JA 47); Brief [25], at 38-41. This internal contradiction creates an ambiguity and forecloses the idea that the damages at issue are clearly excluded.  *See First S. Bank v. Bank of the Ozarks*, 542 F. App'x 280, 283 (4th Cir. 2013).[3]

IFC/Rollins relies heavily on *Blaylock Grading Co., LLP v. Smith*, which involved a contract for land surveying services. 658 S.E.2d 680, 681-82 (N.C. Ct. App. 2008). There, the court determined that the contract's "Risk Allocation"

---

[3] The District Court dismissed Appellants' breach of contract claim without determining whether claims for debris removal costs and/or fire suppression costs, approximately $8,000,000 in damages, were "consequential" damages and thus specifically excluded by the PAA.  *Compare* (JA 1396-97) *with* (JA 483). As found in the *Stan D. Bowles Distributing* decision: "When the parties specifically list the types of consequential damages to be excluded, *only those consequential damages are excluded*." 317 S.E.2d at 690 (emphasis added).

6

provision was not void and would be enforceable to limit the plaintiff's damages to $50,000. *Id.* at 681-82, 684. The court found that while the profession of surveying was regulated, the <u>limitation on liability</u> in the contract entered into by the "sophisticated, professional parties" was enforceable <u>since it did not implicate public health or safety concerns</u>. *Id.* at 683. The use of dangerous pesticides, such as Fumitoxin, has been identified by North Carolina as an important matter of public health and safety since such pesticides "may seriously injure health, property, or wildlife if not properly used." N.C. GEN. STAT. § 143-435.

Despite the extreme hazards involved in applying Fumitoxin, IFC/Rollins claims the PAA prevents all recovery. This result is unconscionable and "elicit[s] a profound sense of injustice." *Blaylock Grading*, 658 S.E.2d at 683. The situation here is a far cry from a dispute involving a land surveying contract with a $50,000 "Risk Allocation" provision. *Id.* at 681-83.[4] IFC/Rollins cannot absolve itself of all liability. This is against North Carolina public policy.

IFC/Rollins contends that Appellants' reliance on *Gore v. George J. Ball, Inc.*, 182 S.E.2d 389 (N.C. 1971) is "misplaced," but does not explain why *Gore* is inapplicable. Response [31], at 16 n.6. IFC/Rollins, through a form agreement, is attempting to insulate itself from all liability arising out of its application of

---

[4] The provision in *Blaylock Grading* also specifically stated that it applied to limit the defendant's liability for negligence. *See* 658 S.E.2d at 681. The PAA does not mention negligence or provide that it limits tort claims. (JA 46-47).

Fumitoxin inconsistent with its label, *i.e.*, applying the product in violation of FIFRA and the North Carolina Pesticide Law. Brief [25], at 35-36. Such an agreement is against North Carolina public policy since it would undercut the purpose of these statutes – to protect the public from harm – and would discourage safe application and in fact encourage careless applications of this deadly and explosive pesticide, leaving customers without recourse. *See* N.C. GEN. STAT. § 143-435; *see also Gore*, 182 S.E.2d at 395-98; *McMurray v. U.S.*, 551 F. App'x 651, 654-56 (4th Cir. 2014); *Strawbridge v. Sugar Mountain Resort, Inc.*, 320 F. Supp. 2d 425, 433 (W.D.N.C. 2004).

## II.    THE PAA DOES NOT BAR APPELLANTS' TORT CLAIMS

### A.    The *Moore* Decision is Inapplicable to Appellants' Tort Claims

IFC/Rollins relies on a single North Carolina decision to support the argument that the PAA precludes a negligence action. Response [31], at 17-18. *Moore v. Coachmen Industries, Inc.*, 499 S.E.2d 772 (N.C. Ct. App. 1998) is inapplicable since, *inter alia*, it addresses the propriety of a product liability action stemming from a contract for the sale of goods.  The instant matter involves claims relating to the negligent application of Fumitoxin under a services contract.

*Moore* addressed an "action for negligence and breach of implied and express warranties flow[ing] from the purchase and eventual destruction" of an RV.  *Id.* at 774.  The court noted that the case involved the sale of goods and

product defect claims. *Id*. at 780. The instant matter involves neither the sale of goods nor product defect claims. In *Ellis-Don Construction, Inc. v. HKS, Inc.*, the court noted that *Moore* is limited to "issues of products liability arising under contracts for the sale of goods." 353 F. Supp. 2d 603, 607 (M.D.N.C. 2004). As such, *Moore* does not apply to the facts at hand and Appellants are not precluded from bringing a negligence action to recover for the damages caused by IFC/Rollins's negligent application of Fumitoxin.

Moreover, the exculpatory language in the PAA is void. The plaintiffs in *Moore* did not assert that the limited warranty at issue was invalid. 499 S.E.2d at 778. The court relied in part on this failure to support its conclusion that the limited warranty was effective. *Id*. Further, the limitation of liability provision was partially in all capital letters, thus, conspicuous. *See id*. These distinctions also render *Moore* inapplicable. The other cases from outside of North Carolina cited on page 18 of the Response are not controlling, are inapplicable (as they dealt with disputes over the sale of goods), and do not involve exculpatory clauses.

## B. The PAA Does Not Clearly and Unequivocally Preclude Negligence Claims

IFC/Rollins's argument that the exculpatory language in the PAA precludes recovery in negligence also runs afoul of the well-settled rule that courts disfavor contracts that absolve a party from its own negligence. *See City of Wilmington v. N.C. Natural Gas Corp.*, 450 S.E.2d 573, 575-76 (N.C. Ct. App. 1994) (finding

indemnity agreement ineffective because it did not explicitly state plaintiff would be insulated from its own negligence in "clear and unequivocal" manner); s*ee also Atl. Contracting & Material Co., Inc. v. Adcock*, 588 S.E.2d 36, 41 (N.C. Ct. App. 2003); *Cash v. Armco Steel Corp*., 462 F. Supp. 272, 276 (N.D. Ga. 1978).

The PAA does not include the word "tort" or "negligence" or any variation thereof. (JA 46-47). No provision in the PAA "clearly and unequivocally" provides that IFC/Rollins is absolved from liability as a result of its own negligence. Contracts will never be interpreted to exempt a party from liability for negligent conduct "in the absence of clear and explicit words that such was the intent of the parties." *Winkler v. Appalachian Amusement Co.*, 79 S.E.2d 185, 190 (N.C. 1953).

In the PAA, IFC/Rollins attempts to limit its liability for "incidental" and "consequential" damages. (JA 47). However, these terms relate to contractual remedies – not tort damages – and IFC/Rollins failed to put forth evidence that the parties agreed to such a limitation on tort liability. *See* N.C. GEN. STAT. § 25-2-715; *see also Berwind Corp. v. Litton Indus., Inc.*, 532 F.2d 1, 7-8 (7th Cir. 1975); *City of Ottawa v. Osmonics, Inc.*, No. 3-10-0431, 2011 WL 10468129, at *3-5 (Ill. App. Ct. May 5, 2011); *Smith Craft Real Estate Corp. v. Handex of Conn., Inc.*, No. CV03082188S, 2005 WL 1433237, at *2-4 (Conn. Super. Ct. May 19, 2005).

### C.    Public Policy Prevents IFC/Rollins from Avoiding All Liability

The District Court was correct in finding that the PAA does not preclude Appellants' tort claims. (JA 1394-97).  If this Court were to find that the PAA applies to preclude Appellants' tort and breach of contract claims, as contended by IFC/Rollins, Appellants would have no remedy for IFC/Rollins destroying Severn's peanuts and dome due to the unlawful application of a dangerous product. As argued previously, the public interest in the safe and proper application of Fumitoxin is greater than the activities previously deemed by North Carolina courts as too important to uphold exculpatory clauses or releases.  Brief [25], at 36-37.  Therefore, Appellants should be able to pursue both contractual and tort claims.  At a minimum, Appellants are entitled to recover up to the limit of IFC/Rollins's insurance coverage and/or limits, as set forth in the PAA. (JA 47).

### III.    THE ECONOMIC LOSS RULE DOES NOT BAR PLAINTIFFS' TORT CLAIMS

### A.    The ELR Should Not Apply to Service Contracts

There is no basis for this Court to apply North Carolina's ELR to the PAA, a service contract involving the application of an extremely dangerous pesticide by professional applicators.  Appellants are unaware of any published opinions where the North Carolina Supreme Court or the North Carolina Court of Appeals has applied the ELR to dismiss tort claims involving damage to property arising out of

11

a service contract.[5]  Traditionally, courts in North Carolina have applied the ELR in cases involving the sale of goods (including mobile homes) or involving the construction of a home or structure. *See Ellis-Don Constr., Inc. v. HKS, Inc.*, 353 F. Supp. 2d 603, 606-07 (M.D.N.C. 2004); *Moore v. Coachmen Indus., Inc.*, 499 S.E.2d 772, 780 (N.C. Ct. App. 1998); *see also Land v. Tall House Bldg. Co.*, 602 S.E.2d 1, 4 (N.C. Ct. App. 2004); *Warfield v. Hicks*, 370 S.E.2d 689, 694 (N.C. Ct. App. 1988).

IFC/Rollins cites three unreported opinions where the U.S. District Court for the Eastern District of North Carolina applied the ELR outside its traditional role in product liability and construction cases.  These decisions were all authored by the same judge.  *See Riggs v. Orkin, Inc.*, No. 7:11-CV-5-D, 2011 WL 2417016, at *1-2 (E.D.N.C. June 13, 2011) (dismissing negligence claim where plaintiffs had entered into termite protection contract, reasoning that plaintiffs "fail[ed] to allege

---

[5] The District Court did not specifically decide whether the ELR could apply to service contracts under North Carolina law. (JA 33, 1393).  The District Court found that such a determination was unnecessary since it would not change its conclusion that the ELR did not apply to Appellants' claims. (JA 33-34). However, contrary to the District Court's statement that the *North Carolina State Ports Authority* decision involved a services contract (JA 33), that case did not involve a services contract, but a dispute involving contracts for the construction of a transit shed and a warehouse and the allegedly defective materials used in both buildings' roofs. *See N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 240 S.E.2d 345, 347, 351 (N.C. 1978).  The defendant-contractor was not alleged to have breached any duty of care, other than the failure to construct the roofs "in accordance with agreed plans and specifications." *Id.* at 350-51. The instant case is not one where the contractor simply failed to abide by duties and specifications set forth in an agreement resulting in only economic harm to the promisee.

a separate and distinct duty from [defendant's] contractual duty"); *Crop Prod. Servs., Inc. v. Ormond*, No. 4:11-CV-41-D, 2012 WL 147950, at *7 (E.D.N.C. Jan. 18, 2012) (holding ELR barred customer's negligence and negligent misrepresentation claims where customer claimed seller was negligent in describing and recommending seller's products); *LRP Hotels of Carolina, LLC v. Westfield Ins. Co.*, 4:13-CV-94-D, 2014 WL 5581049, at *5-6 (E.D.N.C. Oct. 31, 2014) (finding negligent misrepresentation and negligence claims barred by ELR since claims were "based solely on [insurer's] alleged negligence in performing its duties under" policy). Appellants respectfully suggest that these decisions are incorrect. In any event, those opinions are not binding on this Court, and are not even persuasive on the issue of North Carolina law presented. In those decisions the district court did not analyze whether the North Carolina Supreme Court would apply the ELR to the contracts at issue and failed to thoroughly address the "other property" exception to the ELR. Further, in *Ormond*, the court did not discuss whether the contract at issue was a service contract or whether the predominant purpose of the contract was the purchase of a product. 2012 WL 147950, at *7.[6]

---

[6] Where a service contract is involved, there is no property purchased; therefore, all the damage is to other property. *See Louisville Gas & Elec. Co. v. Cont'l Field Sys., Inc.*, 420 F. Supp. 2d 764, 769 (W.D. Ky. 2005). Here, the application of Fumitoxin damaged the peanuts and the dome when it was applied by the certified applicators to kill bugs.

In *Riggs*, the court erroneously concluded that in order to pursue a tort claim, in addition to a contract claim, and thus not be barred by the ELR, a plaintiff must point to an independent tort committed by the defendant involving malice or recklessness. 2011 WL 2417016, at *2 (citing *Strum v. Exxon Co., USA*, 15 F.3d 327, 331 (4th Cir. 1994)). However, such an allegation is not required under North Carolina's ELR analysis, but is required in order to recover punitive damages for breach of contract. *Strum*, 15 F.3d at 330-31; *Newton v. Standard Fire Ins. Co.*, 229 S.E.2d 297, 300-01 (N.C. 1976).

Similar issues are presented by the unpublished decision in *Vigus v. Milton A. Latta & Sons Dairy Farms, Inc.*, No. COA08-700, 2009 N.C. App. LEXIS 830, at *11-14 (N.C. Ct. App. May 19, 2009). In *Vigus*, there is a complete lack of analysis as to whether the ELR should apply to the <u>limited</u> home inspection contract at issue and it is not clear if the plaintiffs raised that issue in opposition to the ELR defense. *Id.* at *11-17. Additionally, the *Vigus* plaintiffs were not claiming that the defendant's negligent performance of the contract caused the destruction of the home – only that the subpar inspection failed to uncover existing damage. *Id.* at *11-15. That is not the situation here. IFC/Rollins's active negligence caused the catastrophic destruction of Severn's property.

Since IFC/Rollins owed Severn a duty separate and distinct from the PAA, the *Vigus*, *Riggs*, *Ormond* and *LRP Hotels* decisions are distinguishable.

14

Appellants are not simply claiming that IFC/Rollins "was negligent in performing its contractual duty" under the PAA, resulting in some economic loss. Instead, Appellants are claiming that IFC/Rollins actively destroyed Severn's property through its negligent application of Fumitoxin. *Cf. Vigus*, 2009 N.C. App. LEXIS 830, at *11-14; *see also* (JA 41-43, 1594).

A federal court sitting in diversity "is bound to apply the applicable state law as it exists and *cannot create or expand the common law*." *Anderson v. Piedmont Aviation, Inc.*, 68 F. Supp. 2d 682, 688 n.3 (M.D.N.C. 1999) (emphasis added); *see also Ellis-Don Constr.*, 353 F. Supp. 2d at 607. Thus, the federal courts in North Carolina should not expand the ELR to an arena that has not been specifically recognized by the North Carolina Supreme Court or the North Carolina Court of Appeals.

In *Ellis v. Louisiana-Pacific Corp.*, this Court set forth the logic and rationale behind the ELR, as stated by the North Carolina courts as well as the U.S. Supreme Court. 699 F.3d 778, 783, 786 (4th Cir. 2012); *see also 2000 Watermark Ass'n, Inc. v. Celotex Corp.*, 784 F.2d 1183, 1185-86 (4th Cir. 1986) (applying South Carolina law). The rationale for applying the ELR is simply not present here. *See Ellis*, 699 F.3d at 783, 786; *2000 Watermark Ass'n*, 784 F.2d at 1185-86. Severn is not merely a "disappointed purchaser suffering an intangible commercial

loss" as a result of damage to the "product itself." *Id.*[7]  Severn suffered, among other damages, a complete loss of approximately 20 million pounds of peanuts and the destruction of its storage dome as a result of IFC/Rollins's negligent and unlawful application of Fumitoxin.

The ELR makes sense in product liability cases and, to a lesser extent, cases involving the construction of a home.  In those cases, the manufacturer of the product or the builder releases the product or building to the care and control of the purchaser, the purchaser's expectations concerning the product or home are not met, and pure economic losses are incurred. *See generally 2000 Watermark Ass'n*, 784 F.2d at 1185-86. However, when a service contract is involved, like the PAA, where the operation is completely controlled by the provider of a professional

---

[7] IFC/Rollins has never argued that the primary purpose of the PAA was the sale of goods, with labor incidentally involved. Therefore, cases such as *Palmetto Linen Service, Inc. v. U.N.X., Inc.*, 205 F.3d 126 (4th Cir. 2000) (applying South Carolina law) have no application to here. *See Eaton Corp. v. Trane Carolina Plains*, 350 F. Supp. 2d 699, 703 n.2 (D.S.C. 2004). Further, Section 8(h)(ii) of the form contract drafted by IFC/Rollins provides that Severn is entitled to IFC/Rollins's "applicable insurance coverage and/or limits" for "actual damages which may arise due to the actions or inactions of [IFC/Rollins] or its employees . . . ." (JA 47). The fact that IFC/Rollins has approximately $25M in liability insurance coverage for Appellants' claims supports this interpretation of the PAA. (JA 1325). IFC/Rollins provided no proof that the ambiguous terms of the PAA were understood by Severn to allocate the risk of the loss at issue here to Severn. Further, IFC/Rollins fails to cite any evidence in the record to support the statement that Severn "received a much lower price for the fumigation [IFC/Rollins] performed" as a result of the damages exclusion. Response [31], at 26. The fact of the matter is the inconspicuous exculpatory terms, as interpreted by IFC/Rollins, are unreasonably favorable to the drafter.

service, the force behind the rationale of the ELR fades. *See Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 407 (Fla. 2013); *David v. Hett*, 270 P.3d 1102, 1106-11, 1113-14 (Kan. 2011); *Ham v. Swift Transp. Co., Inc.*, 694 F. Supp. 2d 915, 921-23 (W.D. Tenn. 2010); *Ins. Co. of N. Am. v. Cease Elec., Inc.*, 688 N.W.2d 462, 467-71 (Wis. 2004); *see also Lesiak v. Cent. Valley Ag Coop., Inc.*, 808 N.W.2d 67, 80-83 (Neb. 2012); *Lewis v. Ceralvo Holdings, LLC*, No. 4:11-CV-00055-JHM, 2012 WL 32607, at *2-3 (W.D. Ky. Jan. 6, 2012).

The service provider, by actively interacting with the customer and/or the customer's property, owes a duty of care to act reasonably and not injure the person or destroy the customer's property. *See Fussell v. N.C. Farm Bureau Mut. Ins. Co., Inc.*, 695 S.E.2d 437, 441 (N.C. 2010); *Pinnix v. Toomey*, 87 S.E.2d 893, 897 (N.C. 1955); *Council v. Dickerson's, Inc.*, 64 S.E.2d 551, 553 (N.C. 1951); *see also Hardin v. York Mem'l Park*, 730 S.E.2d 768, 775-76 (N.C. Ct. App. 2012). Thus, the public policy rationale behind the ELR does not apply to service contracts like the PAA. *See AIU Ins. Co. v. Omega Flex, Inc.*, No. 3:11-cv-00023, 2011 WL 2295270, at *3-4 (W.D. Va. June 9, 2011). As explained by the Supreme Court of Wisconsin:

> [C]ontract law is not better suited than tort law for dealing with negligently provided services. *Tort law provides an incentive generally to guard against negligent conduct in the provision of services*. If tort law is avoided, the ability to deter certain activity is impaired because contract remedies and warranties may be easily disclaimed. *Tort principles address more than merely a private*

> *interest between two commercial companies; they also address*
> *society's interest in minimizing harm by deterring negligent conduct.*
>
> ***
>
> Often the circumstances surrounding service contracts are simple and
> informal (e.g., electricians, plumbers, lawn care providers, etc.). In
> light of the societal interests behind the application of tort principles,
> and the inapplicability of the fundamental premise supporting contract
> law, the policy of maintaining the distinction between tort and
> contract law does not warrant the invocation of the economic loss
> doctrine here.

*Cease Elec.*, 688 N.W.2d at 470 (emphasis added). Under the common law and

sometimes by statute, service providers who interact with the customer or the

customer's property, owe a duty of care to the customer, independent of contract,

to provide the requisite service in a manner that meets the applicable standard of

care.

The cases relied upon by IFC/Rollins do not support application of the ELR

to this matter. IFC/Rollins's failure to apply the Fumitoxin according to the

label/instructions, *i.e.*, the law, did not merely result in an ineffective eradication of

pests – it resulted in the catastrophic destruction of Severn's peanuts and storage

dome, as well as other losses. Accordingly, this Court should not expand the

application of the ELR to the PAA, a pure service contract.

**B.    The "Other Property" Exception Applies to All of Appellants'
        Claimed Damages**

Even if this Court were to apply the ELR to claims relating to the PAA,

which it should not do, the "other property" exception to the ELR would apply,

18

thereby preventing the ELR from barring Appellants' tort claims. Specifically, the damage to the peanuts and the dome constitute damage to "other property" and thus, Appellants' claims for damage to the peanuts, the dome, as well as the resulting debris removal costs, fire suppression expenses and business interruption losses are excepted from the ELR. (JA 1393-94). The District Court correctly determined the peanuts and the dome constituted "other property" and thus fell within an exception to North Carolina's ELR and that IFC/Rollins is "liable for all the damages naturally flowing from" its negligence. (JA 33-34, 1393-94).

The ELR "prohibits recovery for purely economic loss in tort, as such claims are instead governed by contract law." *Lord v. Customized Consulting Specialty, Inc.*, 643 S.E.2d 28, 30 (N.C. Ct. App. 2007). "Economic losses include damages to the product itself," but claimants can "recover in tort rather than contract for damages to property other than the product itself, if the losses are attributable to the defective product." *Id*; *see also Ford v. All-Dry of the Carolinas, Inc.*, 711 S.E.2d 876, at *3 (N.C. Ct. App. Apr. 19, 2011) (unpublished). Here, IFC/Rollins was not selling a product, but providing fumigation services.

In *North Carolina State Ports Authority*, the North Carolina Supreme Court described four exceptions where the ELR does not apply, including the following scenario referred to as the "other property" exception: "The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance

of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee." 240 S.E.2d at 350-51. The Court noted that the listed exceptions were not "all inclusive." *Id.*

In *Firemen's Mutual Insurance Co. v. High Point Sprinkler Co.*, the North Carolina Supreme Court stated: "A carpenter who contracts to repair a house is liable in damages if he performs the repair so unskillfully as to damage other portions of the structure." 146 S.E.2d 53, 60 (N.C. 1966). This is the first case cited by the North Carolina Supreme Court in its *North Carolina State Ports Authority* decision establishing the "other property" exception. 240 S.E.2d at 350. In *High Point Sprinkler*, the Court allowed a negligence action based on the defendant's alleged failure to properly replace a warehouse's "wet sprinkler system" with a "dry sprinkler system," which resulted in damage to the plaintiff's merchandise stored in the warehouse. 146 S.E.2d at 56-57. Like the peanuts and dome involved here, the Court determined that this merchandise would be the <u>prime</u> example of property which was <u>not</u> the subject of the contract. *N.C. State Ports Auth.*, 240 S.E.2d at 350.

Unlike the cases cited by IFC/Rollins, in *Indemnity Insurance Co. of North America v. American Eurocopter LLC*, the court conducted a thoughtful and thorough analysis of the issue and found that North Carolina courts would have an expansive view of the "other property" exception to the ELR. No. 1:03CV949,

2005 WL 1610653, at *10-14 (M.D.N.C. July 8, 2005). In *American Eurocopter*, the plaintiff brought suit claiming the manufacturer provided a defective "main gearbox," which was placed into the helicopter during an overhaul, and that this defective equipment resulted in the helicopter crashing in a neighborhood. *Id.* at *1-2. The district court predicted North Carolina courts would find that where a user owns existing property and "a second manufacturer subsequently sells a separate product to that user pursuant to its own bill of sale, the 'product' is the item as introduced into the stream of commerce by the second manufacturer, even if the product is used . . . in connection with or as part of his existing property." *Id.* at *14. Instead of finding that the helicopter could have been the subject of the contract for the purchase of the gearbox as part of the helicopter overhaul, the court stated:

> [T]he Court concludes that for purposes of the [ELR], as to the negligence claims against Eurocopter, the "product itself" was the gearbox, and the helicopter was "other property" that was not the subject of the gearbox sales contract. . . . This holding is consistent with the general theories of tort and contract law in North Carolina . . . . General tort theories of risk and safety are applicable [here].

*Id.* at *16. This holding is consistent with the rationale behind the ELR and prior pronouncements of the North Carolina Supreme Court.[8]

---

[8] *Dur v. Western Branch Diesel, Inc.*, cited by IFC/Rollins, is also consistent with this approach. 240 F. App'x 568, 570-73 (4th Cir. 2007) (noting distinction between damage to equipment added by contract versus "original, stripped portion

As stated, the ELR does not apply here.  But if it did, this Court must utilize the reasoning set forth in *American Eurocopter*, which results in the inescapable conclusion that the Fumitoxin was the "product itself" and the peanuts and dome were "other property," since the Fumitoxin was merely placed into the dome to kill any pests. *Id.* at \*14; *see also In re New Bern Riverfront Dev., LLC*, 516 B.R. 316, 322 (Bankr. E.D.N.C. 2014); *Lesiak*, 808 N.W.2d at 85; *Omega Flex*, 2011 WL 2295270, at \*4; *Great N. Ins. Co. v. Niro, Inc*., No. JFM-08-1765, 2010 WL 4118361, at \*1 (D. Md. Oct. 15, 2010); *Transco Syndicate #1, Ltd. v. Bollinger Shipyards, Inc.*, 1 F. Supp. 2d 608, 611-13 (E.D. La. 1998); *Kawamata Farms, Inc. v. United Agri Prods.*, 948 P.2d 1055, 1095 (Haw. 1997).[9] Further, R.P. Watson, Severn's Vice President of Operations, testified that the subject matter of the PAA

---

of the [boat] suffer[ing] damage during the fire") (applying Virginia law). The unpublished case of *McManus v. GMRI, Inc.*, also cited by IFC/Rollins, is distinguishable in that the lease agreement at issue "expressly addressed" each of the issues raised by the plaintiff-landlord, the claimed damage was to the leased property and the plaintiff did not specifically oppose dismissal of the negligence claim or allege breach of any independent duty. No. 3:12-CV-009-DCK, 2012 U.S. Dist. LEXIS 92094, at \*7-12, 15-17 (W.D.N.C. July 3, 2012). There was no detailed analysis in the *McManus* decision concerning the "other property" exception. *Id.*

[9] In *Moore v. Coachmen Industries*, the court held that the ELR only prevented "plaintiffs from recovering on their negligence claim against defendants for the loss of their recreational vehicle"–not the plaintiffs' satellite dish and other personal property placed into the RV after purchase. 499 S.E.2d at 774, 780. The plaintiffs' claims related to the destruction of these items of personal property were barred by the unchallenged limitation of liability provision set forth in the manufacturer's limited warranty. *Id.* at 778, 780. Thus, *American Eurocopter* is consistent with *Moore*.

22

was the fumigation service, *i.e.*, the application of Fumitoxin. (JA 1083, 1159-60); *see also* (JA 1323) (determining amount of Fumitoxin by calculating air space rather than amount of peanuts).

IFC/Rollins caused a fire that destroyed the dome and all the peanuts contained therein. This fire also resulted in debris removal costs, fire suppression costs, and the interruption of Severn's business. Incurring these types of costs is not reasonably foreseeable due to a product merely failing to perform as expected. *See Miidas Greenhouse, LLC v. Global Horticultural, Inc.*, 244 P.3d 579, 584 (Ariz. Ct. App. 2010) (finding ELR did not bar claim where peat moss not only failed to meet expectations that it would improve seeds' germination rate but "destroyed the seeds so that they failed to germinate altogether"). The subject matter of the PAA was the application of Fumitoxin. Thus, the District Court was correct in finding that if the ELR was to apply in a case involving a service contract, the "other property" exception should apply to Appellants' damages. (JA 1393-94).

## C.     IFC/Rollins Owed Severn a Separate and Independent Duty

The District court correctly found that IFC/Rollins had a statutory duty, independent of the PAA, to follow the label's instructions and not allow piling of Fumitoxin; thus, the ELR would not bar Appellants' negligence and negligence *per se* claims. (JA 1394-96). The District Court held:

23

> Defendants assumed a statutory duty to plaintiffs to perform their
> services in compliance with these public safety statutes, [FIFRA and
> the North Carolina Pesticide Law]. This duty is independent of
> defendants' contractual obligations. Accordingly, the fact that the
> [PAA] restates the obligation does not nullify or subsume the duties
> that existed independent of the contract.

(JA 1395); *see also* Brief [25], at 35-38. The District Court properly recognized

that FIFRA and the North Carolina Pesticide Law "are public safety statutes which

impose a specific duty for the protection of others." (JA 1395). Further,

IFC/Rollins had a common law duty to conduct the dangerous operation in a

manner compliant with the applicable standard of care.

While Appellants asserted both tort and contract claims against IFC/Rollins,

Appellants were certainly allowed under Rule 8(a)(3) of the Federal Rules of Civil

Procedure to include alternate theories of recovery. A reading of the First

Amended Complaint, the PAA and the submitted expert reports show that this case

is far different than the cases cited by IFC/Rollins. (JA 38-47, 1212-1316). Count I

and Count II in the First Amended Complaint state claims based on negligence and

negligence *per se*, setting forth clear duties, independent of any agreement, to

apply the highly dangerous pesticide in a manner that was reasonable and in

accordance with the law. (JA 39-43). Appellants did not simply allege that the

PAA established the standard of care. *See Miller v. W.H. Bristow, Inc.*, 739 F.

Supp. 1044, 1050 (D.S.C. 1990) (noting "rather obvious rule that where both a

legal and contractual duty are breached, a plaintiff may recover both in tort and contract"). Thus, the authorities IFC/Rollins relies upon are inapplicable here.

IFC/Rollins supplied professional/certified applicators who provided a service that required the application of an extremely dangerous product, extensively regulated by federal and North Carolina law; therefore, IFC/Rollins had an independent duty to apply the Fumitoxin in compliance with the label. *See Oates v. Jag, Inc.*, 333 S.E.2d 222, 225 (N.C. 1985); *see also Stein v. Asheville City Bd. of Educ.*, 626 S.E.2d 263, 266 (N.C. 2006); *Kaltman v. All Am. Pest Control, Inc.*, 706 S.E.2d 864, 870-73 (Va. 2011); *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 272 F. Supp. 2d 482, 496 (E.D. Pa. 2003); *Valley Forge Ins. Co. v. Sam's Plumbing, LLC*, 207 P.3d 765, 769 (Ariz. Ct. App. 2009).[10] In *Kaltman*, the Virginia Supreme Court found that the plaintiffs' tort claims were valid, despite the defendants' argument that the claims only sounded in contract, since statutes related to pesticide applications provided duties independent of the contract. 706 S.E.2d at 870-73.

The authorities relied upon by IFC/Rollins to support the argument that Appellants' negligence *per se* claim is precluded by the ELR are inapposite and do not contradict the position that IFC/Rollins owed Severn a duty separate and

---

[10] The ELR bars negligence actions "where duties are created *solely* by contract." *Palmetto Linen Serv.*, 205 F.3d at 129 (emphasis in original).

independent from the PAA. *See* Response [31], at 31. The result in *Nudelman v. J.A. Booe Building Contractor, Inc.* was not based on the ELR defense, but instead turned on the issue of whether the plaintiffs could pierce the corporate veil in order to hold the construction company's president individually liable for the defective construction of the plaintiffs' house, as opposed to the entity that had the contractual relationship with plaintiffs. No. COA02-267, 2003 N.C. App. LEXIS 509, at *2-8, 11 (N.C. Ct. App. Mar. 4, 2003). The limited discussion concerning the application of the ELR defense in *Nudelman* was merely *dicta*. *Id.* at *5, 12.

In this case, IFC/Rollins violated public safety statutes by applying the Fumitoxin in a manner inconsistent with its labeling, and therefore, the law, which caused Severn far more than "a purely economic loss"; thus, the cases cited by IFC/Rollins from outside of North Carolina do not support the argument that the ELR precludes Appellants' tort claims. *See Spencer v. DHI Mortg. Co., Ltd.*, 642 F. Supp. 2d 1153, 1161-62 (E.D. Cal. 2009) (alleging violation of California lending statutes); *In re Air Bag Prods. Liab. Litig.*, 7 F. Supp. 2d 792, 796-806 (E.D. La. 1998) (alleging defects in cars but no injuries); *Binder v. Bank of America Corp.*, No. 3:10-CV-770-B, 2010 U.S. Dist. LEXIS 124208, at *8-10 (N.D. Tex. Nov. 22, 2010) (alleging violation of Fair Credit Billing Act); *Cemex, Inc. v. LMS Contracting, Inc.*, 3:06CV-124-H, 2009 U.S. Dist. LEXIS 89052, at *11-12 (W.D. Ky. Sept. 28, 2009) (alleging violation of state statutes regulating

blasting).[11] Further, many of the plaintiffs in those cases did not make arguments to rebut the defense that the ELR barred their respective negligence *per se* claims arising out of the alleged statutory violations. *Spencer*, 642 F. Supp. 2d at 1158, 1161-62; *In re Air Bag Prods. Liab. Litig.*, 7 F. Supp. 2d at 802; *Binder*, 2010 U.S. Dist. LEXIS 124208, at *5, 7-9.

IFC/Rollins owed a duty of care to Severn, independent of the informal terms of the PAA drafted by IFC/Rollins. IFC/Rollins had to provide the dangerous service it actively engaged in at Severn's business in a reasonable manner and in compliance with the law, *i.e.*, IFC/Rollins owed a duty to Severn (and all of IFC/Rollins's clients) to not apply Fumitoxin in a manner that could result in the piling of tablets and thus destruction of property. IFC/Rollins failed to apply the Fumitoxin as required by law and this failure resulted in the catastrophic destruction of Severn's large storage dome and approximately 20 million pounds of Severn's peanuts.

---

[11] The related court opinion and filings from the *Cemex* litigation make clear that the dispute was merely contractual in nature and that the losses plaintiffs claimed were caused by the violation of the statutes only dealt with costs of removing undetonated explosives, not property damage caused by the defendants performing blasting operations. *See Cemex, Inc. v. LMS Contracting, Inc.*, 2008 WL 4682349, at *1-5 (W.D. Ky. Oct. 21, 2008); First Amended Complaint, 2006 WL 3032274, at ¶¶ 41-45; Motion for Partial Summary Judgment, 2008 WL 4239541, at pp. 6-7.

## CONCLUSION

IFC/Rollins concedes the District Court erred in dismissing Appellants' tort claims on the basis of Severn's purported contributory negligence. However, affirming the District Court's dismissal since it "ultimately reached the right result" – would also be error. The District Court was correct in its determination that neither North Carolina's ELR nor the so-called consequential damages exclusion in the PAA bar Appellants' tort claims. There is no controlling authority to support the expansive application of the ELR to this matter. Further, IFC/Rollins's interpretation of the PAA would violate North Carolina public policy and would result in an unconscionable outcome.

While Appellants contend the dismissal of their breach of contract claim was erroneous, the parties can move forward with trial on the tort claims. Therefore, Appellants request that this Court remand this matter to the District Court for trial.

Respectfully Submitted,

/s/ James L. Warren III
James L. Warren III
Alexandra Markov
Scott Murray
CARROLL WARREN & PARKER PLLC
Post Office Box 1005
Jackson, Mississippi 39215
(601) 592-1010

28

Howard M. Widis
WIDIS LAW FIRM, PLLC
3125 Springbank Lane, Suite G
Charlotte, North Carolina  28226
(980) 219-7809

Hunter C. Quick
Jay M. Goldstein
NEXSEN PRUET, PLLC
227 West Trade Street, Suite 1550
Charlotte, North Carolina  28202
(704) 339-0304

*Counsel for Appellants*

# ADDENDUM

# <u>TABLE OF CONTENTS</u>

<u>**Addendum Page**</u>

*AIU Ins. Co. v. Omega Flex, Inc.*,
       No. 3:11-cv-00023, 2011 WL 2295270 (W.D. Va. June 9, 2011).........Add. 1

*Binder v. Bank of America Corp.*,
       No. 3:10-CV-770-B, 2010 U.S. Dist. LEXIS 124208
       (N.D. Tex. Nov. 22, 2010)....................................................................Add. 8

*Cemex, Inc. v. LMS Contracting, Inc.*,
       2006 WL 3032274 (W.D. Ky.) (Complaint) .......................................Add. 14

*Cemex, Inc. v. LMS Contracting, Inc.*,
       2008 WL 4239541 (W.D. Ky. (June 30, 2008)...................................Add. 20

*Cemex, Inc. v. LMS Contracting, Inc.*,
       2008 WL 4682349 (W.D. Ky. Oct. 21, 2008)....................................Add. 29

*Cemex, Inc. v. LMS Contracting, Inc.*,
       3:06CV-124-H, 2009 U.S. Dist. LEXIS 89052
       (W.D. Ky. Sept. 28, 2009)...................................................................Add. 33

*City of Ottawa v. Osmonics, Inc.*,
       No. 3-10-0431, 2011 WL 10468129 (Ill. App. Ct. May 5, 2011)........Add. 38

*Crop Prod. Servs., Inc. v. Ormond*,
       No. 4:11-CV-41-D, 2012 WL 147950 (E.D.N.C. Jan. 18, 2012) ........Add. 44

*Dur v. Western Branch Diesel, Inc.*,
       240 F. App'x 568 (4th Cir. 2007).......................................................Add. 50

*First S. Bank v. Bank of the Ozarks*,
       542 F. App'x 280 (4th Cir. 2013).......................................................Add. 55

*Ford v. All-Dry of the Carolinas, Inc.*,
       711 S.E.2d 876 (N.C. Ct. App. Apr. 19, 2011) ..................................Add. 58

*Great N. Ins. Co. v. Niro, Inc.*,
No. JFM-08-1765, 2010 WL 4118361 (D. Md. Oct. 15, 2010)...........Add. 65

*Indemnity Insurance Co. of North America v. American Eurocopter LLC*,
No. 1:03CV949, 2005 WL 1610653 (M.D.N.C. July 8, 2005)............Add. 67

*Lewis v. Ceralvo Holdings, LLC*,
No. 4:11-CV-00055-JHM, 2012 WL 32607
(W.D. Ky. Jan. 6, 2012)......................................................................Add. 85

*LRP Hotels of Carolina, LLC v. Westfield Ins. Co.*,
4:13-CV-94-D, 2014 WL 5581049 (E.D.N.C. Oct. 31, 2014)............Add. 92

*McManus v. GMRI, Inc.*,
No. 3:12-CV-009-DCK, 2012 U.S. Dist. LEXIS 92094
(W.D.N.C. July 3, 2012).....................................................................Add. 97

*McMurray v. U.S.*,
551 F. App'x 651 (4th Cir. 2014)......................................................Add. 105

*Nudelman v. J.A. Booe Building Contractor, Inc.*,
No. COA02-267, 2003 N.C. App. LEXIS 509
(N.C. Ct. App. Mar. 4, 2003).............................................................Add. 110

*Riggs v. Orkin, Inc.*,
No. 7:11-CV-5-D, 2011 WL 2417016
(E.D.N.C. June 13, 2011) ..................................................................Add. 115

*Smith Craft Real Estate Corp. v. Handex of Conn., Inc.*,
No. CV03082188S, 2005 WL 1433237
(Conn. Super. Ct. May 19, 2005) ......................................................Add. 118

*Vigus v. Milton A. Latta & Sons Dairy Farms, Inc.*,
No. COA08-700, 2009 N.C. App. LEXIS 830
(N.C. Ct. App. May 19, 2009)............................................................Add. 121

2011 WL 2295270
Only the Westlaw citation is currently available.
United States District Court, W.D. Virginia,
Charlottesville Division.

AIU INSURANCE COMPANY, as
subrogee of Garthland, LLC, Plaintiff,
v.
OMEGA FLEX, INC., Defendant.

Civil Action No. 3:11–cv–00023.    |    June 9, 2011.

**Attorneys and Law Firms**

Edward A. Jaeger, Jr., White and Williams LLP, Philadelphia, PA, Peter Booth Vaden, Attorney at Law, Charlottesville, VA, for Plaintiff.

Matthew W. Lee, Rocklan William King, III, Wilson Elser Moskowitz Edelman & Dicker LLP, McLean, VA, for Defendant.

*MEMORANDUM OPINION*

NORMAN K. MOON, District Judge.

**\*1** This matter, a tort case removed here from the Circuit Court of Albemarle County, is before the court upon consideration of Defendant's motion to dismiss, which has been fully briefed and heard. For the reasons stated herein, the motion will be granted, in part, and denied, in part.

## I. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint. See Randall v. United States, 30 F.3d 518, 522 (4th Cir.1994) (citation omitted); Fed.R.Civ.P. 12(b)(6); Fed.R.Civ.P. 8. A court must take "the material allegations of the complaint" as admitted, and liberally construe the complaint in favor of a plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969) (citation omitted). However, upon consideration of motions to dismiss for failure to state a claim upon which relief may be granted, I apply the pleading standard as refined by Bell Atlantic v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. ——, 129 S.Ct. 1937 (2009). Plaintiffs must allege facts that "state a claim to relief that is plausible on its

face,"*i.e.,* facts that "have nudged their claims across the line from conceivable to plausible."*Twombly,* 550 U.S. at 570. A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully."*Iqbal,* 556 U.S. at ——, 129 S.Ct. at 1949.

## II. FACTUAL BACKGROUND

Plaintiff, AIU Insurance Company, is the subrogee of Garthland LLC, [1] a limited liability company owned and operated by Ms. Hunter Crosson. AIU insured Garthland's property at 1347 Garth Road in Charlottesville ("the property") for the policy period May 1, 2009, to May 1, 2010. Defendant, Omega Flex, Inc., is a Pennsylvania corporation engaged in the business of designing, manufacturing, and supplying a flexible corrugated stainless steel tubing, commonly known as "CSST," which Defendant has branded as "TracPipe," for use in various gas piping applications.

[1]    The parties sometimes refer to "Garth Land."

Garthland contracted with Alexander Nicholson, Inc. ("Nicholson"), for extensive renovations to a residence on the property at 1347 Garth Road. Nicholson was responsible for the hiring, coordination, and supervision of the subcontractors who worked on the residence, including contractors who installed the home's plumbing system and CSST, which was Omega Flex's TracPipe. The CSST was installed in the basement of the residence, in close proximity to duct work.

On June 3, 2009, lightning struck at or near the property, and the CSST was damaged by the strike. The CSST conducted the electricity produced by the lightning strike, and the electricity arced and created a hole in the CSST. Natural gas escaped from the CSST, ignited, and caused a fire, which resulted in sudden and significant damage to Garthland's and Ms. Crosson's real and personal property, incurring substantial incidental and consequential damages that were not caused by any acts or omissions on the part of AIU's subrogee. AIU paid $249,302.91 to its insured, pursuant to the policy, which subrogates to AIU Garthland's rights and claims against third parties.

## III. DISCUSSION

**\*2** Count I of the complaint alleges that Omega Flex was negligent, and Count II alleges that Omega Flex breached its implied warranty of merchantability. [2] Defendant contends that the negligence count is barred under the common law's privity requirement and Virginia's economic loss rule, and that the breach of implied warranty claim is "similarly flawed in that: (a) the UCC does not apply to the facts of this case, and (b) even if it does, all of the damages the plaintiff seeks are 'consequential' economic losses and thus barred under Virginia Code § 8.2–715, for lack of privity."

[2]  Count III of the complaint further alleges that Omega Flex breached its implied warranty of fitness for a particular purpose, but does not allege that Plaintiff intended to use the product for any purpose separate and apart from its ordinary purpose. A claim for breach of warranty for a particular purpose requires a plaintiff to allege that the product failed to serve a purpose other than its ordinary purpose and peculiar and unique to the plaintiff. See Va.Code § 8.2–315. However, Plaintiff's opposition to the motion to dismiss concedes the dismissal of this count.

### A. Property Damage, Not Economic Loss

The proposition that a party may not recover purely economic losses through tort law is inapposite to the instant case. Plaintiff alleges that Defendant manufactured, supplied and placed into the stream of commerce defective steel tubing, which was used as part of a project to add to and renovate an existing house, and that, as a result of Defendant's negligence, the house was severely damaged. Plaintiff does not merely complain about the inability of the steel tubing to attain some preconceived notion of performance or quality; rather, Plaintiff alleges substantial consequential damages.

Virginia law makes a clear distinction between the two concepts.

[W]here personal injury is threatened, a duty in negligence has been readily found. Property interests also have generally been found to merit protection from physical harm. However, *where mere deterioration or loss of bargain is claimed, the concern is with a failure to meet some standard of quality. This standard of quality must be defined by reference to that which the parties have agreed upon.*

Blake Const. Co., Inc. v. Alley, 233 Va. 31, 35 (1987) (citation omitted; emphasis added). Here, there is no claim of "deterioration or loss of bargain" or of "a failure to meet some

standard of quality .... defined by reference to that which the parties have agreed upon." Id.

The distinction between economic loss and physical injury is one which has been made ... by courts and by commentators. With regard to products liability law, for example, Prosser states the following:

Where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule ... that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery.

Bryant Elec. Co., Inc. v. City of Fredericksburg, 762 F.2d 1192, 1195 n. 6 (4th Cir.1985) (involving a dispute between a contractor and the project owner's architect and engineer to recover the contractor's additional expenses) (quoting Prosser, Law of Torts, 4th Ed. (1971) at 665).

USAA Property & Casualty Ins. Co. v. Armstrong Air Conditioning, Inc., 2004 WL 2331290 (Va. Cir. Ct., Fairfax County 2004), illustrates the distinction between economic loss and property damage. USAA, as subrogee of its insureds, the Cooks, sued various parties in connection with the sale and installation of a furnace, apparently in an existing home. Id. at * 1. Against the supplier of the furnace, USAA had alleged negligence in introducing a defective furnace into the marketplace and failure to warn potential consumers of its dangerous condition. Id. The supplier, which had sold the furnace to another party which installed it, demurred. Id. The court, considering whether the economic loss doctrine barred the tort claims against the supplier, observed as follows:

**\*3** The decisive issue here is whether the defective product was the Cooks' residence of which the furnace was a defective part, or whether the product was only the oil burning furnace that harmed the Cooks' other property, then [sic] residence. The plaintiff's motion for judgment plainly demonstrates that it was the latter. Accordingly, the product, the oil burning furnace, did not injure itself as was the case in Sensenbrenner [v. Rust, Orling & Neale, Architects, Inc., 236 Va. 419 (1988) ], but rather injured other

Add. 2

AIU Ins. Co. v. Omega Flex, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 2295270, 74 UCC Rep.Serv.2d 791

property, not the subject of the oil burning furnace contract.

*Id.*

Similarly, *Factory Mutual Ins. Co. v. DLR Contracting, Inc.,* 2005 WL 2704502 (E.D.Va.2005), held that, where the plaintiff had suffered property damage *and* economic loss, the economic loss rule did not preclude recovery "if the alleged breach of the duty does not implicate contractual provisions and if damages other than for economic losses are being sought, *e.g.,* damage to property not subject of the contract...."*Id.* at *6. In *Factory Mutual,* a roof truss system failed, causing damage to a shopping center which had opened for business a few months earlier. *Id.* at *1. In the resulting subrogation action by the tenants' insurers, the defendant contractors argued that, pursuant to *Sensenbrenner,* the economic loss doctrine barred the claims.*Id.* at *7. The court disagreed, observing that,

> [a]lthough, as in *Sensenbrenner,* the various parties defendant here were not in privity with the insured tenants, the subrogated cause of action by the Plaintiff insurers can nevertheless be maintained for negligence against DLR and any other party alleged to be negligent where more than only economic losses are being sought. In fact, the Plaintiffs seek damages for both the "injury" to property that was not the subject of contractual obligation between the parties, *e.g.,* inventory, display fixtures, etc .... as well as economic loss ... resulting from the alleged negligence of one or more of the Defendants.... Accordingly, the claims by the Plaintiffs against the primary defendants can proceed subject to a determination at trial of the disputed material fact(s) regarding whether a particular defendant was negligent and whether such negligence proximately caused any of the damages alleged.

*Id.*

**B. Tort, Not Contract**

In this matter, Defendant was never directly involved in the project to add to and renovate Ms. Croson's home. There is no allegation that Defendant, as the supplier of a product, was ever cognizant of the specific use to which its product would be put. To the extent Plaintiff's damages could be fairly construed to arise from a contract to renovate a house, a cause of action in tort against the supplier of a product is not precluded.[3] Plaintiff entered into no contract with Defendant; however, even assuming *arguendo* that such a contract existed, a defendant can nonetheless be held liable under both contract and tort law.

[3]    Indeed, the only economic loss unrecoverable in tort in this case is damage to the steel tubing itself. *See East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871–72, 875–76 (1986) (damage to defective product itself not recoverable in tort).

**\*4** If the cause of complaint be for an act of omission or non-feasance which, without proof of a contract to do what was left undone, would not give rise to any cause of action (because no duty apart from contract to do what is complained of exists) then the action is founded upon contract, and not upon tort. If, on the other hand, the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of contract, to take due care, and the defendants are negligent, then the action is one of tort.

*Oleyar v. Kerr,* 217 Va. 88, 90 (1976) (citation omitted). The allegedly breached tort duty must have arisen independently of the contract. *Foreign Mission Bd. of Southern Baptist Convention v. Wade,* 242 Va. 234, 241 (1991) (citing *Spence v. Norfolk & W.R. Co.,* 92 Va. 102, 116 (1895).

> The controlling policy consideration underlying tort law is the safety of persons and property—the protection of persons and property from losses resulting from injury. The controlling policy consideration underlying the law of contracts is the protection of expectations bargained for. If that distinction is kept in mind, the damages claimed in a particular case may more readily be classified between claims for injuries to

Add. 3

persons or property on one hand and economic losses on the other.

*Sensenbrenner,* 236 Va. at 425.

The manufacturer of tubing intended to carry natural gas, then, is subject to duties independent of any contract, as

[i]t is a fundamental principle that the manufacturer of a product is held to a standard of reasonable care. The duty of reasonable care is that care, skill, and diligence in and about the process of manufacturing and preparing for market that a reasonably skillful and diligent person or a reasonably prudent person would use under the same or similar circumstances. Thus, a manufacturer of an article has the duty of exercising reasonable care at least to see that there is no risk of injury from negligent manufacture where the article is used in the ordinary manner for which it is intended. The manufacturer has the duty to see that the article is free of any potentially dangerous defect or defect that might be expected to produce personal injuries or property damage. In addition, the manufacturer has the duty of making the product reasonably safe for any anticipated emergency and he must provide proper safety devices where required under the circumstances and under the duty of reasonable care.

Such a duty of reasonable care is also applicable to manufacturers of products which are designed to be component parts of other manufactured products.

The lack of safety devices may constitute defective design. If the product is unreasonably dangerous for its intended use, or for a use that can reasonably be expected, without a safety device, then the manufacturer may have a duty to install such a device. Cost, feasilibity [*sic*], and obviousness of the danger are factors that must be considered in determining whether such a duty exists.

**\*5** In a negligence action against a manufacturer in Virginia the plaintiff must show: (1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some other reasonably foreseeable purpose, and (2) that the unreasonably dangerous condition existed when the goods left the defendant's hands.

*Dameron v. Fort Worth Steel & Machinery Corp.,* 1985 WL 306781, \*3–4 (Va. Cir. Ct., City of Richmond 1985) (citations omitted).

Manufacturers are expected reasonably to foresee (i) that a person may be injured while the product is being used for the purposes for which it was manufactured and sold and (ii) that a person may be injured while the product is being used in surroundings which are normal for the use of that product.

*Richmond, Fredericksburg and Potomac R. Co. v. Davis Industries, Inc.,* 787 F.Supp. 572, 577 (E.D.Va.1992) (citations omitted).

Production of an unreasonably dangerous product is not the only basis for holding a manufacturer liable for negligence in Virginia. For example, a manufacturer may also be held liable for failure to warn, as it has been stated that

[t]he manufacturer of a chattel will be subject to liability when he

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Featherall v. Firestone Tire and Rubber Co.,* 219 Va. 949, 962 (1979) (quoting Restatement (Second) of Torts § 388); *see also French v. York International Corp.,* 72 Va. Cir. 538, 2007 WL 6006671, \*2 (Albemarle County 2007) (allegation of failure to warn of known hazards of air conditioner refrigerant states independent cause of action in tort against builder of new house).

Defendant in the instant case manufactured a product that was utilized during the renovation of a house. The complaint does not allege that Defendant specified any criteria for the installation of its product at the house, or that Defendant ever visited the site. Instead, it alleges that Defendant manufactured a defective product, resulting in property damage through its failure to use reasonable care and failure to warn. Defendant is not entitled to dismissal of the complaint.

Add. 4

AIU Ins. Co. v. Omega Flex, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 2295270, 74 UCC Rep.Serv.2d 791

*C. Privity*

Defendant insists that Plaintiff's negligence count is barred by a lack of privity. To the contrary, that AIU's subrogor may not have been in privity with Defendant is irrelevant. "In cases not provided for in [Va.Code] § 8.2–318 where recovery of damages for injury to ... property resulting from negligence is sought, lack of privity between the parties shall be no defense." Va.Code § 8.01–223. Consequently, a party which alleges negligent destruction of property is not subject to a privity requirement. *See also Blake Construction, supra,* 233 Va. at 34.

**\*6** The case of *Leesburg Auto Center, LLC v. Leo Construction Company,* 45 Va. Cir. 102, 1997 WL 1070482 (Loudon County 1997), is instructive. In *Leesburg Auto Center,* the defendant struck a power line while working on property adjacent to the plaintiff's business. *Id.* at \*1. The resulting power surge damaged the plaintiff's equipment, including computers and fax machines, and caused monetary losses arising from business interruption. *Id.* The defendant demurred, arguing that the economic loss doctrine barred the plaintiff's negligence claim. *Id.* The court disagreed, overruling the demurrer, noting that "Leesburg Auto Center is alleging damage to property, both direct and consequential. It is not a cause of action for solely economic loss. Hence, privity is not required." *Id.* Like the parties in that case, Plaintiff's subrogor and Defendant had no direct contractual relationship, and Plaintiff must therefore be permitted to attempt to recover in tort.

*C. Warranty*

Citing § 8.2–715 of Virginia's Uniform Commercial Code ("U.C.C."), Va.Code § 8.2–101, *et seq.,* Defendant contends that, because Plaintiff was not in privity with Defendant, Plaintiff is not entitled to recover from Defendant for breach of warranty. Defendant's argument is unavailing.

Under Article 2 of the Virginia U.C.C., an implied warranty of merchantability attached to the sale of the steel tubing. Va.Code § 8.2–314. Defendant thus warranted, *inter alia,* that the tubing was "fit for the ordinary purposes for which such goods are used." *Id.* § 8.2–314(2)(c).

Section 8.2–318 of the U.C.C. generally eliminates privity as a defense to such warranty claims. It provides as follows:

Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods; however, this section shall not be construed to affect any litigation pending on June 29, 1962.

To be sure, § 8.2–715, "Buyer's incidental and consequential damages," imposes a contract requirement under certain circumstances, not applicable here. Section 8.2–715 states as follows:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include:

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

**\*7** (b) injury to person or property proximately resulting from any breach of warranty.

§ 8.2–715. Specifically regarding § 8.2–715(2)(a), the Supreme Court of Virginia has held that

[t]he phrase "at the time of contracting" in subparagraph (a) conveys the understanding of a contract between two parties.... [W]e conclude that § 8.2–715(2)(a) requires a contract between the parties for the recovery of consequential economic

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

AIU Ins. Co. v. Omega Flex, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 2295270, 74 UCC Rep.Serv.2d 791

loss damages incurred as a result of a breach of warranty by the seller.

*Beard Plumbing and Heating, Inc. v. Thompson Plastics, Inc.,* 254 Va. 240, 245 (1997). Addressing the apparent conflict between § 8.2–318 and § 8.2–715(2)(a), the court held that " § 8.2-715(2)(a) requires a contract between the parties for recovery of consequential *economic loss damages* in a claim for breach of the implied warranty of merchantability...." 254 Va. at 246 (emphasis added.).*See also Pulte Home Corp. v. Parex, Inc.,* 265 Va. 518, 525 (2003) (under § 8.2-715(2)(a), home builder, which had settled with new-home buyers as to defective stucco, was precluded from recovering from manufacturer of stucco in the absence of a contract).

When property damage has occurred, involving more than merely disappointed economic expectations, § 8.2-715(2)(b), not § 8.2-715(2)(a), governs the extent of recoverable consequential damages. According to the Comment to § 8.2–715,

> [s]ubsection (2)(b) states the usual rule as to breach of warranty, allowing recovery for injuries "proximately" resulting from the breach. Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of "proximate" cause turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects. If it was not reasonable for him to do so, or if he did in fact discover the defect prior to his use, the injury would not proximately result from the breach of warranty.

In the instant matter, involving a natural gas supply line installed in real property, Plaintiff's subrogor, Garthland (or Ms. Croson), could not have inspected the item in question prior to putting it to use. As long as there was proximate cause linking the breach of warranty with Plaintiff's property damage, a cause of action in warranty lies. In Count II of its complaint, alleging breach of the implied warranty of merchantability, Plaintiff alleges proximate cause. Thus, Plaintiff has stated a cause of action for consequential damages resulting from the breach of the warranty. As long as a plaintiff states facts which, if proven, would "plausibly" entitle him to relief, a motion to dismiss cannot be granted.

*See Twombly,* 550 U.S. at 570; *Iqbal,* 556 U.S. at ——, 129 S.Ct. at 1949.

Defendant cites a number of cases for the principle that a plaintiff may not recover in tort for damage cause by a defective product integrated into construction. These cases are easily distinguishable from the instant case, because in each of the cited cases, the plaintiffs sued for defects in *new* residential construction for which the plaintiffs had *contracted.*Indeed, in each case, the item purchased was the entire structure, and each case but one involved the plaintiff's disappointed economic damages.[4] The courts' reasoning in those cases, regarding why the Virginia U.C.C. did not apply to those plaintiffs' claims, highlights the key distinction between the cited cases and the instant case. Most of the cited cases rely upon *Winchester Homes, Inc. v. Hoover Universal, Inc.,* 30 Va. Cir. 22, 1992 WL 884933 (Fairfax County 1992), which involved a claim by a builder against the supplier of defective roofing material. The court agreed with the defendant that "the homeowners purchased realty, not 'goods' as defined under the UCC."*Id.* at *5. Finding that realty was not subject to the provisions of the U.C.C., the court reasoned as follows:

[4]    The cited cases are: *Glass v. Trafalgar House Property, Inc.,* 58 Va. Cir. 437 (Loudon County 2002); *Bay Point Condominium Associate v. RML Corp.,* 54 Va. Cir. 422 (City of Norfolk 2001); *MacConkey v. F.J. Matter Design, Inc.,* 54 Va. Cir. 1 (City of Virginia Beach 2000); *Winchester Homes, Inc. v. Hoover Universal, Inc.,* 30 Va. Cir. 22 (Fairfax County 1992); and *French v. York International Corp.,* 72 Va. Cir. 538 (Albemarle County 2007).*French* involved personal injury to the plaintiffs.

**\*8** [T]he UCC implied warranties do not pass to the *purchasers of residential housing.*Rather, purchasers receive consumer protections under *Virginia Code § 55–70.1from the developer.*Under § 55–70.1, the developer bears the economic costs of faulty construction and may bargain with the purchaser and disclaim the statutory warranties.

*Id.* at *6 (emphasis added).

In contrast to the facts of *Winchester* and its progeny, in the instant case Plaintiff's subrogor did not contract or otherwise arrange for the construction of new housing. The remedies prescribed by Va.Code § 55–70.1, "**Implied warranties on new homes,**" are simply inapplicable here. Accordingly, the rationale of cases such as *Winchester*—that the costs associated with defective building components should, as

Add. 6

AIU Ins. Co. v. Omega Flex, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 2295270, 74 UCC Rep.Serv.2d 791

a matter of public policy, be shifted to the home builder —is irrelevant here. In the *Winchester*-type case, "[t]he plaintiffs acquired a home, not goods." *Glass v. Trafalgar House Property, Inc.,* 58 Va. Cir. 437, 2002 WL 31431524, *4 (Loudon County 2002)*. Here, however, Plaintiff did not acquire a home.

### IV. CONCLUSION

Plaintiff has alleged a set of facts that, if proved, support its claim for relief. Plaintiff alleges not economic loss, but damage to property—property that was outside the scope of Defendant's obligation to Plaintiff's subrogor. [5] Under the laws of negligence and warranty, the complaint states viable causes of action. Accordingly, the motion to dismiss will be denied, in part, and granted, in part, as follows: regarding Counts I and II of the complaint, the motion to dismiss will be denied; however, as Plaintiff has conceded that dismissal of Count III is appropriate, the motion to dismiss will be granted regarding Count III. [6] An appropriate order follows.

[5]  At the hearing on the instant motion, Defendant argued that the CS ST, once installed in the pre-existing home, became a "fixture" in the home and therefore was inseparable either from the home or from the contractor's work. I pause to add that, given the precedents discussed herein, there is no need for me to address this contention.

[6]  *See* n. 2, *supra*.

For the reasons stated in the accompanying memorandum opinion, Defendant's motion to dismiss (docket no. 4) is **DENIED, in part,** and **GRANTED, in part,** as follows: regarding Counts I and II of the complaint, the motion to dismiss is **DENIED,** and regarding Count III, the motion to dismiss is **GRANTED.**

The Clerk of the Court is directed to send a certified copy of this order and the accompanying memorandum opinion to all counsel of record.

It is so **ORDERED.**

**Parallel Citations**

74 UCC Rep.Serv.2d 791

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 7



**FRED BINDER, LINDA BINDER, WILLIAM MCGLAUN, and CAROL MCGLAUN on behalf of themselves and all similarly situated persons, Plaintiffs, v. BANK OF AMERICA CORPORATION, FIA CARD SERVICES, N.A., and CITIGROUP INC., Defendants.**

**Civil Action No. 3:10-CV-770-B**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

*2010 U.S. Dist. LEXIS 124208*

**November 22, 2010, Decided**
**November 22, 2010, Filed**

**COUNSEL:** [*1] For Fred Binder, Linda Binder, William McGlaun, Carol McGlaun, on behalf of themselves and all similarly situated persons, Plaintiffs: Steve B Jensen, LEAD ATTORNEY, Allen M Stewart, Allen Stewart PC, Dallas, TX; Gary K Shipman, PRO HAC VICE, Shipman & Wright LLP, Wilmington, NC; James D Piel, Allen Stewart PC, Dallas, TX.

For Bank of America Corporation, FIA Card Services NA, Defendants: Richard D Anigian, LEAD ATTORNEY, Haynes & Boone, Dallas, TX; Angela H Zimmern, Bradley R Kutrow, PRO HAC VICE, McGuireWoods LLP, Charlotte, NC; John A Tancabel, Haynes & Boone LLP, Dallas, TX; Kathleen H Dooley, Mary E H Yoost, PRO HAC VICE, McGuireWoods LLP, Charlotte, NC.

For Citigroup Inc, Defendant: Edwin R DeYoung, LEAD ATTORNEY, Carl C Scherz, Roger B Cowie, Locke Lord Bissell & Liddell LLP, Dallas, TX; Julia B Strickland, PRO HAC VICE, Stroock & Stroock & Lavan LLP, Los Angeles, CA; Marcos Daniel Sasso, PRO HAC VICE, Stroock & Stroock & Lavan, Los Angeles, CA.

**JUDGES:** JANE J. BOYLE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JANE J. BOYLE

**OPINION**

## MEMORANDUM ORDER AND OPINION

Before the Court is Defendants Bank of America Corporation's and FIA Card Services, N.A.'s (collectively "BOA") Motion to Dismiss and Supporting Brief [*2] filed June 30, 2010 ("Mot. Dismiss") (doc. 21). Having considered the parties' submissions and responses thereto, BOA's Motion is **GRANTED** for the reasons discussed below. The claims of Plaintiffs Fred Binder and Linda Binder ("the Binders") against Bank of America Corporation and FIA Card Services, N.A. are hereby **DISMISSED**. [1]

1    Plaintiffs William McGlaun's and Carol McGlaun's claims against Citigroup, Inc. have been stayed pending arbitration proceedings pursuant to the parties' Stipulation filed September 20, 2010 (doc. 33) and this Court's Order of September 21, 2010 (doc. 34). Other parties are also named in the complaint as having purchased Sealand memberships but are not named as plaintiffs. This Memorandum Order and

2010 U.S. Dist. LEXIS 124208, *2

Opinion reaches only the Binders' claims.

# I.

## BACKGROUND[2]

> 2  The background facts are derived from Plaintiffs' First Amended Complaint ("Complaint" or "FAC") (doc. 20), filed June 9, 2010, and on undisputed facts gleaned from the parties' court papers. Where there may be a dispute over a stated fact, the Court has so indicated by claiming the fact as one stated by that party to be true.

The Binders bring this action on behalf of themselves and others who purchased Sealand [*3] Travel Club memberships from Royal Palms Travel, Inc. ("Royal Palms"), financed on credit cards provided by BOA. (FAC 1.) The Binders allege that Royal Palms has operated a fraudulent scheme to sell worthless discount travel plans. (FAC ¶ 12.) The Binders attended a Royal Palms sales presentation at Royal Palms' Dallas, Texas location on November 1, 2008, and were told that the Sealand membership would enable them "to get the lowest travel prices anywhere" by sales representatives using "high pressure sales tactics." (FAC ¶¶ 16-17.) The Binders agreed to purchase a club membership after the presentation and signed a retail installment contract for a loan for the purchase price of $5,593.00. (FAC ¶ 17.) The contract provided that the Binders would pay no interest and no finance charges, and monthly payments were to begin November 1, 2008. *Id.* The Binders made no upfront payment to Royal Palms but were told that they would be issued a new credit card by BOA and that their membership charges would be transferred to that new card. *Id.* The Binders made two monthly payments of $55.00 directly to BOA on November 14, 2008 and December 15, 2008, assuming that the repayment obligations would [*4] be what Royal Palms had promised. (FAC ¶ 18.) On or about December 15, 2008, the Binders received the credit card agreement and the actual, "plastic" credit card from BOA, upon which they learned that they would have a zero percent interest rate only until May 2009, after which the interest rate would increase to 14.99%. *Id.* "Immediately upon receipt" of the agreement the Binders tried to cancel their Royal Palms membership. *Id.* At that time the Binders also contacted BOA to inform BOA that "the characteristics and real price of the vacation club had been falsely misrepresented to them at the time of purchase" and dispute the Royal Palms charges. [3] *Id.* On January 13, 2009 the Binders

completed a credit dispute form, which they sent to BOA, and over the next several months the Binders continued to correspond with BOA to get the charges reversed. (FAC ¶ 19.) BOA ultimately denied the Binders' request for a reversal of charges, sought payment through a collection agency, and reported the outstanding balance to the credit reporting agencies as "charged off as bad debt." (FAC ¶¶ 19-21.) The Binders allege that they were directly harmed by BOA's failure to conduct an adequate investigation [*5] into the Royal Palms charges, BOA's enforcement of the debt after notice that the membership was a scam, and BOA's reporting to credit agencies that the Binders' debt was delinquent. (FAC ¶¶ 35-40.) The Binders seek actual damages, injunctive relief, restitution, pre- and post-judgment interest, expenses, attorney's fees, and costs on behalf of themselves and all similarly situated persons, based on common law negligence and a negligence per se claim based on violations of the Fair Credit Billing Act, *15 U.S.C. § 1601* ("FCBA"). (FAC ¶ 41.)

> 3  The Binders also filed a complaint against Royal Palms with the Texas Attorney General's Office on December 15, 2008. (FAC ¶ 19.) On March 17, 2010, the Texas Attorney General filed suit against Royal Palms and its affiliates in Texas state court, alleging that Royal Palms committed deceptive trade practices and other violations of Texas state law. Plaintiff's Original Petition, *State v. Royal Palms Travel, Inc*., Cause No. 10-03099 (162d Dist. Ct., Dallas County, Tex. Mar. 17, 2010). On March 17, 2010, the State of Texas obtained a temporary restraining order against Royal Palms. Ex Parte Temporary Restraining Order, *State v. Royal Palms Travel,* [*6] *Inc*., Cause No. 10-03099 (162d Dist. Ct., Dallas County, Tex. Mar. 17, 2010).

# II.

## LEGAL STANDARD

In analyzing a motion under *Rule 12(b)(6)*, the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)*. The motion should be granted only if the complaint does not include enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. A claim must be "nudged . . . across

the line from conceivable to plausible." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 555*). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *SW Bell Tel., LP v. City of Houston, 529 F.3d 257, 260 (5th Cir. 2008)* (quoting *Twombly, 550 U.S. at 555*).

**III**.

**ANALYSIS**

BOA moves to dismiss the Binders' claims pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. The Court will examine BOA's specific contentions below.

*A. Negligence* [*7*] *Claim*

Defendant BOA argues that the economic loss rule precludes the Binders' recovery under a negligence theory. (Mot. Dismiss 3-6.) The Binders state in their Response in Opposition to the Binders' Motion to Dismiss ("Opp'n") that they "agree that the 'economic loss rule' precludes imposition of a common law negligence duty in these circumstances." (Opp'n 17 n.2.) Accordingly, the Court **DISMISSES** the Binders' common law negligence claim. [4]

> 4    The Court declines to examine BOA's arguments regarding common law duties of lenders given that it finds that the economic loss rule precludes the Binders' recovery under a negligence theory.

*B. Negligence Per Se Claim*[5]

> 5    Although the First Amended Complaint technically lists only one count, "NEGLIGENCE", the parties' briefing on BOA's Motion to Dismiss discusses common law negligence and negligence per se claims as separate claims. The Court therefore treats the First Amended Complaint as presenting separate counts of negligence and negligence per se when ruling on BOA's Motion to Dismiss.

BOA argues that the Binders' negligence per se claim is barred by the economic loss rule. BOA also argues that the First Amended Complaint does not adequately plead [*8*] a violation of the FCBA, and that even if it did, the

investigative requirements of *Section 1666* of the FCBA cannot serve as the basis of a negligence per se claim. The Court will address these arguments below.

i. Economic Loss Rule

BOA argues that the economic loss rule, which the Binders concede bars their negligence claim, [6] also bars the Binders' negligence per se claim. (Mot. Dismiss 2, 3-5, Mot. Reply 1, 2-3.) Specifically, BOA argues that Texas' economic loss rule bars the Binders' recovery under both negligence and negligence per se theories because they allege purely economic losses as their injuries, the payment of money for allegedly worthless services and damage to their credit rating. (Mot. Dismiss 4.) The Binders make no argument to rebut BOA's claim that the economic loss rule bars their negligence per se claim.

> 6    *See* Section III(A), *supra*.

Under the economic loss rule, a party asserting a negligence claim "must plead and prove either a personal injury or property damage as contrasted to mere economic harm." *Express One Int'l, Inc. v. Steinbeck, 53 S.W.3d 895, 899 (Tex. App.-Dallas 2001)*; *see also Blanche v. First Nationwide Mortgage Corp., 74 S.W.3d 444, 453 (Tex. App.-Dallas 2001)* [*9*] (citing *Express One, 53 S.W.3d at 899*). Damage to a plaintiff's credit rating arising out of a creditor's reporting to a credit agency has been considered a purely economic loss. *Blanche, 74 S.W.3d at 452-53*. Courts applying Texas law regularly find that the economic loss rule bars negligence per se claims. *See, e.g., Bell v. Am. Traffic Solutions, Inc., 633 F. Supp. 2d 305, 316 (N.D. Tex. 2009), aff'd in part and vacated in part on other grounds, 371 Fed Appx. 488, 2010 WL 1141639 (5th Cir. 2010)*; *Strauss v. Ford Motor Co., 439 F. Supp. 2d 680, 688 (N.D. Tex. 2006)*; *Trans-Gulf Corp. v. Performance Aircraft Servs., Inc., 82 S.W.3d 691, 694-95 (Tex. App.-Eastland 2002)*.

The Court finds that the Billings' negligence per se claim is barred by the economic loss rule. The Binders seek money damages for economic harms under a negligence per se theory, namely the recovery of money spent on the Sealand membership and damage to their credit history caused by BOA's reporting of the charges in dispute, in violation of the FCBA. The Binders also put forth no argument on why the economic loss rule should not apply to their claims. Accordingly, the Court finds that the Binders' negligence per se [*10*] claim

Add. 10

should be and hereby is **DISMISSED**.

ii. FCBA Billing Error

The Court finds that the Binders' failure to properly allege a billing error under *Section 1666* of the FCBA [7] constitutes additional grounds to dismiss the Binders' negligence per se claim. The FCBA provides that debtors may challenge perceived billing errors on credit card statements through a specific procedure, thus triggering the creditor's obligations under the FCBA to investigate and verify its billing. *Esquibel v. Chase Manhattan Bank USA, N.A., 487 F. Supp. 2d 818, 825 (S.D. Tex. 2007).* A debtor may maintain a cause of action under the FCBA if he alleges a violation of *Section 1666*'s billing dispute resolution procedure. *Beaumont v. Citibank (S.D.) N.A., 2002 U.S. Dist. LEXIS 5276, 2002 WL 483431, at *3 (S.D.N.Y. Mar. 28, 2002).* In order to state a claim under *Section 1666*, a plaintiff must allege "(1) the existence of a billing error; (2) plaintiff's timely notification of the billing error; and (3) failure of the card issuer to comply with the procedural requirements of *Section 1666*." *Id.* The parties are in dispute as to whether the Binders properly pleaded a "billing error" and proper notice under the FCBA.

> 7    The FCBA is enforced by the Truth [*11] in Lending Act, *15 U.S.C. §§ 1601-1677*, and implemented by Regulation Z, *12 C.F.R. §§ 226.1-226.35*. *Esquibel v. Chase Manhattan Bank USA, N.A., 487 F. Supp. 2d 818, 825 (S.D. Tex. 2007).*

The Court finds that the Binders did not properly plead a billing error under the FCBA. *Section 1666(b)* states that:

> For the purpose of this section, a "billing error" consists of any of the following:
>
>   (1) A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.
>
>   (2) A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.
>
>   (3) A reflection on a statement of goods not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement

made at the time of a transaction.

>   (4) The creditor's failure to reflect properly on a statement a payment made by the obligor or a credit issued to the obligor.
>
>   (5) A computation error or similar error of an accounting nature of the creditor on a statement.
>
>   (6) Failure to transmit the statement . . . to the last address of the obligor which [*12] has been disclosed to the creditor . . . .
>
>   (7) Any other error described in regulations of the Board.

*15 U.S.C. § 1666(b).* The Binders argue that they sufficiently pleaded a billing error under *Section 1666(b)(3)* by alleging that Royal Palms did not deliver services "in accordance with the agreement made at the time of the transaction," as the parties had agreed that the loan would remain interest-free. [8] (Opp'n 8-10; FAC ¶ 18.) The Court finds that this is an unsupported interpretation of *Section 1666(b)*. Under the Official Staff Interpretations to *12 C.F.R. § 226.13*, complaints about the quality of goods or services received do not constitute "billing errors" under the FCBA. *12 C.F.R. § 226, Supp. I. com. 13(a)(3)*; *see also Greisz v. Household Bank (Ill.), 8 F. Supp. 2d 1031, 1042 (N.D. Ill. 1998), aff'd, 176 F.3d 1012 (7th Cir 1999)*; *Beaumont, 2002 U.S. Dist. LEXIS 5276, 2002 WL 483431, at *4*. Additionally, the FCBA, its implementing regulations, and Official Staff Interpretations focus on what might be considered clerical errors - the debtor was billed the wrong amount, billed for items he did not purchase, billed for items he refused or did not receive, or the creditor made some type of computational error [*13] or did not mail a statement. *See, e.g., 12 C.F.R. § 226.13(a)* (defining billing error under the Truth In Lending Act). Here, the Binders do not dispute that they received a travel club membership and that they were charged the agreed purchase price of $5,593.00, nor do they argue that BOA made a computational error. Rather, they argue that the "characteristics" and "real price" of the travel club were misrepresented to them at the time of purchase. (FAC ¶ 18.) While perhaps the Binders' allegations do not concern "quality" as one normally thinks of a physical good such as an automobile, the Court finds convincing BOA's argument that misrepresentations concerning the "characteristics" of a travel club membership, including the representation that the loan would remain

interest-free, are more properly construed as misrepresentations regarding the quality of the membership than as a billing error under the FCBA. *See* Mot. Dismiss 16-18, Mot. Reply 4-5. *See also Beaumont, 2002 U.S. Dist. LEXIS 5276, 2002 WL 483431, at *4* (finding no allegation of billing error where plaintiff did not state that he "failed to receive a statement, received a statement that contained an error (such as the presence or absence of a particular [*14] charge or a miscalculation), or received a statement reflecting a charge about which he requested additional information"). The Court declines to adopt the Binders' more expansive interpretation of a FCBA billing error and therefore **DISMISSES** the Binders' negligence per se claim. [9]

> 8    After reviewing the credit card agreement and learning that the card would have a zero percent interest rate only until May 2009, the Binders immediately tried to cancel the membership, contacted BOA to dispute the charges, and informed BOA that the "characteristics and real price of the vacation club membership had been falsely misrepresented to them at the time of purchase." (FAC ¶ 18.)
>
> 9    The Binders argue that the *Beaumont* court misinterpreted the FCBA's provisions regarding billing errors, "rendering meaningless *subsection (b)(3)* of the statutory definition." (Opp'n 10.) Without determining the precise metes and bounds of *Section 1666 subsection (b)(3)*, the Court notes that the interpretation adopted by the Court today would not preclude finding a billing error under *subsection (b)(3)* where the plaintiff was charged for goods or services he refused or never received. Additionally, the Court notes that [*15] the Binders cite no authority supporting their more expansive interpretation.

iii. Notice Requirement of the FCBA

BOA also argues that the Binders fail to allege that they sent the proper written notice of the alleged billing error to FIA within sixty days, as required by *Section 1666*, as the First Amended Complaint does not state when the Binders received their first FIA credit card statement showing the Sealand charge. (Mot. Dis. 18-19.) In response, the Binders argue that the Court "should infer from Plaintiffs' allegations that they first received a credit card agreement and a credit card from Defendants 'on or about December 15, 2008,' that they had also not

received a credit card *statement* from Defendants before that time." (Opp'n 11)(emphasis in original) (citing FAC ¶ 18). As the Binders allege that they sent written notice of their complaint by January 13, 2009, they argue their notice to BOA was sent within the required sixty days. *Id.* BOA argues in reply that the Binders' payment on November 14, 2008 necessarily implies that the Binders must have received a billing statement prior to November 14, 2008, meaning that the Binders' notice to BOA was untimely. (Mot. Reply 5-6.) [*16] The Court finds BOA's arguments unpersuasive and holds that, drawing all reasonable inferences in the Binders' favor, the Binders pleaded sufficient facts to allow the Court to infer that they gave timely notice to BOA. [10]

> 10    BOA argues that the Court may not infer that the Binders received their first statement after making payments on the card. (Mot. Reply 5-6.) While it may be uncommon for credit card holders to make payments prior to receiving their first statement, it is certainly plausible that the Binders did so, given their allegation that "monthly payments were to begin on November 1, 2008." (FAC ¶ 17.) The Court also notes that it is likely uncommon for credit card holders to receive their first statement prior to receiving their credit card agreement and their physical, "plastic" credit card. At any rate, the Court does not reach the issue of whether the Binders would be able to prove proper notice at trial.

C. Other Defenses

BOA also argues that the investigative requirements of *Section 1666* cannot serve as the basis of a negligence per se claim. (Mot. Dismiss 19-24.) BOA also argues that the Binders' negligence per se claim must be dismissed as to Defendant Bank of America [*17] Corporation ("BAC") because BAC, as a bank holding company, is not a creditor as defined by the FCBA and therefore not subject to the FCBA's investigatory obligations. (Mot. Dismiss 24-25.) Because the Court finds that the Binders' negligence per se claim must be dismissed due to the economic loss rule and the Binders' failure to plead a billing error under *Section 1666* of the FCBA, the Court does not reach these arguments.

IV.

CONCLUSION

2010 U.S. Dist. LEXIS 124208, *17

For the reasons discussed above, Defendants Bank of America Corporation's and FIA Card Services, N.A.'s Motion to Dismiss is **GRANTED**. Plaintiff Fred Binder's and Linda Binder's claims against Defendants Bank of America Corporation and FIA Card Services, N.A. are **DISMISSED WITHOUT PREJUDICE**. The Court does not take lightly dismissal of a claim without reaching its merits. Thus, a plaintiff will be given the opportunity to amend a complaint where it appears that more careful or detailed drafting might overcome the deficiencies on which dismissal is based. *Hitt v. City of Pasadena, 561 F.2d 606, 608 (5th Cir. 1977)* (observing that a complaint should only be dismissed under *Rule 12(b)(6)* "after affording every opportunity for the plaintiff to state a claim [*18] upon which relief can be granted.") (citation omitted). The Court notes that the Binders request in their Opposition Brief, "[r]egardless of this Court's disposition of Defendants' Motion to Dismiss. . . that they be provided opportunity to amend their complaint to plead additional statutory causes of action under federal and/or state law, based on the identical factual allegations in the First Amended Complaint." (Opp'n 17 n. 2.)

If Plaintiffs are able to replead any Counts to overcome all of the grounds stated herein for dismissal, they should do so by no later than twenty (20) days from the date of this Order. Further, any repleading shall be accompanied by a synopsis of no more than five (5) pages, explaining how the amendments overcome the grounds stated herein for dismissal. Should Plaintiffs replead, Bank of America Corporation and FIA Card Services, N.A. are hereby granted leave to file a response to Plaintiffs' synopsis. Any such response shall not exceed five (5) pages and must be filed within ten (10) calendar days of the repleading. No further briefing will be permitted.

**SO ORDERED**.

**SIGNED November 22, 2010**.

/s/ Jane J. Boyle

**JANE J. BOYLE**

**UNITED STATES DISTRICT JUDGE**

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 55 of 176

CEMEX, INC. D/B/A Kosmos Cement Company, And..., 2006 WL 3032274...

2006 WL 3032274 (W.D.Ky.) (Trial Pleading)
United States District Court, W.D. Kentucky,
Louisville Division.

CEMEX, INC. D/B/A Kosmos Cement Company, And Kosmos Cement Company, a Kentucky General
Partnership Comprised of Cemex, Inc., d/b/a Kosmos Cement Company and Others, Plaintiffs,
v.
LMS CONTRACTING, INC. and Landers Explosives, Inc., Defendants.

Civil Action No. 3:06-CV-124-H.
2006.

**First Amended Complaint**

Comes now Plaintiffs, Cemex, Inc. d/b/a Kosmos Cement Company and Kosmos Cement Company, a Kentucky general partnership ("Plaintiffs"), for their causes of action against Defendants, LMS Contracting, Inc. and Landers Explosives, Inc., and alleges and states as follows:

### *JURISDICTION AND VENUE*

1. All material events which give rise to this action occurred in the Western District of Kentucky. There is diversity of citizenship between Plaintiffs and defendants and the matter in controversy exceeds the sum $75,000, exclusive of costs and interest. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332(a)(1); and,

2. Venue is properly vested in this Court pursuant to 28 U.S.C. 1391(a).

### *PARTIES*

3. Plaintiff, Cemex, Inc. d/b/a Kosmos Cement Company ("CEMEX") is a corporation organized under the laws of the State of Louisiana, and is doing business in the Commonwealth of Kentucky. Cemex, Inc. holds legal title to the real property upon which the Project, that is the subject of this litigation, was constructed.

4. Plaintiff, Kosmos Cement Company is a Kentucky General Partnership ("Partnership") which is comprised of Cemex, Inc. d/b/a/ Kosmos Cement Company, as majority interest holder and managing partner, and others.

5. Defendant, LMS Contracting, Inc. ("LMS") is a corporation organized under the laws of the State of Indiana, and is doing business in the Commonwealth of Kentucky. LMS' registered agent for Service of Process is CSC-Lawyers Incorporating Service Company, 421 West Main Street, Frankfort, KY 40601.

6. Defendant, Landers Explosives, Inc. ("Landers"), upon information and belief, is a corporation organized under the laws of the State of Indiana, having a business address of 16875 North St. Road 66, Magnate, IN 47520. Landers is doing business in the Commonwealth of Kentucky, and undertook the activities set out in this complaint within the Commonwealth of Kentucky. Accordingly, Landers is subject to service of process upon the Secretary of State of the Commonwealth of Kentucky in accordance with the provisions of the Kentucky Long Arm Statute, KRS 454.210.

Add. 14

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 56 of 176

CEMEX, INC. D/B/A Kosmos Cement Company, And..., 2006 WL 3032274...

*FACTS*

7. The events which gave rise to this cause of action involve the construction of a so-called "Slot Storage Facility and Tunnel" designed to be utilized by Plaintiffs for processing of crushed limestone at Plaintiffs' Battletown Quarry in Meade County, Kentucky (hereinafter the "Project").

8. In October 2004, Plaintiffs' and LMS entered into a written contract under the terms of which LMS agreed to conduct certain blasting and excavation work in furtherance of the Project work, all as more fully set out in the terms, conditions, specifications, and drawings that constitute the Project's Contract Documents (hereinafter the "Contract" or the "Contract Documents"). The Contract required LMS to remove rock from Plaintiffs' property along defined and predetermined physical parameters in a manner that would leave Plaintiffs' adjacent property undamaged and in a condition sufficient to allow Plaintiffs to place concrete walls and foundations upon and against Plaintiffs' property at locations and in the manner specifically defined in the Contract Documents.

9. Among other provisions, the Contract required that LMS would conduct its blasting and excavation work in such a manner as to ensure that Plaintiffs' property adjacent to the Slot and Tunnel would be clean and free of broken and loose rock.

10. These and other Contract requirements were defined in part by Engineering Drawings prepared by M3 Engineering; these Engineering Drawings were provided to LMS as part of the Project's Contract Documents.

11. LMS subcontracted a portion of its Contract work to Landers (the "Subcontract"); Landers perform the blasting and excavation work for the Project provided for in the Project Contract Documents. At all times relevant to this Complaint, LMS was legally responsible to Plaintiffs for the work subcontracted to Landers.

12. LMS and Landers utilized an excessive amount of explosives in performance of the blasting work required by the Contract and Subcontract and mis-applied the explosives so-utilized in performance of the Contract and Subcontract work, thereby damaging Plaintiffs' property by creating conditions identified in the blasting industry as "severe backbreak and overbreak". These conditions created loose rock, uneven floors and benches, and other damage to Plaintiffs' property, and otherwise left Plaintiffs' property in a state that did not conform to the Contract Documents.

13. The damage that LMS and Landers caused to Plaintiffs' property created hazardous working conditions that, in turn, caused (a) substantial delays to completion of the Project work (since the Project site was no longer safe and workers could not be permitted in the vicinity of the hazardous conditions created by LMS and Landers); (b) the need to install large curtains around Plaintiffs' property to stabilize the loose rock created by LMS and Landers so that workers could be permitted to re-enter the areas below, and (c) the need to apply a supplemental product known in the industry as "Shotcrete" to other portions of Plaintiffs' property to stabilize the loose rock where curtains could not be installed. Installation of curtains, application of Shotcrete and accompanying time delays, all caused by the actions of LMS and Landers, significantly increased Plaintiffs' costs in placing their crushed stone facility into operation.

14. The M3 Engineering Drawings provided that a new piece of equipment, known as a "Stacker Conveyor", owned by Plaintiffs was to be placed on a solid rock foundation on Plaintiffs' property at the edge of the Slot formed by LMS's and Landers' blasting and excavation work. The purpose of the Stacker Conveyor was to fill the Slot, when the Slot and tunnel construction was completed, with crushed limestone from above.

15. The severe backbreak and overbreak caused by LMS's and Landers' mis-application of excessive explosives fractured the Stacker Conveyor's rock foundation.

16. LMS and Landers attempted to create a new foundation for the Stacker Conveyor approximately ten feet below the elevation of the original foundation; however, this effort again failed as a result of mis-application of explosives by LMS and Landers,

Add. 15

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 57 of 176

CEMEX, INC. D/B/A Kosmos Cement Company, And..., 2006 WL 3032274...

forcing Plaintiffs to redesign and relocate the foundation for the Stacker Conveyor at additional cost and delay to completion of the Project.

17. LMS and Landers failed to construct benches, floors, and vertical walls of the Slot Storage Facility and Tunnel in accordance with the requirements of the M3 Engineering Drawings. Under the M3 Engineering design, when the Project was completed crushed limestone was to have been loaded into the Slot from above by the Stacker Conveyor. As the Slot was filled, crushed limestone would fall through an opening in an arched, cast concrete roof in a tunnel that was to be constructed beneath the Slot. The crushed stone would thence fall onto a conveyor belt assembly within the tunnel that would carry the stone onto barges moored in the Ohio River, adjacent to the project site.

18. M3 Engineering designed the Tunnel in a manner which anticipated that concrete would be poured directly against vertical rock walls created by the blasting and excavation operations. Under the M3 Engineering design this would create vertical concrete walls which would then support the arched concrete roof of the Tunnel.

19. LMS and Landers over-blasted the Tunnel, making it wider than designed. This caused Plaintiffs to expend unanticipated funds and time constructing additional forming, pouring additional concrete, and placing additional backfill to create the vertical concrete walls of the Tunnel.

20. The Contract required LMS to correct any defective work; either its own defective work or defective work performed by Landers.

21. LMS refused to correct its own defective work or Landers' defective work, causing Plaintiffs to incur additional cost correcting defective work performed by LMS and Landers.

22. The Contract required that LMS was to complete its Project work by December 10, 2004.

23. LMS failed to complete its Project work by December 10, 2004, and, in fact, abandoned the work, in an incomplete state, on or about February 15, 2005.

24. The foregoing defective work and the refusal to correct the defective work caused substantial delays in completion of the overall Project work. These delays caused additional damage to Plaintiffs by adversely impacting Plaintiffs' crushed limestone production schedule at the Battletown Quarry.

25. Ultimately, when LMS and Landers abandoned their project work, Plaintiffs were forced to retain a replacement contractor, at additional cost, to finish the LMS Contract work.

26. Unknown to Plaintiffs, in abandoning their work, LMS and Landers also abandoned undetonated explosives which they had placed within the rock walls at the Project site. This condition created a severe safety hazard to anyone working on the Project. It also violated Kentucky law.

27. Specifically, LMS and Landers violated:
(a) KRS 351.330(16) which provides, "no person shall use explosives in such a manner that safety to persons or property is threatened."

(b) 805 KAR 4:075(5) which provides, "no explosives or blasting agents shall be abandoned."

(c) 805 KAR 4:095(5) which provides, "drilling shall not be started until all remaining butts of holes are examined for unexploded charges, and if any are found, they shall be free fired before work proceeds."

Add. 16

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 58 of 176

CEMEX, INC. D/B/A Kosmos Cement Company, And..., 2006 WL 3032274...

(d) 805 KAR 4:095(7) which provides, "no explosives or blasting agents shall be left unattended at the blast site."

(e) 805 KAR 4:140(1) which provides, "if a misfire is found, the blaster shall guard the blasting area and exclude all employees from the danger zone."

(f) 805 KAR 4:140(2) which provides, "no other work shall be done except that necessary to remove the hazard of the misfire and only those employees necessary to do the work shall remain in the danger zone."

(g) 805 KAR 4:140(7) which provides, "drilling, digging, or picking shall not be permitted until all missed holes have been detonated or the authorized representative has approved that work can proceed."

(h) 805 KAR 4:140(8) which provides, "a misfire shall be handled under the direction of the blaster in charge. All connections shall be carefully traced and a search made for unexploded charges."

28. When the undetonated explosives were discovered, Plaintiffs were required to take measures, at an additional expense to Plaintiffs, to remove the undetonated material. This removal process required Plaintiffs to retain an explosives expert to remove the undetonated material and to cease all operations in the vicinity of the former LMS and Landers work area until the undetonated material was properly removed.

## COUNT I

### BREACH OF CONTRACT AGAINST LMS

29. Plaintiffs restate and incorporate by reference as though set forth at this point in their entirety all allegations contained in Paragraphs 1 through 27, above.

30. LMS was under a contractual duty to assure that its work and Lander's work fully conformed in all respects with the requirements of the Contract Documents, and was free of defects, either latent or patent.

31. LMS was under a contractual duty to indemnify Plaintiffs from any damage to Plaintiffs' property or additional costs incurred by Plaintiffs arising as a result of the manner in which LMS or Landers performed their Contract work.

32. LMS breached the Contract by failing to perform its work and supervise performance of Lander's work in accordance with the M3 Engineering Drawings and other Contract Documents, by performing its work in a manner that caused significant damage to Plaintiffs' property, and by causing Plaintiffs to incur additional expense correcting defective work performed by LMS and Landers.

33. LMS also breached the contract by (1) refusing to remedy its defective work and Landers' defective work, and (2) refusing to reimburse Plaintiffs the costs and expenses they incurred in correcting the defective work.

34. LMS also had a contractual duty to comply with all state and federal laws as well as regulations promulgated by the Mine Safety and Health Administration and the Occupational Safety and Health Administration. LMS breached this contractual duty by abandoning undetonated explosives at the Project site.

35. The breach of contract by LMS caused Plaintiffs to incur significant damages.

### COUNT II

Add. 17

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 59 of 176

CEMEX, INC. D/B/A Kosmos Cement Company, And..., 2006 WL 3032274...

### VIOLATION OF KRS 446.070 BY LMS AND LANDERS

36. Plaintiffs restate and incorporate by reference as though set forth at this point in their entirety all allegations contained in Paragraphs 1 through 34 above.

37. KRS 446.070 provides that "a person injured by the violation of any statute may recover from the offender such damages as he has sustained by reason of the violation."

38. As set forth in more detail above, the abandonment of undetonated explosives at the Project by LMS and Landers created a severe safety hazard and violated Kentucky law.

39. Plaintiffs were damaged by the expenses they incurred in suspending production activities in the vicinity of the undetonated explosives and removing the undetonated explosives from the Project site.

### COUNT III

### NEGLIGENCE PER SE AGAINST LMS AND LANDERS

40. Plaintiffs restate and incorporate by reference as though set forth at this point in their entirety all allegations contained in Paragraphs 1 through 38 above.

41. At all times relevant herein LMS and Landers had an obligation not to violate the law.

42. In the attempted performance of their Contract Work LMS and Landers violated Kentucky laws and regulations enacted for public safety.

43. Plaintiffs are within the class of persons the statutes and regulations violated by LMS and Landers were enacted to protect.

44. The expenses and lost production costs incurred by Plaintiffs in removing the undetonated explosives from the Project site is the type of harm these statutes are designed to prevent.

45. LMS and Landers are responsible to Plaintiffs under the Doctrine of Negligence Per Se for the damages incurred by Plaintiffs as a result of violation by LMS and Landers of the statutes and regulations described above.

46. The foregoing statutory and regulatory violations by LMS and Landers were knowing and/or reckless, thus entitling Plaintiffs to an award of both punitive damages and compensatory damages.

### COUNT IV

### NEGLIGENCE AGAINST LMS AND LANDERS

47. Plaintiffs restate and incorporate by reference as though set forth at this point in their entirety all allegations contained in Paragraphs 1 through 45 above.

48. In addition to the foregoing, and/or in the alternative, LMS and Landers owed a duty to Plaintiffs to use reasonable care in the blasting and excavation operations on Plaintiffs' property at the Battletown Quarry.

49. LMS and Landers failed to exercise reasonable care in performing blasting and excavation activities on Plaintiffs' property.

Add. 18

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 60 of 176

CEMEX, INC. D/B/A Kosmos Cement Company, And..., 2006 WL 3032274...

50. As a direct and proximate result of the negligent actions of LMS and Landers set forth herein, above, Plaintiffs have suffered damages.

51. The foregoing negligence of LMS and Landers was knowing and/or reckless, thus entitling Plaintiffs to an award of both punitive damages and compensatory damages.

## COUNT V

### STRICT LIABILITY AGAINST LMS AND LANDERS

52. Plaintiffs restate and incorporate by reference as though set forth at this point in their entirety all allegations contained in Paragraphs 1 through 50 above.

53. Blasting is an ultra hazardous activity. LMS and Landers are strictly liable to Plaintiffs for the costs incurred by Plaintiffs and damage to Plaintiffs' property caused by their blasting activities.

54. As a direct and proximate result of the blasting activity of LMS and Landers Plaintiffs incurred additional expense and damage to its property.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against LMS and Landers for:

A. A monetary award sufficient to compensate Plaintiffs for the damages caused by the Defendants, which include, but are not limited to, costs to correct the defective work, costs to remove the undetonated material, damages from lost production resulting from the delays experienced by Plaintiffs, costs to redesign the Stacker Conveyor's foundation and the Tunnel, costs of additional construction materials needed to construct the Tunnel and Stacker Conveyor's foundation, costs of stabilizing the loose rock in the Slot and Tunnel, costs of scaling and excavating the Slot's walls, costs to complete the work, costs of additional project management resulting from the delays, and costs incurred by the abandonment of the Project by LMS and Landers;

B. Punitive damages;

C. The costs of bringing this action, including reasonable attorney's fees;

D. Pre- Judgment and Post-Judgment interest; and

E. Any and all other such relief to which Plaintiffs may be entitled.

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 19

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 61 of 176

CEMEX, INC. d/b/a Kosmos Cement Company and..., 2008 WL 4239541...

2008 WL 4239541 (W.D.Ky.) (Trial Motion, Memorandum and Affidavit)
United States District Court, W.D. Kentucky.
Louisville Division

CEMEX, INC. d/b/a Kosmos Cement Company and Kosmos
Cement Company, Kentucky General Partnership, Plaintiffs,

v.

LMS CONTRACTING, INC. and Landers Explosives, Inc., Defendants.

No. 306CV00124.
June 30, 2008.

Hearing and Oral Argument Requested

**Defendant Lms Contracting, Inc's Motion for Partial Summary Judgment**

Jonathan E. Breitenstein, Demoisey Law Office, PLLC, 905 Baxter Avenue, Louisville, KY 40204, Telephone: 502-585-5500, Facsimile: 502-585-1386, jonathan@demoiseylaw.com, Counsel for the Defendant, LMS Contracting, Inc.

Comes now the Defendant, LMS Contracting, Inc., Defendant, by counsel and pursuant to Fed R. Civ. P. 56(b) and (c) and respectfully moves this Court for Summary Judgment in regard to the claims asserted against LMS Contracting, Inc. (hereinafter "LMS") by Plaintiff Cemex, Inc. d/b/a Kosmos Cement Company and Kosmos Cement Company, A Kentucky General Partnership Comprised of Cemex, Inc d/b/a Kosmos Cement Company. (all of whom are hereinafter referred to jointly as "Cemex") This motion is supported by the Federal Rules of Civil Procedure, the law of Kentucky, and the following Memorandum.

LMS' Memorandum will seek the dismissal of the following "Counts" or causes of action found in Cemex's First Amended Complaint:
Count II: "Violation of KRS 446.070"

Count III: "Negligence Per Se" (with a request for punitive damages)

Count IV: "Negligence" (with a request for punitive damages)

Count V: "Strict Liability"

**I. HISTORY AND CASE SUMMARY**

The "Battletown Quarry" is a rock quarry located in Battletown, Meade County, Kentucky on the banks of the Ohio River where limestone has been mined for a hundred years. The quarry is now owned by a division of Cemex, a global company that produces cement and ready-mix concrete. The quarry produces limestone which is mined, crushed on-site, and then transported by barge to be processed into cement.

After the limestone is mined (which utilizes explosive blasting) the limestone is taken to a large "crusher" that essentially a facility that makes very large rocks/boulders into smaller rocks. The smaller limestone rocks are then carried from the crusher by conveyer belt to a "stockpile" where the mound of crushed rock rests in a subsurface crater-like "hole" awaiting later transport.

Add. 20

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 62 of 176

CEMEX, INC. d/b/a Kosmos Cement Company and..., 2008 WL 4239541...

At the bottom of the stockpile/crater is another hole into which the rock falls (being "funneled" actually) into a tunnel that contains another conveyor system which, this time, takes the crushed rock to barges on the Ohio River.

In 1997, the quarry operators began to notice cracking in the roof of the tunnel of the then existing barge loading facilities. Over the course of years, and after considering alternatives, Cemex determined to construct a new slot storage facility. In 2004, Cemex contracted with consulting engineer, M3 Engineering, to design a new slot storage facility and conveyor system at the Battletown Quarry to replace the existing conveyor and tunnel system that was in failure.

After bids had been solicited on the project, in October of 2004 a *Master Contractor's Agreement for Explosives* Services was entered between Cemex and LMS. (Attached hereto as **Exhibit A**) This agreement was for the blasting and excavation portion of the project. Other contractors would perform services relative to the creation/fabrication of the tunnel and conveyor systems. In this case, Cemex intended to convert a tract of unimproved land (the area of this project had been the floor of old quarry operations and the lowest elevation of mining/limestone removal) into a limestone-collection and transportation area. This project would result in a hole being blasted approximately 85 feet in depth and 120 feet in width. Cemex's design plans desired clean, nearly vertical, walls to be blasted deep into the ground. A lateral view drawing is attached hereto for reference (**Exhibit B**). This expectation was set forth in the contract between Cemex and LMS.
"The blasting and excavation of the tunnel shall be tightly controlled because the new concrete tunnel (*at the bottom of the excavation)* will be cast against the as-blasted rock. Over blasting will require additional concrete to be poured during the tunnel construction." (Cemex/LMS Contract, Exhibit A, "Scope of Work" Section 1.3, paragraph 3,at bates# CE10062).


Unfortunately, geologic and other site-specific factors precluded clean vertical walls from being achieved via blasting alone, and Cemex did indeed pour additional concrete and incur other expenses to achieve this result.

LMS, in turn hired Landers Explosives, Inc. (hereinafter "Landers") as a subcontractor for its work at Battletown. LMS performed the excavation of blasted rock from the slot area and performed "scaling" of the walls that is, the mechanical removal of loose rocks from the blasted rock walls in the slot. Landers performed all drilling and blasting work pursuant to its own blast designs. LMS and Landers began blasting and excavating in October of 2004

The first sign of trouble on the project came on December 1, 2004 when Cemex's quarry supervisor, Nick Hollcroft, halted LMS and Landers' work in the slot and instructed LMS to scale the loose rock off the slot walls before proceeding with any additional work. The issue of "loose rock" on the newly blasted walls would become increasingly problematic since employees would be working below these newly blasted walls as the slot became increasingly deeper (through blasting and excavation) and later when forming and pouring the cement tunnel that would be in the bottom of the slot storage facility. In early 2005, LMS and Landers work on the project came to a halt as LMS refused to be responsible for, various "remedial" work demanded by Cemex which at that time regarded installing belting or fencing along the rock walls to contain loose rock.

LMS and Landers maintain that subsurface geologic conditions (the basic quality and solidity of the subsurface rock they encountered) made it impossible to (a) prevent loose rock from being exposed on the walls or (b) to create solid/clean rock walls in strict conformity with engineering plans. Simply put, the rock at the location selected by Cemex wasn't suitable for the original design. However, Cemex maintains that the problems with the project are the result of improper or imprecise blasting techniques.

In March of 2005, Cemex filed suit against both LMS and Landers.

Cemex seeks to recover from LMS under four theories: (A) Breach of Contract ["Count 1"]; (B) Negligence ["Count IV"]; (C) Strict Liability ["Count V"]; and (4) Negligence Per Se relative to undetonated explosives based on the violation of various blasting regulations [designated as "Counts II and III" in the Amended Complaint].

Add. 21

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 63 of 176

CEMEX, INC. d/b/a Kosmos Cement Company and..., 2008 WL 4239541...

In this Motion, LMS seeks summary judgment as to all of these claims except for the Breach of Contract Action.

## II. LEGAL ARGUMENT:

### A. Damages Claimed - and Not Claimed - by Cemex:

As a preamble this section, it is necessary to set forth the "damage model" that Cemex claims in this matter. These categories of claimed economic damages provide, in part, the basis for this Motion. Cemex claims these categories of damages or injuries:
a. Costs of completing LMS's contracted portion of the project;

b. Additional scaling of the rock walls;

c. Stabilization of the rock walls including the use of temporary belting and shotcreting;

d. Redesign of portions of the project and the costs of implementing the changes;

e. Project Management expenses due to delay;

f. Costs of paying third parties to remove undetonated explosives found/exposed in the rock walls after LMS and Landers left the job site; and

g. Attorney's Fees and Punitive Damages.

For purposes of this Motion, it is even more relevant to set forth those categories of damages or injuries that Cemex is not claiming:

Steven Martin, Cemex's project manager was designated by Cemex to be deposed, pursuant to Fed. R. Civ. Procedure 30 (b) (6), on the issues of damages sustained by Cemex. Mr. Martin testified that Cemex didn't incur damage to any "property" - it only incurred additional construction expenses:
Q. Let's talk about damages from blasting. Were any -- I've got to run down laundry list. Were any buildings damaged by blasting?

A. None that we're aware of. There was something brought to my attention by Nick Hollcroft that he didn't recall being there before. There was a fracture in a wall support, like a retainer on a wall, that he didn't notice was there before, but we didn't pursue that.

Q. That's not claimed in this Damage Binder?

A. No.

Q. Okay. Was the crusher damaged by blasting?

A. Not that we were aware of [or] that we could find.

Q. Were any people injured by blasting?

A. No.

Add. 22

Q. Any Cemex equipment damaged by blasting?

A. Not to my knowledge.

Q. Any materials or supplies damaged by blasting?

A. Not to my knowledge.

Q. Any trees on Cemex property damaged by blasting?

A. No. If they were, they probably were going to be taken out anyway. That wouldn't have been a concern.

Q. Any electrical equipment or electrical supply cables damaged by blasting?

A. No.

Q. Water lines damaged by blasting?

A. No.

Q. Telephone lines damaged by blasting?

A. No.

Q. Is there any property of Cemex that is claimed in this binder to have been damaged related to blasting activities that you're aware of?

A. Nothing other than the ground, the basic slot. There was no property, as far as buildings, equipment or anything like that.


(Deposition of Steven Martin., pp. 152-154). [1]

---

[1]    True and accurate copies of the quoted excerpts of Mr. Martin's testimony are attached hereto as Exhibit C. The original deposition has been filed with the Court separately by Landers Explosives.

In short, Cemex has never claimed that Landers damaged any persons or property of Cemex other than perhaps that Landers damaged subsurface rock ("the ground") more that it should have been damaged naturally by the blasting done pursuant to the contract. As such, its losses are entirely economic in nature and such damages would fall within the province of the contract. As recently stated by the Kentucky Supreme Court, the "recovery of economic loss is foreclosed when a product or service falls short of an expected level of quality yet *causes no personal injury or property damage." Presnell Contr. Mgrs. v. EH Constr.,* *134 S.W.3d 575, 583 (Ky. 2004)(Keller, J. concurring opinion).* Mr. Martin was quite clear on this issue:

Q. Cemex is not claiming that Landers Explosives damaged any structures out there, is it?

A. I don't think so.

Q. The claim, as you understand it, is that Landers Explosives didn't provide the quality of walls that Cemex had asked for?

A. Primarily, yes

---

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 65 of 176

CEMEX, INC. d/b/a Kosmos Cement Company and..., 2008 WL 4239541...

Q. Anything else?

A. That the main problem. (Martin Depo. at page 139) and later:

A. Well, it was all - - that was the name of the contract, the blasting and excavation contract, that's what I was referencing. That contract turned out bad, which resulted in all this extra work." (Martin Depo., pp. 150-51).


As set forth below Cemex's remedy at law for alleged damages related to unsatisfactory performance of a contract lie in a breach of contract action and do not support claims in negligence, negligence per se, strict liability (indeed all torts) or demands for punitive damages.


## B. Cemex Cannot Maintain a Tort Claims in Addition To Its Contract Claims (The "Economic Loss Doctine")

Under majority rule, the existence of a contract generally precludes the opportunity to present the same case as a tort claim. This is precisely what is occurring in this matter. Cemex is not pleading any new or distinct damages that cannot be recovered from LMS, should Cemex prevail in convincing a jury that LMS did breach its contract. As the Sixth Circuit has explained:

> "The economic loss rule bars recovery in tort for economic loss. Economic loss is both substantive loss in the value of a product caused ay a defect in that product (direct economic loss) and consequential loss flowing from the defect, such as lost profits (consequential economic loss). **The economic loss rule marks the border between tort and contract law.** Where tort law, primarily out of concern for safety, fixes the responsibility for a defective product directly on the parties responsible for placing the product into the stream of commerce, contract law gives the parties to a venture the freedom to allocate risk as they see fit. **Were there no economic loss rule, 'contract law might drown in a sea of tort."** (Emphasis added)


*Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir. 2002) (quoting *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858 (1986) (citations omitted).


This rule is applicable to all matters, wherein an express contract is the basis for the parties relationship. Justice Keller's concurrence in *Presnell* sets forth the understanding as to how the reasoning in the majority *Presnell* opinion would apply.

> "The phrase "economic loss rule" necessarily implies that the focus on the inquiry under its analysis is on **the type of damages suffered** by the aggrieved party."


*Presnell,* 134 S.W.3d at 589 (Keller, J., concurring opinion).


In the instant matter Cemex's tort claims do not set forth any "damage" or "losses" other than those recoverable - or which arise naturally - "merely in the breach of a contract." Under Presnell and such claims are not actionable under Kentucky law. In essence, a claim that LMS failed to perform its services in a workmanlike manner is nothing more than an action based on an implied warranty, improperly asserted as a tort claim. Such claim is co-extensive with Cemex's claim that LMS breached its express warranty that the project would be completed in a good workmanlike manner and, to consider it here [as a separate tort claim] would be superfluous. This same rationale is applicable to **each and every one** of Cemex's tort claims pursuant to Negligence Per Se ["Count II"], KRS §446.070 ["Count II"], Negligence ["Count IV"] and Strict Liability ["Count V"], since Kentucky does not distinguish between the various forms and mutations of tort liability when barring them from appearing within contractual disputes. Hereinafter, LMS will also review the counts of Negligence Per Se, KRS §446.070, and derivative punitive damages separately.

Add. 24

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 66 of 176

CEMEX, INC. d/b/a Kosmos Cement Company and..., 2008 WL 4239541...

**C. Cemex is Not Entitled to Damages Pursuant to KRS §446.070 or "Negligence Per Se"**

In "Count II" [Violation of KRS §446.070] of its Amended Complaint, Cemex maintains that LMS and Landers violated a statute and regulations regarding the use of explosives which in turn would give rise to Cemex being able to pursue a claim on its own behalf pursuant KRS §446.070. Cemex claims it was injured by "the abandonment of undetonated explosives" in that it incurred expenses relative to "suspending production activities in the vicinity of the undetonated explosives and removing the undetonated explosives." *First Amended Complaint* at paragraphs 38 and 39. In "Count III" [Negligence Per Se] of its *First Amended Complaint,* Cemex again states that LMS and Landers violated Kentucky laws and regulations, adding this time that such "knowing and/or reckless" actions entitle Cemex to punitive damages as well as compensatory damages. (paragraph 46). Not only are these claims barred by the Economic Loss Doctrine, they also fail to state of cause of action standing on their own. The issue of an award in this matter of punitive damages is addressed in a separate section below.

KRS §446.070 titled, "Penalty no bar to civil recovery" states:

> "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

Under Kentucky law, the violation of a statute, ordinance, or administrative regulation, may give rise to a civil cause of action for negligence per se. Alderman v. Bradley, 957 S.W.2d 264, 267 (Ky. App. 1997), citing Britton v. Wooten, 817 S.W.2d 443 (1991). See also Real Estate Marketing, Inc. v. Franz, 885 S.W.2d 921 (Ky.1994). However, the violation of a statute or regulation does not necessarily imply negligence. Id. In order for a violation to become negligence per se, the plaintiff must (a) be a member of the class of persons intended to be protected by the regulation, and (b) the injury suffered must be an event that the regulation was designed to prevent. Id. Only when both requirements are affirmatively demonstrated is negligence per se established with the applicable regulation or statute defining the relevant standard of care. Id.

> "It is true, of course, that the violation of a statute, ordinance, or administrative regulation, is a breach which may, in the proper circumstance, constitute negligence *per se. See Britton v. Wooten,* Ky., 817 S.W.2d 443 (1991). *See also Real Estate Marketing, Inc. v. Franz, Ky.,* 885 S.W.2d 921 (1994).* It is not true, however, that violation of a statute or regulation necessarily implies negligence. In order for a violation to become negligence per se, the plaintiff must be a member of the class of persons intended to be protected by the regulation, and the injury suffered must be an event which the regulation was designed to prevent. Only when both requirements are affirmatively demonstrated is negligence per se established with the applicable regulation or statute defining the relevant standard of care. (citations omitted).

*Alderman v. Bradley,* 957 S.W.2d 264 (Ky.App.,1997).

In the instant matter, Cemex claims that unexploded ordnance was discovered on the site some eight months after LMS and Landers left. According to his report as disclosed by Cemex, Mr. Ludwizak (their expert witness in this matter) went to the Battletown Quarry in September of 2005 and conducted an inspection of all of the rock wall surfaces and proceeded to remove, detonate or otherwise dispose of the misfired and/or undetonated explosives. Cemex never contacted LMS or Landers to remove the newly discovered/misfired explosives.

To establish negligence per se on the basis of a statutory violation, under Kentucky law, the party must establish that: (1) the injury was caused by the violation; (2) the injury was of a type intended to be prevented by the statute; and (3) the injured party was of the class meant to be protected by the statute. In this matter, Cemex restates various regulations that set forth basic safe handling and usage of explosives and the protocols for the handling of noted misfires/undetonated material including but not limited to: KRS 351.330(16), "no person shall use explosives in such a manner that safety to persons or property is threatened"; 805 KAR 4:075(5), "no explosives or blasting shall be abandoned"; 805 KAR 4:095(7), "no explosives shall be

Add. 25

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 67 of 176

CEMEX, INC. d/b/a Kosmos Cement Company and..., 2008 WL 4239541...

left unattended at the blast site." Here, Cemex claims its *"injury"* was that it was paid money to dispose of the undetonated explosives. A clear understanding of the statute and regulations is that the laws are in place for "safety" which relates to the physical safety of natural persons who are at risk of death or serious injury from the misuse of explosives. These natural persons would constitute a "class" of persons who are protected by the law. Cemex, a corporation, could therefore not be a *member* of such class under these circumstances.

Even were the corporation deemed to be a member of a class protected by the laws, in no event could the "costs of removal" of the explosives be an "injury of a type intended to be prevented by the statute." The types of injuries envisioned by the laws are physical injuries, not the costs of tangential corrective measures or associated "down time." Therefore, Cemex cannot, as a matter of law, maintain a cause of action pursuant to KRS 446.070 based upon the damages it has claimed to have incurred.

**D. Plaintiff's Claims for Punitive Damages Also Fail Under Kentucky Law**

Cemex has asserted a claim for punitive damages in this action pursuant to its claims for both "Negligence Per Se" ["Count III" at paragraph 46] and "Negligence" ["Count IV" at paragraph 51]. In both instances, Cemex alleges that LMS acted "knowingly" or "recklessly."

Kentucky's statute on punitive damages, KRS §411.184, sets forth at subsections (3) and (4), the following
(3) In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question.

(4) In no case shall punitive damages be awarded for breach of contract.

In the instant matter, any allegedly "reckless" or "knowingly" committed blasting or explosives related negligence was conducted not by LMS, but by Defendant Landers Explosives. Landers Explosives was therefore an agent LMS and therefore LMS cannot be held liable for punitive damages which might be assessed against Landers without proof that LMS "authorized or ratified" or otherwise "should have anticipated" Landers acting towards Cemex with "oppression, fraud or malice" KRS § 411.184(2). The record is void of such proof or inference that LMS authorized or ratified Landers acting with oppression, fraud, or malice, and even Cemex's stated allegation of either "knowing or reckless" conduct does not support (as a matter of law) an award of punitive damages.

Further, as set forth in subsection 4, "in no case shall punitive damages be awarded for breach of contract." As set forth above, all of Cemex' s claims and alleged damages are within the province of its contract with LMS for blasting and excavation. As this suit is -in fact- a bundle of claims all falling within alleged breaches of an express written contract, punitive damages may not be awarded.

Assuming arguendo that Cemex might maintain a cause of action for punitive against LMS despite the existence of their contract, and despite the fact that Landers Explosives is a wholly separate entity (agent), Cemex would still fail in such claim as a matter of law.

KRS 411.184(2) states the standard of proof that must be met for an award of punitive damages:

(2) A plaintiff shall recover punitive damages only upon proving, *by clear and convincing evidence,* that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice. (Emphasis added).

Add. 26

Appeal: 15-1063   Doc: 33      Filed: 06/10/2015   Pg: 68 of 176

CEMEX, INC. d/b/a Kosmos Cement Company and..., 2008 WL 4239541...

Kentucky's Supreme Court has clarified that in order to justify punitive damages there must first be a finding of a failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by a "wanton or reckless disregard for the lives, safety or property of others." *Williams v. Wilson,* 972 S.W.2d 260, 263 (Ky. 1998), *citing Horton v. Union Light, Heat & Power Co.,* 690 S.W.2d 382, 389 (Ky. 1985). This bears an element not distinguishable from malice implied from the facts. *Id.* Therefore, there must be an element either of malice or willfulness, or such an utter and wanton disregard of the rights of others from which it can be assumed the act was malicious or willful. *City of Middlesboro v. Brown,* 63 S.W.2d 179, 181 (Ky. 2001). Such a standard includes the well-established common law standard for awarding punitive damages, which is gross negligence. *Williams* at 263.

Further, as stated above KRS 411.184(4) clearly states that in no circumstances shall punitive damages be awarded in a breach of contract action. Claims made by a property owner against contractors for the contractor's improper performance are inherently based on the contractor's alleged breach of the contract they had with the property owner. To wit, the Plaintiff affirms in his Complaint that the damages he allegedly sustained were a direct and proximate result of LMS' breach of their contract even going so far as asserting/admitting that LMS had a "contractual duty to comply" with all the laws and regulations, the alleged violation of which gave rise to Cemex's additional tort claims for Negligence Per Se. (First Amended Complaint, paragraphs 29-35).

Even if a client's claims are viewed in the context of general tort principles, in order to recover punitive damages a plaintiff cannot show mere "ordinary" negligence on the part of the defendant, but rather must meet the higher standard of "gross" negligence that can only be achieved by demonstrating that the defendant's conduct tended to show a "wanton or reckless disregard for the lives, safety or property of others" such that malice may be implied from the facts. Further, the defendant's gross negligence must be proven by *clear and convincing evidence,* which is a higher standard of proof than the preponderance of the evidence standard that is typically utilized in civil lawsuits. KRS §411.184(2), *supra.*

Here, it is abundantly clear from the record that Plaintiff has wholly failed to establish that LMS' conduct in allegedly failing to meet strict requirements of their contract was malicious, reckless, willful or wanton. Therefore, Plaintiff is not entitled to recover punitive damages from LMS or even Landers Explosives. The Plaintiff has failed to specifically set forth any facts or allegations necessary to obtain an award of punitive damages in this matter. Notwithstanding, the Plaintiffs will be unable to demonstrate by clear and convincing evidence at Trial that LMS' conduct contained an intentional or malicious element necessary for an award of punitive damages. They have offered evidence that LMS intentionally caused harm to Cemex. Accordingly, it can only be inferred that the Plaintiffs maintain that LMS acted with malice, which is considered conduct that is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or that reflects a flagrant indifference to the rights of the plaintiff. KRS 411.184(1)(c).

There certainly has been no clear and convincing evidence offered by the Plaintiffs or anyone on their behalf to suggest that LMS activities in connection with its blasting and excavation contract constituted oppression, fraud, or malice or a gross deviation from an applicable standard of care. In Kentucky, a finding of "gross negligence" clearly requires more than a failure to exercise ordinary care. It requires a finding of a failure to exercise even slight care such as to demonstrate a wanton or reckless disregard for the rights of others. *Phelps v. Louisville Water Co.,* 103 S.W.3d 46, 51-52 (Ky. 2003) *See also Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.,* 238 S.W.3d 644, 655 n. 33 (Ky. 2007). In a case where gross negligence is used as the basis for punitive damages, gross negligence has the same character of outrage justifying punitive damages as *willful* and malicious *misconduct* in torts where the injury is intentionally inflicted. Consequently, Summary Judgment is warranted on the Plaintiffs' claim for punitive damages.

## III. CONCLUSION

A court may grant summary judgment where the pleadings, evidence, and arguments of the moving party clearly establish the non-moving party has no legally cognizable cause of action. *Dinsmore Instrument Co. v. Bombardier, Inc.,* 199 F.3d 318 (6th Cir. 1999). In *Paintsville Hospital Co. v. Rose,* 683 S.W.2d 255, 256 (Ky. 1985), the Supreme Court of Kentucky held that

Add. 27

**CEMEX, INC. d/b/a Kosmos Cement Company and..., 2008 WL 4239541...**

for summary judgment to be proper, the movant must show that the adverse party cannot prevail under any circumstances. The Court has also stated that "the proper function of summary judgment is to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 480 (Ky. 1991).

Summary judgment is particularly appropriate here because the issue turns on the application of legal principles. For all of the reasons set forth above, LMS Contracting, Inc. respectfully moves this Court for summary judgment in regard to all Cemex's claims based upon negligence including its sought punitive damages.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 28

2008 WL 4682349
Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
at Louisiville.

CEMEX, INC. d/b/a Kosmos Cement Company
and Kosmos Cement Company, Plaintiffs
and
St. Paul Fire & Marine Insurance
Co., Intervening Plaintiff
v.
LMS CONTRACTING, INC. and
Landers Explosives, Inc., Defendants.

Civil Action No. 3:06-
CV-124-H.    |    Oct. 21, 2008.

**Attorneys and Law Firms**

Angela R. Stephens, David B. Ratterman, Joseph L. Hardesty, Steven M. Henderson, Matthew Arnold Gillies, Stites & Harbison, PLLC, Louisville, KY, for Plaintiffs.

James R. Chadward Kessinger, Michael S. Maloney, Schiller Osbourne Barnes & Maloney, PLLC, Louisville, KY, for Intervening Plaintiff.

J. Fox Demoisey, Jonathan E. Breitenstein, Demoisey Law Office, PLLC, Louisville, KY, Ralph E. Burnham, Montgomery, Rennie & Jonson, Cincinnati, OH, for Defendants.

**MEMORANDUM OPINION**

JOHN G. HEYBURN, District Judge.

**\*1** Plaintiffs, Cemex, Inc. ("Cemex") and Kosmos Cement Company ("Kosmos") (collectively referred to as "Plaintiffs"), brought suit seeking recovery under tort and contract for damages from work that LMS Contracting, Inc. ("LMS") and its subcontractor Landers Explosives, Inc. ("Landers") (collectively referred to as "Defendants") performed on Cemex's property. St. Paul Fire & Marine Insurance Co. ("St.Paul") provided a Commercial General Liability insurance policy to LMS (the "Policy").

After LMS called upon St. Paul to defend and indemnify, St. Paul filed an Intervening Complaint to clarify its rights

under the Policy. St. Paul now moves for summary judgment on the question of whether the insurance policy covers the damages in question. This is an important question in this dispute because LMS has filed for bankruptcy and the Policy may be the only asset available to satisfy Cemex's claims. The Court decides the Policy coverage as a matter of law.

**I.**

Plaintiffs sought to build a slot storage facility and tunnel to process crushed limestone at Cemex's Battletown Quarry. Kosmos entered into a contract with LMS to perform the necessary blasting and excavation work (the "Contract"). LMS then subcontracted the blasting work to Landers. While the parties dispute the reasons, both parties agree that Landers' blasting did not meet the project specifications. Specifically, the Contract called for smooth vertical walls, which LMS did not deliver. The blasting created conditions known in the blasting industry as "backbreak and overbreak," which resulted in the walls not meeting contract specifications.

Plaintiffs demanded that LMS take responsibility for the required remedial measures. The parties disagreed about the cause of the remedial problems and about who should bear the responsibility of paying for the cost of the remedial work necessary to comply with the Contract specifications. Cemex said that LMS made a blasting mistake; LMS says that Cemex misrepresented the subsurface conditions.

Eventually, LMS defaulted on the Contract and filed for bankruptcy. Cemex was forced to undertake the remedial work itself in order to complete the construction of the storage facility and tunnel. Cemex alleges that Defendants' actions damaged its property in four areas of the slot storage facility and tunnel: 1) property outside the limits of the vertical walls of the excavation, 2) property in the tunnel area, 3) property in the area of the stacker conveyor foundation, and 4) property in the area of the escape tunnel. Furthermore, Cemex alleges certain damages arose from Defendants leaving explosives on the work site.

During a conference with the parties, several important facts became clear. First, the alleged excessive blasting did not cause any disturbance above ground level. It damaged no structures or persons outside the surface area of the contract work. Rather, the alleged excessive blasting caused unstable conditions and loose rock below ground level. Second, the money recovery which Plaintiffs seek is exactly the same

Cemex, Inc. v. LMS Contracting, Inc., Not Reported in F.Supp.2d (2008)

2008 WL 4682349

money recovery which it seeks in its breach of contract claim against LMS. It is the amount of money it claims was necessary to complete the work according to the Contract specifications.

**\*2** St. Paul provided the Policy to LMS which was in force at the time the contract dispute arose. After LMS filed bankruptcy, the Bankruptcy Court lifted the automatic stay to allow Cemex to proceed against LMS in name only. LMS called upon St. Paul to defend and indemnify it under the terms of the Policy. St. Paul denied liability under the Policy, but did agree to defend. Subsequently, St. Paul filed its Intervening Complaint asking this Court to determine its obligations under the Policy. This currently pending motion for summary judgment followed.

## II.

The Policy provides general liability coverage for LMS according to its terms and exclusions. In a previous Memorandum Opinion, the Court determined Kentucky law applies to this suit. Therefore, any ambiguity in the Policy is interpreted in favor of the insured. *Bituminous Cas. Corp. v. Kenway Contracting, Inc.,* 240 S.W.3d 633, 638 (Ky.2007). The parties dispute three issues: whether Plaintiffs' damages are "property damages" as defined by the Policy; whether the damages were caused by an "event;" and whether any Policy language excludes otherwise covered damages. The first two of these are not dispositive.

The Policy defines "property damage" as physical damage to tangible property of others, including all resulting loss of use of that property; or loss of use of tangible property that is not physically damaged. Here, LMS did not impair the value of any existing structure or improvement. LMS did nothing to damage or limit the intended uses of the property. LMS had entered into a contract to disturb the property by blasting, all for the purpose of improving the property in accordance with the contract specifications. By failing to meet the requirements of that contract, one might conclude that property had been "damaged." However, such a definition certainly stretches the meaning of property damage beyond a common sense. Nevertheless, the definition of property damage contains no language precluding faulty workmanship from qualifying as property damage. For purposes of this discussion, the Court will assume that the blasting did cause property damage as the Policy defines it.

The Policy defines an "event" as an accident. Courts have debated whether an intended act can constitute an accident. The Kentucky Supreme Court has come down on the side that intentional conduct by the insured may qualify as an accident, where the result was unintended or unexpected. *See Bituminous Cas. Corp.,* 240 S.W.3d at 639. In *Bituminous,* the insured contracted with a homeowner to destroy a carport attached to the home. The employee carrying out the work intentionally tore down not only the carport, but also part of the home. The court held that the destruction was covered by the CGL policy, because the insured did not expect or intend for the damage to the house to result from the actions of their employee. *Id.* at 642.Similarly, LMS did not intend or expect the damage to Plaintiff's property, such as the backbreak and overbreak, to result from Lander's blasting. This unexpected result fits the definition of an accident. Also, LMS did not intend or expect for explosives to be left on the job site, and as such the damage caused by leaving the explosives resulted from an accident.

## III.

**\*3** An insurer and its insured allocate known risks arising from the insured's business by agreeing upon "business risk" exclusions in a general liability insurance policy. *Bituminous Cas. Corp.,* 240 S.W.3d at 640. As a consequence of this contractual allocation, the Policy will cover some risks, while others will require that the insured cover on its own. St. Paul argues that the Policy excludes coverage here in five ways: 1) the contract liability exclusion, 2) the control of property exclusion, 3) the pollution injury or damage exclusion, 4) the expected or intended bodily injury or property damage exclusion, and 5) the product recall exclusion. The Court will consider each as necessary.

The contract liability exclusion is easily resolved. It precludes coverage where the insured has assumed liability under a contract or agreement. The term "assume liability" means to take on the liability of another. In this case, LMS did not assume any liability by contracting with Cemex, because LMS has not agreed to take on another's liability. Thus the contract liability exclusion does not apply. Now the Court will next address a more difficult problem.

## A.

St. Paul argues that the Policy's control of property exclusion bars Plaintiffs' recovery. The exclusion denies coverage in four situations, two of which are pertinent to this case. First, the exclusion applies to damage to "[t]hat particular part of real property being worked on by or for you if such property damage results from your work."Second, the exclusion applies to damage to "[t]hat particular part of any property that must be restored, repaired, or replaced because your work was incorrectly performed on it."

The phrasing of the exclusion has created debate where insureds performed work beyond the scope of the original contract. *See Bituminous Cas. Corp.,* 240 S.W.3d at 640. The debate centers around whether the phrase "being worked on" means only property that the insured contracted to work on, or means any property on which the insured performed work. The Kentucky Supreme Court ruled that the ambiguity created by such a provision should be construed against the drafter, and thus excludes only coverage for damages to property within the scope of the contract. *Id.* at 641. Under the facts in *Bituminous,* the exclusion did not bar coverage because its terms were ambiguous in those circumstances. Applying the same reasoning here, however, the result is different. The control of property exclusion does apply to all damages incurred within the scope of the contract between LMS and Cemex.

Here, the Contract required more than merely blasting a certain size hole in the ground. Rather, it required blasting for foundation and walls to certain written specifications capable of supporting poured concrete. Thus, when LMS overblasted the rock, the problem was not necessarily that the blasting actually damaged any existing improvement. It did not. Rather, the blasting created conditions that would not support the concrete to be poured. This is not merely a case where too much was destroyed, but a case where the walls that were to be created did not meet contract specifications. To correct the overblasting would require additional work and expense for which LMS might be contractually responsible.

**\*4** Thus, the case is more analogous to a situation where a house cannot be built, because the foundation is too weak, than to the *Bituminous Casualty* case, where the house was destroyed, because the insured accidentally destroyed too much of the property. *Bituminous Cas. Corp.,* 240 S.W.3d at 636. Cemex's claimed remedies speak to this point. Through its remedial measures, Cemex created a stable foundation upon which the concrete could be poured. When viewed in this light, all of Cemex's damages resulted from LMS's faulty

work on property where it had contracted to work. Where the remedy sought only restores the benefits of contractual promises, the damage falls within the scope of the work.

Thus, the control of property exclusion bars recovery for the additional expenses which Cemex incurred to complete the work in accordance with the Contract.

### B.

Looking at this case from a broader perspective will help provide a proper framework for the Court's analysis. It helps demonstrate the correctness of the Court's policy interpretation.

To adopt Plaintiffs' interpretation of the Policy would provide insurance against the possibility that LMS would be unable to complete the contract due to its financial circumstances. Were LMS not bankrupt, Cemex would collect from LMS the money necessary to correct LMS's faulty work and get the product for which Cemex contracted. However, since LMS is bankrupt, Cemex cannot collect from LMS. Instead, Cemex has tried to characterize a breach of contract claim as a claim for property damages. But CGL policies are not intended to insure against the possibility of bankruptcy. One wishing to protect itself against such a risk will often require the builder to take out a performance or surety bond.

In fact, the contract between Kosmos and LMS included a provision relating to performance bonds. The provision required LMS to obtain a performance bond if request by Kosmos. This provision was separate from the provision that required LMS to carry a CGL policy. Therefore, Plaintiffs knew the proper method for protecting themselves against the possibility of LMS going bankrupt, and knew the difference between a CGL policy and a performance bond. The failure of LMS to obtain a performance bond and the failure of Plaintiffs to require one, do not decide this case. On the other hand, Plaintiffs' failure to obtain a performance bond where it was clearly contemplated does not convert a CGL policy into a performance bond.

The Court is not alone in pointing out that CGL policies and performance bonds are separate and distinct protections against different risks. *See e.g. Stoneridge Development Co., Inc. v. Essex Ins. Co.,* 382 Ill.App.3d 731, 321 Ill.Dec. 114, 888 N.E.2d 633 (Ill.App.2008); *Indiana Ins. Co. v. DeZutti,* 408 N.E.2d 1275 (Ind.1980). While many courts

Add. 31

look to the definitions of "property damage" or "occurrence" as excluding faulty workmanship, the Court has already held that those definitions may include faulty workmanship. Instead, the Court holds that the control of property exclusion precludes coverage for faulty workmanship in this case. While the Court has taken a different route, it has reached the same result as many other courts, based upon the distinct roles of CGL policies and performance bonds. This is a more faithful reading of the Policy as it does not require the Court to torture the clear language of the phrases "property damage" or "occurrence." Instead, it effectuates St. Paul's and LMS's intention to enter into a CGL policy and not a performance bond. The control of property exclusion and the damage to your products or completed work exclusion evidence this intention. While the completed work exclusion does not apply here, because LMS never completed the work, when the two exclusions are read together it is clear that the parties intended these exclusions to eliminate coverage for faulty work.

**C.**

**\*5** Although the Court need not consider any of the other proposed exclusions, one final issue remains. Plaintiffs argue that the explosives left on the property caused property damage in the form of lost use of the property and costs incurred to remove them. The same reasoning that governed the Court's prior analysis of the physical damage applies here. If leaving the explosives did not cause property damage, then the damage is not covered under the Policy. If leaving the explosives did cause property damage, then the question remains as to what property was damaged. In this case, leaving the explosives damaged the property that was being worked on. Plaintiffs have not pointed to any other property damaged by the abandoned explosives. Thus the Policy excludes both the damage caused by the blasting and caused by the abandoned explosives under the control of property exclusion.

The Court will enter an order consistent with this Memorandum Opinion.

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 32



**CEMEX, INC., d/b/a KOSMOS CEMENT COMPANY, et al., PLAINTIFFS VS. LMS CONTRACTING, INC., AND LANDERS EXPLOSIVES, INC., DEFENDANTS**

**CIVIL ACTION NO. 3:06CV-124-H**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY**

*2009 U.S. Dist. LEXIS 89052*

**September 28, 2009, Decided
September 28, 2009, Filed**

**PRIOR HISTORY:** *Cemex, Inc. v. LMS Contr., Inc., 2008 U.S. Dist. LEXIS 85209 (W.D. Ky., Oct. 20, 2008)*

**COUNSEL:** [*1] For CEMEX, Inc., doing business as Kosmos Cement Company, Inc., Plaintiff: Angela R. Stephens, David B. Ratterman, Joseph L. Hardesty, Steven M. Henderson, LEAD ATTORNEYS, Matthew Arnold Gillies, Stites & Harbison, PLLC, Louisville, KY.

For Kosmos Cement Company, a Kentucky General Partnership Comprised of Cemex, Inc., d/b/a Kosmos Cement Company and Others, Plaintiff: Angela R. Stephens, David B. Ratterman, Joseph L. Hardesty, Matthew Arnold Gillies, Steven M. Henderson, LEAD ATTORNEYS, Stites & Harbison, PLLC, Louisville, KY.

For St. Paul Fire and Marine Insurance Company, Intervenor Plaintiff: James R. Chadward Kessinger, Michael S. Maloney, LEAD ATTORNEYS, Schiller Osbourne Barnes & Maloney, PLLC, Louisville, KY.

For LMS Contracting, Inc., Defendant, Counter Claimant: J. Fox DeMoisey, Jonathan E. Breitenstein, LEAD ATTORNEYS, DeMoisey Law Office, PLLC, Louisville, KY.

For CEMEX, Inc., Kosmos Cement Company, Intervenor Defendants: Angela R. Stephens, David B. Ratterman, Joseph L. Hardesty, Matthew Arnold Gillies, LEAD ATTORNEYS, Steven M. Henderson, Stites & Harbison, PLLC, Louisville, KY.

For CEMEX, Inc., Counter Defendant: David B. Ratterman, Joseph L. Hardesty, Matthew Arnold Gillies, [*2] Steven M. Henderson, LEAD ATTORNEYS, Angela R. Stephens, Stites & Harbison, PLLC, Louisville, KY.

For Landers Explosives, Inc., Counter Claimant: Ralph E. Burnham, Montgomery, Rennie & Jonson, Cincinnati, OH.

For CEMEX, Inc., Counter Defendant: Angela R. Stephens, David B. Ratterman, Joseph L. Hardesty, Matthew Arnold Gillies, Steven M. Henderson, LEAD ATTORNEYS, Stites & Harbison, PLLC, Louisville, KY.

**JUDGES:** John G. Heyburn II, United States District Judge.

**OPINION BY:** John G. Heyburn II

**OPINION**

Appeal: 15-1063   Doc: 33   Filed: 06/10/2015   Pg: 75 of 176

Page 2
2009 U.S. Dist. LEXIS 89052, *2

**MEMORANDUM OPINION**

Plaintiffs, Cemex, Inc. ("Cemex") and Kosmos Cement Company ("Kosmos") (collectively referred to as "Plaintiffs"), brought suit seeking recovery under tort and contract for damages from work that LMS Contracting, Inc. ("LMS") and its subcontractor Landers Explosives, Inc. ("Landers") performed on Cemex's property. Landers now moves for summary judgment on the grounds that the tort actions against it are prohibited by the economic loss rule and the absence of privity between Cemex and Landers. Plaintiffs move for partial summary judgment against Landers on claims of negligence and strict liability.

For the reasons that follow, the Court concludes that Plaintiffs may not pursue their claims against Landers. [*3] At this time, the Court is addressing only the cross motions for summary judgment between Landers and Cemex, not any motions relating to LMS.

I

This lawsuit arose from a construction project taking place on Plaintiffs' property. In October 2004, Cemex and LMS entered into a written contract providing that LMS would conduct certain blasting and excavation work on Cemex's property in order for Cemex to then create a "Slot Storage Facility and Tunnel." The tunnel was to be used by Cemex in its processing of crushed limestone. LMS then subcontracted the blasting portion of the project to Landers Explosives, Inc.

Cemex has brought suit against Landers on multiple theories of tort, in essence claiming that Landers was negligent in blasting the areas to be used for the storage facility and tunnel and that Landers should be held strictly liable for all damages caused by the blasting. Cemex has phrased its negligence claims both as ordinary negligence and negligence per se based on Landers' alleged violations of Kentucky statutes regulating the use of explosives in construction projects. It is undisputed that there is no contract between Cemex and Landers. Cemex asserts that Landers' negligence [*4] caused extensive damage to the area where the storage facility and tunnel was to be constructed, which created unstable rock walls and required Cemex to expend additional monies in building the facility.

II

Summary judgment is appropriate where the moving party establishes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. "The moving party has the 'initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record showing an absence of a genuine issue of fact." *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002)* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*. Then "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Fed. R. Civ. P. 56(e))*.

III

Landers contends that the economic loss rule bars Plaintiffs' claims. The general doctrine is well explained by Justice Keller of the Kentucky Supreme Court in his concurring opinion in *Presnell Construction Managers, Inc. v. EH Construction, LLC, 134 S.W.3d 575, 583-584 (Ky. 2004)*:

> The [*5] 'economic loss rule' is a judicially created doctrine that marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others. The crux of the doctrine is not privity but the premise that economic interests are protected, if at all, by contract principles, rather than tort principles. Although originally rooted primarily in product liability cases to protect manufacturers from tort liability for damage that is limited to the product itself, the economic loss rule has evolved into a modern, general prohibition against tort recovery for economic loss.

(citations omitted). As Justice Keller explains, "[T]he rule is stated with ease but applied with great difficulty." *Id. at 584*.

In Kentucky, the economic loss rule applies "to

products liability cases, to business purchases, and to construction cases." *Davis v. Siemens Medical Solutions USA, Inc.,* 399 F.Supp.2d 785, 801 (W.D.Ky. 2005). As a general matter, it prohibits a party who contracted with another to provide a specific product from recovering for the [*6] loss in value of the product "caused by a defect in that product (direct economic loss) and consequential loss flowing from the defect, such as lost profits (consequential economic loss)." *Mt. Lebanon, 276 F.3d at 848.* In determining what the "product" contracted for is, the Court should be guided by the ability of the purchasing party to allocate the risk of loss by contract. *Id. at 852*

As a preliminary matter, Plaintiffs claim that Kentucky has not adopted the economic loss rule and that it should not be applied to this case. While it is true that the Kentucky Supreme Court has never expressly adopted the economic loss rule, the Kentucky Court of Appeals has adopted the rule, *Falcon Coal Co. v. Clark Equipment Co.,* 802 S.W.2d 947 (Ky. Ct. App. 1990), and the Kentucky Supreme Court appears to have applied a similar rationale to other cases. *See, e.g., Real Estate Marketing, Inc. v. Franz,* 885 S.W.2d 921, 41 11 Ky. L. Summary 35 (Ky. 1994); *Presnell,* 134 S.W.3d 575. Moreover, this Court is bound by the Sixth Circuit's prediction that "the Kentucky Supreme Court will apply the economic loss rule to bar a tort claim in a case that involves a business purchase." *Mt. Lebanon, 276 F.3d at 849.*

A.

Next, the Court must [*7] consider whether the economic loss rule should apply to the facts of this case. As this Court has previously announced, the economic loss rule under Kentucky law applies to construction cases. *Davis,* 399 F.Supp.2d at 801. Furthermore, the Sixth Circuit has held that the rule applies to cases involving purchasers and subcontractors who did not have any direct contractual relationship. *Mt. Lebanon, 276 F.3d at 852.* Finally, the proper "approach is to apply [it] if the purchasing party had the opportunity to allocate the risk of loss by contract." *Id.* Here, not only did the parties have the "opportunity" to allocate the risk of loss arising from the blasting, the parties *did* allocate the risk of loss. The contract between LMS and Plaintiffs clearly provides that LMS will be responsible for all damages arising from the blasting activity. Under the Sixth Circuit's analysis in *Mt. Lebanon,* the economic loss rule

would apply in this case.

The remaining issue is what recovery does the rule bar here. Plaintiffs claim that their losses include damage to the ground surrounding the project zone and, primarily, the cost of repairing the blasting damage to properly construct the storage facility [*8] and tunnel. Plaintiffs claim that these damages are separate from the "product" at issue, namely the construction project, and should, therefore, all be compensated. Landers argues that these damages are the very essence of economic losses.

At the outset, the Court notes the difficulty in determining the extent of damages that the economic loss rule bars. This case is not the simple case of a defective tractor that damages only itself. Rather, this is a complex construction case involving the destruction of grounds necessary to complete the construction project. The Court is, however, guided by the principles of the Sixth Circuit in *Mt. Lebanon.* "We predict that the Kentucky Supreme Court would hold that the product for economic loss rule purposes includes the entire unit for which a party to a complex transaction has the ability to distribute risk by contract and insure against it." *Mt. Lebanon, 276 F.3d at 851.* This guiding principle strongly indicates that the land surrounding the blasting zones is part of the "product" for purposes of the economic loss rule. Plaintiffs admit,

> The Contracts required the Defendants to remove rock from Cemex's property along defined and predetermined [*9] physical parameters in a manner that would leave Cemex's adjacent property undamaged and in a condition sufficient to allow Cemex to place concrete walls and foundations upon and against Cemex's property at location and in the manner specifically defined in the Contract Documents. LMS and Landers were to conduct its blasting and excavation work in such a manner as to ensure that Cemex's property adjacent to the Slot Storage and Tunnel Facility would be clean and free of broken and loose rock. . . . [Defendants] mis-applied the explosives so-utilized in performance of the Contracts' work [and] . . . left Cemex's adjacent property in a state that did not conform to the Contract Documents.

(Pl.'s Mot. Partial Summ. J. 7-8.) These admissions show that the parties contemplated damages to the surrounding walls as a part of the project and, as indicated above, the parties were able to allocate the risk for any such blasting damage. These are the circumstances under which the economic loss rule should apply.

Examination of two cases helps to illustrate why this result is proper. In *Mt. Lebanon,* the defendant provided defective wood to a general contractor who built a nursing home for the plaintiff. [*10] When that wood failed, it caused significant damage to the entire nursing home, not just damage to the wood itself. Although the plaintiff argued that the economic loss rule should bar recovery only for damage to the wood itself, the Sixth Circuit held that "the product is the entire nursing home because Mt. Lebanon had the ability to allocate risk contractually and/or insure against loss with respect to the entire nursing home." *Mt. Lebanon, 276 F.3d at 851.* Likewise, in this case, Plaintiffs had the ability to allocate the risk of loss to the surrounding rock walls.

In *Barton Brands, Ltd. v. O'Brien & Gere, Inc. of N. Am., 550 F.Supp.2d 681 (W.D.Ky. 2008)*, this Court ruled that the economic loss doctrine applied to bar the plaintiff's recovery for losses resulting from a defective design of a pollution control system. In *Barton Brands,* the plaintiff contended that the economic loss rule should only bar recovery of damage to the system itself, not damage to the many expensive bags that were housed inside of the system. This Court, however, determined that recovery for the lost bags was also barred because the bags were stored inside the system's housing. *Id. at 689.* In the present [*11] case, the walls surrounding the blasting zones are similar to those bags as they were in the same area as the project and could be accounted for in allocating risk.

Therefore, the Court is convinced that the economic loss rule bars all Plaintiffs' damages.

B.

Finally, Plaintiffs contend that the economic loss rule does not prohibit their claims against Landers because Plaintiffs' claims are based on independent duties created by various Kentucky statutes regulating blasting. While the Court recognizes that Kentucky has allowed independent torts, such as fraudulent misrepresentation, to be actionable even where the economic loss rule

applies to the plaintiff's other tort claims, Plaintiffs do not present such separately actionable torts.

In essence, Plaintiffs' contention that Landers has a statutory duty is nothing more than a claim of negligence per se. Plaintiffs claim that because Landers violated various regulatory statutes related to blasting, it violated its duties to Plaintiffs. In asserting that the economic loss rule does not apply where statutes provide the basis for independent duties, Plaintiffs rely on *Real Estate Marketing, Inc. v. Franz.* However, *Franz* does not support Plaintiffs' [*12] contention. While *Franz* recognized an independent claim based on violations of building codes, the Kentucky Supreme Court was explicit that this was only the case because *KRS § 198B.130* specifically creates a personal cause of action. *Franz, 885 S.W.2d at 927.* In fact, the court dismissed the *Franz* plaintiff's negligence per se claims based on violations of the statute because negligence per se claims must be treated the same as a basic negligence claim. *Id.* "[N]egligence per se is merely a negligence claim with a statutory standard of care substituted for the common law standard of care." *Id.* (citation omitted). Here, statutes allegedly violated by Landers do not create a private cause of action. Therefore, Plaintiffs' negligence per se claims meet the same fate as its basic negligence claims.

IV

Landers also argues that the absence of privity bars Plaintiffs' claims. The economic loss rule and privity of contract are "inextricably intertwined concepts." *Barton Brands, 550 F.Supp.2d at 684.* The Kentucky Supreme Court succinctly stated the privity doctrine as applied to cases such as this in *Presnell:* "Although privity is no longer required to maintain a tort action, one who is not a [*13] party to the contract or in privity thereto may not maintain an action for negligence which consists merely in the breach of the contract." *Presnell, 134 S.W.3d at 579.* As discussed above, Plaintiffs have alleged three different sources of liability against Landers: strict liability, negligence and negligence per se. The Court finds that the first two may also be dismissed on independent grounds.

A.

First, Plaintiffs' claim of strict liability is not applicable to our facts. Plaintiffs contend that whenever damage results from the use of explosives, the blasting party is strictly liable for the damages. While it is true

2009 U.S. Dist. LEXIS 89052, *13

that Kentucky courts routinely apply strict liability to blasting actions, such a claim is inappropriate under the current facts. *See, e.g., Randall v. Shelton, 293 S.W.2d 559, 560 (Ky. 1956)* (stating that strict liability "is applied where the defendant engages in the extrahazardous activity of blasting and injures *another's* property") (emphasis added). In all of the cases applying strict liability to blasting, the defendants were engaged in blasting and their conduct damaged either the property or person of someone not connected to the blasting.

The Court has been unable [*14] to locate a Kentucky case, and the parties have not cited the Court to such a case, in which the plaintiffs were the party that hired the blasters and the blasting occurred on the plaintiffs' property per the plaintiffs' instructions. However, from the other Kentucky cases, it appears that the injury suffered must be to *another* person not related to the blasting. As Landers points out, if the Court were to hold Landers strictly liable, any party who contracts with a blasting company would be able to recover in strict liability if the party is dissatisfied with the company's performance. The Court predicts that the Kentucky Supreme Court would not extend the strict liability doctrine to such extremes and, therefore, finds that strict liability is not applicable to the facts of this case. [1]

    1 Moreover, the economic loss rule, as discussed above, operates to bar recovery under strict liability. Thus, even if a strict liability action could be maintained against a party engaged by the plaintiffs to conduct blasting, such an action is prohibited under the facts of this case.

B.

The Court next addresses Plaintiffs' claim in

negligence. Plaintiffs assert that Landers had a duty to conduct core [*15] borings before beginning their work and that Landers had a duty to warn Plaintiffs that the geological features of the ground would prevent the project from being completed to Plaintiffs' original specifications. Although Plaintiffs assert that these duties are independent of any contract, the fact remains that Landers would have had no such duties in the absence of the contract. *See Barton Brands, 550 F.Supp.2d at 687* ("Absent a contract with Barton Brands, Astec did not owe Barton Brands an affirmative duty to determine the cause of fires. Such an obligation, if it existed at all, would have arisen from the contractual relationship between Astec and O'Brien & Gere, to which Barton Brands was not a party."). If Landers had these duties, it was only so that it could properly carry out its blasting work under its contractual relationship with LMS. In fact, Plaintiffs admit that "the *Contracts* placed a duty on Defendants to conduct any surveys or subsurface investigations necessary to carry out the work." (Pl.'s Mot. Partial Summ. J. 27) (emphasis added). Because the allegations of negligence are, in essence, a rephrasing of a basic contract claim where no contract exists between Plaintiffs [*16] and Landers, such claims are barred under the doctrine of privity. *Presnell, 134 S.W.3d at 579.*

The Court will enter an order consistent with this Memorandum Opinion.

September 28, 2009

/s/ John G. Heyburn II

**John G. Heyburn II, Judge**

**United States District Court**

2011 WL 10468129
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

NOTICE: This order was filed under Supreme
Court Rule 23 and may not be cited as
precedent by any party except in the limited
circumstances allowed under Rule 23(e)(1).
Appellate Court of Illinois,
Third District.

CITY OF OTTAWA, Plaintiff–Appellant,

v.

OSMONICS, INC., Tobin Brothers Plumbing,
Inc., Vissering Construction, Inc., and McClure
Engineering Ass'ns, Inc., and Basalay, Cary
and Alstadt Architects, Ltd., an Illinois
Corporation, Defendants–Appellants.

No. 3–10–0431.    |    May 5, 2011.

Appeal from the Circuit Court for the 13th Judicial Circuit,
LaSalle County, Illinois, No. 06 L 180, James Lanuti, Judge
Presiding.

ORDER

Justice O'BRIEN delivered the judgment of the court:

*Held:* **The trial court erred in granting summary
judgment to Osmonics, Inc., where Osmonics's contract
with the city did not clearly and unequivocally preclude
the city from filing a suit sounding in negligence. The
trial court did not err in granting summary judgment
to Basalay, Cary and Alstadt Architects, where Basalay
had no duty to design the water treatment building
in such a way as to preclude flooding of the city's
administrative offices.**

**\*1** Following a breach in the City of Ottawa's "reverse
osmonics" piping system that resulted in water damage to
both the previously existing business offices of the city and
the city's new building housing the water treatment system,
the city sued the designer of the reverse osmosis system,
Osmonics Inc., and the architect, Basalay, Cary and Alstadt
Architects, Ltd., which designed the water treatment building
and the corridor connecting the treatment building with the

existing business offices. The trial court granted summary
judgment to Osmonics and Basalay and denied the city's
motion to amend its pleading as to Basalay. The city appeals
the trial court's rulings. We reverse in part, and affirm in part.

FACTS

Following a breach in the City of Ottawa's "reverse osmonics"
piping system that resulted in water damage to both the
existing business offices of the city and the new building
housing the water treatment system, the city sued the
designer of the reverse osmosis system, Osmonics, and the
architectural firm, Basalay, that designed the new building
and created the corridor connecting the new building with the
business offices. The city also sued several other entities, the
claims against which have been resolved.

The breach in the osmosis system occurred approximately
two years after the system was installed by Osmonics. It
was Osmonics's responsibility to supply, install and start-
up the filtration equipment and train the employees. As a
result of the system failure, water flowed from the building
housing the osmosis system down the corridor designed by
Basalay and into the existing administrative offices, causing
damage to the city offices and equipment. The assistant water
superintendent for the City of Ottawa agreed with reports
indicating the breach in the osmosis system occurred when
a flange failed due to compressed air that had accumulated
as a result of leaks in glue joints that allowed air to infiltrate
the system. In its complaint against Osmonics, the city
alleged Osmonics was negligent and breached its warranty of
fitness for a particular purpose and an implied warranty of
merchantability.

Osmonics filed a motion for summary judgment in which
it argued the terms of its contract with the city barred the
city's claims. Under the "Warranty and Claims" section of
Osmonics's contract with the city the following is set forth,
in pertinent part:

Section 3.3 "SELLER EXPRESSLY DISCLAIMS
LIABILITY FOR INCIDENTAL AND/OR
CONSEQUENTIAL DAMAGES INCLUDING,
WITHOUT LIMITATION, LOST PROFITS. THIS
WARRANTY IS MADE EXPRESSLY IN LIEU OF
ALL OTHER

WARRANTIES, EXPRESS OR IMPLIED, INCLUDING
ALL IMPLIED WARRANTIES OF MERCHANTABILITY

Add. 38

City of Ottawa v. Osmonics, Inc., Not Reported in N.E.2d (2011)

2011 WL 10468129

OR FITNESS FOR ANY PARTICULAR PURPOSE. BUYER ASSUMES ALL LIABILITIES FOR USE AND MISUSE BY BUYER, ITS AGENTS OR ASSIGNEES.

Section 3.5 Seller's obligation under this warranty is limited to the repair or replacement at its factor [*sic* ], for the original user, of any product or component part thereof which shall prove to have been defective. No allowance will be made for repairs or alterations made by Buyer without seller's written consent or approval.

*2 Section 3.6 In no event shall Seller be liable to Buyer for any amount, including costs incurred or expended by Seller in attempting to correct any product deficiency, relating to any claim by Buyer against Seller in excess of the aggregate total purchase price under this contract. No charges or expenses incident to any claim will be allowed. The remedies provided herein are exclusive, and Seller shall incur no liability other than that stated herein."

Based on the terms of the contract, Osmonics asserted that Ottawa expressly disclaimed consequential and incidental damages arising out of both contract and tort causes of action and that the exclusive remedy in the event of a system failure was replacement or repair within the warranty period of any defective product or component. The trial court granted Osmonics's motion for summary judgment based on the contract and dismissed the counts against it. The city asserts summary judgment was improperly granted to Osmonics because Osmonics's contract with the city does not preclude a suit for negligence

In an amended complaint, the city also alleged negligence against Basalay, asserting the firm had provided design plans and specifications that failed to prevent or otherwise provide for foreseeable pipe failure discharging water into the adjacent administration building. The city asserts that the deposition testimony of George Cary, a Basalay architect who designed the structure for the water treatment plant, supports its assertion that Basalay breached its standard of professional conduct. Cary stated the new building was established a foot higher than the existing building which housed the administrative offices and Basalay had to accommodate the difference in elevation in its design. The elevation of the floor was indicated by the project engineer firm, which also was responsible for the design of the floor. Cary stated the elevation of the corridor could not have been raised without moving the location of the building. Cary stated he knew water flows downhill. He stated no openings other than the

door leading to the corridor were designed into the exterior walls of the new building. Basalay was never told there was a concern regarding flooding, although Cary admitted he was aware the new building would house pipes carrying significant amounts of water. Cary attested he was aware that if water is a potential problem, floor drains and the slope of the floor can be used to address the escape of water. Cary was aware of a trench drain incorporated into the floor plan for the new building. The floor was not sloped toward the trench. It was not Basalay's responsibility to design a drain system for the floor of the building. Basalay's project included the walls roofs of the new building and the renovation of the old building.

The trial court granted Basalay's motion for summary judgment, finding no genuine issue of material fact. The trial court also denied the city's motion to amend its complaint to include, in part, allegations that Basalay designed a slope in the corridor with knowledge that foreseeable pipe failure would result in a downward flow of water into the administrative building. The trial court found the city had been given ample opportunities to gather evidence, including expert opinion. The trial court also denied the city's motion to reconsider the summary judgment ruling, which the city supplemented with the affidavit of Daniel Gavin, a certified architect. Gavin opined that Basalay had a professional responsibility to discuss the design of the corridor, doorway and floor with the engineer; to propose and discuss options other than the corridor and doorway; and to warn the city of the dangers of water flow from one building to the other by means of the corridor and doorway. On appeal, the city asserts there exists a genuine issue of material fact as to whether Basalay's architectural design of the water treatment building structure and corridor was adequate in a water treatment plant when it was foreseeable to Basalay that in the event of a crack, leak, or break in the water treatment plant, water would flow down the corridor slope into the administration building.

*3 Because our conclusions are distinct to, and different for, each party, we address the trial court's rulings accordingly. We review summary judgment orders *de novo. Connecticut Specialty Insurance Co., v. Loop Paper Recycling, Inc.,* 356 Ill.App.3d 67, 72 (2005). When reviewing a ruling on a summary judgment motion, we must construe all evidence in the light most favorable to the nonmoving party. *Stratman v. Brent,* 291 Ill.App.3d 123, 137 (1997). Summary judgment is properly granted where the pleadings, admissions and depositions on file, together with the affidavits, demonstrate there is no genuine issue of material fact and the moving

Add. 39

party is entitled to judgment as a matter of law. *Loop Paper Recycling, Inc., 356 Ill.App.3d at 71–72.*

This case also concerns contract interpretation, which we also review *de novo. Doornbos Heating and Air Conditioning, Inc. v. James D. Schlenker, M.D., S.C.,* 403 Ill.App.3d 468, 488 (2010). A written contract is presumed to reflect the intention of the parties. *Doornbos,* 403 Ill.App.3d at 488. In construing a contract, our primary objective is to ascertain and give effect to the intent of the parties as expressed in the written agreement. *Doornbos,* 403 Ill.App.3d at 488. If the written agreement is unambiguous, then a court must construe the parties' intent from the writing itself as a matter of law and effectuate its plain and ordinary meaning. *Doornbos,* 403 Ill.App.3d at 488. In the event of a contractual ambiguity, the court may consider extrinsic evidence to resolve any uncertainties present in the written agreement.*Doornbos,* 403 Ill.App.3d at 488.

In the instant case, the city admits that section 3.3 of the contract operates as a bar to its counts against Osmonics for breach of warranty of fitness for a particular purpose and implied warranty of merchantability. The city asserts, however, that the exculpatory clauses of section 3 of the contract do not bar a claim for negligence. The city argues that because the contract provisions were drafted by Osmonics they must be strictly construed against it. The city also argues that because there is no language in the exculpatory clauses referring specifically to negligence or tort claims and because the term "consequential damages" refers to contract rather than tort damages, the contract cannot be construed to preclude claims sounding in negligence.

The general rule regarding exculpatory clauses in Illinois is that such clauses will be enforced unless it would be against the settled public policy of the state to do so, or there is something in the social relationship of the parties militating against upholding the agreement. *Tyler Enterprises of Elwood, Inc. v. Skiver,* 260 Ill.App.3d 742, 750 (1994). Nevertheless, such clauses are not favored and are to be strictly construed against the party they benefit, particularly if the party was also the draftsman, as is the case here. See *Tyler,* 260 Ill.App.3d at 750. "Such clauses must spell out the intention of the parties with great particularity and will not be construed to defeat a claim that is not explicitly covered by their terms."*Tyler,* 260 Ill.App.3d at 750 (Internal quotes omitted).

**\*4** In *Tyler,* this court construed a contract provision that read: "In no event shall Elanco be liable for consequential damages, whether or not arising out of negligence. Elanco's liability and Formulator's exclusive remedy for any cause of action arising out of this contract, including negligence, is expressly limited to Formulator's option to replacement of, or repayment of the purchase price for, the Technical Chemical with respect to which damages are claimed."*Tyler,* 260 Ill.App.3d at 751. In *Tyler,* despite the defendant's apparent attempt to limit damages for any cause of action, we concluded the provision at issue did not preclude a claim sounding in strict liability because, in part, a party's negligence is irrelevant in a strict liability action. *Tyler,* 260 Ill.App.3d at 751. We also stated the term "consequential damages" refers to contract rather than tort damages. *Tyler,* 260 Ill.App.3d at 751.

Moreover, although a specific reference to "negligence" is not required, unless the circumstances clearly indicate that such was the plaintiff's understanding and intention, general clauses exempting the defendant from all liability for loss or damage will not be construed to include loss or damage resulting from the defendant's intentional, negligent or reckless misconduct. See *Berwind Corp. v. Litton Industries, Inc.* 532 F.2d 1, 4–5 (7th Cir.1976). In *Berwind,* in construing contract terms that appeared under the heading of "warranty," the court noted several concepts of contract interpretation that we find applicable in this case. See *Berwind,* 532 F.2d at 6–7. The *Berwind* court first noted the exculpatory provision at issue appeared under the heading "Warranty," where the reader would expect to find further reference to the subject of warranty. *Berwind,* 532 F.2d at 7. Secondly, the application of "the Bahamas rule" indicated the subsequent general phrase, "and in no event are we to be liable," was modified by the preceding specific terminology, "[o]ur liability under this contract is limited," leading the reader to believe the natural meaning of the clause was "in no event are we to be liable under this contract."*Berwind,* 532 F.2d at 7. Thirdly, the *Berwind* court noted the exculpatory language did not contain the words "negligence," "tort" or their cognates. *Berwind,* 532 F.2d at 7.

From the cases of *Tyler, Berwind,* and others, we understand that the accepted rules of interpretation of exculpatory clauses require that the agreement be given a fair and reasonable interpretation based upon a consideration of all of its language and provisions. See *Berwind,* 532 F.2d at 5–6 (citing cases upon which Illinois courts have relied). Furthermore, such clauses are to be strictly construed against their maker.

City of Ottawa v. Osmonics, Inc., Not Reported in N.E.2d (2011)

2011 WL 10468129

*Berwind,* 532 F.2d at 4. If there is any doubt as to the meaning of an exculpatory clause, the party seeking its protection cannot be said to have carried his burden. *Berwind Corp.,* 532 F.2d at 6.

**\*5** In the instant case, the City of Ottawa does not assert that it is not a sophisticated commercial entity, therefore, there is no public policy bar or social relationship disparity that would preclude us from finding an exculpatory clause. Nevertheless, a fair and reasonable interpretation of Osmonics's contract with the city is that it does not bar a claim sounding in negligence. Osmonics, which drafted the contract, seeks to construe section 3.5 as a warranty clause subject to the time limitation of section 3.1. Osmonics then seeks to construe the last sentence of section 3.6 as another exculpatory clause that ostensibly precludes claims of any other kind. First of all, the clause upon which Osmonics wishes to rely occurs in a general and specific discussion of warranty terms. Secondly, the last sentence of section 3.6 reads: "The remedies provided herein are exclusive, and Seller shall incur no liability other than that stated herein."Occurring as it does at the end of paragraph 3.6, the last sentence of 3.6 naturally refers to only the warranty damage provisions and is not entitled to be given the weight of a separate exculpatory clause precluding any other type of claim. Osmonics's attempt to find relief in the "incidental and consequential" damages language of section 3.3 also falls short of sustaining its burden of dispelling any doubt as to the meaning of the language at issue. Osmonics did not offer evidence to indicate the parties' intentions included meanings other than those expressed in the contract. We must therefore agree with the city that Osmonics failed to include in the contract clear and explicit language or unequivocal terms indicating an intention that the city was barred from bringing suit against Osmonics under a theory of negligence. Any doubt in interpreting the meaning of any exculpatory clause should be resolved in favor of the city. For these reasons we reverse the trial court's ruling granting summary judgment to Osmonics.

The city next asserts the trial court erred in granting Basalay summary judgment because Basalay, well-trained in architecture, had a duty to design the corridor in a way that avoided the down slope of water from the new to the old building and a duty to warn the city that a breach in the system would cause water to flow down the corridor and cause damage in the adjacent administration building. The city asserts Basalay's failures proximately caused the water damage. In response, Basalay argues it did not owe Ottawa a duty regarding plumbing services or design, that its duty

was defined by its contract with the city, and in any case, any failure on the part of Basalay was not the proximate cause of the damages to the city.

In *Ferentchak v. Village of Frankfort,* 105 Ill.2d 474, 476 (1985), the court considered a case in which plaintiffs sought to hold a civil engineer liable in negligence because work he had done in accordance with the terms of a contract was in fact insufficient to protect the plaintiffs' home from flood damage. The civil engineer had contracted with a property developer to design a water drainage system for a group of lots. *Ferentchak,* 105 Ill.2d at 476–77. The contract did not require the civil engineer to set foundation grade levels but, as it turned out, the water drainage system was ineffective in relation to the foundation level of plaintiffs' home. *Ferentchak,* 105 Ill.2d at 476–78. The *Ferentchak* court held that the defendant's reliance upon the terms of his contract was not misplaced and that the contract did not give rise to a duty to perform work outside its parameters. *Ferentchak,* 105 Ill.2d at 480–81. Even when considering whether the defendant was negligent in failing to exercise the degree of skill or care required of a civil engineer, the *Ferentchak* court reiterated that the scope of the engineer's duty in tort was defined by his contract, which did not require that he set the foundation grade levels. *Ferentchak,* 105 Ill.2d at 481–82.

**\*6** We find *Ferentchak* instructive in the instant case. Here, the city does not contend that Basalay did not perform according to the terms of the contract it had with the city. Cary, Basalay's architect, testified Basalay's part of the project included the walls and roofs of the new building and the renovation of the old building. Although Cary was aware that water could be relieved through a system of drains and slope, Basalay was not responsible for the design or construction of the floor or the drainage system. Furthermore, Cary stated the new building was established a foot higher than the existing building which housed the administrative offices, a process over which Basalay had no control. Cary stated that Basalay had to accommodate the difference in elevation and that the slope could not be changed absent a change in the location of the building. Because Basalay had no contractual duty to accommodate in its design work the potential for flooding from a failure in Osmonics's system, the city's attempt to find Basalay liable for negligence fails.

Basalay's proximate cause argument also has merit. Although proximate cause is ordinarily a question for the trier of fact, what constitutes proximate cause becomes a question of law

Add. 41

"when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them." *Merlo v. Public Service Co. of Northern Illinois,* 381 Ill. 300, 318 (1942). Illinois courts draw a distinction between a condition and a cause. *First Springfield Bank & Trust v. Galman,* 188 Ill.2d 252, 257 (1999). If the negligence charged does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury. *First Springfield,* 188 Ill.2d at 257. The test to be applied is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence. *First Springfield,* 188 Ill.2d at 257.

In the in instant case, we do not believe Basalay might have reasonably anticipated that the breach in Osmonics's pipe system would be a natural and probable result of its own act of designing the water treatment building with a downward slope toward the administration building. The facts before us are not in dispute and the inference to be drawn from them does not support a finding that Basalay's design plan was the proximate cause of the flood damage incurred by the city.

We also find no reason to question the trial court's denial of the city's motion to amend its complaint. A ruling on a motion to amend the pleadings is within the discretion of the trial court. *Deming v. Montgomery,* 180 Ill.App.3d 527, 533, (1989). In this case, an examination of the proposed amendment indicates the city is basically repleading its original count under the guise of further allegations. The city's proposed expert affidavit does not change our conclusion. As we have stated, Basalay's professional duty was defined by the terms of its contract with the city. The trial court did not err in granting Basalay's summary judgment motion.

*7 For these reasons, we affirm the trial court's ruling granting Basalay summary judgment and reverse the trial court's ruling granting Osmonics summary judgment.

For the foregoing reasons, the judgment of the circuit court of LaSalle County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

Justice WRIGHT concurred in the judgment.

Justice HOLDRIDGE concurred in part, dissented in part in the judgment.

Justice HOLDRIDGE, concurring in part and dissenting in part:

I agree with the decision to affirm the trial court's grant of summary judgment to Basalay, Cary and Alstadt Architects, and to affirm the trial court's denial of the plaintiff's motion to file an amended complaint. However, I also would have affirmed the trial court's grant of summary judgment to Osmonics, Inc., and I therefore dissent from that portion of the judgment of the court.

It is well settled that parties may waive their rights, duties and obligations by express agreement. *Lake County Trust Co. v. Two Bar B, Inc.,* 182 Ill.App.3d 186, 192 (1989). Parties may even go so far as to contract for an exclusive remedy under a contract (*O'Shield v. Lakeside Bank,* 335 Ill.App.3d 834, 839 (2002)) and, once agreed upon, an exclusive remedy provision is binding upon all of the parties and will be enforced by Illinois courts. *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.,* 256 Ill.App.3d 31, 34 (1993). Moreover, our courts have recognized and enforced exclusive remedy provisions even when the contract omits the word "exclusive" if the contract, taken as a whole, warrants that construction. *Hicks v. Airborne Express, Inc .,* 367 Ill.App.3d 1005, 1011 (2005)." 'An exclusive remedy clause will be enforced unless it violates public policy or something in the social relationship of the parties works against upholding the clause.' " *Hicks,* 367 Ill.App.3d at 1011 (quoting *W.E. Erickson Construction, Inc. v. Chicago Title Insurance Co.,* 266 Ill.App.3d 905, 910 (1994)). While exclusive remedy clauses must be strictly construed against the benefitting party, public policy permits exclusive remedy clauses between competent parties in order to allow such parties to allocate business risk as they see fit. *Hicks,* 367 Ill.App.3d at 1011.

Here, the City of Ottawa and Osmonics, Inc. are exactly the type of parties one would expect to enter into a contract containing an exclusive remedy provision. Ottawa, admittedly a sophisticated municipal corporation, issued a bid package soliciting bids for work to be performed on a water improvement project. The record established that no less than 16 vendors submitted bids, and Osmonics was awarded the contract only after several months of deliberation and weighing of the merits of each bid. There can be no doubt that at least one factor in Osmonics submitting the successful bid was the fact that the exclusive remedy provision allowed it to reduce its insurance costs on the project. In fact,

Add. 42

Ottawa avers in its complaint that it seeks $142,919.14 on behalf of its insurance carriers, Martin Boyer Company, Inc. and the Illinois Municipal Risk Management Association. The record clearly supports the conclusion that the contract unambiguously provided an exclusive remedy provision that allocated the risks of negligence and breach of warranties to Ottawa.

**\*8** I find the majority's reliance upon *Tyler Enterprises of Elwood, Inc. v. Jack Skiver,* 260 Ill.App.3d 742 (1994), and *Berwind Corp. v. Litton Industries, Inc.,* 532 F.2d 1 (7th Cir.1976), to be misplaced. Both *Tyler* and *Berwind* are clearly distinguishable from the instant matter. In *Tyler,* the court held that a statutory cause of action for strict liability, which did not arise out of the contractual relationship of the parties, was not covered by the contractual remedy provision that excluded all causes of action "arising out of this contract, including negligence."*Tyler,* 260 Ill.App.3d at 761. Here, we are dealing with an exclusive remedy provision that did not limit the parties to causes of action "arising out of this contract." Instead, the language in the instant matter is clear in stating that "[t]he remedies provided herein are exclusive, and [Osmonics] shall incur no liability other than that stated herein."

Similarly, in *Berwind,* the court merely held that an ambiguous exclusive remedy provision will be strictly construed against the drafter. *Berwind,* 532 F.2d at 4. As the majority points out, in *Berwind,* the exclusive remedy clause was found in a section of the contract entitled "Warranties" which led the court to conclude that the clause was limited in application to breach of warranty claims. Here, unlike *Berwind,* the exclusive remedy clause is contained in the section of the contract entitled "Warranties and Claims" and, thus, clearly establishes the intent of the parties that the exclusive remedy provision applies to both "warranties" and "claims." Likewise, the ambiguous language of the remedy clause in *Berwind,* interpreted by the court to mean that "in no event are we to be liable under this contract," was insufficient to shield the drafter against a negligence claim. *Berwind,* 532 F.2d at 7. Here, we do not have the ambiguous contract provision that confronted the court

in *Berwind.*Rather, the contract provision in the instant matter clearly and unambiguously limits all remedies: "[t]he remedies provided herein are exclusive, and [Osmonics] shall incur no liability other than that stated herein."

There are several other cases in which contract language similar to the provisions at issue herein has been held under Illinois law to prevent an action for negligence. See *Arkwright Mutual Insurance Co. v. Garrett & West, Inc.,* 790 F.Supp. 1386, 1388 (N.D.Ill.1992); *Gates Rubber Co. v. USM Corp.,* 508 F.2d 603 (7th Cir.1975); *Illinois Central Gulf R.R. Co. v. Paragas, Inc.,* 772 F.2d 253 (5th Cir.1984). In *Arkwright,* the court held, under Illinois law, that a contract which contained two provisions, one specific to warranties and another more general clause that prohibited recovery of "any incidental or consequential damages of any nature whatsoever," evidenced a specific intent of two sophisticated business parties to bar any tort claims between the parties. *Arkwright,* 790 F.Supp. at 1390. Similarly, in *Gates,* the court found that a warranty limitation provision, accompanied by a provision barring recovery of "any special indirect or consequential damages," barred an action in tort. *Gates,* 508 F.2d at 617. Likewise, in *Paragas,* the court refused to read into a commercially negotiated liability limitation clause what the court referred to as a "negligence loophole." *Paragas,* 772 F.2d at 255 (contract provision preventing recovery of "all indirect, special or consequential damages" was sufficient to establish the party's intent to prevent any actions sounding in tort).

**\*9** Given the similarity of the contract language at issue herein "expressly disclaiming liability for incidental and/or consequential damages" and the contract language found sufficient to bar a tort action in *Arkwright, Gates,* and *Paragas,* I would hold that the plain language of the contract in the instant matter bars Ottawa's claims against Osmonics. I would, therefore, find that the trial court did not err in granting summary judgment to Osmonics. I respectfully dissent from that portion of the judgment of the court reversing the trial court's grant of summary judgment to Osmonics.

---

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 43

2012 WL 147950
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina,
Eastern Division.

CROP PRODUCTION SERVICES, INC., Plaintiff,

v.

Thomas ORMOND, Sr., Ormond
Farms, et al., Defendants.

No. 4:11–CV–41–D.    |    Jan. 18, 2012.

**Attorneys and Law Firms**

Ross W. Johnson, Ryan P. Howell, Faegre & Benson, LLP,
Des Moines, IA, Luther Donald Starling, Jr., Daughtry,
Woodard, Lawrence & Starling, Smithfield, NC, for Plaintiff.

Trawick H. Stubbs, Jr., Stubbs & Perdue, PA, New Bern, NC,
for Defendants.

**ORDER**

JAMES C. DEVER III, Chief Judge.

 *1 Crop Production Services, Inc. ("plaintiff" or "CPS")
sued Ormond Farms and its four partners ("defendants" or
"Ormond") for breach of contract under various contractual
legal theories [D.E. 1, 4, 26]. Defendants counterclaimed
against CPS, seeking to transform a straightforward contract
case into a far-reaching tort case [D.E. 30]. CPS seeks to
dismiss some of defendants' noncontractual counterclaims
for failure to state claims upon which relief can be granted
[D.E. 35]. As explained below, the court grants plaintiff's
motion to dismiss and dismisses defendants' counterclaims
for tortious interference with contract, unfair and deceptive
trade practices, treble damages, negligence, and negligent
misrepresentation.

**I.**

Ormond Farms (the "Farm") is a general partnership that
operates various farmlands in eastern North Carolina. See
2d Countercl. [D.E. 30] ¶ 2. The partnership is comprised
of four partners: Thomas Ormond, Sr., Gloria W. Ormond,
Thomas B. Ormond, Jr ., and Sheila B. Ormond (collectively,
the "partners").Id. In 2010, the Farm raised cotton, corn, and

soybeans, and purchased all of its needed seed, chemicals,
and fertilizer from Crop Production Services ("plaintiff" or
"CPS").Id. ¶¶ 8, 9. The Farm also hired CPS to provide
agronomic services, such as soil sampling, crop protection
application, field management, and prescription of crop
protection chemicals. See id. ¶¶ 12–13.

The Farm entered into a credit agreement with CPS that
permitted the Farm to receive materials and agronomic
services from CPS via a credit account See Am. Compl. [D.E.
26] ¶¶ 7, 7(a), Ex. A. As security for the credit account,
the Farm and the partners executed a promissory note for
$2,500,000 due on February 5, 2011, and a security agreement
giving CPS a lien on the Farm's crops and equipment. See
id. ¶¶ 20–21, 23–25, Exs. BE. In addition, the partners each
signed a surety agreement guaranteeing the Farm's payment
of all obligations to CPS. Id. ¶¶ 27–28, 30–31, 33–34, 3637,
Ex. F.

As part of the Farm's arrangement with CPS, the Farm paid
for a "scouting" service, in which CPS employees monitored
the Farm's crop fields to identify potential weed and
pest problems and recommend appropriate crop protection
chemicals. See 2d Countercl. ¶¶ 14, 17, 18. After the Farm
planted crops in April 2010, two CPS scouts, Hank Cherry,
Jr. ("Cherry"), and Jurden Braxton Bell, III ("Bell"), started
monitoring the Farm's fields. Id. ¶ 18.

Cherry monitored the Farm's cotton fields, which consisted
of approximately 5,000 acres of cotton situated in the middle
of crop fields owned by other farms. Id. ¶ 20.In May
2010 and again in June 2010, Cherry recommended that the
Farm aerially apply a mixture of crop protection chemicals
to its cotton fields. See id . ¶¶ 21–22.The recommended
mixtures were comprised mostly of chemicals that CPS
manufactured and distributed. See id. ¶¶ 23–32.The Farm
hired an experienced crop duster to aerially apply the CPS
mixtures. Id. ¶¶ 33–34.The crop duster voiced concern about
applying the mixture aerially to the Farm's cotton, because
the cotton was adjacent to crop fields owned by other farms.
Id. ¶ 35.The Farm contacted Cherry, who reassured it that the
mixture contained an "anti-drift chemical" that would prevent
any problems.Id. ¶ 36.The crop duster applied the mixture to
the Farm's cotton, and within a week the Farm received calls
from the owners of the adjacent crop fields complaining that
the mixture had damaged their crops. Id. ¶¶ 37–38.Multiple
sources verified that ceratin chemicals in the CPS mixture
drifted onto the adjacent fields and damaged the crops. See
id. ¶¶ 39–41.The Farm settled with the owners of the adjacent

Add. 44

fields by purchasing their damaged crops for $735,000. *Id.* ¶ 42.

**\*2** In September 2010, when the Farm began to harvest its cotton, the average yield was 300 pounds-per-acre. *Id.* ¶¶ 43–44.The Farm harvested an average of 950 pounds-per-acre from cotton fields not sprayed with the CPS mixtures. *Id.* ¶ 45.A cotton field owned by a nearby farm that did not use the mixture yielded over 1,000 pounds-per-acre. *Id.* ¶ 46.

Bell monitored the Farm's soybean fields. *See id.* ¶¶ 47–48.Based on Bell's having identified certain weeds in the soybean fields, CPS recommended the application of a herbicide that it distributed. *Id.* ¶¶ 48–49.Within days of spraying the herbicide, the soybean plants diminished to half their original size. *Id.* ¶ 50.The Farm notified CPS of the herbicide's effect on the soybean plants, and a CPS employee informed the Farm that the herbicide suppressed the growth of soybeans. *Id.* ¶ 51.The CPS employee recommended a fertilizer to counteract the effect of the herbicide, and the Farm followed the employee's advice. *Id.* Nevertheless, when the Farm harvested its soybeans, fields sprayed with the herbicide yielded 14 bushels-per-acre, and fields not sprayed with the herbicide yielded over 50 bushels-per-acre. *Id.* ¶ 52.

In March 2011, the Farm informed a CPS credit officer that, due to the damage the recommended chemicals had caused to the cotton and soybean crops, the Farm was unable to pay for the chemicals. *Id.* ¶ 53.CPS gave the Farm three options: (1) pay the entire amount immediately; (2) sign a release of liability for the 2010 crop year, pay $1,750,000 immediately, and pay the remaining balance over five years with 9% interest (secured by a lien on the next five years' harvest); or (3) prepare for litigation. *Id.* ¶ 57.The Farm was not willing or able to pay CPS the amount and was not willing to release CPS from liability for the crop damage. *Id.* ¶ 58.

On March 23, 2001, CPS sued the Farm and the partners (collectively, "defendants") to collect the Farm's outstanding payments and enforce the various surety agreements between CPS and defendants. *See id.* ¶ 59; Compl. [D.E. 4] ¶¶ 1–37. As a result of the lawsuit, the Farm's banking institution refused to renew the Farm's line of credit.2d Countercl. ¶ 59. The Farm, however, was able to find alternative financing. *Id.* ¶ 60.The Farm then "discovered that [it was] unable to purchase supplies [it] needed from many of [its] regular suppliers because representatives from CPS had informed these creditors and suppliers [that] there would be consequences if they furnished [credit or supplies to the

Farm]."*Id.* ¶ 60.In addition, "CPS made it known to vendors of products distributed by CPS that none of those products were to be sold to the [Farm]," and "[s]everal of these vendors and suppliers refused to sell CPS products to the [Farm] ... as direct result of CPS'[s] actions." *Id.* ¶ 61–62.

On June 20, 2011, defendants filed an answer, alleged counterclaims against CPS, and alleged third-party claims against various CPS employees [D.E. 15]. CPS amended its complaint on July 20, 2011 [D.E. 26]. On August 3, 2011, defendants filed an answer to CPS's amended complaint, alleged counterclaims against CPS, and alleged third-party claims against the CPS employees. *See* 2d Countercl.

**\*3** Defendants assert eight counterclaims against CPS: (1) negligence, *id.* ¶¶ 63–71; (2) breach of express warranty, *id.* ¶¶ 7276; (3) breach of implied warranty of fitness for particular purpose, *id.* ¶¶ 7783; (4) negligent misrepresentation, *id.* ¶¶ 8490; (5) breach of fiduciary duty, *id.* ¶¶ 91–97; (6) tortious interference with a prospective economic advantage, *id.* ¶¶ 98–102; (7) breach of implied covenant of good faith and fair dealing, *id.* ¶¶ 103–12; and (8) unfair and deceptive trade practices, *id.* ¶¶ 113–17.In addition, defendants asserted two third-party claims against four CPS employees: (1) negligence, *id.* ¶¶ 128–36; and (2) negligent misrepresentation, *id.* ¶¶ 137–43.

On August 29, 2011, CPS and the CPS employees moved to dismiss four of defendants' counterclaims, defendants' request for punitive damages, and defendants' third-party claims against the CPS employees, due to a failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) [D.E. 35]. On September 29, 2011, defendants voluntarily dismissed their third-party claims against the CPS employees [D.E. 37]. On October 19, 2011, defendants filed a response in opposition to CPS's motion to dismiss [D.E. 41]. On November 11, 2011, CPS replied to defendants' response [D.E. 42].

## II.

North Carolina substantive law controls defendants' state-law counterclaims. The standard for a motion to dismiss under Rule 12(b)(6), however, is a procedural matter controlled by federal law. *See, e.g., Colgan Air, Inc. v. Raytheon Aircraft Co.,* 507 F.3d 270, 275 (4th Cir.2007); *Wilson v. Dryvit Sys., Inc.,* 206 F.Supp.2d 749, 752 (E.D.N.C.2002), *aff'd,*71 F. App'x 960 (4th Cir.2003) (per curiam) (unpublished).

Add. 45

Crop Production Services, Inc. v. Ormond, Not Reported in F.Supp.2d (2012)

2012 WL 147950

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."*Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009); *see*Fed.R.Civ.P. 12(b)(6); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–57 (2007); *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (per curiam); *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir.2007) (en banc). A court accepts all factual allegations in the complaint as true.*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). A court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."*Tellabs, Inc .,* 551 U.S. at 322.A court need not accept, however, the complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement."*Nemet Chevrolet Ltd. v. Consumeraffairs.com. Inc.,* 591 F.3d 250, 255 (4th Cir.2009); *see also Iqbal,* 129 S.Ct. at 194950. Similarly, a court is not bound accept as true "unwarranted inferences, unreasonable conclusions, or arguments."*Giarratano v.. Johnson,* 521 F.3d 298, 302 (4th Cir.2008) (quotation omitted); *see Iqbal,* 129 S.Ct. at 1949–50.

**\*4** CPS moves to dismiss the following counterclaims: (1) tortious interference with a prospective economic advantage; (2) unfair and deceptive trade practices; (3) request for punitive damages; and (4) negligence and negligent misrepresentation, CPS Mot. Dismiss Countercl. [D.E. 35] 2. The court examines each counterclaim seriatim.

### A.

CPS argues that defendants' counterclaim for tortious interference with a prospective economic advantage fails because defendants have not alleged sufficient facts to show a prospective contract and because defendants did not allege actual damages. *See* CPS Mem. Supp. Mot. Dismiss Countercl. [D.E. 35–1] 79.

In North Carolina, the " 'interfere[nce] with a man's business, trade or occupation by maliciously inducing a person not to enter a contract with a third person, which he would have entered into but for the interference, is actionable if damage proximately ensues.' " *Dalton v. Camp,* 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001) (quoting *Spartan Equip. Co. v. Air Placement Equip. Co.,* 263 N.C. 549, 559, 140 S.E.2d 3, 11 (1965)) (alternation in original). A party alleging tortious interference must show the existence of a prospective contract with which the tortfeasor interfered. *See, e.g., Dalton,* 353 N.C. at 654, 548 S.E.2d at 710; *Coleman v. Whisnant,* 225 N.C. 494, 506–07, 35 S.E.2d 647, 655–56 (1945). A prospective contract exists when there is a reasonable expectation that the third party otherwise would have entered into the contract. *See Owens v. Pepsi Cola Bottling Co. of Hickory, N.C. Inc.,* 330 N.C. 666, 680–81, 412 S.E.2d 636, 644–45 (1992); *accord Dalton,* 353 N.C. at 653, 548 S.E.2d at 710; *Coleman,* 225 N.C. at 506, 35 S.E.2d at 656.For example, in *Owens,* the Supreme Court of North Carolina held that the plaintiff provided sufficient evidence of a prospective contract when "[p]laintiff's forecast of evidence show[ed] that he had a valid business relationship with several schools and factories in the Granite Falls area, and that he had a reasonable expectation of continuing to do business with these customers." 330 N.C. at 680, 412 S.E.2d at 64445.Likewise, in *Coleman,* the Supreme Court of North Carolina held that a prospective contract existed when the plaintiff's allegations showed that, over the course of two years, the defendant had undermined the plaintiff's attempts to license a patented idea to various mills, form a partnership with another mill, and contract for the manufacturing of plaintiff's patented idea. 225 N.C. at 506, 35 S.E.2d at 656.

In contrast, in *Spartan Equipment* the Supreme Court of North Carolina held that the plaintiff-corporation could not proceed with its claim of tortious interference with a prospective economic advantage when the plaintiff did "not allege[ ] that its prospective sale to [a third party] would have been consummated but for the malicious interference of [the defendant]."263 N.C. at 559, 140 S.E.2d at 11.Similarly, in *Dalton,* the Supreme Court ofNorth Carolina affirmed summary judgment for a defendant when the evidence showed that the plaintiff's contract negotiations with a third party had broken down after a disagreement of terms—"such circumstances fail[ed] to demonstrate that a ... contract would have ensued."353 N.C. at 655, 548 S.E.2d at 710.

**\*5** Defendants' sparse factual allegations do not show that it was plausible that the Farm had a reasonable expectation of entering into a contract with a third party. First, defendants allege that the Farm "discovered that [it was] unable to purchase supplies [it] needed from many of [its] regular suppliers because representatives from CPS had informed these creditors and suppliers [that] there would be consequences if they furnished [credit or supplies to the Farm]." 2d Countercl. ¶ 60. Defendants do not explicitly assert that they expected to purchase supplies from their "regular suppliers." *See Spartan Equip. Co.,* 263 N.C. at

Add. 46

Crop Production Services, Inc. v. Ormond, Not Reported in F.Supp.2d (2012)

2012 WL 147950

559, 140 S.E.2d at 11.Moreover, defendants do not provide supporting factual allegations, such as the nature and length of their relationship with these suppliers, or even the suppliers' names and locations. *See Owens,* 330 N.C. at 680, 412 S.E.2d at 64445.Although defendants' allegations make the existence of a prospective contract possible, such fact-empty allegations fall short of making it plausible. *See Iqbal,* 129 S.Ct. at 1949–50; *Twombly,* 550 U.S. at 556–57.

Second, defendants allege that "CPS made it known to vendors of products distributed by CPS that none of those products were to be sold to the [Farm]," and that "[s]everal of these vendors and suppliers refused to sell CPS products to the [Farm] ... as direct result of CPS'[s] actions." 2d Countercl. ¶¶ 61–62. These allegations fail for the same reason: defendants do not allege the existence of a prospective contract and fail to provide adequate factual allegations to support the inference that a prospective contract existed. In addition, CPS notes that these "vendors" were likely "CPS locations," CPS Mem. Supp. Mot. Dismiss Countercl. 8, not third parties. *See, e.g., Dalton,* 353 N.C. at 654, 548 S.E.2d at 709 (requiring interference with "a contract with a third person" (quotation omitted)).

Third, defendants contend that the Farm's bank refused to renew the Farm's line of credit.2d Countercl. ¶ 59. However, defendants do not allege that the bank's refusal was due to CPS's malicious interference, *see Coleman,* 225 N.C. at 506, 35 S.E.2d at 656, but rather because of the "lawsuit and the potential ramifications." 2d Countercl. ¶ 59.

In sum, defendants fail to plausibly allege that the Farm had a prospective contract with which CPS maliciously interfered. *See Spartan Equip. Co.,* 263 N.C. at 559, 140 S.E.2d at 11.Accordingly, the court dismisses defendants' tortious interference counterclaim.

**B.**

Next, CPS seeks to dismiss defendants' claim for a violation of the Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen Stat. § 75–1.1. In support, CPS argues that defendants did not allege any "substantial aggravating circumstances" or damages. CPS Mem. Supp. Mot. Dismiss Countercl. 9–14.

To state a claim under the UDTPA, a party must show (1) an unfair or deceptive act or practice (2) in or affecting

commerce (3) which proximately caused injury to the party or to the party's business. *See, e.g.,* N.C. Gen.Stat. § 75–1.1; *Dalton,* 353 N.C. at 656, 548 S.E.2d at 711.A practice is unfair if it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."*Branch Banking & Trust Co. v. Thompson,* 107 N.C.App. 53, 61, 418 S.E.2d 694, 700 (1992) (quotation omitted). It is deceptive if it "has the capacity or tendency to deceive."*Id.* at 61, 418 S.E.2d at 700.Whether a practice is unfair or deceptive under the UDTPA is a question of law for the court. *See, e.g., Bartolomeo v. S.B. Thomas, Inc.,* 889 F.2d 530, 534 (4th Cir.1989); *Dalton,* 353 N.C. at 656, 548 S.E.2d at 711; *Tucker v. Blvd. at Piper Glen LLC,* 150 N.C.App. 150, 153, 564 S.E.2d 248, 250 (2002).

**\*6** "North Carolina courts have repeatedly held that a mere breach of contract, even if intentional," does not rise to the level of being an unfair or deceptive trade practice. *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 347 (4th Cir.1998) (quotations omitted); *see, e.g., Mitchell v. Linville,* 148 N.C.App. 71, 74, 557 S.E.2d 620, 623 (2001); *Branch Banking & Trust Co* ., 107 N.C.App. at 62, 418 S.E.2d at 700.Rather, a party must allege some type of egregious or aggravating circumstances accompanying a contract breach. See *Norman Owen Trucking. Inc. v. Morkoski,* 131 N.C.App. 168, 177, 506 S.E.2d 267, 273 (1998); see *also Bartolomeo,* 889 F.2d 530, 534–36; *Kelly v. Georgia-Pacific LLC,* 671 F.Supp.2d 785, 799 (E.D.N.C.2009); *PCS Phosphate Co. v. Norfolk S. Corp.,* 520 F.Supp.2d 705, 717–18 (E.D.N.C.2007), *aff'd,*559 F.3d 212 (4th Cir.2009).

Defendants allege that CPS committed "deceptive or negligent" conduct by negligently misrepresenting and concealing material facts regarding crop protection products.2d Countercl. ¶ 117(c); *see id.* ¶¶ 64–70 (asserting that CPS owed defendants a contractual duty to provide the Farm with proper advice and products). These allegations, however, support only a claim for breach of contract. Defendants believe that CPS gave poor advice, and are therefore dissatisfied with CPS's performance of its contractual obligations. A promisee's dissatisfaction with a promisor's performance of its contractual obligations does not constitute substantial aggravating circumstances. *See, e.g., Mitchell,* 148 N.C.App. 7478, 557 S.E .2d 623–25 (rejecting a UDTPA claim regarding homebuilder's construction deficiencies because homebuyers' allegations did not "elevat[e] [the homebuilder's] actions beyond breach of contract or warranty."); *Kelly,* 671 F.Supp.2d at 799 (dismissing plaintiff's UTDPA claim because allegations

Add. 47

2012 WL 147950

that defendant's product was defective "did not rise to substantial aggravating circumstances"); *Terry's Floor Fashions, Inc. v. Georgia–Pacific Corp.,* No. 5:97–CV–683–BR(2), 1998 WL 1107771, at \*910 (E.D.N.C. July 23, 1998) (unpublished) (dismissing plaintiff's UDTPA claim because allegations of "defendant's deliberate misrepresentation of the traits and qualities" of a product were not "substantial aggravating circumstances" (quotation omitted)). Thus, the court dismisses defendants' UDTPA counterclaim concerning CPS's alleged "deceptive or negligent" conduct because defendants "fail[ed] to allege any acts beyond that of a breach of contract." *Branch Banking & Trust Co.,* 107 N.C.App. at 62, 418 S.E.2d at 700.Likewise, to the extent that defendants rely on CPS's alleged tortious interference with a prospective contract, 2d Countercl. ¶¶ 116, 117(d), to assert an unfair and deceptive trade practices counterclaim, that counterclaim also fails and is dismissed.

### C.

Originally, CPS sought to dismiss defendants' claim for punitive damages. *See* CPS Mem. Supp. Mot. Dismiss Countercl. 15–16. Defendants responded that they are not seeking punitive damages, but rather treble damages pursuant to N.C. Gen.Stat. § 75–16. *See* Defs.' Resp. CPS Mot. Dismiss. Countercl. 8. Because the court has dismissed defendants' UDTPA counterclaim, defendants' claim for treble damages is dismissed as moot.

### D.

**\*7** Finally, CPS argues that North Carolina's economic loss rule bars defendants' counterclaims for negligence and negligent misrepresentation. *See* CPS Mem. Supp. Mot. Dismiss Countercl. 16–24. North Carolina courts have applied the economic loss rule to prohibit recovery for purely economic loss in tort when a contract or warranty has already allocated the risk. *See, e.g., Kelly,* 671 F.Supp.2d at 791: *N.C. State Ports State Auth. v. Lloyd A. Fry Roofing Co.,* 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), *rejected in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.,* 313 N.C. 230, 328 S.E.2d 274 (1985); *Land v. Tall House Bldg. Co.,* 165 N.C.App. 880, 882–85, 602 S.E.2d 1, 3–4 (2004); *Moore v. Coachmen Indus., Inc.,* 129 N.C.App. 389, 401–02, 499 S.E.2d 772, 780 (1998); *Warfield v. Hicks,* 91 N.C.App. 1, 9–10, 370 S.E.2d 689, 694 (1988). The economic loss rule precludes a tort action "against a party

to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract." *Spillman v. Am. Homes of Mocksville, Inc.,* 108 N.C.App. 63, 65, 422 S.E.2d 740, 741–42 (1992).

The rationale for the rule is that it confines parties to the contract's terms when seeking redress concerning the subject matter of the contract. *See Kelly,* 671 F.Supp.2d at 791–92.The rule recognizes that parties to a contract generally do not become each others fiduciaries. *See Broussard,* 155 F.3d at 347 (" 'parties to a contract do not thereby become each others' fiduciaries; [therefore,] they generally owe no special duty to one another beyond the terms of the contract.' " (quoting *Branch Banking & Trust Co.,* 107 N.C.App. at 61, 418 S.E.2d at 699)). Likewise, the rule prevents a party from seeking an extra-contractual tort remedy in an attempt to avoid a contract's allocation of risk. *See Moore,* 129 N.C.App. 389, 401–02, 499 S.E.2d 772, 780 (1998); *see also Reece v. Homette Corp.,* 110 N.C.App. 462, 466, 429 S.E .2d 768, 770 (1993). When injury occurs to the subject matter of a contract, "[i]t is the law of contract and not the law of negligence which defines the obligations and remedies of the parties...." *Spillman,* 108 N.C.App. at 65, 422 S.E.2d 742.For a party to pursue a tort claim stemming from a contract, a plaintiff "must allege a duty owed him by [a] defendant separate and distinct from any duty owed under a contract." *Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc.,* 994 F.Supp. 350, 362 (W.D.N.C.1997) (quotation omitted); *see Kelly,* 671 F.Supp.2d at 791–96.

Defendants claim that CPS was negligent in describing and recommending CPS crop protection products, 2d Countercl. ¶¶ 63–71, resulting in damages to the Farm's crops and crops owned by neighboring farm. *Id.* ¶¶ 3738, 43–46, 50, 52, 71.Defendants, however, contracted with CPS to recommend and provide appropriate crop protection products. *See id.* ¶¶ 89, 12–13.Defendants' tort counterclaims, therefore, are based solely on CPS's negligence in performing its duties under the contract. Defendants do not allege any duties owed by CPS that are "separate and distinct" from the terms of the contract. *Vanwyk Textile Sys., B.V.,* 994 F.Supp. at 362.Consequently, the economic loss rule bars defendants' counterclaims for negligence and negligent misrepresentation. *See Kelly,* 671 F.Supp.2d at 796;*accord Maynard Co-op. Co. v. Zeneca, Inc.,* 143 F.3d 1099, 1100–03 (8th Cir.1998) (economic loss rule barred farmer's tort claims against defendant who recommended crop chemical that did

Add. 48

**Crop Production Services, Inc. v. Ormond, Not Reported in F.Supp.2d (2012)**

2012 WL 147950

not perform as described); *Bailey Farms, Inc. v. NOR–AM Chem. Co.,* 27 F.3d 188, 190–92 (6th Cir.1994) (economic loss rule barred farmer's tort claims against defendant who recommended fumigant that damaged crops).

### III.

**\*8** As explained above, the court GRANTS plaintiff's motion to dismiss [D.E. 35] and DISMISSES defendants' counterclaims for tortious interference with contract, unfair and deceptive trade practices, treble damages, negligence, and negligent misrepresentation.

SO ORDERED.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

240 Fed.Appx. 568
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

Philip A. DUR, Plaintiff—Appellant,

v.

WESTERN BRANCH DIESEL,
INCORPORATED, Defendant—Appellee.

No. 06–1728.  |  Argued: May
24, 2007.  |  Decided: July 9, 2007.

**Synopsis**
**Background:** Boat owner brought diversity action against
mechanic alleging negligence. The United States District
Court for the Eastern District of Virginia, Gerald Bruce
Lee, J., granted summary judgment for mechanic. Owner
appealed.

**Holdings:** The Court of Appeals held that:

[1] damage to boat caused by fire was within contemplation
of contract to repair boat;

[2] economic loss rule raised for first time by mechanic in
its reply brief to its motion for summary judgment could be
considered; and

[3] miscarriage of justice did not occur by decision of Court
of Appeals to refuse to vacate and remand case for district
court to consider third-party beneficiary theory.

Affirmed.

 **\*569**  Appeal from the United States District Court for the
Eastern District of Virginia, at Alexandria. Gerald Bruce Lee,
District Judge. (1:05–cv–01306–GBL).

**Attorneys and Law Firms**

**ARGUED:** John F. O'Connor, Jr., Steptoe & Johnson,
L.L.P., Washington, D.C., for Appellant. Thomas Saunders
Berkley, Vandeventer & Black, L.L.P., Norfolk, Virginia,
for Appellee. **ON BRIEF:** Frank H. Griffin, IV, Steptoe &
Johnson, L.L.P., Washington, D.C., for Appellant. Edward J.
Powers, Vandeventer & Black, L.L.P., Norfolk, Virginia, for
Appellee.

Before NIEMEYER and DUNCAN, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

**Opinion**

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this
circuit.

PER CURIAM:

This is a negligence action under Virginia substantive law.
The district court granted summary judgment in favor of the
defendant. The plaintiff has appealed. We affirm.

**I.**

This negligence action stems from an electrical fire on
board a boat. Philip Dur (Plaintiff), a retired Rear Admiral
in the  **\*570**  United States Navy, owned the boat at the
time of the fire. Plaintiff had purchased the boat, named
the "DeGrasse," from the Navy in 1998. The DeGrasse,
which Plaintiff has described as an old admiral's launch,
had been assigned to Plaintiff when he was on active duty.
Following Plaintiff's retirement, the Navy decommissioned,
stripped, and sold the DeGrasse "as is" to Plaintiff. (J.A. 34).
Plaintiff subsequently contracted with Moon Engineering
(General Contractor) in Norfolk, Virginia, to perform "a hull,
mechanics and electronics retro fit" on the DeGrasse in order
that Plaintiff could use the DeGrasse as a personal watercraft.
*Id.* Throughout this opinion, we refer to this contract as "the
Retrofit Contract."

Upon what General Contractor and Plaintiff believed to be
the completion of the retrofitting work on the DeGrasse,
Plaintiff successfully piloted the DeGrasse from Norfolk to
Alexandria, Virginia. During the voyage, Plaintiff noticed
that the DeGrasse's tachometer had stopped working. Upon

arriving in Alexandria, Plaintiff also noticed that a fan belt running between the alternator and the flywheel on the DeGrasse's starboard engine was missing, and that there was "melted wiring leading from the amp meter, to the starter and then to the battery switch." (J.A. 34). Plaintiff then contacted General Contractor and "demanded changes." *Id. See also* (J.A. 24–25, Plaintiff's Opposition to Defendant's Motion For Summary Judgment) ("When Admiral Dur observed that additional electrical work needed to be completed, he contacted Moon Engineering to insist that the work be done.").

General Contractor "agreed to ensure that the DeGrasse's electrical system was repaired" and subcontracted with Western Branch Diesel, Inc. (Subcontractor) to perform the repair work in Alexandria. (Plaintiff's Opening Br. at 4). Plaintiff admits that he never had a written contract with Subcontractor, nor does Plaintiff allege that he ever had an oral contract with Subcontractor.

Subcontractor performed work on the DeGrasse's electrical system on September 27–28, 2001. On October 1, 2001, while still in the custody of Subcontractor in Alexandria, the DeGrasse caught fire and suffered what Plaintiff describes in his complaint in the present negligence action as "significant damage." (J.A. 6). The fire caused no personal injuries. The record contains no details regarding the actual damage the DeGrasse suffered in the fire.

On November 15, 2005, Plaintiff filed the present diversity action in the United States District Court for the Eastern District of Virginia against Subcontractor, alleging that Subcontractor's negligence had caused the fire aboard the DeGrasse. Among the allegations of negligent conduct, Plaintiff alleged that Subcontractor had been negligent by, *inter alia*, "failing to properly service, repair and/or alter the electrical system in the DeGrasse" and "failing to complete the work, and by allowing the boat's electrical system to remain in a dangerous condition." (J.A. 7). The complaint demanded judgment against Subcontractor "in an amount no less than $200,000, together with interest and the cost of this action, and such other and further relief as this Court deems just and proper." (J.A. 8).

Subcontractor moved for summary judgment. In moving for summary judgment, Subcontractor argued that because it performed its work aboard the DeGrasse pursuant to contract, Plaintiff could not pursue a negligence claim against it without demonstrating a separate common-law duty of care.

In response, Plaintiff argued that, contrary to Subcontractor's argument, contractors owe a common-law duty **\*571** of care, separate and apart from their contractual duties, to use ordinary skill and care not to create a hazardous condition that could physically injure persons or damage property. Moreover, relevant to one of the issues on appeal, Plaintiff's written opposition to Subcontractor's motion for summary judgment included the following footnote regarding third-party beneficiary status:

> [2] It is possible that Admiral Dur is a third-party beneficiary under the contractual relationship between [Subcontractor] and [General Contractor]. However, because a common-law duty of care exists even for those who are actually contracting parties, the Court need not resolve this issue. Moreover, [Subcontractor] has not alleged in its motion that [Plaintiff] is a third-party beneficiary or argued that such status would have any relevance to its motion.

(J.A.30). In its summary judgment reply brief, Subcontractor responded that Plaintiff's negligence claim against it failed because the record contained no evidence that the DeGrasse had suffered damage caused by the fire beyond the subject of the Retrofit Contract. In support of this argument, Subcontractor cited and relied upon *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55, 58 (1988).

The summary judgment record only consists of: (1) Plaintiff's complaint; (2) Subcontractor's answer; (3) an affidavit by John Beavers, service manager for Subcontractor, to the effect that Subcontractor only worked on the DeGrasse "because of a contract to perform repairs and service of the vessel's electrical system," (J.A. 22); (4) Plaintiff's admission, pursuant to a request to admit, that no written contract existed between him and Subcontractor; (5) the "INTERVIEW SUPPLEMENT" prepared by an investigator of the Alexandria Fire Department detailing his post-fire interview with Plaintiff, (J.A. 34–36); and (6) Subcontractor's work records concerning the DeGrasse.

The district court granted summary judgment in favor of Subcontractor. Plaintiff noted the present timely appeal.

## II.

**[1]** The sole cause of action in this case is Plaintiff's negligence cause of action against Subcontractor under

Add. 51

Virginia substantive law. In order to sustain a cause of action based on negligence under Virginia law, a plaintiff must establish "the existence of a legal duty, a breach of the duty, and proximate causation resulting in damages." *Atrium Unit Owners Ass'n v. King,* 266 Va. 288, 585 S.E.2d 545, 548 (2003). The primary issue presented in this appeal is whether there is a legal duty in tort owed by the Subcontractor to Plaintiff. The determination of whether Subcontractor owed Plaintiff a legal duty in the context of the electrical work Subcontractor performed on the DeGrasse in its role as a subcontractor is a pure question of law. *Burns v. Johnson,* 250 Va. 41, 458 S.E.2d 448, 451 (1995) ("The question whether a duty of care exists in a negligence action is a pure question of law.").

We review the grant of summary judgment de novo. *Higgins v. E.I. DuPont de Nemours & Co.,* 863 F.2d 1162, 1167 (4th Cir.1988). A motion for summary judgment may be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing a district court's grant of summary judgment, we must construe the facts in the light most favorable to the non-moving party; here, Plaintiff. *Smith v. Virginia Commonwealth Univ.,* 84 F.3d 672, 675 (4th Cir.1996) (en banc).

**\*572** In granting summary judgment in favor of Subcontractor, the district court primarily relied upon *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55 (1988). In *Sensenbrenner,* the plaintiffs contracted with a builder for construction of a house and installation of an enclosed swimming pool. *Id.* at 56. The builder in turn entered into a subcontract with an architectural firm to design the home, the pool, and its enclosure. *Id.* After the architectural firm had furnished the requisite plans, the builder entered into a subcontract with a swimming pool contractor for construction of the swimming pool. *Id.* Various components of the swimming pool proved to be defective, causing damage to the swimming pool itself and to the plaintiffs' house. *Id.*

The plaintiffs sued the architectural firm and the swimming pool subcontractor for negligence. The *Sensenbrenner* court held that the plaintiffs could not sustain a negligence cause of action against the architectural firm nor the swimming pool subcontractor, reasoning:

> The plaintiffs here allege nothing more than disappointed economic expectations. They contracted with

a builder for the purchase of a package. The package included land, design services, and construction of a dwelling. The package also included a foundation for the dwelling, a pool, and a pool enclosure. The package is alleged to have been defective—one or more of its component parts was sufficiently substandard as to cause damage to other parts. The effect of the failure of the substandard parts to meet the bargained-for level of quality was to cause a diminution in the value of the whole, measured by the cost of repair. This is a purely economic loss, for which the law of contracts provides the sole remedy.

*Id.* at 58. *Sensenbrenner* squarely applies the economic loss rule, which rule provides that a cause of action in which only economic damages are sought (i.e., the benefit of a contractual bargain) can only be maintained against a party with whom the plaintiff has privity of contract. *Id.* The *Sensenbrenner* court also reiterated that Virginia Code § 8.01–223, "which abolishes the lack-of-privity defense in actions for the recovery of damages to persons or property resulting from negligence," has "no application to claims for purely economic losses." *Id.* at 56–57. Accordingly, Virginia Code § 8.01–223 offered no aid to the plaintiffs in *Sensenbrenner.*

In the present case, the district court applied *Sensenbrenner* as follows:

> The facts here are very similar to those in *Sensenbrenner.* [Plaintiff] contracted with [General Contractor] to perform electrical work on his boat. (Pl.' Opp., at 2). Like the contractor in *Sensenbrenner,* [General Contractor] in turn hired a subcontractor, [Subcontractor], to perform the contracted services. In performing its duties, [Subcontractor] destroyed [Plaintiff's] boat. As the Court stressed in *Sensenbrenner,* the sole area of law available to the Plaintiff here is contract law because the damage caused to Plaintiff's property was solely the property subject to the contract and the losses were purely economic. As Plaintiff's complaint states, "[Plaintiff] contracted for repairs, service, replacement and alterations of the electrical system" for his boat. (Pl.'s Complaint, at 2.) It was precisely these activities that gave rise to the damages to Plaintiff's boat. And the damages that Plaintiff suffered were exclusively

Add. 52

to the boat. Plaintiff does not allege that any other injury to persons or property not contemplated by the contract in fact occurred.

**\*573** The Court holds that Plaintiff may only recover under contract law because Plaintiff's losses were within the contemplation of the contract to repair his boat and did not cause injury to persons or property beyond the contemplation of the agreement.

(J.A. 55–56).

We agree with the district court that *Sensenbrenner* forecloses Plaintiff's negligence cause of action against Subcontractor. Viewing the evidence in the light most favorable to Plaintiff, the record only supports the conclusion that the work performed by Subcontractor on the DeGrasse's electrical system was performed to fulfill General Contractor's obligations under the Retrofit Contract. The General Contractor did not initially fulfill its obligation under the Retrofit Contract to provide the DeGrasse with a properly working electrical system, and therefore, General Contractor subcontracted with Subcontractor to fulfill that obligation once it became clear that further repair was needed. Therefore, the damage to the DeGrasse caused by the fire fell within the scope of the contractual package, and thus, amounted to nothing more than economic loss for which the law of contracts provides Plaintiff the sole remedy.

 **[2]**   Moreover, the record is completely absent of any evidence that the DeGrasse suffered damage beyond the scope of the Retrofit Contract. As such, Virginia Code § 8.01–223 has no application here. In Plaintiff's own words to the investigator of the Alexandria Fire Department, Plaintiff purchased the DeGrasse "as is" in "stripped" condition and subsequently contracted with General Contractor to perform a "hull, mechanics and electronics retro fit." (J.A. 34). The record contains insufficient evidence (in fact no evidence) for a reasonable jury to find that the original, stripped portion of the DeGrasse suffered damage during the fire. [1] In conclusion, we hold the district court properly granted summary judgment in favor of Subcontractor with respect to Plaintiff's negligence claim.

[1]   Plaintiff argues that he should be excused from his failure of proof on this point by claiming that he did not have an opportunity to put in evidence regarding damages because Subcontractor raised the economic loss rule from *Sensenbrenner* for the first time in its reply brief to his opposition brief to Subcontractor's motion for

summary judgment. We reject Plaintiff's argument. First, in the face of a properly supported motion for summary judgment, as was the case here, Plaintiff was obligated to come forward with any and all such evidence to support his negligence cause of action. *See* Fed.R.Civ.P. 56(e). Second, Subcontractor's initial Memorandum in Support of its Motion for Summary Judgment contained sufficient legal argument regarding Subcontractor's lack of a legal duty owed to Plaintiff to put Plaintiff on notice that it should have come forward with any evidence it had showing that the original, stripped portion of the DeGrasse suffered damage during the fire.

### III.

 **[3]**   Lastly, Plaintiff argues that the district court erred in granting summary judgment to Subcontractor based upon a lack of privity of contract between him and Subcontractor without addressing whether Plaintiff was a third-party beneficiary of the contract between General Contractor and Subcontractor. Va.Code § 55–22 ("[I]f a covenant or promise be made for the benefit, in whole or in part, of a person with whom it is not made ... such person ... may maintain in his own name any action thereon which he might maintain in case it had been made with him only and the consideration had moved from him to the party making such covenant or promise.").

 **\*574** Plaintiff's argument is without merit. First, assuming *arguendo* the district court erred in failing to address whether Plaintiff was a third-party beneficiary of the contract between General Contractor and Subcontractor, Plaintiff invited the error by telling the district court: "the Court need not resolve this issue." (J.A. 30). *See* United States v. Jackson, 124 F.3d 607, 617 (4th Cir.1997) (According to the invited error doctrine, " 'a court cannot be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request.' "). Second, Plaintiff's failure to make the argument below that he now makes on appeal with regard to third-party beneficiary status constitutes a waiver of the issue, subject only to plain error review. *See* In re: Celotex Corp., 124 F.3d 619, 630–31 (4th Cir.1997) (adopting plain error standard of review used in criminal cases, as set forth in United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), for application in civil cases). [2] Although, in the final footnote of his written response to Subcontractor's motion for summary judgment, Plaintiff mentioned the mere possibility that he is a third-party beneficiary to the contract between General Contractor and

Add. 53

Subcontractor, he presented absolutely no argument on the matter.

2    Under *Olano*'s plain error test, we may only exercise our discretion to correct a forfeited error, if we: (1) find error; (2) find the error is plain; (3) find the error affects the substantial rights of the party or parties alleging the error; and (4) after examining the particulars of the case, find the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *Id.* at 731, 113 S.Ct. 1770.

Assuming *arguendo* that Plaintiff could satisfy the first three prongs of *Olano*'s plain error test, he certainly cannot satisfy the final miscarriage of justice prong. There simply can be no miscarriage of justice in our refusing to vacate and remand this case for the district court to consider a third-party beneficiary theory when not only did Plaintiff never move to amend his complaint to allege a cause of action based upon a third-party beneficiary theory, but Plaintiff was so confident in his primary theory of recovery that he expressly told the district court not to consider a third-party beneficiary theory.

## IV.

For the foregoing reasons, we hold the district court did not commit reversible error in granting Subcontractor's motion for summary judgment. Accordingly, we affirm.

*AFFIRMED.*

**Parallel Citations**

2007 WL 2005028 (C.A.4 (Va.))

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 54

542 Fed.Appx. 280
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

FIRST SOUTH BANK, Plaintiff–Appellee,
v.
BANK OF THE OZARKS, Defendant–Appellant.
First South Bank, Plaintiff–Appellee,
v.
Bank of the Ozarks, Defendant–Appellant.

Nos. 12–2154, 12–2185.    |    Argued:
Sept. 17, 2013.    |    Decided: Oct. 18, 2013.

**Synopsis**
**Background:** Lender filed suit against successor in interest
to another bank, claiming breach of participation agreement
under which lender agreed to fund up to $4.15 million of
bank's property development loan for $7.1 million to property
developer that later defaulted, upon which successor deducted
expenses before paying lender its 58.041% share of remaining
assets. The United States District Court for the District of
South Carolina, Richard M. Gergel, J., 2012 WL 3597665,
denied successor's motion for judgment on pleadings and
bank's summary judgment motion, and after bench trial,
entered judgment in favor of bank. Successor appealed.

**Holding:** The Court of Appeals held that agreement was
ambiguous regarding obligation for expenses arising from
servicing loan.

Affirmed.

**\*280**  Appeals from the United States District Court for the
District of South Carolina, at Beaufort. Richard M. Gergel,
District Judge. (9:11–cv–02587–RMG).

**Attorneys and Law Firms**

**ARGUED:** John Coffman Lindley, III, Johnston, Allison &
Hord, PA, Charlotte, North Carolina, for Appellant. Alice F.
Paylor, Rosen, Rosen & Hagood, LLC, Charleston, South
Carolina, for Appellee. **ON BRIEF:** Elizabeth J. Palmer,
Rosen, Rosen & Hagood, LLC, Charleston, South Carolina,
for Appellee.

Before KING, SHEDD, and THACKER, Circuit Judges.

**Opinion**

Affirmed by unpublished PER CURIAM opinion.

Unpublished opinions are not binding precedent in this
circuit.

**\*281**  PER CURIAM:

Bank of the Ozarks appeals the district court's judgment in
favor of First South Bank in this breach of contract action.
For the following reasons, we affirm.

**I.**

In June 2010, Woodlands Bank agreed to issue a $7.1 million
development loan to Lakeside Development, LLC (the
Borrower or Lakeside). Seeking another bank to help fund
the loan, Woodlands approached First South Bank, and the
banks eventually entered into a Participation Agreement (the
Agreement), whereby First South Bank agreed to fund up to
$4.15 million of the development loan. During negotiations,
First South Bank demanded that Woodlands be responsible
for all expenses arising from servicing the loan and would not
have entered into the Agreement without this promise.

To that end, the Agreement specifically discussed the
handling of expenses, providing as follows in Paragraph 4:

  4. EXPENSES. Seller [Woodlands] may at its discretion
  make additional advances for taxes, insurance premiums
  and other items deemed necessary by [Woodlands] to
  collect, enforce, or protect the Loan and any Property
  securing the Loan including, but not limited to, attorneys'
  fees, court costs and disbursements (Expenses). Purchaser's
  [First South Bank's] percentage of Expenses is:

Add. 55

A. {X} No Shared Expenses. [Woodlands] will bear all expenses.

B. {} Shared Expenses. _____ percent of Expenses, or if no percentage is indicated, that percentage of Expenses which [First South Bank's] unreimbursed investment is of the principal amount of the Loan outstanding on the date Expenses are incurred. All Expenses will be shared in the proportion indicated on the date Expenses are incurred. [First South Bank] will pay to [Woodlands] on demand [First South Bank's] share of Expenses. [Woodlands] will remit to [First South Bank's] share of Expenses recovered by [Woodlands].

(J.A. 25). The banks selected option A, indicating by marking with an X that Woodlands was responsible for all expenses.

In addition to expenses, the Agreement also addressed "Payments," providing in Paragraph 3 that "[Woodlands] will receive all Payments and apply them to Borrower's account," and that "[First South Bank's] percentage of all Payments is ... [First South Bank] First Out: 100 percent of Payments before Default until such time as [First South Bank] has received [First South Bank's] Investment plus interest thereon." (J.A. 25). "Payments" are defined in Paragraph 9 as "principal, interest, and other charges received by [Woodlands] with respect to the Loan from whatever source derived." (J.A. 26).

Finally, Paragraph 19 addressed what would happen in the event Lakeside defaulted on the underlying development loan:

> 19. DEFAULT AND LIQUIDATION OF LOAN. Notwithstanding any payment terms to the contrary, in the event of default, or if [Woodlands] in its sole discretion should otherwise accelerate and liquidate the Loan, all Payments collected and received by [Woodlands] will be applied ratably as follows: first, to Expenses; second, to the unpaid principal amount of the Loan in proportion to the respective unpaid investments of [Woodlands] and [First South Bank] in the Loan at the time of Default; and third, to the respective accrued interest and other charges of [Woodlands] and **282** [First South Bank]. Upon Borrower's

Default, all Payments and Borrower Fees received from Borrower, whether designated for repayment of the loan or undesignated, will be deemed intended for the repayment of the Loan in accordance with this Agreement.

(J.A. 26). Paragraph 19 does not define "payment terms," "Payments," or "Expenses."

Shortly after signing the Agreement, Woodlands entered receivership under the Federal Deposit Insurance Corporation, and Bank of the Ozarks purchased the loan to Lakeside Development and became Woodlands' successor in interest to the Agreement. Thereafter, Lakeside defaulted on the loan. Bank of the Ozarks began collecting the loan from Lakeside's assets, including liquidating one of Lakeside's trust accounts that had secured the initial loan. Bank of the Ozarks then deducted all of its expenses–$81,452.39–before paying First South Bank its 58.041% share of the remaining assets.

First South Bank responded by suing Bank of the Ozarks in federal district court, alleging breach of contract for deducting expenses before paying First South Bank's share of the recovery. Bank of the Ozarks moved for judgment on the pleadings, attaching the Agreement and arguing that Paragraph 19 permitted it to deduct expenses incurred after a default. First South Bank filed a cross-motion for summary judgment, arguing that Paragraph 4 unambiguously required Bank of the Ozarks to bear all expenses. The district court denied both motions, concluding "as a matter of law that the Participation Agreement is ambiguous with regard to the issue raised in this action." (J.A. 53–54). Thereafter, the court held a bench trial during which both parties presented extrinsic evidence regarding their understanding of the Agreement. At the close of evidence, the court ruled in favor of First South Bank and ordered Bank of the Ozarks to pay $47,275.78. *First South Bank v. Bank of the Ozarks,* 2012 WL 3597665 (D.S.C. Aug. 12, 2012). The court expounded upon its earlier ruling concerning the ambiguity of the Agreement, explaining that "[w]hile Paragraph 4 plainly and without qualification states that [Bank of the Ozarks] is to bear all Expenses, paragraph 19 appears to permit [Bank of the Ozarks], after default, to pay Expenses out of the proceeds that it receives." *Id.* at *6. The court found that it could not "reconcile these two provisions" and that the Agreement was thus ambiguous. *Id.* By separate order, the court later granted attorneys' fees and costs in the amount of $41,668.95.

Add. 56

First South Bank v. Bank of the Ozarks, 542 Fed.Appx. 280 (2013)

## II.

Bank of the Ozarks now appeals, contending that the court erred in denying its motion for judgment on the pleadings. [*] We review this ruling de novo, *Butler v. United States,* 702 F.3d 749, 751–52 (4th Cir.2012). Under South Carolina law, which applies here, an agreement is ambiguous if it is "susceptible to more than one interpretation or its meaning is unclear." *Miles v. Miles,* 393 S.C. 111, 711 S.E.2d 880, 883 (2011). "Whether a contract is ambiguous is to be determined from the entire contract and not from isolated portions of the contract." *Farr v.* **\*283** *Duke Power Co.,* 265 S.C. 356, 218 S.E.2d 431, 433 (1975). A contract may be ambiguous because of "indefiniteness of expression," internal inconsistency, or inclusion of "words that have a double meaning." *Crystal Pines Homeowners Ass'n v. Phillips,* 394 S.C. 527, 716 S.E.2d 682, 685 (S.C.Ct.App.2011) (internal quotation marks omitted).

[*]    Because Bank of the Ozarks is only appealing this pretrial order, we requested that the parties file supplemental briefs addressing whether, under *Varghese v. Honeywell Int'l, Inc.,* 424 F.3d 411, 420–23 (4th Cir.2005), Bank of the Ozarks was precluded from arguing that the contract was unambiguous. Having reviewed the supplemental briefs and the responses of the parties at oral argument, we are satisfied that, under the particular facts of this case, Bank of the Ozarks preserved its argument.

Bank of the Ozarks argues that the Agreement, specifically Paragraph 19, unambiguously provides that, in event of a default, expenses are shared. Bank of the Ozarks rests its argument on the first sentence of Paragraph 19, which provides "[n]otwithstanding any payment terms to the contrary, in the event of default" Bank of the Ozarks could apply all "Payments" first to "Expenses." (J.A. 26). In Bank of the Ozarks' view, Paragraph 4, which defines expenses, is a "payment term" swept aside by Paragraph 19. And, because

Paragraph 19 permits Bank of the Ozarks to apply recovered sums first to expenses, Bank of the Ozarks contends that it was authorized to deduct its expenses prior to paying First South's share.

In response, First South Bank contends that "payment terms" in Paragraph 19 refer only to Paragraph 3, which addresses "Payments." First South Bank notes that, while Paragraph 4 has no limiting language suggesting that expenses are handled differently in the event of a default, Paragraph 3 specifically mentions that First South Bank is entitled to "100 percent of Payments before default." (J.A. 25). Thus, in First South Bank's view, Paragraph 19 simply reaffirms what is stated in Paragraph 3 regarding what occurs to "payments" after default and has no impact on Paragraph 4 and Bank of the Ozarks' duty to shoulder all expenses.

We agree with the district court that the contract is ambiguous. As First South Bank notes, "payment terms" in Paragraph 19 are not defined by the contract, and they can reasonably be read as limited to Paragraph 3. Under that reading, Paragraph 19 simply reinforces the reference to default in Paragraph 3. "Payment terms" certainly could encompass a broader section of the Agreement, but, critically, the fact that the phrase *could* be read in such a way confirms its ambiguity. Because "payment terms" could be read in several different manners, Bank of the Ozarks is incorrect that the phrase unambiguously sweeps aside Paragraph 4's rule for expenses. Accordingly, we agree with the district court that the Agreement is internally inconsistent and thus ambiguous.

## III.

For the foregoing reasons, we affirm the district court's denial of Bank of the Ozarks' motion for judgment on the pleadings.

*AFFIRMED.*

---

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 57

Ford v. All-Dry of the Carolinas, Inc., 211 N.C.App. 197 (2011)

711 S.E.2d 876

211 N.C.App. 197
Unpublished Disposition
NOTE: THIS OPINION WILL NOT APPEAR
IN A PRINTED VOLUME. THE DISPOSITION
WILL APPEAR IN A REPORTER TABLE.
Court of Appeals of North Carolina.

Sharon FORD and Gwin Buffington, Plaintiffs,

v.

ALL–DRY OF THE CAROLINAS, INC., Defendant.

No. COA10–931.    |    April 19, 2011.

**Opinion**

 **\*1** Appeal by plaintiffs and defendant from order entered
15 January 2010 and judgment entered 11 February 2010 by
Judge Dennis J. Winner in Haywood County Superior Court.
Heard in the Court of Appeals 24 January 2011.

**Attorneys and Law Firms**

Smathers and Hyde, by Patrick U. Smathers, and Song &
Song, PLLC, by Jonathan J. Song, for plaintiffs-appellants.

Young, Morphis, Bach & Taylor, L.L.P., by Paul E.
Culpepper and Timothy D. Swanson, for defendant-appellant.

MARTIN, Chief Judge.

On 12 June 2006, plaintiff Sharon Ford purchased a home
located at 171 Birch Road in Maggie Valley, North Carolina.
Prior to her purchasing the home, three needed repairs were
identified: 1) the retaining wall needed to be fixed or replaced;
2) the foundation needed to be stabilized; and 3) the deck
needed to be stabilized.

Defendant All–Dry of the Carolinas, Inc. ("All–Dry")
submitted a proposal dated 1 May 2006 which quoted a price
of $24,000.00 for the material and labor involved in the
installation of a Grip–Tite Foundation Pier System in order
to address these needed repairs. Ms. Ford was also given a
copy of an unsigned warranty and literature advertising that
All–Dry's Grip–Tite Foundation Pier System would cause
a home to "solidly rest on bedrock or equal low-bearing
strata instead of unstable soil" and to "eliminate shifting,
settling problems." The literature also advertised that after
installation, an "investment in a solid home or commercial
building will be safe." Ms. Ford accepted All–Dry's proposal

and, on or about 28 June 2006, All–Dry began the repair work
on Ms. Ford's home.

The work was completed on 30 June 2006. That day, All–Dry
gave Ms. Ford a document which she signed stating in part:

> This amendment is made part of the contract submitted
> to ——, dated ——. In the piering and foundation
> business, there is one overriding goal by All–Dry of the
> Carolinas, and this is to "stabilize" the affected area against
> further vertical "settlement." Until this is accomplished,
> any repairs of a cosmetic nature performed on your home
> will be futile due to the fact that this type of structural
> damage is usually progressive.

> As an added consideration, we will attempt to close cracks,
> render doors and windows operational, and move walls
> back to their original position. This is something we would
> sincerely like to see happen; however, we are painfully
> aware of the consequences of such efforts, and you, as our
> customer, must be also. There are several factors which
> affect any contractor's ability to cause the above mentioned
> items to occur.

> ....

> Due to the above factors [skin friction, obstructions,
> brick or stone veneer, concrete piers], the possibility
> of further cosmetic or consequential damages occurring
> during a lifting operation is much greater than while only
> stabilizing the area in question. As a result, All–Dry of the
> Carolinas, Inc., does not accept any responsibility for these
> consequential damages if they should occur. We, of course,
> will proceed slowly and with extreme care to minimize the
> possibility of any damage during the lifting process.

 **\*2** Approximately two months after the installation was
completed, Ms. Ford began to have difficulty opening her
windows and doors. Interior plaster walls cracked, there were
nail pops in her ceilings and walls, and spaces developed
in her window and door trim. The slope in her floors
changed and the cracks that were in the basement and outside
foundation walls increased in size. By August 2006, Ms. Ford
noticed that her refrigerator and stovetop had begun to tilt
to one side. By September 2006, she noticed additional floor
sloping in her dining room. By October 2006, cracks began
to appear in her walls. Since this time, Ms. Ford's home has
experienced further deepening cracks, more nail pops, more
tilting of floors, pooling and running of water when it rains, a

Add. 58

Ford v. All-Dry of the Carolinas, Inc., 211 N.C.App. 197 (2011)

711 S.E.2d 876

bedroom wall on the main floor of the house separating from the back wall, and shifting of stairs.

Ms. Ford filed a complaint against All–Dry on 30 November 2007 alleging breach of contract, fraud, unfair and deceptive practices in commerce, and negligent infliction of emotional distress. By an amended complaint, Gwin Buffington was added as an additional party-plaintiff, and claims for breach of warranties and negligence were asserted.

By its answers to the complaint and amended complaint, All–Dry denied the allegations contained therein and moved to dismiss. The matter was tried by a jury. At trial, a number of different experts testified as to the manner in which the work was performed, the damages, and the cost of necessary repairs. Without any repairs, the director of building inspections for Haywood County testified that the structure would be condemned and, if not repaired, demolished.

At the close of all the evidence, All–Dry moved for directed verdict. The trial court granted the motion with respect to plaintiffs' claims for negligence and fraud, denied the motion with respect to plaintiffs' claims for breach of contract, and reserved ruling on the motion with respect to plaintiffs' claims for unfair and deceptive practices in commerce. The jury returned a verdict finding All–Dry breached the contract and awarded damages in the amount of $126,000.00. The jury also found that All–Dry failed to obtain a building permit, that its conduct was in commerce, and that such conduct had proximately caused plaintiffs to be damaged in the amount of $146,300.00.

All–Dry moved for a new trial and a judgment notwithstanding the verdict. The trial court granted judgment notwithstanding the verdict with respect to plaintiffs' claim for unfair practices, but denied the motions with respect to plaintiffs' claim for breach of contract. Judgment was entered awarding plaintiffs $126,000.00 plus interest and the plaintiffs' costs. Both plaintiffs and defendant appeal.

## PLAINTIFFS' APPEAL

## I.

Plaintiffs contend the trial court erred in granting defendant's motion for directed verdict on their negligence claim. A motion for a directed verdict tests the sufficiency of the

evidence to support a verdict for the non-moving party. *Williams v. CSX Transp., Inc.,* 176 N.C.App. 330, 344, 626 S.E.2d 716, 728 (citing *Whaley v. White Consol. Indus., Inc.,* 144 N.C.App. 88, 92, 548 S.E.2d 177, 180, *disc. review denied,* 354 N.C. 229, 555 S.E.2d 277 (2001)), *granting petition for disc. review withdrawn,* 360 N.C. 491, 632 S.E.2d 775 (2006). The trial court takes the non-movant's evidence as true and considers it "in the light most favorable to him, giving to the non-movant the benefit of every reasonable inference that may legitimately be drawn from the evidence with contradictions, conflicts, and inconsistencies being resolved in the non-movant's favor." *Whaley,* 144 N.C.App. at 92, 548 S.E.2d at 180. The motion should be denied unless the evidence is insufficient to justify a verdict for the non-movant. *E.g. Dickinson v. Pake,* 284 N.C. 576, 583, 201 S.E.2d 897, 902 (1974).

**\*3** "North Carolina has adopted the economic loss rule, which prohibits recovery for economic loss in tort. Instead, such claims are governed by contract law." *Moore v. Coachmen Indus., Inc.,* 129 N.C.App. 389, 401, 499 S.E.2d 772, 780 (1998). The rule specifically provides that "[w]here a defective product causes damage to property other than the product itself, losses attributable to the defective product are recoverable in tort rather than contract." *Id.* at 402, 499 S.E.2d at 780 (citing *Reece v. Homette Corp.,* 110 N.C.App. 462, 467, 429 S.E.2d 768, 770 (1993)).

> The rationale for the economic loss rule is that the sale of goods is accomplished by contract and the parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective. To give a party a remedy in tort, where the defect in the product damages the actual product, would permit the party to ignore and avoid the rights and remedies granted or imposed by the parties' contract.

*Id.* at 401–02, 499 S.E.2d at 780; *see also Wilson v. Dryvit Sys., Inc.,* 206 F.Supp.2d 749, 754 (E.D.N.C.2002), *aff'd,* 71 F. App'x. 960 (4th Cir.2003) (applying North Carolina law and noting that defendant's "cladding is an integral component of plaintiff's house. The damage caused ... therefore constitutes damage to the house itself. No 'other' property damage has resulted, and plaintiffs have suffered purely economic losses"); *Land v. Tall House Bldg. Co.,*

165 N.C.App. 880, 884, 602 S.E.2d 1, 4 (2004); *Gregory v. Atrium Door & Window Co.,* 106 N.C.App. 142, 143–44, 415 S.E.2d 574, 575 (1992) (water damage to flooring caused by malfunctioning and deteriorating doors constituted economic loss not recoverable in negligence); *Warfield v. Hicks,* 91 N.C.App. 1, 10, 370 S.E.2d 689, 694, *disc. review denied, 323 N.C. 629, 374 S.E.2d 602 (1988).*

In the present case, plaintiffs alleged that All–Dry's negligent construction caused damage only to the house itself. As such, even taken in the light most favorable to plaintiffs, the economic loss rule prevents any recovery on a claim for negligence and therefore defendant's motion for a directed verdict as to that claim was properly granted.

## II.

Plaintiffs next allege that the trial court erred in granting All–Dry's motion for judgment notwithstanding the verdict on their claim that All–Dry committed unfair and deceptive practices in commerce. Specifically they allege that a finding by the jury that defendant failed to obtain a building permit as required by law constitutes an aggravating circumstance to support a verdict for plaintiffs on their claim for a violation of North Carolina's act prohibiting unfair and deceptive practices in commerce. We disagree.

The act declares "unlawful" "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen.Stat. § 75–1.1(a) (2009). Whether an alleged commercial act or practice is unfair or deceptive in violation of N.C.G.S. § 75–1.1 is a question of law. *Hardy v. Toler,* 288 N.C. 303, 310, 218 S.E.2d 342, 346–47 (1975) (noting that the jury should determine the facts, and based on the jury's findings, the court should then determine as a matter of law whether the defendant engaged in unfair or deceptive acts or practices). Our review of questions of law is *de novo. E.g. Davis v. Dep't of Crime Control & Pub. Safety,* 151 N.C.App. 513, 516, 565 S.E.2d 716, 719 (2002).

**\*4** "In determining the unfair or deceptive nature of an act or practice, each case is fact specific." *Carcano v. JBSS, LLC,* 200 N.C.App. 162, ——, 684 S.E.2d 41, 50 (2009) (citing *Marshall v. Miller,* 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981)). " 'A practice is unfair when it *offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or*

*substantially injurious to consumers.' " Id.* (quoting *Bus. Cabling, Inc. v. Yokeley,* 182 N.C.App. 657, 663, 643 S.E.2d 63, 68, *disc. review denied, 361 N.C. 567, 650 S.E.2d 599 (2007)).* "Stated another way, 'a party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position.' " *Id.* (quoting *McInerney v. Pinehurst Area Realty, Inc.,* 162 N.C.App. 285, 289, 590 S.E.2d 313, 316–17 (2004)). "The 'relevant gauge' of an act's unfairness or deception is '[t]he effect of the actor's conduct on the marketplace.' " *Id.* at ——, 684 S.E.2d at 50 (quoting *Ken–Mar Fin. v. Harvey,* 90 N.C.App. 362, 365, 368 S.E.2d 646, 648, *disc. review denied, 323 N.C. 365, 373 S.E.2d 545 (1988)).*

Additionally, while under the act "commerce" is intended to include all types of business activities, "the Act does not apply to all wrongs in a business setting." *Id.* at ——, 684 S.E.2d at 50 (citing *Hageman v. Twin City Chrysler–Plymouth, Inc.,* 681 F.Supp. 303 (M.D.N.C.1988) (holding that the act does not apply to every dispute between parties)). In order to recover under the Act, the unfair or deceptive act or practice must be more than just a breach of contract. *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.,* 139 N.C.App. 360, 367–68, 533 S.E.2d 827, 832–33 (" '[A]ctions for unfair or deceptive trade practices are distinct from actions for breach of contract, and ... a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75–1.1.' ") (quoting *Branch Banking & Trust Co. v. Thompson,* 107 N.C.App. 53, 62, 418 S.E.2d 694, 700, *disc. review denied, 332 N.C. 482, 421 S.E.2d 350 (1992)), disc. review denied, 353 N.C. 262, 546 S .E.2d 93 (2000).* The plaintiff must show *substantial aggravating circumstances* attending the breach in order to recover under the Act. *Id.* at 368, 533 S.E.2d at 833. We note that, given this substantial requirement, it is, in fact, " 'unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations.' " *Id.* (quoting *Broussard v. Meineke Discount Muffler Shops,* 155 F.3d 331, 347 (4th Cir.1998)); *see also Bob Timberlake Collection, Inc. v. Edwards,* 176 N.C.App. 33, 42, 626 S.E.2d 315, 323, *disc. review denied, 360 N.C. 531, 633 S.E.2d 674 (2006).*

**\*5** Our research reveals no North Carolina precedent for concluding that failure to perform an administrative act, such as obtaining a building permit, is a "substantial aggravating circumstance" sufficient to enhance a claim for breach of contract to one for a violation of the act prohibiting unfair

Add. 60

practices in commerce. Failing to obtain a building permit does not amount to the required "inequitable assertion of [defendant's] power or position." *Carcano,* 200 N.C.App. at ——, 684 S.E.2d at 50. We cannot say that plaintiffs established the additional egregious, immoral, oppressive, unscrupulous, or substantially injurious acts needed to impose the heightened penalty under the Act. Thus, we will not disturb the trial court's ruling granting All–Dry's motion for judgment notwithstanding the verdict on the unfair practices claim.

### III.

Plaintiffs next contend the trial court erred in limiting its instruction on plaintiffs' unfair practices claim to defendant's failure to obtain a building permit. The verdict sheet submitted to the jury first asked the jury to find whether there was a breach of contract. Immediately following the breach of contract issue, the verdict sheet asked the jury to determine whether All–Dry "perform[ed] repairs to the plaintiffs' foundation without obtaining a building permit as required by law?" Plaintiffs argue that the jury should have been permitted to consider additional factors which plaintiffs allege were substantially aggravating in violation of the act prohibiting unfair and deceptive practices in commerce, including misleading written promotional materials given to plaintiffs, the faulty installation of the Grip–Tite system, and less than full disclosure of relevant and material facts and terms until after completion of the project. We disagree.

Plaintiffs acknowledge that statements made in All–Dry's promotional materials "may be accurate statements ... when the Grip–Tite pier system is properly designed and installed." They argue, however, that in the present case, those statements were misleading because of the minimal experience of the All–Dry employees involved in the project. Any warranties made and breached in the written representations given to plaintiffs, along with the actual faulty installation of the Grip–Tite system, are relevant to the breach of contract claim; but neither of these factors rise to the level of being substantially aggravating for the purposes of an unfair and deceptive practices claim. "Neither an intentional breach of contract nor a breach of warranty ... constitutes a violation of Chapter 75." *Mitchell v. Linville,* 148 N.C.App. 71, 74, 557 S.E.2d 620, 623 (2001) (citing *Branch Banking & Trust Co.,* 107 N.C.App. at 62, 418 S.E.2d at 700; *Trust Co. v. Smith,* 44 N.C.App. 685, 691, 262 S.E.2d 646, 650, *disc. review denied,* 300 N.C. 379, 267 S.E.2d 685 (1980),

*overruled on other grounds, Marshall v. Miller,* 302 N.C. 539, 276 S.E.2d 397 (1981)).

**\*6** Plaintiffs also contend the trial court erred by not instructing the jury that it could consider whether All–Dry did not fully disclose all relevant, material facts and terms until after completion of the project. Failure to disclose information has been considered deceptive when tantamount to misrepresentation, *Kron Med. Corp. v. Collier Cobb & Assocs.,* 107 N.C.App. 331, 339, 420 S.E.2d 192, 196, (holding that defendant insurance broker's failure to correct plaintiff's belief that a deposit on insurance premiums would be refundable if the actual coverage used was less than projected constituted a violation of an insurance regulation statute, which constituted an unfair or deceptive practice as a matter of law), *disc. review denied,* 333 N.C. 168, 424 S.E.2d 910 (1992); however, in the present case, the damage incurred by plaintiffs as a specific result of any false representations by defendant was not *separate and apart* from the damage arising out of the breach of contract claim. "Plaintiffs are entitled to one recovery for the same alleged wrongful conduct, but not multiple recoveries under theories of breach of contract and unfair and deceptive trade practices." *See Decker v. Homes, Inc./Constr. Mgmt. & Fin. Grp.,* 187 N.C.App. 658, 666, 654 S.E.2d 495, 501 (2007) (citing *Marshall v. Miller,* 47 N.C.App. 530, 542, 268 S.E.2d 97, 103 (1980), *modified and aff'd,* 302 N.C. 539, 276 S.E .2d 397 (1981); *United Labs. v. Kuykendall,* 335 N.C. 183, 191– 92, 437 S.E.2d 374, 379 (1993)). We hold therefore that plaintiffs' assertions that the trial court erred in instructing the jury are without merit.

### ALL–DRY'S APPEAL

### I.

All–Dry contends the trial court committed prejudicial error by not submitting to the jury its requested instruction on plaintiffs' duty to mitigate. Where a party properly requests the trial court to give specific jury instructions and those instructions are correct and supported by the evidence, "the trial court is required to give the instructions." *Maglione v. Aegis Family Health Ctrs.,* 168 N.C.App. 49, 55, 607 S.E.2d 286, 291 (2005) (citing *Whiteside Estates, Inc. v. Highlands Cove, L.L.C.,* 146 N.C.App. 449, 464, 553 S.E.2d 431, 441 (2001), *disc. review denied,* 356 N .C. 315, 571 S.E.2d 220 (2002)).

Ford v. All–Dry of the Carolinas, Inc., 211 N.C.App. 197 (2011)

711 S.E.2d 876

As a threshold issue, it is not at all clear from the record that All–Dry properly tendered a written request for the mitigation instruction. When the topic of a mitigation instruction was broached during the charge conference, the trial judge replied, "I hadn't—you didn't request such a charge, so I hadn't thought about it." Defendant's attorney responded that "I would request that you think about it." The trial judge then replied, "you haven't really requested it in a way that I've got to give it." " 'Where a requested instruction is not submitted in writing and signed pursuant to G.S. 1–181 it is within the discretion of the court to give or refuse such instruction.' " *Lusk v. Case,* 94 N .C.App. 215, 216, 379 S.E.2d 651, 652 (1989) (quoting *State v. Harris,* 67 N.C.App. 97, 102, 312 S.E.2d 541, 544, *disc. rev. denied,* 311 N.C. 307, 317 S.E.2d 905 (1984)). As All–Dry did not submit a written request, it was within the trial judge's absolute discretion whether or not to give the instruction. As such we do not need to reach the issue of whether a properly requested mitigation instruction would have been appropriate and we find no error in the trial court's refusal to instruct the jury with respect to plaintiffs' duty to mitigate.

## II.

**\*7** All–Dry also alleges that the trial court erred in denying its motions for directed verdict prior to the jury deliberations and for judgment notwithstanding the verdict (JNOV).

"The standard for appellate review of a trial court's decision on a motion for directed verdict is the same as the standard of review for a judgment notwithstanding the verdict (JNOV)." *Poore v. Swan Quarter Farms, Inc.,* 94 N.C.App. 530, 532, 380 S.E.2d 577, 578 (citing *Colony Assoc. v. Fred L. Clapp & Co.,* 60 N.C.App. 634, 637, 300 S.E.2d 37, 39 (1983)), *decision modified on denial of reargument,* 95 N.C.App. 449, 382 S.E.2d 835 (1989). "A motion for a directed verdict or a JNOV must be granted if the evidence when taken in the light most favorable to the non-movant is insufficient as a matter of law to support a verdict in favor of the non-movant." *Id.* (citing *Harvey v. Norfolk S. Ry. Co.,* 60 N.C.App. 554, 556, 299 S.E.2d 664, 666 (1983)). "The evidence is sufficient to withstand either motion if there is more than a scintilla of evidence supporting each element of the non-movant's case." *Id.* at 523–33, 380 S.E.2d at 578 (citing *Broyhill v. Coppage,* 79 N.C.App. 221, 226, 339 S.E.2d 32, 35 (1986)).

The elements of a breach of contract claim are "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill,* 138 N.C.App. 19, 26, 530 S.E.2d 838, 843 (2000). The parties do not contest that a valid contract existed.

All–Dry alleges that it completed the necessary work pursuant to the parties' contract by installing seventeen pushpiers in plaintiffs' home. The trial court, however, allowed the issue to go to the jury based upon a theory that All–Dry did not perform its duties under the contract in a "workmanlike manner" as the contract implied. The trial court also noted that there was some evidence that All–Dry breached its express warranty in that a jury could find that plaintiffs' house settled subsequent to the installation of the pushpier system. However, because we agree with the trial court that there was substantial, competent evidence to support the jury's finding that the contract was breached by reason of All–Dry's failure to perform in a workmanlike manner, we need not reach the issue of whether there was sufficient evidence to additionally support the jury's verdict on the alternative theory of express warranty.

All–Dry points to *Everts v. Parkinson,* 147 N.C.App. 315, 332, 555 S.E.2d 667, 678 (2001) and *Oates v. Jag, Inc.,* 66 N.C.App. 244, 246, 311 S.E.2d 369, 370 (1984), *rev'd on other grounds,* 314 N.C. 276, 333 S.E.2d 222 (1985), in support of its argument that an implied warranty is only available to vendee-grantees against vendor-builders. However, these cases stand for the proposition that breach of the implied warranty of *habitability* is not available to future purchasers of a home against the original home builder when the parties have no privity of contract. This line of cases is inapplicable to the present case as All–Dry and plaintiffs were in privity of contract and, furthermore, plaintiffs did not allege a breach of the implied warranty of habitability but rather a breach of the implied warranty of workmanlike installation. When a party contracts to install something, there exists an implied warranty that it will be installed in a workmanlike manner. *Cantrell v. Woodhill Enters.,* 273 N.C. 490, 497, 160 S.E.2d 476, 481 (1968) ("It is the duty of every contractor or builder to perform his work in a proper and workmanlike manner, and he impliedly represents that he possesses the skill necessary to do the job he has undertaken.").

**\*8** Substantial evidence was presented upon which the jurors could base their finding that the implied workmanlike warranty was breached. No building permit was obtained for the job. No engineering analysis was prepared prior to the start of the job. Evidence was presented that All–Dry failed

Add. 62

Ford v. All-Dry of the Carolinas, Inc., 211 N.C.App. 197 (2011)

711 S.E.2d 876

to address the need to support an interior foundation wall. Other evidence showed that one of the piers installed did not sit flush with the house and that, to compensate, All-Dry inserted a wooden shimmy to fill the space between the pier and the house. There was evidence that the brackets were not attached to the house and that such failure was a fault in workmanship. Furthermore, testimony was presented that the brackets were not, as they should have been, encased in concrete in order to be protected from the elements, and that no backfill was placed around the piers. Some of the piers were not completely vertical and therefore did not have full bearing contact. One expert testified that the work performed appeared to be incomplete and that the system installed did not ensure continued lateral stability of the house, thus exerting an upward force and causing additional cracking.

Plaintiffs' experts Roger Moore and William Burgin both testified that All-Dry's installation of the push pier system failed to meet the standard and quality of workmanlike construction in the area. This testimony more than supported the jury's conclusion that All-Dry breached its contractual obligations to plaintiffs.

Nevertheless, All-Dry further contends that its motions for either a directed verdict or a judgment notwithstanding the verdict should have been granted on the breach of contract claim because, it alleges, any damages were speculative. Again, we do not agree.

Contrary to All-Dry's assertions, there was substantial evidence demonstrating the costs which would be incurred in order to repair the home and bring the plaintiffs to the same position that they would have been in had All-Dry fully performed the contract in a workmanlike manner. During the trial, William Burgin testified that plaintiffs would incur approximately $50,000.00 in repair costs. He specifically testified that to complete the remaining structural work would cost approximately $25,000.00 and to repair the esthetic and architectural damage would cost approximately $25,000.00. John Chase estimated that the costs to repair would be between $141,000.00 and $146,000.00.

Edward Medlock also testified about the costs that would be incurred in repairing the home. He testified that a repair plan to stabilize the structure would require a complete geotechnical evaluation that would cost approximately $10,000.00. Medlock also suggested that a specialty engineering firm conduct a site specific evaluation and then design and install a foundation support system at a cost of approximately $50,000.00. He then estimated that addressing the foundation and framing issues would cost approximately an additional $5,000.00 and that the construction costs to replace or repair the structural damages would cost an additional $50,000.00. Ultimately, Medlock testified that the costs to repair the home would likely outweigh its value such that demolition of the existing structure and building of a new home may be more cost-effective.

**\*9** All-Dry also contends plaintiffs failed to offer any proof that the damage to their property resulted from any breach by All-Dry. However, we direct All-Dry to, among other evidence, testimony by William Burgin that the pushpier system, as installed by All-Dry, continues to worsen the cracking in plaintiffs' walls and the sloping of plaintiffs' floors.

Finally, All-Dry argues that, because of the express warranty provided to plaintiffs, the measure of damages in this case was incorrectly calculated and should have been limited to the cost of making the work conform to the contract. In general, when assessing damages in construction contract disputes:

> '[t]he fundamental principle which underlies the decisions regarding the measure of damages for defects or omissions in the performance of a building or construction contract is that a party is entitled to have what he contracts for or its equivalent. What the equivalent is depends upon the circumstances of the case. In a majority of jurisdictions, where the defects are such that they may be remedied without the destruction of any substantial part of the benefit which the owner's property has received by reason of the contractor's work, the equivalent to which the owner is entitled is the cost of making the work conform to the contract. But where, in order to conform the work to the contract requirements, a substantial part of what has been done must be undone, and the contractor has acted in good faith, or the owner has taken possession, the latter is not permitted to recover the cost of

Add. 63

Ford v. All-Dry of the Carolinas, Inc., 211 N.C.App. 197 (2011)

711 S.E.2d 876

making the change, but may recover the difference in value.'

*Hayworth v. Brooks Lumber Co.,* 65 N.C.App. 555, 558, 309 S.E.2d 572, 574 (1983) (quoting *Robbins v. Trading Post, Inc.,* 251 N.C. 663, 666, 111 S.E.2d 884, 887 (1960)).

As All–Dry correctly points out, "[i]f a construction contract provides that the contractor will repair, replace or adjust defects in materials or workmanship at no cost to the buyer then the measure of damages for such defects is limited to the cost of making the work conform to the contract." *Id.,* at 558, 309 S.E.2d at 574 (citing *Leggette v. Pittman,* 268 N.C. 292, 150 S.E.2d 420 (1966)). The warranty in this case "guarantee[d] the performance of the Grip–Tite Piering System for a period of twenty-five (25) years. This guarantees that the footings will not settle. If such settling does occur, [All–Dry] will correct the problem at [its] expense or refund the full amount of the money paid to [it]."

Here, however, settling was not the only breach of contract by All–Dry. The failure to perform in a workmanlike manner caused a number of other problems besides settlement—including gaps in window and door frames, cracks in walls, nail pops in ceilings and walls, spaces in window and door trim, changes in floor slopes, cracks in basement and outside foundation walls, walls separating from other walls, and shifting of stairs. With all of these extensive needed repairs, it is clear that plaintiffs are entitled to the difference between the value of what they contracted to obtain—a repaired home without foundation or other construction issues—and the present condition of the home after the unworkmanlike construction did not address its foundational issues and in fact caused a great deal of further damage. *See id.* at 558, 309 S.E.2d at 574.

*10 John Chase testified that in its present condition, the house is worth approximately $36,100.00. He testified that if the foundation was repaired, the value of the home would increase to $163,000.00 and that if the sheetrock and floors were also repaired, the value of the home would increase to approximately $196,000.00. Bruce Crawford, the Haywood County director of building inspections testified that, without repair, the structure would be condemned and demolished.

William Burgin testified that it would cost plaintiffs approximately $50,000.00 to repair the damages caused by All–Dry. Edward Medlock estimated that it would cost plaintiffs $115,000.00 to repair the damages. John Chase estimated that it would cost between $141,000.00 and $146,000.00 to repair the damages to the home.

The jury's conclusion that plaintiffs were entitled to $126,000.00 in damages is a figure consistent with estimates that the home required repairs which would cost between $50,000.00 and $146,000.00 in order that its value could be increased by approximately $126,000.00 to $159,900.00 so that the home would be repaired and undamaged as contracted for by plaintiffs.

Affirmed.

Judges HUNTER and THIGPEN concur.
Report per Rule 30(e).

**Parallel Citations**

711 S.E.2d 876 (Table), 2011 WL 1483726 (N.C.App.)

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 64

2010 WL 4118361
Only the Westlaw citation is currently available.
United States District Court,
D. Maryland.

GREAT NORTHERN INSURANCE CO

v.

NIRO, INC.

Civil No. JFM–08–1765.   |   Oct. 15, 2010.

**Opinion**

J. FREDERICK MOTZ, District Judge.

**\*1** Dear Counsel:

I have reviewed the memoranda submitted in connection with GEA's motion for partial summary judgment. The motion is granted in part and denied in part.

### *Plaintiff's Tort Claims*

The "risk of death of personal injury" exception to the economic loss doctrine does not apply because that exception applies only where the risk of injury is prospective. Nevertheless, plaintiff's tort claims are not barred by the economic loss doctrine because the damage to plaintiff's facility, clean-up costs, and destroyed gum arabic product constituted "damage to property other than the product itself" under Maryland law. See *A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 634 A.2d 1330, 1334 (Md.1994); *National Coach Works of Virginia v. Detroit Diesel Corp.,* 128 F.Supp.2d 821, 831 (D.Md.2001).

Moreover, the *"de minimis"* rule that has been applied by some courts when considering the economic loss rule would not bar plaintiff's tort claims here. As an initial matter, it is not entirely clear that Maryland would adopt the *de minimis* rule. Moreover, the $73,000 that plaintiff claims in connection with its property claim is significantly greater than the claims for $171.36 and 29 pieces of wire that led to the adoption of the *de minimis* rule in *Delmarva Power & Light Co. v. Meter– Treater, Inc.,* 218 F.Supp.2d 564, 571 (D.Del.2002) and *Rich Prods. Corp. v. Kemutec, Inc.,* 66 F.Supp.2d 937, 972 n. 34 (E.D.Wis.1999). That said, plaintiff may recover in tort only "damage to property other than the product itself," and that damage does not include either repairs to the FSD system or the roughly $1.7 million plaintiff claims for substitute drying service costs.

### *Plaintiff's Claim For The $1.7 in Substitute Drying Service Costs is Governed by TIC Gums' Contract with Defendant and is Barred Under the Terms of That Contract*

The Terms and Conditions to the contract immunize defendant from liability "in contract or in tort, including negligence and strict liability, for any special, punitive, indirect, incidental or consequential damages of any kind or character."Plaintiff argues that its claims for substitute drying service costs is one for direct damages, not consequential damages. However, Maryland law is clear that rental services obtained as a substitute for defective goods are classified as incidental and consequential damages. See *Mercedes–Benz of N. Am. v. Garten,* 618 A.2d 233, 242–43 (Md.App.1993); *see also Golt v. Phillips,* 517 A.2d 328, 334 (Md.1986) (finding that a wrongfully evicted tenant was entitled to consequential damages, including substitute housing costs).[1]

[1]   Plaintiff also makes a half-hearted argument that the Terms and Conditions never came into effect because they were not signed by an officer of defendant. The fallacy in this contention is that the terms and conditions were not separate from the larger contract entered into between TIC Gums and Niro. *See, e.g.,* Section 7.0 of the contract, which states that "Niro, Inc.'s Standard Terms and Conditions (see Appendix A) are part of this proposal" and Section 13.0, which proposes technical exceptions and clarifications to the Standard Terms and Conditions.

### *Contractual Limitation on the Amount of Recovered Damages*

Although I find that the amount of damages that plaintiff may recover in this action is less than the $1,347,000 contract price, if for some reason I am wrong in my conclusion, the limitation in the damages provision of the Terms and Conditions would limit any damages recovered by plaintiff to the $1,347,000 contract price.

**\*2** Despite the informal nature of this letter, it should be flagged as an opinion and docketed as an order.

### ORDER

For the reasons stated in the accompanying memorandum to counsel, it is, this 15th day of October 2010

**Great Northern Ins. Co v. Niro, Inc., Not Reported in F.Supp.2d (2010)**

2010 WL 4118361

ORDERED that defendant's motion for partial summary judgment is granted in part and denied in part.

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 66

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

2005 WL 1610653
Only the Westlaw citation is currently available.
United States District Court,
M.D. North Carolina.

INDEMNITY INSURANCE COMPANY
OF NORTH AMERICA, Plaintiff,
v.
AMERICAN EUROCOPTER LLC,
American Eurocopter Corporation
and Eurocopter, S.A.S., Defendants.

No. 1:03CV949.    |    July 8, 2005.

**Attorneys and Law Firms**

Albert M. Myers, III, Jonathan R. Friedman, Thomas J. Strueber, Lord Bissell & Brook, Atlanta, GA, Reid Russell, Thomas More Buckley, Patterson Dilthey Clay Bryson & Anderson, LLP, Raleigh, NC, for Plaintiff.

Anthony T. Lathrop, Moore & Van Allen, PLLC, Charlotte, NC, Brian R. Faulkner, Domenico C. Perrella, Eric C. Strain, Hugh R. Koss, Nixon & Peabody LLP, San Francisco, CA, for Defendants.

Daniel Alan M. Ruley, James R. Fox, Bell Davis & Pitt, P.A., Winston-Salem, NC, Christopher R. Kiger, Mark A. Ash, Smith Anderson Blount Dorsett Mitchell & Jernigan, Raleigh, NC, for Movants.

### *MEMORANDUM OPINION*

BEATY, J.

**\*1** This matter is before the Court on Motions for Summary Judgment [Document # 19, 21] by Defendants American Eurocopter LLC, American Eurocopter Corporation and Eurocopter, S.A.S. ("Defendants"), as well as various other procedural motions, motions to strike, and motions in limine. For the reasons discussed below, Defendants' Motions for Summary Judgment [Document # 19, 21] are denied. The Court will address the procedural motions as part of this Memorandum Opinion, and will address the remaining motions in limine at trial.

### I. FACTUAL BACKGROUND

Plaintiff Indemnity Insurance Company of North America ("Plaintiff") brings multiple claims related to the crash of a Life Flight Air Medical Transport helicopter ("the helicopter") owned by Duke University Medical Center ("Duke") and insured by Plaintiff. The helicopter was manufactured by Eurocopter, S.A.S., ("E.S.A.S.") a French Corporation, and was purchased by Duke in 1992 for $1,460,143. Duke contracted with Corporate Jets, Inc. ("CJ") to maintain and operate the helicopter for Duke. Pursuant to the Service Agreement between Duke and CJ, CJ was responsible for servicing, maintaining, operating, repairing, and piloting the helicopter for Duke. In September 2000, the main gearbox and related components of the helicopter required an overhaul. CJ obtained an overhauled main gearbox (which is apparently similar to a rebuilt transmission) and related components from Defendant American Eurocopter Corporation for $249,992.51. American Eurocopter Corporation is a separate corporate entity organized under the laws of Delaware with its principal place of business in Texas, and is the predecessor to American Eurocopter LLC. Defendants American Eurocopter Corporation and American Eurocopter LLC are referred to collectively as "American Eurocopter." American Eurocopter is a distributor for E.S.A.S., and also provides repair services and sells overhauled parts that have been overhauled by American Eurocopter for use in helicopters manufactured by E.S.A.S.

According to Plaintiff, American Eurocopter negligently performed the overhaul of the main gearbox in that the overhauled main gearbox sold to CJ included an oil pump with a pump driver gear that did not meet production specifications. Plaintiff contends that the overhauled oil pump, which was contained in the overhauled main gearbox, was defective or contained improper parts, and was not airworthy. Plaintiff further contends that American Eurocopter knew that the overhauled oil pump was defective because tests performed by American Eurocopter during the overhaul of the oil pump indicated that the oil temperatures from the pump exceeded its allowed limits. Plaintiff contends that American Eurocopter did not address the defect and falsely certified that the overhauled gearbox was "airworthy."

CJ received the overhauled main gearbox and related components from American Eurocopter and installed the main gearbox and components into the helicopter on October 12, 2000. The aircraft was then placed back into service. Four days later, on October 16, 2000, the helicopter departed Duke on an air medical transport mission. During the

Add. 67

flight, the main transmission oil pressure warning light (the "warning light") illuminated. The pilot landed the helicopter at Alamance Regional Medical Center ("Alamance Hospital"). The flight nurses and patient left for Duke in a ground ambulance. The pilot, who was employed by CJ, called and described the problem to the helicopter mechanic, who was also employed by CJ. It was surmised between them that the problem likely related to a faulty warning light switch, rather than any actual problem with the helicopter or the gearbox. The CJ mechanic drove from Durham to Alamance Hospital to check the helicopter. The mechanic performed a visual inspection for oil leaks and found none. There were no helicopter maintenance facilities at Alamance Hospital, and the mechanic did not bring tools or a replacement switch with him. Therefore, the pilot and the mechanic made the decision to disconnect the oil pressure switch from the warning light, thus disabling the warning system, run the Helicopter on the ground, hover it, and if there were no further indications of any problems, fly it back to Duke (approximately 35 miles away) without ever reconnecting the warning light. However, during the return flight, the helicopter crashed into a residential neighborhood approximately 1.3 miles from Alamance Hospital. The pilot died and the helicopter was destroyed. The crash caused property damage to nearby homes and some personal injury medical expenses, together totaling $52,508.00. [1]

[1]   This figure represents the amount of damages alleged in the pleadings. The exact amount to be claimed is subject to the proof to be offered by Plaintiff at trial. In addition, the present action does not involve claims related to the death of the pilot, because those claims are the subject of a separate lawsuit brought by the pilot's estate in Texas state court.

**\*2** Plaintiff contends that the crash was caused by the negligently overhauled oil pump, which failed to maintain adequate oil pressure. The decreasing oil pressure was inadequate to lubricate the power transfer gears, causing temperatures to rise and the gears to melt. This led to failure of the gears and ultimately a total loss of power in the main rotor, causing the helicopter to crash. However, Defendants contend that the oil pump was not negligently overhauled, and that even if there were a problem with the oil pump, the warning light operated properly, and the mechanic and pilot were negligent in deciding to disconnect the warning light and fly the helicopter back to Duke for repairs.

## II. CLAIMS AND DEFENSES

Plaintiff brings claims against E.S.A.S. for (1) Product Defect based on the alleged defective design of the helicopter itself; (2) Failure to Warn regarding potential defects in the helicopter and its component parts; (3) Misrepresentation of the helicopter as "airworthy;" and (4) Negligent Design and Manufacture of the Helicopter and its component parts. As to Defendant American Eurocopter, Plaintiff brings the following claims: (1) Product Liability for defects in the helicopter components, presumably based on the allegedly defective gearbox; (2) Failure to Warn of hazards related to the main gearbox; (3) Misrepresentation that the main gearbox was safe for flying, when in fact American Eurocopter knew or should have known that the main gearbox was not airworthy and that the airworthiness was "affirmatively misrepresented;" (4) Negligent Maintenance and Repair of the main gearbox based on American Eurocopter's negligence in overhauling the gearbox and failure to properly test the gearbox before certifying it as airworthy; (5) Negligence Per Se based on American Eurocopter's failure to follow required FAA regulations in performing the overhaul of the gearbox that was eventually sold to CJ; (6) Breach of Contract by American Eurocopter for failing to provide overhauled or component parts that were "airworthy" as required by the contracts between CJ and American Eurocopter; and (7) Breach of Express and Implied Warranties based on American Eurocopter's express certification that the gearbox was "airworthy," "in compliance with FAA regulations," and "free from defects in material and workmanship."

Defendants have moved for Summary Judgment based on the following contentions. First, Defendants contend that as to all of Plaintiff's claims, the claims must fail because any alleged misconduct or failure by the Defendants was not the proximate cause of the crash. Second, Defendants contend that all of Plaintiff's claims would be covered by North Carolina's product liability statutes, and therefore would be barred pursuant to North Carolina General Statute § 99B-3 and § 99B-4 due to the pilot and mechanic's alteration of the warning light and failure to properly heed the warning light. Third, Defendants contend that Plaintiff's tort claims are barred by the "economic loss doctrine" because Plaintiff seeks recovery for damage to the "product itself." Finally, Defendant American Eurocopter contends that Plaintiff's contract claims fail because the applicable contract for the overhaul of the gearbox included a limitation of warranties and damages that provided for repair or replacement of the gearbox, but that excluded liability for any consequential or incidental damages. Thus, as to the first two defenses,

Defendants seek summary judgment on all claims; as to the third defense Defendants seek summary judgment as to the tort claims; and as to the fourth defense Defendant American Eurocopter seeks summary judgment as to the contract claims.

 **\*3** In addition to the Motions for Summary Judgment, the parties have filed various procedural motions related to the summary judgment briefing. The Court will first address the procedural motions, and will then consider the substance of Defendants' Motions for Summary Judgment.

### III. PROCEDURAL MOTIONS

American Eurocopter filed a Brief in Support of Its Motion for Summary Judgment [Document # 22] that, due to a formatting error, exceeded the applicable page limitation by three pages. Plaintiff filed a Motion to Strike American Eurocopter's Summary Judgment Brief for Exceeding the Page Limit [Document # 31]. American Eurocopter then filed a Motion for Leave to Exceed the Page Limit [Document # 41]. American Eurocopter subsequently filed a duplicate Motion for Summary Judgment [Document # 71] that was reformatted to be only 20 pages, and that would be necessary only if the motion for leave to exceed the page limit was denied.

After reviewing all of the motions, the Court finds that American Eurocopter's original Brief is Support of Its Motion for Summary Judgment should be allowed. Therefore, Plaintiff's Motion to Strike [Document # 31] is DENIED, Defendants' Motion for Leave to Exceed the Page Limit [Document # 41] is GRANTED, and the Brief in Support of the Motion for Summary Judgment [Document # 22] will be allowed as originally filed. American Eurocopter's subsequent Motion for Summary Judgment [Document # 71] will therefore be DENIED as moot.

Plaintiff has also filed a Motion to Strike Defendants' Reply Brief [Document # 61] because Plaintiff contends that the Reply Brief goes beyond simply replying to Plaintiff's Response. However, the Reply Brief addresses the arguments raised in the original Motions for Summary Judgment and in Plaintiff's Response. Therefore, Plaintiff's Motion to Strike the Reply Brief [Document # 61] is DENIED.

On June 21, 2005, the Court held a settlement conference between the parties whereupon the legal positions of the parties were briefly discussed and made clear. Subsequently, on June 24, 2005, Plaintiff filed a Motion for Leave to File

a Supplemental Brief in Opposition to Defendants' Motions for Summary Judgment [Document # 126]. Defendants filed a Response [Document # 142] objecting to Plaintiff's request to file a supplemental brief. The Motions for Summary Judgment were referred to this Court on March 29, 2005, and this case has been scheduled for trial beginning July 11, 2005. The Court finds that to allow Plaintiff leave to file a Supplemental Brief at this time would not allow for sufficient time for Defendants to fully respond to the Supplemental Brief or for this Court to consider the additional arguments prior to trial. Moreover, the Court has resolved the Motions for Summary Judgment without reaching the issues raised in Plaintiff's Supplemental Brief. Therefore, Plaintiff's Motion for Leave to File a Supplemental Brief [Document # 126] is DENIED.

Finally, the Court notes that the parties have filed multiple motions to strike and motions in limine relating to evidence and expert witnesses to be presented at trial. However, the Court will not address those motions in this Memorandum Opinion. Instead, the Court will hear those motions and make any necessary determinations on those issues at the trial in this matter, consistent with the determinations in this Opinion. [2]

[2]    The Court notes that as to one of Plaintiff's proposed expert witnesses, Mr. Stimpson, Defendants have filed a Motion to Strike based on the fact that Plaintiff refused to allow Mr. Stimpson to be deposed. Under Fed.R.Civ.P. 26(b)(4), "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial."Based on the evidence presented by the parties at this time, it appears that Plaintiff, in violation of the Federal Rules, simply refused to allow Mr. Stimpson to be deposed, to Defendants' prejudice. However, the Court will allow the parties to be heard on this motion and on the other evidentiary issues at the trial in this matter.

### IV. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

 **\*4** Summary judgment is appropriate when "there is no genuine issues as to any material fact and ... the moving party is entitled to a judgment as a matter of law...."Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law...."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). There can be "no genuine issue as to any material fact" if the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case," since "a complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs.,* 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.,* 381 F.2d 245, 249 (4th Cir.1967)). When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield,* 67 F.3d 53, 56 (4th Cir.1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." *Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1339 (4th Cir.1992)(en banc).

As noted above, Defendants have moved for summary judgment based on the following contentions: (1) the alleged misconduct by the Defendants was not the proximate cause of the crash; (2) Plaintiff's product liability claims are barred pursuant to North Carolina General Statute § 99B-3 and § 99B-4 due to the pilot and mechanic's alteration or misuse; (3) Plaintiff's tort claims are barred by the "economic loss doctrine"; and (4) Plaintiff's contract claims fail because the contract for the overhaul of the gearbox included a limitation of warranties and damages. The Court will consider each of these contentions in turn.

**A. Proximate Cause**
Defendants contend that they are entitled to summary judgment on all claims because even if the gearbox was defective or negligently overhauled, that defect was not the proximate cause of the crash. Defendants contend that the alleged negligence of the pilot and mechanic when they decided to fly the helicopter back to Duke after the warning light came on was an independent, intervening cause of the accident. In Defendants' view, the proximate cause of the crash was the decision by the pilot and mechanic to disable the warning light and fly the helicopter back to Duke,

and therefore the gearbox, even if defective, was not the proximate cause of the crash as a matter of law.

**\*5** However, under North Carolina law, there may be more than one proximate cause of an injury. When two or more proximate causes join and concur in producing an injury, the tortfeasors are jointly and severally liable. *See* *Hairston v. Alexander Tank & Equipment Co.,* 310 N.C. 227, 236, 311 S.E.2d 559, 566-67 (1984). In *Hairston,* a motorist ended up on the side of the road when the tires on his new car came off while he was driving, apparently because the car dealer had failed to tighten the new tires sufficiently. While the motorist was standing on the side of the road, a truck driver negligently struck the motorist. The motorist sued the truck driver and the car dealer. The car dealer moved for judgment as a matter of law based on the contention that the proximate cause of the accident was the truck driver, not the tire problem. However, the North Carolina Supreme Court held that the truck driver's negligence did not insulate the prior negligence of the car dealer as a matter of law.

In defining an "insulating cause," the North Carolina Supreme Court held that "[a]n efficient intervening cause is a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result in question. It must be an independent force, entirely superseding the original action and rendering its effect in the causation remote. It is immaterial how many new elements or forces have been introduced, if the original cause remains active, the liability for its result is not shifted." *Hairston,* 310 N.C. at 236, 311 S.E.2d at 566-67. The test to determine whether the negligent conduct is insulated by the negligence of another is "reasonable unforeseeability on the part of the original actor of the subsequent intervening act and resultant injury." *Id.* at 237, 311 S.E.2d 559, 311 S.E.2d at 467. However, the original tortfeasor need not have been able to forsee "the injury in the precise form in which it actually occurred. All that the plaintiff is required to prove on the question of foreseeability, in determining proximate cause, is that in 'the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected.' " *Hairston,* 310 N.C. at 233-34, 311 S.E.2d at 565 (quoting *Hart v. Curry,* 238 N.C. 448, 449, 78 S.E.2d 170, 170 (1953)); *see also* *Harton v. Forest City Tel. Co.,* 141 N.C. 455, 464, 54 S.E. 299, 302 (1906) (holding that the original negligence "will not be considered too remote if, according to the usual experience of mankind, the result ought to have been apprehended"); *Riddle v. Artis,*

Add. 70

243 N.C. 668, 672, 91 S.E.2d 894, 897 (1956) ("Ordinarily, 'the connection is not actually broken if the intervening event is one which might in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation." ' (internal citations omitted)); *Johnson v. Skinner*, 99 N.C.App. 1, 13, 392 S.E.2d 634, 641 (1990) ("[A] defendant may be liable despite the negligent act of another if at the time of his act he is on notice of circumstances that make the intervention of others likely ... [and] reasonable people must anticipate ... occasional negligence which is one of the incidents of human life." (internal quotations omitted)). This determination is an inference of fact and is "ordinarily a question for the jury." *Hairston,* 310 N.C. at 235, 311 S.E.2d at 565.

**\*6** The Federal District Court for the Western District of North Carolina summarized these rules as follows:

1. Under accepted North Carolina law, the proximate cause of an injury is a factual question for the jury, rather than a question of law for the court.

2. There may be more than one proximate cause of an injury.

3. If the negligence of an actor is a proximate cause of any part of the injuries, he is liable for that part.

4. Defendants' negligence, in order to be actionable, need not be the sole proximate cause of injury, nor the last act of negligence.

5. If the intervening act of a third person is reasonably foreseeable, it does not insulate a previously negligent party from liability for injuries caused by or contributed to by that previous negligence....

*Martin v. Smith,* 534 F.Supp. 804, 806-07 (W.D.N.C.1982) (citations omitted).

Thus, under North Carolina law in the present case, even if the mechanic and pilot were determined to be negligent, and even if their negligence were a proximate cause of the crash, American Eurocopter would still be liable if its own negligence contributed to the crash and if it was forseeable that the mechanic and pilot might try to return the helicopter to Duke for repairs after the warning light illuminated and the helicopter had landed. As established by the North Carolina Supreme Court in *Hairston,* "[t]he well-settled rule in this jurisdiction is that except in cases so clear that there can be no

two opinions among men of fair minds, the question should be left for the jury to determine whether the intervening act and the resultant injury were such that the author of the original wrong could reasonably have expected them to occur as a result of his own negligent act." *Hairston,* 310 N.C. at 238, 311 S.E.2d at 567. In this case, as in *Hairston,* the actions by the mechanic and pilot were not "so highly improbable and extraordinary an occurrence in this series of events as to bear no reasonable connection to the harm threatened by" American Eurocopter's alleged original negligence. *Id.*

Thus, the Court finds that there is a factual question whether the pilot and mechanic were in fact negligent and whether their actions were an intervening, insulating cause of the crash, and these factual questions are for the jury to determine. In this case, the evidence is not so conclusive to establish as a matter of law that the allegedly defective gearbox was not a proximate cause of the crash. Therefore, summary judgment on this basis is not appropriate. [3]

3    The Court notes that North Carolina law provides for contribution among joint tortfeasors. *See* N.C. Gen.Stat. § 1B-1. Although not an issue in the present case, if American Eurocopter pursues a separate contribution action against CJ and establishes that the mechanic and pilot were also negligent and were a contributing cause to the crash, CJ would be required to pay its pro rata share, or 50%, of any judgment that may have been entered against American Eurocopter. *See* N.C. Gen.Stat. § 1B-2 (providing that "[i]n determing the pro rata shares of tort-feasors in the entire liability ... [t]heir relative degree of fault shall not be considered."); *see also* *State Farm Mut. Auto. Ins. Co. v. Holland,* 324 N.C. 466, 471, 380 S.E.2d 100, 103 (1989) (noting that "where one of the joint tortfeasors is not made a party to the original action, either by the plaintiff or the original defendant, the original defendant may nevertheless, by separate action, seek contribution from the other tortfeasor. In such a case he must establish, not only that a judgment has been entered against him, but that the other party is in fact a joint tortfeasor, that is, that the other party is liable jointly with the original defendant to the plaintiff.").

**B. Product Liability Defenses for Alteration or Misuse**

**1. North Carolina's Products Liability Act**

Defendants next contend that they are entitled to summary judgment on all claims based on affirmative defenses provided by North Carolina's Products Liability Act. North Carolina's Products Liability Act is codified in North Carolina

Add. 71

General Statute Chapter 99B and covers "any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling of any product." N.C. Gen.Stat. § 99B-1. North Carolina does not recognize strict products liability. See N.C. Gen.Stat. § 99B-1.1. Instead, "a products liability plaintiff may base the claim on various causes of action, including negligence (negligent design, manufacture, assembly, or failure to provide adequate warnings) and breach of warranty." Moore v. Coachmen Indus., 129 N.C.App. 389, 397, 499 S.E.2d 772, 777 (1998).

*7 The defenses provided for in Chapter 99B apply to any products liability claim, including a breach of warranty claim. See N.C. Gen.Stat. § 99B-1.2.[4] In the present case, Defendants contend that they are entitled to summary judgment on all of Plaintiff's claims because the defenses provided in Chapter 99B provide them with an affirmative defense as a matter of law. Under North Carolina General Statutes § 99B-3, "[n]o manufacturer or seller of a product shall be held liable in any product liability action where a proximate cause of the personal injury, death, or damage to property was either an alteration or modification of the product by a party other than the manufacturer or seller." N.C. Gen.Stat. § 99B-3. An alteration or modification "includes changes in the design, formula, function, or use of the product from that originally designed, tested, or intended by the manufacturer." N.C. Gen.Stat. § 99B-3. In addition, North Carolina General Statute § 99B-4 further provides that "[n]o manufacturer or seller shall be held liable in any product liability action if: (1) The use of the product giving rise to the product liability action was contrary to any express and adequate instructions or warnings delivered with, appearing on, or attached to the product or on its original container or wrapping, if the user knew or with the exercise of reasonable and diligent care should have known of such instructions or warnings; or (2) The user knew of or discovered a defect or dangerous condition of the product that was inconsistent with the safe use of the product, and then unreasonably and voluntarily exposed himself or herself to the danger, and was injured by or caused injury with that product; or (3) The claimant failed to exercise reasonable care under the circumstances in the use of the product, and such failure was a proximate cause of the occurrence that caused the injury or damage complained of." N.C. Gen.Stat. § 99B-4.[5]

[4] The Court notes, however, that Defendants contend that Texas contract law applies to the contract claims. To the extent that the breach of warranty claims arise under Texas law, the North Carolina Products Liability Act defenses would not apply as defenses to those contract claims.

[5] Plaintiff asserts that these defenses should not apply because American Eurocopter was not a "manufacturer" or "seller" of a product, and because the overhaul involved repair services, not a "product." However, these assertions are inconsistent with the essence of Plaintiff's product liability claims, in which Plaintiff claims that a defect in the helicopter components caused the crash. (See Compl. ¶¶ 31-56). In the Complaint, Plaintiff specifically alleges that Defendant American Eurocopter "manufactured and introduced into the stream of commerce" the overhauled gearbox. (Compl.¶ 20). The apparent inconsistency in Plaintiff's contentions may ultimately affect the viability of Plaintiff's product liability claims, if the Court accepts Plaintiff's contention that no product is involved. The parties, however, have not addressed this issue in their summary judgment briefing, and the Court will not at this time deem Plaintiff to have abandoned its product liability claims based on these inconsistent contentions.

Plaintiff contends that these defenses do not apply because the pilot and mechanic were independent contractors employed by CJ and were not agents of Duke. Plaintiff also contends that there is a genuine issue of material fact regarding whether the pilot and mechanic altered or modified the allegedly defective product in this case, or acted unreasonably in flying the helicopter back to Duke after the warning light illuminated. Finally, Plaintiff contends that even if the mechanic did alter or misuse the product, the mechanic was actually acting as an agent of American Eurocopter based on the fact that CJ was an Authorized Service Center for American Eurocopter.[6]

[6] If the pilot and mechanic were agents of American Eurocopter, their actions would be imputed to American Eurocopter, and their actions, therefore, could not provide a defense for American Eurocopter.

Defendants contend that there is no issue of material fact regarding the mechanic's alteration or misuse of the product because the mechanic's decision to disable the warning light and send the helicopter back to Duke for repairs was an alteration or misuse as a matter of law. Defendants further contend that the pilot and mechanic were not agents of American Eurocopter and were in fact agents of Duke,

Add. 72

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 114 of 176

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

and that even if they were independent contractors, their alteration or misuse of the product bars liability under the North Carolina Product Liability Law.[7] Because both parties' contentions raise the question of a potential agency relationship-either between CJ and American Eurocopter, or between CJ and Duke-the Court will turn to a consideration of the rules for establishing an agency relationship under North Carolina law.

[7]    If the pilot and mechanic are determined to be agents of Duke, and if the jury determines that they were negligent and that their negligence contributed to the crash, the doctrine of contributory negligence would bar any negligence claims by Duke against Defendants under North Carolina law.

## 2. Establishment of "Agency" under North Carolina Law

**\*8** Under North Carolina law, agency is defined as "the relationship which arises from 'the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." ' *Hayman v. Ramada Inn, Inc.,* 86 N.C.App. 274, 277, 357 S.E.2d 394, 397 (1987) (quoting *Colony Assocs. v. Fred L. Clapp & Co.,* 60 N.C.App. 634, 637-38, 300 S.E.1d 37, 39 (1983)). The existence of an agency relationship "depends on the degree of control retained by the principal over the details of the work as it is being performed. The controlling principle is that [agency] arises from the right of supervision and control." ' *Id.* (quoting *Vaughn v. North Carolina Dep't of Human Resources,* 296 N.C. 683, 686, 252 S.E.2d 792, 795) (1979)). When the parties operate pursuant to a License Agreement, such as a franchisee-franchisor relationship, "the existence of an agency relationship ... is determined by the nature and extent of control and supervision retained and exercised by the franchisor over the methods or details of conducting the day-to-day operations." *Id.* In general, under North Carolina law, if a franchisor provides certain standards for operations and retains a right of inspection but does not maintain daily control over the franchisee's operations, no agency relationship exists, and the franchisee is an independent contractor. *See, e.g.,id.;Miller v. Piedmont Steam Co.,* 137 N.C.App. 520, 528 S.E.2d 923 (2000). However, the extent of daily control is often a factual question, and "[u]nless there is but one inference that can be drawn from the facts, whether an agency relationship exists is a question of fact for the jury." *Hylton v. Koontz,* 138 N.C.App. 629, 635, 532 S.E.2d 252, 257 (2000); *see alsoCrinkley v. Holiday Inns, Inc.,* 844 F.2d 156, 166-67

(4th Cir.1988) (finding that under North Carolina law, a franchisee may be an agent of the franchisor based on "apparent authority").

In the present case, CJ employed the pilot and mechanic and contracted with Duke to maintain and operate the helicopters. However, CJ also contracted with American Eurocopter, and allegedly performed maintenance and operations as specifically trained and directed by American Eurocopter. At this time, the Court concludes that based on the nature of the agreements among the parties, it appears that CJ was an independent contractor, but there are genuine issues of fact regarding the specific degree of control exercised by both Duke and American Eurocopter over CJ. Given the case law cited above, the Court concludes that summary judgment on this issue is not appropriate at this time, since there is insufficient evidence to determine the existence or scope of any agency relationship-either between CJ and American Eurocopter or between CJ and Duke-as a matter of law.[8]

[8]    To the extent the parties have filed motions in limine with respect to evidence regarding the existence of an agency relationship, the Court will allow the parties to be heard at trial, and if necessary will conduct a brief hearing outside the presence of the jury to determine whether there is sufficient evidence of an agency relationship between CJ and American Eurocopter to allow this issue to be submitted to the jury. This determination would include consideration of both actual authority or apparent authority, based not only on the Service Center Agreement but also on the degree of control exercised by American Eurocopter over CJ and the authority represented to third parties by American Eurocopter. There is insufficient evidence as to these issues to make any summary determination at this time.

Moreover, the Court notes that even if the pilot and mechanic are determined to be independent contractors and not agents of American Eurocopter, the provisions of North Carolina General Statute § 99B-3 and § 99B-4 would not necessarily provide a defense to American Eurocopter. As discussed below, those defenses would not apply in certain situations where American Eurocopter contracted to provide training or assistance to CJ, and the Court will therefore turn to a consideration of the scope of the Chapter 99B defenses under North Carolina law.

## 3. Products Liability Defenses for Acts of a Third Party Trained or Assisted by the Manufacturer

Add. 73

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

**\*9** Under North Carolina and Fourth Circuit case law, North Carolina General Statute § 99B-3 and § 99B-4 would bar liability on the part of a manufacturer if a third party altered, misused, or improperly installed the product, or failed to follow express and adequate warnings and instructions, "but only if the manufacturer has not 'contracted to instruct [the contractor] on installation procedures, and ... in fact assisted [the contractor] in the installation.' " *Lienhart v. Dryvit Sys., Inc.,* 255 F.3d 138, 148 (4th Cir.2001). In *Lienhart,* the Fourth Circuit held that if the manufacturer of stucco siding "contracted to instruct third parties and assisted those third parties in installing [the product], the third parties' failure to follow instructions cannot provide [the manufacturer] with an affirmative defense to liability under North Carolina law." *Id.* This holding was based on a decision of the North Carolina Supreme Court in which the North Carolina court held that a manufacturer of a roofing system could be held liable under Chapter 99B for products liability when its roofing system was improperly installed by an authorized installer. *Westover Products, Inc. v. Gateway Roofing Co., Inc.,* 94 N.C.App. 63, 380 S.E.2d 369 (1989). In that case, the contract between the manufacturer and the authorized contractor stated that the manufacturer would provide instruction and training on proper installation in order to assure adequate quality and uniformity, and would provide technical assistance and advice. The North Carolina Supreme Court held that the provisions of § 99B-4 would not bar liability against the manufacturer where the manufacturer "contracted to instruct [the contractor] on installation procedures, and ... in fact assisted [the contractor] in the installation of the roof." *Id.* at 71, 380 S.E.2d at 374.

Thus, under the applicable case law, the defenses of § 99B-3 and § 99B-4 would not apply if American Eurocopter contracted with CJ to train and assist CJ in the installation and maintenance of the product at issue (the allegedly defective gearbox). Therefore, even if CJ was not an agent of American Eurocopter, American Eurocopter would not be relieved of liability for CJ's alleged alteration or misuse of the gearbox or failure to follow instructions or warnings related to the gearbox, if American Eurocopter had contracted to train CJ and assisted CJ with respect to the gearbox. In the present case, CJ entered into a Service Center Agreement with American Eurocopter, pursuant to which American Eurocopter provided standards and training for CJ mechanics. Under these circumstances, the Court concludes that there is a genuine issue of fact regarding the relationship between American Eurocopter and CJ and the extent to which American Eurocopter agreed to provide training and assistance to CJ in the installation and maintenance of the gearbox. Because there is not sufficient evidence to make this determination as a matter of law, summary judgment is inappropriate at this time.

## 4. Other Issues of Material Fact with Respect to the Products Liability Defenses

**\*10** Finally, the Court notes again that there is a genuine issue of fact for the jury whether the mechanic and pilot's decision to disconnect the warning light did, in fact, alter or misuse the gearbox and whether that misuse was a proximate cause of the injury. *See, e.g.,Hastings ex rel. Pratt v. Seegars Fence Co.,* 128 N.C.App. 166, 169-70, 493 S.E.2d 782, 784-85 (1997) (noting that "in order for G.S. § 99B-3 to bar plaintiff's recovery, the [alteration or misuse] must have been a proximate cause of her injury" and "[i]ssues of proximate cause and foreseeability, involving application of standards of conduct, are ordinarily best left for resolution by a jury under appropriate instructions from the court."). The issue remains then as to whether there was an improper alteration or misuse of the gearbox by the pilot or mechanic under the provisions of N.C. Gen.Stat. § 99B-3.

To the extent that Defendants contend that the mechanic and employee failed to heed an adequate warning when they chose to fly the helicopter back to Duke, the Court also notes that there is evidence within the Flight Manuals which indicated that a pilot should "[l]and as soon as possible" when the oil pressure warning illuminates, but further provided in the same provision that the gearbox "has successfully passed a bench test consisting in running the gearbox for 45 minutes with zero oil pressure, at the power corresponding to minimum power in level flight."This reference creates at least some question as to whether the pilot and mechanic failed to heed an adequate warning or unreasonably exposed themselves to known danger, since the warning as described in the Flight Manual would indicate that the helicopter could be flown for up to 45 minutes, even after the oil pressure warning light illuminated. Thus, an issue remains whether the pilot and mechanic used the product contrary to express and adequate instructions or acted unreasonably under the provisions of N.C. Gen.Stat. § 99B-4. Therefore, on this basis as well, the Court concludes that summary judgment is inappropriate on this particular affirmative defense claimed by Defendants.

## C. Economic Loss Doctrine
Defendants next contend that Plaintiff's claims for the damage to the helicopter itself are precluded by the "economic loss

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

doctrine." "North Carolina has adopted the economic loss rule, which prohibits recovery for economic loss in tort. Instead, such claims are governed by contract law."*Moore v. Coachmen Indus.,* 129 N.C.App. 389, 401, 499 S.E.2d 772, 780 (1998). The economic loss doctrine is a judicially-created tool to attempt to protect contract law from being overrun by the concepts of tort law, except in cases where tort principles of risk should apply. "The rationale for the economic loss rule is that the sale of goods is accomplished by contract and the parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective."*Moore,* 129 N.C.App. at 401-02, 499 S.E.2d at 780. However, under North Carolina law, "[w]here a defective product causes damage to property other than the product itself, losses attributable to the defective product are recoverable in tort rather than contract."*Moore,* 129 N.C.App. at 401-02, 499 S.E.2d at 780."The distinction that the law makes between recovery in tort for physical injuries and recovery in warranty for economic loss is hardly arbitrary. It rests upon an understanding of the nature of the responsibility a manufacturer must undertake when he distributes his products. He can reasonably be held liable for physical injuries caused by defects in requiring his products to match a standard of safety defined in terms of conditions that create unreasonable risks of harm or arise from a lack of due care."*2000 Watermark Ass'n. Inc. v. Celotex Corp.,* 784 F.2d 1183, 1186 (4th Cir.1986). Thus, tort concepts of safety and risk apply when a manufacturer negligently produces products that are dangerous to people or other property, and the manufacturer is responsible for injuries caused by his negligence. However, this rationale does not apply where a manufacturer's products simply fail to "meet the business needs of his customers."*Id.*

**\*11** In the present case, Defendants contend that Plaintiff's negligence claims are barred by this economic loss doctrine. [9] In analyzing this contention, the Court notes that there are two separate Defendants, each with its own relevant contract. As to Defendant E.S.A.S., Plaintiff brings claims for negligent design and manufacture of the helicopter, defects in the helicopter itself, and negligent failure to warn regarding problems with the helicopter or its components. The economic loss doctrine may be implicated with respect to these claims because in 1992, Duke purchased the helicopter as manufactured by E.S.A.S., and the terms of that purchase included specific contractual warranties. As to Defendant American Eurocopter, Plaintiff brings negligence claims for the alleged defects in the main gearbox as manufactured and introduced into the stream of commerce by American

Eurocopter, as well as claims for negligent overhaul and repair, negligent failure to warn, and negligence per se for violating safety standards in the manufacture and testing of the main gearbox. The economic loss doctrine may be implicated with respect to these claims because CJ purchased the overhauled gearbox from American Eurocopter in 2000, and the terms of that purchase included specific warranty provisions governing the sale. In evaluating whether these claims sound only in contract law, or also implicate tort law, the Court notes that much of the parties' dispute turns on whether the helicopter as a whole is considered to be the "defective product," for which recovery should be confined to contract law, or whether the gearbox (or parts contained in the gearbox) would be the "product" so that damage to any property other than the gearbox (including damage to the helicopter itself) could be recovered in tort.

[9]    Plaintiff also brings claims for "misrepresentation" based on the assertion that American Eurocopter "knew or should have known" that the gearbox was not, in fact, airworthy, and the Complaint includes a demand for punitive damages. However, the parties did not attempt to address the impact of this claim on the application of the economic loss doctrine until the proposed Supplemental Briefing filed recently. Because Defendants have not had an adequate opportunity to respond on this point, the Court will not reach this issue at this time. However, the Court notes that as a general principle under North Carolina law, claims for fraud take a claim beyond a simple breach of contract. *See, e.g.,2000 Watermark Assoc.,* 784 F.2d at 1185 ("[H]istorically the only tort action available to the disappointed purchaser suffering an intangible commercial loss was an action for fraud."); *see also Mosley & Mosley Builders, Inc. v. Landin, Ltd.,* 97 N.C.App. 511, 389 S.E.2d 576 (1990) (noting the distinction between simple breach of contract and claims involving fraud or deception in claim for Unfair and Deceptive Trade Practices under N.C. Gen.Stat. § 75-1.1).

In order to analyze the impact of the economic loss rule with respect to these claims, the Court will first review the general contours of the economic loss rule in North Carolina. The Court will then consider the similar rules adopted by the United States Supreme Court sitting in admiralty jurisdiction, particularly as to the issue of how the economic loss rule should be applied when "component parts" are incorporated into another product. The Court will then compare these rules and analyze the North Carolina case law with respect to the issue of "component parts," in order to determine what

Add. 75

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

approach the North Carolina courts are likely to adopt when a part (such as the gearbox) is sold separately as a finished product but is then used in conjunction with what may be "other property" (such as the helicopter). Finally, the Court will then apply these rules to the facts of the present case to determine which of Plaintiff's claims, if any, will be barred by the economic loss rule.

**1. General Contours of the Economic Loss Rule in North Carolina**

In North Carolina, the economic loss rule is grounded in the historical principle that "[a] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract."*Kaleel Builders, Inc. v. Ashby,* 161 N.C.App. 34, 43, 587 S.E.2d 470, 476 (2003) (quoting *Spillman v. American Homes of Mocksville, Inc.,* 108 N.C.App. 63, 65, 422 S.E.2d 740, 741-42 (1992)). However, there are categorical exceptions to this rule under North Carolina law, including where "(1) The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee .... [or] (2) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee."*Kaleel Builders,* 161 N.C.App. at 42-43 n. 1, 587 S.E.2d at 476 n. 1 (quoting *North Carolina State Ports Authority v. Lloyd A. Fry Roofing Co.,* 294 N.C. 73, 82, 240 S.E.2d 345, 350-51 (1978), *rejected on other grounds by Trustees of Rowan Tech. v. Hammond Assoc.,* 313 N.C. 230, 328 S.E.2d 274 (1985)); *see also Shoffner Indus., Inc. v. W.B. Lloyd Constr. Co.,* 42 N.C.App. 259, 265, 257 S.E.2d 50, 55 (1979) ("It is well settled in North Carolina that where a contract between two parties is intended for the benefit of a third party, the latter may maintain an action in contract for its breach or in tort if he has been injured as a result of its negligent performance.").

***12** The North Carolina courts have applied the economic loss doctrine in both commercial and consumer transactions, and without regard to whether the product failed in a sudden or calamitous manner. *See Moore,* 129 N.C.App. at 401-02, 499 S.E.2d at 779-80. Instead, where a defective product fails, North Carolina courts have focused on the nature of the resulting injury, and specifically whether the defective product causes "damage to property other than the product itself."*Id.* Thus, negligence claims under North Carolina law for damage to the product itself are precluded by the economic loss rule in North Carolina, but damage to "other property" may be recovered in tort. *See id.;see also Reece v. Homette Corp.,* 110 N.C.App. 462, 466, 429 S.E.2d 768, 770 (1993) (holding that the economic loss doctrine precludes recovery where the plaintiff seeks damages only for "the very product manufactured by defendant [but][t]his claim is substantially different from a claim arising from a factual situation where the manufactured product causes physical injury to a person or to property other than the manufactured product itself."); *Spillman v. American Homes of Mocksville, Inc.,* 108 N.C.App. 63, 65, 422 S.E.2d 740, 742 (1992) (holding that the economic loss doctrine precludes tort recovery "when the injury resulting from the breach is damage to the subject matter of the contract."). [10]

[10]　In interpreting the proper scope of the economic loss doctrine, courts applying the law of states outside North Carolina have applied tests that are different than these North Carolina law rules, at least in part because state law varies considerably in the area of products liability. For example, North Carolina has specifically rejected the notion of strict product liability, and recognizes product liability claims based only on negligence or breach of warranty. *See* N.C. Gen.Stat. § 99B-1.1. Thus, a party bringing a breach of warranty claim is constrained by general contract principles (with some statutory lessening of the privity requirement), while a party bringing a negligence claim is constrained by general tort principles and by the historical principle that there can be no tort recovery for a breach of contract, and the similar economic loss rule that there can be no tort recovery for "economic losses," unless one of the exceptions exists based on personal injury or damage to other property. Of course, a negligence claim also requires that the plaintiff demonstrate actual negligence that proximately caused the plaintiff's injury. Other states have adopted more sweeping product liability provisions, and courts have then used the economic loss rule to constrain that broad liability, particularly between commercial entities. *See, e.g., Palmetto Linen Serv., Inc. v. U.N.X., Inc.,* 205 F.3d 126 (4th Cir.2000) (interpreting economic loss rule in a commercial transaction under South Carolina law to preclude recovery for injury to not only the product itself but also "other property" reasonably contemplated by the parties to a contract); *Redman v. John D. Brush & Co.,* 111 F.3d 1174, 1182 (4th Cir.1997)(stating that under Virginia law, "an economic loss is a loss that flows from the failure of the product to perform as expected").

Add. 76

Appeal: 15-1063   Doc: 33   Filed: 06/10/2015   Pg: 118 of 176

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

However, North Carolina courts have clearly held that the application of the economic loss rule in this state depends upon the existence of injury to a person or to property other than the product itself, and given the historical basis for this rule and the more limited nature of product liability claims in North Carolina, there is no basis to anticipate that the North Carolina state courts would redefine this rule. *Cf.Ellis-Don Constr., Inc. v. HKS, Inc.,* 353 F.Supp.2d 603, 606 (M.D.N.C.2004) (holding that in North Carolina, the economic loss rule is "firmly rooted in traditional concepts of warranty and contract law" but has not been expanded beyond those traditional notions by North Carolina courts).

## 2. U.S. Supreme Court's Analysis of the Economic Loss Rule under Federal Admiralty Law

The United States Supreme Court, sitting in admiralty law, has adopted a similar rule to that expressed in North Carolina law and has held that the distinction between tort law and contract law rests "on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products" and "[d]amage to a product itself is most naturally understood as a warranty claim."*East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 871-72, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865 (1986). In *East River,* the defendant supplied turbines for the plaintiff's supertankers. The Supreme Court found that the turbines were supplied as "an integrated package," and each was "properly regarded as a single unit."*Id.* Components of the turbines failed and caused damage to other parts of the turbines. In that case, the economic loss doctrine barred the plaintiff's product liability claims because the claims were only for damage to the turbines themselves. *Id.*

In a subsequent decision, the Supreme Court further addressed the question of what property would be considered the "product itself" and what property would be considered "other property" for purposes of the economic loss rule. *See Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997). In *Saratoga,* the Supreme Court held that "[w]hen a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the 'product itself' under *East River.'"Id.* Based on this rule, the Supreme Court held that certain equipment added to a vessel after its purchase would be considered "other property." In reaching this conclusion, the Court noted that "[s]tate law often distinguishes between items added to or used in conjunction with a defective item purchased from a Manufacturer (or its distributors)" and "the case law does suggest a distinction between components added to a product

by a manufacturer before the product's sale to a user ... and those items added by a user to the manufactured product.... [W]e would maintain that distinction."*Id.*

**\*13** Thus, the Supreme Court has held that under federal admiralty law, the "product itself" is the finished product as distributed by a manufacturer into the stream of commerce for use, and if that product is subsequently used in conjunction with or as part of a larger item or system, the larger item or system constitutes "other property." However, when component parts are provided by a manufacturer to another seller or manufacturer for incorporation into a finished product that then enters the stream of commerce, it is the finished product, not the component parts, which constitute the "product itself." This issue is particularly relevant to the case presently before the Court, because the parties dispute whether the gearbox is the "product" or whether the helicopter is the "product" for purposes of the economic loss rule. The Court will therefore turn back to a consideration of North Carolina law, as well as case law from various other states, to determine how the North Carolina courts might address this issue.

## 3. Economic Loss Rule as Applied to "Component Parts" in North Carolina

The North Carolina courts have not specifically addressed the scope of the economic loss doctrine where a manufacturer or a third party provides a "replacement part" for an existing product. However, North Carolina courts, like the Supreme Court, have focused on the "finished product" or the "manufactured product" as the "product itself." As noted above, North Carolina courts have also indicated that where a contract governs the sale of a product, contract law governs the subject matter of the contract, but tort law applies to injuries to "other property" that are not the subject matter of the contract.

The North Carolina Court of Appeals applied these rules in *Moore,* in which an electrical system that was installed by the manufacturer as original equipment in a recreational vehicle malfunctioned and caused damage to the entire vehicle. *See Moore,* 129 N.C.App. at 401, 499 S.E.2d at 780. In that case, the North Carolina Court of Appeals held that the economic loss rule precluded a negligence claim for damage to the vehicle itself because the vehicle was the "finished product" that had been sold under warranty by the manufacturer. The court noted that "plaintiffs bargained for a complete and functional recreational vehicle, not for wheels, electrical convertor box, stereo, etc. Thus, they had

Add. 77

no reasonable expectation that ... any of the ... manufacturers of unbranded components would resolve any problem they encountered with the vehicle."*Id.;see also Reece v. Homette Corp.,* 110 N.C.App. 462, 429 S.E.2d 768 (1993) (holding that where plaintiffs sued a mobile home manufacturer for defects in the mobile home that caused damage to the mobile home itself, the economic loss rule precluded recovery in tort because the mobile home was a finished product and the contract was for the mobile home itself); *Spillman v. American Homes of Mocksville, Inc.,* 108 N.C.App. 63, 65, 422 S.E.2d 740, 742 (1992) (same); *Land v. Tall House Bldg. Co.,* 165 N.C.App. 880, 602 S.E.2d 1, 4 (2004) (holding that where a plaintiff entered into a contract for general construction of a home, any damage to the home caused by the exterior finish system was damage to the house itself since the contract was for the home, not for the finish system, and negligence claims were therefore barred by the economic loss rule); *cf.Red Hill Hosiery Mill, Inc. v. Magnetek, Inc.,* 138 N.C.App. 70, 530 S.E.2d 321 (2000), *appeal after remand at* 159 N.C.App. 135, 582 S.E.2d 632 (2003) (holding that where a separately-purchased light fixture allegedly malfunctioned and caused a fire in the building in which the light fixture was installed, the product for purposes of the product liability determination was the light fixture, although not specifically considering the economic loss rule); *Byrd Motor Lines, Inc. v. Dunlop Tire & Rubber Corp.,* 63 N.C.App. 292, 304 S.E.2d 773 (1983) (viewing separately-purchased tires as the "product" where the tires were installed on plaintiff's existing trucks and caused automobile accidents resulting in property damage to the trucks, although not specifically considering the economic loss rule).

**\*14** Courts outside of North Carolina have taken various approaches in defining the specific contours of the "other property" exception to the economic loss rule. For example, the Court of Appeals for the Third Circuit has held that where the original manufacturer provides a replacement part that is contemplated by the original contract, and the replacement part is integrated into the finished product, that replacement part becomes part of the "product" and damage caused by the replacement part to the original product is damage to the "product itself." *See Sea-Land Service, Inc. v. General Electric Co.,* 134 F.3d 149, 153 (3d Cir.1998); *see also Agrotors, Inc. v. Bell Helicopter Textron, Inc.,* 2004 WL 2039954 (E.D.Pa. Sept.9, 2004) (holding that any replacement part becomes part of the pre-existing "product"). However, the Third Circuit in *Sea-Land* specifically "distinguish[ed] from the product additional parts that are not encompassed in the original bargain but are

subsequently acquired. These should not be integrated."*Id.* Other courts have considered these various approaches and have held that a separately-purchased replacement part does not become part of the previously-purchased property. *See, e.g., Mountain West Helicopter, LLC v. Kaman Aerospace Corp.,* 310 F.Supp.2d 459, 466 (D.Conn.2004) (holding that where a helicopter owner replaced the helicopter's clutch assembly with a new clutch assembly at the manufacturer's urging, and the new clutch assembly was defective and caused the helicopter to crash, the helicopter owner could bring a tort claim for the loss of the helicopter itself, which represented "damages for an injury to property other than the alleged defective product"); *Transco Syndicate # 1, Ltd. v. Bollinger Shipyards, Inc.,* 1 F.Supp.2d 608, 611 (E.D.La.1998) (holding that where plaintiff purchased a defective engine and incorporated it into a tug boat, and a defect in the engine caused a fire that consumed the boat, plaintiff could recover in tort for the loss to the boat as "other property," noting that the "object of the parties' contract constitutes the 'product' under *East River* "); *Mays Towing Co. v. Universal Machinery Co.,* 755 F.Supp. 830, 833 (S.D.Ill.1990) (holding that where plaintiff purchased engines and incorporated them into plaintiff's existing boat, the parties "bargained for the engines, not the construction of a vessel," and when the engines proved to be defective and destroyed themselves and the boat, any recovery for the engines themselves was in contract law, but recovery for the boat was "other property" that could proceed in tort).

Of course, many of these varying approaches stem from the variety of state law approaches to products liability claims. After reviewing all of the various approaches in light of North Carolina law, this Court believes that in applying the economic loss rule to component parts, North Carolina courts would continue to focus on the "finished product" or "manufactured product" as sold into the stream of commerce to a user, even if the user, after purchasing the product, then uses that product in conjunction with other property. Thus, where property is already owned by a user, and a second manufacturer subsequently sells a separate product to that user pursuant to its own bill of sale, the "product" is the item as introduced into the stream of commerce by the second manufacturer, even if the product is used (by the user) in connection with or as part of his existing property. In the context of replacement parts that are integrated into a product already owned by the user, this Court finds that the approach most consistent with North Carolina law would recognize that where a user purchases a product (such as a light bulb) and then installs the product into other property

Add. 78

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 120 of 176

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

already owned by the user (such as a light fixture in the user's pre-existing home), the product that is sold by the light bulb manufacturer into the stream of commerce to the user pursuant to its own terms of sale would constitute the "product itself." Thus, if the light bulb were negligently manufactured and as a result exploded, causing a fire that destroyed the user's home in which it was installed, the economic loss rule would not preclude the homeowner from pursuing a negligence claim against the light bulb manufacturer for the damage to his home. This approach is consistent with North Carolina's formulation of product liability principles and the economic loss doctrine, based on the scope of potential product liability under North Carolina law and the historical distinctions between tort and contract law. Having concluded that this is the rule the North Carolina courts would follow, the Court will therefore apply this rule to the claims brought in the present case.

**4. Application of this Economic Loss Rule to Plaintiff's Negligence Claims**

 **\*15**  In the present case, Duke entered an agreement in 1992 to purchase a helicopter manufactured by E.S.A.S., a French corporation. In a separate agreement in 2000, CJ ordered an overhauled gearbox for the helicopter from American Eurocopter, which is a separate corporate entity organized under the laws of Delaware with its principal place of business in Texas. Plaintiff brings claims against each of these two potential defendants: (1) negligence as to the helicopter itself as purchased from E.S.A.S. in 1992; and (2) negligence as to the overhauled gearbox as purchased from American Eurocopter in 2000. Since the analysis of these claims is different, the Court will consider them separately.

First, with respect to E.S.A.S., the subject matter of the parties' contract was the helicopter itself. The sale of that helicopter was governed by specific terms and conditions, and the helicopter itself was the "finished product" sold to Duke as the user in 1992. Therefore, with respect to any claims as to negligence with respect to the design of the helicopter itself, the Court finds that the helicopter was the "product" that was the subject of the parties' bargain, and any negligence claims against E.S.A.S. for negligent design or manufacture of the helicopter itself would be barred by the economic loss rule to the extent Plaintiff now seeks recovery for the helicopter itself from E.S.A.S.[11] However, any equipment added by Duke to the helicopter after the sale (such as medical equipment) would be "other property" (as recognized by the U.S. Supreme Court's decision in *East*

*River* ), and any damage to property on the ground where the helicopter crashed would be "other property."[12] Under North Carolina law, damage to that "other property" could be the basis for a negligence claim against E.S.A.S. if the Plaintiff is able to establish negligence by E.S.A.S. that proximately caused the crash.[13]

[11]    The parties have not addressed the question of whether there was a post-sale failure to warn regarding the helicopter or its components that would take these claims outside the scope of the economic loss doctrine and the Court therefore does not reach that issue in this opinion.

[12]    The parties have not addressed the question of whether Plaintiff is a proper party to bring claims for damage to the property on the ground, where Plaintiff has paid the property owners for all of those losses. Therefore, the Court will assume for purposes of this motion that Plaintiff is a proper party to pursue those losses.

[13]    The Court notes that Defendant has not at this time challenged the sufficiency of Plaintiff's evidence regarding the negligent design or manufacture of the helicopter itself. Therefore, those claims may go forward subject to Plaintiff's presentation of evidence sufficient to support the allegations that E.S.A.S. negligently designed or manufactured the helicopter. In addition, as further discussed above, any recovery against E.S.A.S. would not include the loss of the helicopter itself pursuant to the economic loss rule.

As to Defendant American Eurocopter, the agreement between the parties covered the sale of an overhauled gearbox that was manufactured and placed into the stream of commerce by American Eurocopter, based on the evidence presently before the Court. American Eurocopter overhauled helicopter transmissions and sold one of the overhauled transmissions (as a gearbox) to CJ for use in the helicopter. Based on the evidence before the Court, the overhauled transmissions were not manufactured by E.S.A.S., the helicopter manufacturer, but were instead "manufactured and introduced into the stream of commerce" by American Eurocopter. (Compl.¶ 20). Thus, the gearbox that was sold in 2000 was overhauled by a separate corporate entity pursuant to a separate bill of sale and sent directly to the user. That bill of sale included a limitation of warranties that Defendants contend covers the terms of the agreement between the parties. American Eurocopter charged $249,992.51 for the overhauled gearbox, and provided a limited warranty for 9 months or 750 hours of flight time from the date of sale.

Add. 79

CJ obtained a credit toward the price by sending the old helicopter gearbox to American Eurocopter in trade.

**\*16** Plaintiff contends that American Eurocopter was negligent for the following reasons: first, because the overhaul was negligent and resulted in a defective gearbox, second, because the overhauled gearbox negligently failed to comply with required FAA safety standards, and third, because American Eurocopter negligently failed to warn CJ or Duke regarding safety problems with the oil pumps contained in the gearbox. Plaintiff also contends that during testing of the gearbox, the oil pump exceeded heat limits and American Eurocopter used improper methods to cool the oil pump in an attempt to get the gearbox to pass the required safety testing. Based on these allegations, Plaintiff contends that American Eurocopter falsely represented that the gearbox was "airworthy."

Based on these facts as presented at this time, the Court finds that the subject matter of the contract between CJ and American Eurocopter was the overhauled gearbox, and the negligence claims against American Eurocopter are for negligence with respect to the gearbox. CJ negotiated for, and obtained, an overhauled gearbox, which was provided as a finished product with its own warranties and terms of sale. Although the gearbox did serve as a replacement part in the helicopter, it was manufactured by a different entity other than the original manufacturer, and there is no reason to conclude that the original sale of the helicopter in 1992 covered the separate sale of an overhauled gearbox by a separate entity eight years later. [14]

[14]    The 1992 terms and conditions of sale as to the helicopter itself provided limited warranties as to the helicopter itself and any optional equipment, spares, tools, or overhauled parts manufactured by E.S.A.S. However, the contract did not govern equipment or overhauled parts provided later by another manufacturer.

Based on these circumstances as alleged by the Plaintiff, the Court concludes that for purposes of the economic loss doctrine, as to the negligence claims against American Eurocopter, the "product itself" was the gearbox, and the helicopter was "other property" that was not the subject of the gearbox sales contract. Therefore, any negligence claim against American Eurocopter for damage to the gearbox itself would be precluded by the economic loss rule. However, the negligence claims against American Eurocopter for its alleged negligence in manufacturing and testing the gearbox could include damages for the loss of the helicopter and

damage to property on the ground, if American Eurocopter's negligence is determined to be a proximate cause of those losses. This holding is consistent with the general theories of tort and contract law in North Carolina, since a party who negligently manufactures a helicopter transmission, negligently performs required safety testing, and falsely certifies that the transmission is "airworthy," and then contracts with a purchaser for the sale of the transmission, is properly held liable for the resulting damage if its negligence causes the destruction of the helicopter or other property used in connection with the transmission. General tort theories of risk and safety are applicable in such a situation.

To the extent that Defendants have moved for summary judgment on this issue, the Court has concluded that Plaintiff could assert claims for some damages against both E.S.A.S. and American Eurocopter based on the evidence as it presently appears before the Court. As to Plaintiff's claims that E.S.A.S. was negligent with respect to the helicopter's design, manufacture, or warnings, the economic loss rule would preclude recovery against E.S.A.S. for the loss of the helicopter itself, but not for the damage to property on the ground when the helicopter crashed. As to Plaintiff's claims that American Eurocopter was negligent with respect to the gearbox's manufacture, testing, or warnings, the economic loss rule would preclude recovery against American Eurocopter for the loss of the gearbox itself, but not for the damage to the helicopter or to the property on the ground. Because the economic loss rule would not preclude any of the claims in their entirety, Defendants' motion for summary judgment on this basis will be denied. However, if the evidence as revealed at trial is consistent with the evidence presently before the Court, [15] the jury will be appropriately instructed regarding potential measures of damages against each Defendant based on the conclusions outlined above. [16]

[15]    If the evidence at trial reveals significant differences with respect to the relationship between the parties and the scope of the relevant contracts, the Court will allow the parties the opportunity to address the applicability of the economic loss doctrine, as outlined herein, to the claims based on the evidence presented at trial.

[16]    The Court notes that with respect to the measure of damages for the loss of the helicopter against American Eurocopter, North Carolina law clearly provides that the proper measure of damages would be the fair market value of the helicopter at the time of the crash, without including the gearbox itself (since recovery for the

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

gearbox would be precluded by the economic loss rule), and the Court would see no basis to depart from this general rule in the present case. *Cf.State v. Maynard,* 79 N.C.App. 451, 452, 339 S.E.2d 666, 667 (1986).

**D. Breach of Contract Claims**

*17 Finally, Defendant American Eurocopter contends that Plaintiff's breach of contract claims should be dismissed because the contract for the sale of the overhauled gearbox expressly limited the remedies to repair or replacement of the gearbox. In order to evaluate this contention, the Court will first outline the parties' contentions, and will then summarize the terms of the relevant contracts. The Court will then consider Defendant's contention that CJ and Duke failed to comply with the applicable warranty requirements. Finally, the Court will consider whether there is evidence to indicate that the limited warranty provided by American Eurocopter failed of its essential purpose.

**1. Allegations and Contentions of the Parties with Respect to Plaintiff's Breach of Contract Claims**

Plaintiff [17] brings a claim against American Eurocopter for breach of contract, based on Plaintiff's contention that American Eurocopter breached its express warranty to Duke and to CJ because the gearbox and its components were expressly certified as "airworthy" when they were not, in fact, airworthy. In addition, Plaintiff similarly contends that American Eurocopter breached its express certification that the overhaul was performed "in accordance with current regulations of the Federal Aviation Administration and manufacturer's recommendations."Plaintiff also contends that American Eurocopter impliedly warranted that the overhauled gearbox was suitable for its intended use. Plaintiff acknowledges that it was CJ that directly contracted with American Eurocopter for the overhauled gearbox. However, Plaintiff contends that the overhauled gearbox was obtained for Duke's benefit, and that Duke was an intended third party beneficiary of any agreement between CJ and American Eurocopter. [18] Plaintiff further contends that CJ and Duke relied on the express warranties provided by American Eurocopter.

[17]    As Duke's insurer, Plaintiff stands in Duke's shoes with respect to these claims. The parties do not address Plaintiff's ability, as Duke's insurer, to bring these claims on Duke's behalf, and the Court will therefore assume for purposes of this motion that Plaintiff is a proper party to assert these claims.

[18]    Defendants do not directly address whether Duke was, in fact, an intended third party beneficiary of the agreement, although the bill of sale for the gearbox reflects that it is to "Corporate Jets Maintenance, Inc., Duke Life Flight, Duke North Hospital."Because the parties do not directly address this issue, the Court will assume for purposes of this motion that Duke was an intended third-party beneficiary of the agreement.

American Eurocopter contends that there are two specific sources of a contractual relationship between American Eurocopter and CJ: (1) the "Spare Parts Agreement" between CJ and American Eurocopter, and (2) the "Purchase Agreement" included on the invoice from American Eurocopter shipped to CJ and Duke with the overhauled gearbox. American Eurocopter contends that these agreements provided for limited warranties that were the exclusive remedy for either CJ or for Duke as third-party beneficiary. The limited warranties provided for repair or replacement of parts, and disclaimed all incidental or consequential damages.

American Eurocopter further contends that Plaintiff, acting on behalf of Duke, cannot bring any claim for breach of the limited warranties because the limited warranty in the parts agreement required return of the parts and a written claim within 30 days of failure, and provided that the warranty only applied to the extent the helicopter was operated in accord with the Flight and Maintenance manuals. Defendant contends that Plaintiff may not recover for any breach of contract because these contractual provisions were not complied with, since CJ and Duke failed to return the defective gearbox (which was destroyed in the helicopter crash), failed to file a written claim, and did not comply with the Flight and Maintenance manuals based on the actions by the pilot and mechanic on the night of the crash. In any event, Defendant contends that all of these issues related to the breach of contract claims are governed by Texas law because the terms of sale for the overhauled gearbox included a Texas choice of law provision.

*18 In response, Plaintiff contends that the limitation of remedies included in the parts agreement and invoice do not apply because CJ contracted with American Eurocopter more broadly for American Eurocopter to provide repair services, and American Eurocopter breached that agreement by failing to provide adequate repair services. Plaintiff further contends that to the extent the limitation of remedies applies, the remedy failed of its essential purpose because Duke and CJ

Add. 81

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 123 of 176

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

could not obtain repair or replacement of the gearbox after it was destroyed in the helicopter crash.

Finally, Plaintiff contends that North Carolina law should apply. However, for purposes of the summary judgment motion, Plaintiff contends that even if Texas law applies, the result is the same and the warranty limitations are inapplicable.

## 2. Terms of the Contracts and Warranties Between CJ and American Eurocopter

The dispute between the parties with respect to their contractual relationship and any breach thereof is not subject to an easy determination because there were multiple agreements between various of the parties, and the nature and source of the contract terms that apply to the present claims is unclear. Therefore, in order to determine the applicable contract terms and limitations, the Court must first determine what contracts govern the parties' rights in relation to the gearbox. The first potential contract between the parties is a "Spare Parts Ordering Agreement" between CJ and American Eurocopter, in which American Eurocopter provided a limited warranty for certain helicopter parts that CJ ordered from American Eurocopter. Under Paragraph 7, American Eurocopter warranted all overhauled products by American Eurocopter to be free from defects in material and workmanship under normal use and service. However, "Seller's obligation under this warranty is limited to replacing or repairing parts" if returned to the Seller within 6 months or 500 flying hours. The contract provides that this was the exclusive remedy in lieu of "all incidental or consequential damages."

Another source of contractual obligations relied upon by the parties is based upon the Service Center Agreement between CJ and American Eurocopter, which established CJ as an authorized service center for E.S.A.S. helicopters. The Agreement provided that "[a]ll parts sold to the Service Center by American Eurocopter shall be exclusively subject to American Eurocopter's standard warranty."Pursuant to this Agreement, CJ was required to incorporate that standard warranty clause into all of its agreements with its customers (such as Duke) for sale of American Eurocopter's parts and equipment.

The final source of contractual rights cited by the parties is contained in the "Purchase Agreement" contained in the invoice sent by American Eurocopter to CJ at "Duke Life Flight" with the overhauled transmission. This agreement

provided that American Eurocopter warranted all parts overhauled by American Eurocopter to be free from defects in material and workmanship under normal use and service for 9 months or 750 flying hours. The invoice provided that American Eurocopter's obligation under the warranty was limited to "repair or replacement" of the defective parts. The invoice required the buyer to return the parts within 30 days of a part failure, and further provided that the warranty would only apply to the extent the helicopter and parts were maintained in accordance with the Flight Manual and Maintenance Manual. The invoice provided that these warranties were the exclusive warranties, excluded any claims for negligence or strict liability, and provided that there were the exclusive remedies "to the exclusion of any and all other remedies including ... incidental or consequential damages."In addition to these provisions in the invoice itself, American Eurocopter also issued a certification that the overhauled gearbox was "airworthy."

**\*19** Based on these various agreements and terms, the Court draws the following conclusions: American Eurocopter provided an express warranty that the overhauled gearbox would be free from defects in material and workmanship and that the overhauled gearbox was "airworthy." The evidence also indicates that American Eurocopter expressly warranted that the overhaul was performed "in accordance with current regulations of the Federal Aviation Administration and manufacturer's recommendations."To the extent Texas law would apply as Defendants suggest, the Court finds that there is a genuine issue of material fact as to whether any of these express warranties could have been disclaimed by the language in the invoice or any of the other agreements. See Tex. Bus. & Com.Code Ann. § 2.316(a) (providing that a limitation or negation of express warranties is "inoperative to the extent that such construction is unreasonable"); Mercedes-Benz of North America, Inc. v. Dickenson, 720 S.W.2d 844, 852 (Tex.App.Fort Worth 1986) ("The principal purpose of section 2.316 is to protect a buyer from unexpected and unbargained for language of disclaimer by denying effect to such language when inconsistent with express warranties made."); Materials Marketing Corp. v. Spencer, 40 S.W.3d 172 (Tex.App. Texarcana 2001) (holding that disclaimer of warranties in language of invoice did not preclude recovery for breach of express warranties). Therefore, even if the other implied warranties were disclaimed, there is a jury question as to whether there was a breach of any express warranties that would provide a basis for Plaintiff's contract claims. Having determined that Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to the breach of

Add. 82

contract claims, the Court will turn to Defendant's contentions that Plaintiff's claims are nevertheless precluded under the terms of the agreements.

### 3. Plaintiff's Failure to Comply with Warranty Requirements

To the extent that American Eurocopter contends that any warranty was voided because the helicopter and parts were not maintained or used as required by the Flight Manuals, the Court concludes that there are genuine issues of material fact as to whether any action by the pilot or mechanic in disconnecting the warning light and flying the helicopter back to Duke would constitute a violation of the contract provisions to void the warranty. As previously discussed, there are questions for the jury whether the actions of the pilot and mechanic were, in fact, alterations of the product, and the issue of whether Duke or CJ breached any warranty requirements will be for the jury. In addition, Plaintiff will be entitled to present its own defenses as to these alleged breaches by CJ or Duke. In any event, these determinations are for the jury, and the Court cannot find as a matter of law that CJ or Duke breached the warranty terms so as to void any warranties expressly given by American Eurocopter.

### 4. Limitation of Damages and Failure of Essential Purpose

**\*20** The final question then is whether the limitation of remedies nevertheless limits Plaintiff to "repair or replacement" of the gearbox and precludes recovery of consequential damages, including the destruction of the helicopter itself. Such limitations are generally enforceable under Texas law, particularly between commercial parties. Tex. Bus. & Com.Code Ann. § 2.719 (providing that an agreement may limit the buyer's remedies to repair or replacement of non-conforming goods or parts); Mercedez-Benz, 720 S.W.2d at 854 ("The parties to a contract are free to reasonably limit their remedies under section 2.719."). However, "where an apparently fair and reasonable limitation because of circumstances fails in its purpose or operates to deprive a party of the substantial value of the bargain, the limited remedy must give way to the general remedy provisions of the code."Id.

Texas courts have held that a "repair or replace" warranty fails of its essential purpose when the seller is unwilling or unable to correct defects in the product. See, e.g.,Mercedes-Benz, 720 S.W.2d at 854-55 (holding that there was sufficient evidence from which a jury could find that a repair or replace warranty

on a car failed of its essential purpose where the car was taken for repairs multiple times over an eight-month period and was never properly corrected); Metro Nat'l Corp. v. Dunham-Bush, Inc., 984 F.Supp. 538, 544 (S.D.Tex.1997) (holding that a "parts and labor" warranty failed of its essential purpose where the defendant initially provided replacement compressors but then ceased providing replacements during the warranty period). In addition, a Federal District Court in Minnesota applying Texas contract law held that there was sufficient evidence from which a jury could find that a "repair and replace" warranty on the purchase of an airplane failed of its essential purpose when the airplane crashed and repair was impossible. Held v. Mitsubishi Aircraft Int'l., 672 F.Supp. 369, 383 (D.Minn.1987) ("If the alleged defective design caused the crash, then defendants cannot 'repair or replace' its defective parts and must be required to replace the plane or refund its value").

Defendant, however, cites a Second Circuit case applying California law for the contention that the crash of an airplane would not cause the limited remedy to fail of its essential purpose. Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp., 617 F.2d 936 (2d Cir.1941). However, in that case, the court held that where the manufacturer provided a one-year limited warranty and the airplane crash occurred more than three years after the sale, and there were no allegations of intentional misrepresentation, the one-year warranty did not fail of its essential purpose. Id. at 940-41.However, other courts have held that where a helicopter or airline crash occurs during the warranty period, a "repair or replace" warranty fails of its essential purpose. SeeHeld, 672 F.Supp. at 383; Champlain Enters., Inc. v. United States, 957 F.Supp. 26 (N.D.N.Y.1997) (holding that a genuine issue of material fact existed as to whether an airplane warranty for repair or replacement of defective parts failed of its essential purpose when a defective part allegedly caused the airplane to crash, since "a reasonable juror could conclude that requiring [the seller] to merely provide a new part when the entire aircraft has been destroyed, 'operates to deprive [Plaintiff] of the substantial value of the bargain." ' (internal citations omitted)); see alsoComind, Companhia de Seguros v. Sikorsky Aircraft Div. of United Techs. Corp., 116 F.R.D. 397 (D.Conn.1987) (holding that where a latent defect allegedly caused the crash of a helicopter, a limited warranty for repair or replacement of defective parts fails of its essential purpose).

**\*21** Based on these cases and the facts of the instant case as presently before the Court, the Court concludes

Add. 83

Indemnity Ins. Co. of North America v. American Eurocopter LLC, Not Reported in...

2005 WL 1610653

that there is a genuine issue of material fact as to whether the "repair and replace" warranty failed of its essential purpose, when the allegedly defective part destroyed itself. The Court concludes, therefore, that the evidence presently before the Court would support an inference that "because of circumstances," the repair or replace remedy "fails in its purpose or operates to deprive a party of the substantial value of the bargain." *Mercedez-Benz,* 720 S.W.2d at 854. Therefore, the Court finds that American Eurocopter has failed to establish that the limitation of remedy provisions preclude Plaintiff's breach of contract claims as a matter of law, and summary judgment on this basis is therefore inappropriate.

**V. CONCLUSION**

After having considered all of Defendants' contentions, the Court finds that there are genuine issues of material fact precluding summary judgment for Defendants as to each of Plaintiff's claims. Therefore, Defendants' Motions for Summary Judgment [Documents # 19, 21] are DENIED in their entirety. Defendants' Motion to Exceed the Page Limit for the Summary Judgment Brief [Document # 41] is GRANTED, Plaintiff's Motion to Strike Defendants' Summary Judgment Brief for Exceeding the Page Limit [Document # 31] is DENIED, and Defendants' duplicate Motion for Summary Judgment [Document # 71] is DENIED AS MOOT. Plaintiff's Motion to Strike Defendants' Reply Brief [Document # 61] is DENIED, and Plaintiff's Motion for Leave to File a Supplemental Brief [Document # 126] is also DENIED. The Court will hear and determine the parties' remaining motions in limine and motions to strike at the trial in this matter, consistent with the determinations in this Opinion.

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 84

2012 WL 32607

2012 WL 32607
Only the Westlaw citation is currently available.
United States District Court,
W.D. Kentucky.

Ruth Jean LEWIS et al., Plaintiffs

v.

CERALVO HOLDINGS, LLC et al., Defendants.

Civil Action No. 4:11–CV–
00055–JHM.   |   Jan. 6, 2012.

**Attorneys and Law Firms**

James H. Moore, III, Natalie Ellen Corrigan, Campbell, Woods, Bagley, Emerson, Mcneer& Herndon, Ashland, KY, for Plaintiffs.

Mason L. Miller, William E. Messer, Miller & Wells, PLLC, Lexington, KY, for Defendants.

Mason L. Miller, William E. Messer, Miller & Wells, PLLC, Lexington, KY, for Defendants.

*MEMORANDUM OPINION AND ORDER*

JOSEPH H. McKINLEY, Chief Judge.

**\*1**  This matter is before the Court on Defendants Ceralvo Holdings, LLC ("Ceralvo") and Armstrong Coal Company, Inc.'s ("Armstrong") Motion to Dismiss [DN 6]. Fully briefed, this matter is ripe for decision.

### I. BACKGROUND

Plaintiffs are the owners of certain real property located in Ohio County, Kentucky. (Compl.¶ 14.) In 1977, Plaintiffs or their successors in interest entered into a Coal Lease Agreement (the "Lease") with Peabody Coal Company.(*Id.* at ¶ 15.)The Lease granted Peabody Coal and its successors or assigns the "right and privilege to conduct mining operations on the demised premises ... and ... continuous right of ingress and egress to and from the demised premises ... for the purpose of mining, removing, transporting, and processing coal from the demised or adjoining premises."(Compl., Ex. 2 Coal Lease Agreement 7.)

Defendant Ceralvo is Peabody Coal's successor in interest under the Lease. (Compl.¶ 17.) According to the Complaint, Defendant Armstrong is Defendant Ceralvo's agent "with respect to the mining and transportation of coal on, over, across, through, or under the demised premises on behalf of and under the authority of Defendant Ceralvo."(*Id.* at ¶ 18.)Plaintiffs allege that Defendants are currently engaged in transporting "coal on, over, across, through, or under the demised premises owned by Plaintiffs and subject to the Lease Agreement from foreign lands that are not adjoining the demised premises," in violation of the lease. (*Id.* at ¶ 21.)

Plaintiffs filed suit in Ohio County, Kentucky Circuit Court on April 25, 2011, alleging claims against both Defendants for breach of contract, trespass, unjust enrichment, injunctive relief, punitive damages, and to quiet title. Defendants removed the action to this Court on the basis of diversity jurisdiction on May 17, 2011. Defendants have now filed a motion to dismiss the Complaint for failure to state a claim.

### II. STANDARD OF REVIEW

Upon a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), a court "must construe the complaint in the light most favorable to plaintiff,"*League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir.2007) (citation omitted), "accept all well-pled factual allegations as true[,]"*id.,* and determine whether the "complaint states a plausible claim for relief[,]"*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). Under this standard, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A plaintiff satisfies this standard only when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."*Iqbal,* 129 S.Ct. at 1949. A complaint falls short if it pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct."*Id.* at 1949, 1950.Instead, the allegations must " 'show[ ] that the pleader is entitled to relief.' " *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

**\*2**  If "matters outside the pleadings are presented to and not excluded by the court" when ruling upon a motion under Rule 12(b)(6), the Federal Rules require that "the motion

Add. 85

must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). This Rule does not require the Court to convert a motion to dismiss into a motion for summary judgment every time the Court reviews documents that are not attached to the complaint. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir.1999). "[W]hen a document is referred to in the complaint and is central to the plaintiff's claim ... [,] the defendant may submit an authentic copy [of the document] to the court to be considered on a motion to dismiss, and the court's consideration of the document does not require conversion of the motion to one for summary judgment." *Id.* (quotation omitted).

## III. DISCUSSION

### A. Breach of Contract

Defendants have moved to dismiss the breach of contract claim against Defendant Armstrong arguing that Defendant Armstrong is not a party to the contract. In their response, Plaintiffs concede that the Complaint does not create a claim for breach of contract against Defendant Armstrong and that this claim should be dismissed as to Defendant Armstrong. (Pls.' Resp. to Defs.' Mot. to Dismiss 17, 21 [DN 7].) Therefore, the Court **GRANTS** Defendants' motion and dismisses the breach of contract claim against Defendant Armstrong.

### B. Economic Loss Rule

Defendants next contend that Plaintiffs' claim for trespass is barred by the economic loss rule. Although the economic loss rule has been applied to cases involving Kentucky law on multiple occasions, it was only recently formally adopted by the Kentucky Supreme Court in *Giddings & Lewis, Inc. v. Indus. Risk Ins.*, 348 S.W.3d 729 (Ky.2011). "Generally speaking, the rule 'prohibits purchasers of products from recovering purely economic damages under most tort theories.' " *Grace v. Armstrong Coal Co., Inc.*, 2009 WL 366239, at *4 (W.D.Ky. Feb.13, 2009) (quoting *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1028 (6th Cir.2003)). As Judge Heyburn has explained, "[v]irtually every classic description of the economic loss rule pertains to and often limits its application to the sale of products [in order to] ... preserve the distinction between the remedies available under the U.C.C. and those available in tort." *Louisville Gas and Elec. Co. v. Cont'l Field Sys., Inc.*, 420 F.Supp.2d 764, 769 (W.D.Ky.2005). While the Kentucky Supreme Court formally adopted the rule as "applie[d] to

claims arising from a defective product sold in a commercial transaction," *Giddings*, 348 S.W.3d at 733, it did not address the rule's application to other contractual situations. However, "federal courts charged with the task of applying Kentucky law have predicted that Kentucky courts would limit the application of the economic loss rule to products liability cases, business purchases cases, and construction cases." *Brewer Mach. & Conveyor Mfg. Co. v. Old National Bank*, 248 F.R.D. 478, 481–82 (W.D.Ky.2008) (collecting cases).

**\*3** Defendants contend that Plaintiffs' trespass claim is barred by the economic loss rule as Plaintiffs have already asserted a breach of contract claim based on the same conduct. Essentially Defendants are requesting the Court to expand the economic loss rule and apply it to a mineral lease contract. In *Louisville Gas and Electric Company v. Continental Field Systems, Inc.*, the defendants argued that the economic loss rule should be extended to services contracts. 420 F.Supp.2d at 768. In determining whether such an expansion of the rule should be allowed, Judge Heyburn noted the "conceptual difficulty of applying the economic loss rule to services." *Id.* at 769. He found that the cases addressing the economic loss rule in Kentucky attempted to "preserve the distinction between the remedies available under the U.C.C. and those available in tort[, but] [s]uch a distinction would be immaterial here because the U.C.C. does not govern services." *Id.* Judge Heyburn also found that it would be difficult to limit the rule to purely economic loss when applied to a services contract. *Id.* Ultimately, Judge Heyburn found nothing to suggest that Kentucky courts were likely to expand the economic loss rule in such a fashion. *Id.*

As for the instant case, Kentucky courts have given no indication that they would extend the economic loss rule to mineral lease contracts. While the Kentucky Supreme Court has formally adopted the rule in *Giddings*, the holding of that case was limited to "claims arising from a defective product sold in a commercial transaction." *Giddings*, 348 S.W.3d at 733. In its discussion of the rule, the Kentucky Supreme Court found that the rule "recognizes that economic losses, in essence, deprive the purchaser of the benefit of his bargain and that such losses are best addressed by the parties' contract and relevant provisions of Article 2 of the Uniform Commercial Code." *Id.* at 738.

The Court finds that, much like services contracts, application of the economic loss rule to mineral leases does not advance or protect the interests of the rule that were identified in *Louisville Gas* and *Giddings*. First, the U.C.C. as adopted

2012 WL 32607

by Kentucky, does not apply to leases of mineral rights. See K.R.S. §§ 355.2A–102, 355.2A–103(h), (j). Therefore, the U.C.C. would not govern the breach of such a lease. Also, much like services contracts, it would be difficult to restrict application of the rule only to economic losses born of the contract and not damage to other property. Furthermore, at least one other court has found that the Kentucky Supreme Court is unlikely to expand the rule and apply it to a contract for the drilling of natural gas. See *Pioneer Res. Corp. v. Nami Res. Co., LLC,* 2006 WL 1778318, at * 6–7 (E.D.Ky. June 26, 2006). These issues make it unlikely that the economic loss rule would be applied by the Kentucky Supreme Court to mineral leases like the one in the instant case. See *Id.; see also Grace v. Armstrong Coal Co., Inc.,* 2009 WL 366239, at *4 (W.D.Ky. Feb.13, 2009) (finding that the economic loss rule does not apply to employment contracts); *Brewer,* 248 F.R.D. at 481 (W.D.Ky.2008) (refusing to apply the economic loss rule to the account contract between Plaintiff and its bank). Accordingly, the Court **DENIES** Defendants' motion to dismiss based upon the economic loss rule. [1]

[1]    Furthermore, the Court notes that even if the economic loss rule were to apply, it could not bar tort claims against Defendant Armstrong, because as Defendants have pointed out, Defendant Armstrong is not a party to the mineral lease contract.

## C. Trespass

**\*4** Defendants next argue that Plaintiffs' claim for trespass should be dismissed because it fails to state a claim upon which relief can be granted. "Generally, a trespass occurs when a person enters or remains upon real property in possession of another without the possessor's consent." *Rumell v.Barden & Robeson Corp.,* 2007 WL 5277890, at *4 (Ky.Ct.App. Dec. 7, 2007). "Kentucky law allows recovery under trespass in either of three instances: (1) the defendant was engaged in an extra-hazardous activity, (2) the defendant committed an intentional trespass, or (3) the defendant committed a negligent trespass." *Rockwell Int'l Corp. v. Wilhite,* 143 S.W.3d 604, 619 (Ky.Ct.App.2003). In the instant case the Court need only address the intentional and negligent theories of trespass. The Court will address the negligent theory first.

Kentucky follows the Restatement (Second) of Torts § 165 for the elements of negligent trespass. *Id.* "The Restatement requires three basic elements for a negligent trespass: (1) the defendant must have breached its duty of due care (negligence); (2) the defendant caused a thing to enter the land of the plaintiff and (3) the thing's presence causes harm to the land." *Id.* at 620 (citing *Mercer v. Rockwell Int'l Corp.,* 24 F.Supp.2d 735 (W.D.Ky.1998)). Defendants contend that Plaintiffs have failed to allege actual harm to their property, because the Complaint only states that "Plaintiffs have been damaged in an amount in excess of the jurisdictional limits of this Court."(Compl.¶ 29.) Defendants argue that this conclusory thread-bare statement is insufficient under *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) to support the damages element. The Court agrees. Plaintiffs' allegation of damages does not contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, the Court finds that Plaintiffs' Complaint fails to state a claim for negligent trespass under Kentucky law.

Defendants next argue that Plaintiffs have also failed to state a claim for intentional trespass. Under Kentucky law, " '[a]ny intended intrusion or encroachment which is not privileged is actionable without regard for the shortness of the period of the interference, or the absence of pecuniary harm.' " *Smith v. Carbide and Chem. Corp.,* 226 S.W.3d 52, 54 (Ky.2007) (quoting 6–A American Law of Property § 28.1 (A.J. Casner ed.1954)). While negligent trespass requires a showing of harm, intentional trespass is actionable regardless of such a showing, although damages may only be nominal. *Id.* at 55.

Defendants contend that they were on the demised premises under color of title and, therefore, they cannot be liable for willful trespass. In support of this proposition, Defendants cite *Seals v. Amburgey,* 2009 WL 3531641, at *6 (Ky.Ct.App. Oct.30, 2009). The Court finds this argument unpersuasive. The trespass alleged in *Seals* was for cutting down timber on the land of another in violation of K.R.S. § 364.130(1).*Seals,* 2009 WL 3531641, at *4. Kentucky law specifically addresses such a trespass and provides that the plaintiff in such an action shall receive triple damages unless the trespasser cut down the timber with color of title. K.R.S. § 364.130(1). As such, the court in *Seals* was not attempting to determine whether a trespass had occurred, but was instead attempting to determine the appropriate measure of damages under K.R.S. § 364.130. *Seals,* 2009 WL 3531641, at *4. The instant suit does not involve trespass to timber or K.R.S. § 364.130, therefore, the color of title analysis identified in *Seals* does not apply. Furthermore, that language is only necessary to determine the appropriate measure of damages and not whether a trespass did in fact occur. Accordingly,

Add. 87

2012 WL 32607

Defendants' argument based on color of title and *Seals* is not well taken.

**\*5** Defendants' final argument is that Plaintiffs' trespass claim is really a breach of contract claim in tort clothing that should be dismissed because it is based on the same duty created by the contract. In support of this argument, Defendants cite *Consol. Rail Corp. v. Grand Trunk Western R.R. Co.,* 2009 WL 3460334 (E.D.Mich. Oct.22, 2009). In *Consolidated Rail,* the Plaintiff/Counter–Defendant, Consolidated Rail, had a contract with the Defendant/Counter–Plaintiff, Grand Trunk, that allowed Consolidated Rail to cross Grand Trunk's railroad tracks to service a specific customer. However, Consolidated Rail exceeded the bounds of that contract and crossed Grand Trunk's railroad tracks to service a different customer. When Grand Trunk discovered this, it refused to allow Consolidated Rail to cross its railroad tracks to service the new customer. Consolidated Rail filed suit against Grand Trunk, and Grand Trunk counter-claimed alleging breach of contract, and several torts including trespass and unjust enrichment.

Applying Michigan law, the court in *Consolidated Rail* found that "where a contract exists, a tort claim may only be maintained on the basis of a legal duty that is 'separate and distinct from the contractual obligation.' " *Id.* (quoting *Rinaldo's Constr. Corp. v. Michigan Bell Tel. Co.,* 454 Mich. 65, 559 N.W.2d 647, 657–58 (Mich.1997)). The court dismissed the trespass claim because it was not based on a separate and distinct legal duty but instead, "arose solely out of the contractual relationship between the parties and not from any independent legal obligations supporting a cause of action in tort." *Id.* at *8, 559 N.W.2d 647 (internal quotation marks omitted).

While *Consolidated Rail* applied the "separate and distinct" duty test found in Michigan law, the Court's own research reveals that a form of this test has been applied by the Kentucky Court of Appeals. In *Mims v. Western–Southern Agency, Inc.,* 226 S.W.3d 833, 836 (Ky.Ct.App.2007), the court adopted the position of the District Court of the District of Columbia and found that

> The failure to perform a contractual obligation typically does not give rise to a cause of action in tort.... However, if a plaintiff can establish the existence of an independent legal duty, he may maintain an action in tort even though

the acts complained of also constitute a breach of contract.

*Id.* (quoting *Jones v. Hartford Life and Accident Ins. Co.,* 443 F.Supp.2d 3, 5 (D.D.C.2006)). The court in *Mims* applied the independent legal duty test to determine if there was a valid negligence action in light of a breach of contract claim. The test has also been applied to claims of conversion. *See First Const., LLC v. Gravelroad Entm't, LLC,* 2008 WL 2038878, at *5 (E.D.Ky. May 12, 2008); *Francis v. Nami Res. Co., LLC,* 2008 WL 852047, at *13–14 (E.D.Ky. Mar.28, 2008).

The Court sees no reason why the test articulated in *Mims* should not be applied to the trespass claim in the instant suit. Plaintiffs have alleged a breach of contract claim against Defendants contending that they have exceeded the scope of the contract by transporting coal from non-adjacent land over the Plaintiffs' property. (Compl.¶ 21.) Plaintiffs have also alleged that the Defendants' actions in transporting the coal from non-adjacent lands was undertaken without permission, consent, license, or legal right to do so and constitutes a trespass. (*Id.* at ¶ 26–27.)Much like *Consolidated Rail,* the Plaintiffs have essentially argued that the Defendants' conduct exceeds the contract, thus creating a trespass. The Court finds that such a claim is born from Defendant Ceralvo's failure to accurately perform the contract, and is not based on the existence of an independent legal duty. What Plaintiffs are really seeking are damages against Defendant Ceralvo for that breach of contract. Therefore, the trespass claim against Defendant Ceralvo must be dismissed. *See Hatton v. Falcon Coal Co.,* 734 S.W.2d 806, 807–08 (Ky.Ct.App.1986) (finding that breach of contract and not trespass was the appropriate claim, for statute-of-limitations purposes, when defendant in a mineral lease exceeded the contract by cutting down timber).

**\*6** However, Plaintiffs and Defendants agree that only Defendant Ceralvo is party to the contract and that Defendant Armstrong is not, and never was, a party to the contract. Accordingly, Plaintiffs have voluntarily dismissed the breach of contract claim against Defendant Armstrong. As Defendant Armstrong is not subject to the contract and its articulated duties, it cannot be said that the trespass claim alleged against it is born from a contractual duty. Therefore, the trespass claim against Defendant Armstrong should remain. *See Consolidated Rail,* 2009 WL 3460334, at *7 (finding the contract at issue did not apply to Consolidated Rail's co-counter-defendant, therefore the torts alleged against the co-

counter-defendant were based on duties separate and distinct from any contractual duties and should not be dismissed).

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss the trespass claim. It is **GRANTED** as to Defendant Ceralvo, but is **DENIED** as to Defendant Armstrong.

### C. Unjust Enrichment

Defendants argue that Plaintiffs' claim for unjust enrichment should be dismissed because "a plaintiff cannot recover under a theory of breach of contract and a theory of unjust enrichment when each theory is based on the same subject matter."(Defs.' Mem. Support of Mot. Dismiss 17.) Defendants acknowledge that a plaintiff is entitled to plead alternative and inconsistent theories of recovery under Fed.R.Civ.P. 8(d)(3), but contends that under *Shane v. Bunzl Distribution USA, Inc.,* 200 F. App'x 397, 404 (6th Cir.2006) an unjust enrichment claim must be dismissed "where there is an explicit contract which has been performed."*Shane,* 200 F. App'x at 404 (quoting *Codell Constr. Co. v. Ky.,* 566 S.W.2d 161, 165 (Ky.Ct.App.1977)).

However, as Plaintiffs point out, this argument has been made before and rejected in *Holley Performance Products, Inc. v. Keystone Automotive Operations, Inc.,* 2009 WL 3614735, at *4 (W.D.Ky. Oct. 29, 2009). Unlike the case in *Shane,* which had advanced to such a stage that the court was able to determine whether the contract at issue was valid and enforceable, the court in *Holley* found that the contract's validity and enforceability could not yet be determined. *Id.* at *4–6.Therefore, the court found that "at this early stage of litigation, it is proper for Keystone to allege both its claim for breach of contract and unjust enrichment."*Id.* at *6.

The Court agrees with the holding in *Holley* and finds that at this early stage of litigation, it is unclear whether the contract is valid and enforceable, therefore, Plaintiffs are permitted to plead both a breach of contract and an unjust enrichment claim under Fed.R.Civ.P. 8(d)(3). Accordingly, the Court **DENIES** Defendants' motion to dismiss the unjust enrichment claim.

### D. Injunctive Relief

Defendants have moved to dismiss Count IV of Plaintiffs' Complaint which seeks to enjoin Defendants from transporting coal from non-adjoining lands across Plaintiffs' property. Defendants argue that this is a claim for injunctive

relief which has not been adequately pled. Regardless of how Plaintiffs have labeled their request for an injunction, it is not a free standing claim, it is a form of relief that can be requested. *See Overstreet v. Lexington–Fayette Urban Cnty. Gov't,* 305 F.3d 566, 573 (6th Cir.2002) ("A preliminary injunction is an extraordinary *remedy* [.]") (emphasis added). As such, the Plaintiffs' request for an injunction must be pled according to Fed.R.Civ.P. 8(a)(3), which requires only "a demand for relief sought," not the more stringent standard of Fed.R.Civ.P. 8(a)(2). The Court finds that Plaintiffs have satisfied their pleading requirements under the federal rules and requested injunctive relief. Accordingly, the Court **DENIES** Defendants' motion to dismiss the request for injunctive relief.

### E. Punitive Damages

**\*7** Defendants next seek to dismiss Plaintiffs' claim for punitive damages. Defendants argue that punitive damages cannot be awarded for a breach of contract and are only appropriate in connection with Plaintiffs' trespass claim. Defendants contend that because the trespass claim should be dismissed that the punitive damages claim should also be dismissed.

It is true that under Kentucky law, "[i]n no case shall punitive damages be awarded for breach of contract."K.R.S. § 411.184(4). Therefore, the punitive damages claim can only survive if the trespass claim survives. The Court has dismissed the trespass claim, but only as against Defendant Ceralvo. Because the trespass claim against Defendant Armstrong has survived, so too does the Plaintiffs' claim of punitive damages against Defendant Armstrong. Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss the punitive damages. It is **GRANTED** as to Defendant Ceralvo, but is **DENIED** as to Defendant Armstrong.

### F. Declaratory Judgment to Quiet Title

Defendants lastly seek to dismiss Plaintiffs' claim to quiet title to the coal haulroad arguing that Plaintiffs have failed to join a necessary party as required by Fed.R.Civ.P. 19. Defendants argue that certain Peabody Affiliates claiming to possess an ownership interest in the coal haulroad have not been joined. Defendants contend that Plaintiffs' failure to join these parties requires dismissal of the quiet title claim.

Fed.R.Civ.P. 19"establishes guidelines for determining when it is proper to dismiss a case because a person or entity has

an interest in the outcome of the litigation that could be impaired in the absence of that person or entity, but joinder of the person or entity will deprive the court of subject matter jurisdiction."*Glancy v. Taubman Ctrs., Inc.,* 373 F.3d 656, 664 (6th Cir.2004)."Assessing whether joinder is proper under Rule 19 is a three-step process."*Id.* at 666.First the court must determine if the non-party is a necessary party to the action under Rule 19(a).*Id* . Next, if the court finds that the party is necessary then it must determine if joinder of that party is feasible-will joinder of the party destroy the court's jurisdiction to hear and determine the case. *Id.* Finally, if the court finds that joinder is not feasible then it "must analyze the Rule 19(b) factors to determine whether [it] should 'in equity and good conscience' dismiss the case because the absentee is indispensable."*Id.*

Under the Rule 19 analysis, the movant must first satisfy the threshold requirement of showing the necessity of the missing party before the Court can address the second or third step. *See Id.*(First, the court *must* determine whether the person or entity is a necessary party under Rule 19(a).) (emphasis added); *see also Temple v. Synthes Corp. Ltd.,* 498 U.S. 5, 8, 111 S.Ct. 315, 112 L.Ed.2d 263 (1990) (finding that the necessity analysis of Rule 19(a) is a threshold requirement); *Kar Kraft Eng'g v. Shelby,* 2007 WL 1544397, at *2 (E.D.Mich. May 25, 2007) ("[A] joinder analysis does not reach the factors under Rule 19(b) if the court first determines that the party seeking to be joined is not a necessary party.")

 **\*8** Although not articulated by Defendants, the rule under which they are seeking dismissal of the quiet title claim is Fed.R.Civ.P. 12(b)(7). As such, the moving party bears the burden of demonstrating the necessity of the missing party under Rule 19(a).*Citizen Band Potawatomi Indian Tribe of Okla. V. Collier,* 17 F.3d 1292, 1293 (10th Cir.1994); *Russian Collections Ltd. v. Melamid,* 2009 WL 4016493, at *2 (S.D.Ohio Nov.18, 2009). The moving party may satisfy this burden through the production of affidavits or other relevant extra-pleading evidence. *Citizen Band Potawatomi,* 17 F.3d at 1293.

Plaintiffs' Complaint alleges that "Plaintiffs hold legal title in fee simple absolute and are the owners in possession of the coal haul roads that have been constructed by Defendants or their predecessors in interest[.]" (Compl.¶ 41.) Defendants contend that there are several entities that are necessary parties because they have an interest related to the ownership of the coal hauroad and disposition of the quiet title claim

without them would impair or impede their ability to protect that interest. In support of this statement, Defendants have attached an Amended and Restated Non–Exclusive Hauroad Easement Agreement ("Hauroad Agreement") which was filed in the Ohio County, Kentucky Clerk's Office. [2] (*See* Defs.' Mot. Dismiss, Ex. 1.)

2    It appears to the Court that the amended agreement was filed due to the attachment of an incorrect map in the original agreement, and that the terms of both agreements are the same. *See* (Hauroad Agreement 2 ("[T]he parties hereto desire to amend and restate the aforesaid Non–Exclusive Hauroad Easement Agreement to include a corrected Exhibit B map, upon the same terms and conditions hereinafter set forth.").)

The Hauroad Agreement lists Beaver Dam Coal Company, Ohio County Coal Company, LLC, Grand Eagle Mining, Inc., and Central States Coal Reserves of Kentucky, LLC as the owners of "certain surface tracts of real estate; certain easements and easement rights over surface tracts of third parties" as well as "of a certain existing 200 foot (200') wide coal hauroad known as "Walton Creek Hauroad" running from the West Fork Surface Mine to the Matanzas–Equality County Road and overlying the above mentioned tracts, easements, and areas of easement rights[.]" (Hauroad Agreement 2.) The agreement further states that the owners grant to Western Land Company, LLC and its designees, which includes Defendant Ceralvo, a perpetual non-exclusive easement over the hauroad. (*Id.*)

The Court finds that Defendants have carried their burden and demonstrated the absence of a necessary party, or as it looks, necessary parties. The Hauroad Agreement states that the grantors, Beaver Dam Coal Company, Ohio County Coal Company, LLC, Grand Eagle Mining, Inc., and Central States Coal Reserves of Kentucky, LLC, are the owners of the hauroad. Clearly these grantors have claimed an interest relating to the subject of this action, quieting title to the coal hauroad that runs over Plaintiffs' real property. Furthermore, determining the merits of the Plaintiffs' quiet title claim without the grantors would impair or impede their ability to protect that interest. Therefore, the Court finds that the grantors identified in the Hauroad Agreement are necessary parties.

Having made that determination, the Court must now determine whether joinder of the grantors to the current action is feasible and if it is then it must order the grantors to be joined. Fed.R.Civ.P. 19(a)(1). The feasibility of the

Add. 90

joinder is dependant on an analysis of the grantors' effect on the Court's diversity subject matter jurisdiction. If the addition of the grantors would destroy diversity jurisdiction, then joinder is not feasible and the Court would need to determine if the grantors are indispensable. However, the parties have completely failed to address either of these steps in their respective briefs. This failing precludes the Court from fully determining whether the necessary parties are able to be joined to this action under Rule 19. Accordingly, the Court **RESERVES** the determination of this issue and orders that Defendants submit additional briefing addressing the feasibility and dispensability of the grantors to this action **NO LATER THAN TEN (10) DAYS** from the entry of this order. Plaintiffs are ordered to respond **NO LATER THAN SEVEN (7) DAYS** from the filing of Defendants' supplemental brief. No Reply will be permitted.

## IV. CONCLUSION

**\*9** For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants Ceralvo Holdings, LLC ("Ceralvo") and Armstrong Coal Company, Inc.'s ("Armstrong") Motion to Dismiss [DN 6] is **GRANTED IN PART, DENIED IN PART,** and **RESERVED IN PART.**The Defendants' motion is **GRANTED** as to the breach of contract claim against Defendant Armstrong and the trespass and punitive damages claims against Defendant Ceralvo. The motion is **RESERVED** as to the quiet title claim, and is **DENIED** as to all other aspects.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 91

2014 WL 5581049

2014 WL 5581049
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina,
Eastern Division.

LRP HOTELS OF CAROLINA, LLC, Plaintiff,
v.
WESTFIELD INSURANCE COMPANY, Defendant.

No. 4:13–CV–94–D.    |    Signed Oct. 31, 2014.

**Attorneys and Law Firms**

John M. Sperati, Smith Debnam Narron Drake Saintsing &
Myers, L.L .P., Raleigh, NC, for Plaintiff.

Jeffrey B. Kuykendal, John Timothy Jeffries, McAngus
Goudelock & Courie, PLLC, Charlotte, NC, for Defendant.

**ORDER**

JAMES C. DEVER, III, Chief Judge.

 **\*1**  On March 11, 2013, LRP Hotels of Carolina, LLC
("LRP" or "plaintiff") filed a complaint against Westfield
Insurance Company ("Westfield" or "defendant") in Lenoir
County Superior Court. *See* Compl. [D.E. 1–1]. The dispute
involves an insurance claim that LRP filed with Westfield
concerning damage LRP's hotel in Kinston, North Carolina
allegedly sustained in August 2011 due to Hurricane Irene.
LRP asserts the following claims against Westfield: (1)
breach of contract; (2) unfair and deceptive trade practices;
(3) breach of covenant of good faith and fair dealings; (4)
fraud; (5) negligent misrepresentation; and (6) negligence.
*See* Compl. ¶¶ 35–77. On April 16, 2013, Westfield timely
removed the action based on diversity jurisdiction. *See* [D.E.
1]. On June 30, 2014, Westfield moved for partial summary
judgment concerning: (1) a portion of the breach of contract
claim; (2) the unfair and deceptive trade practices claim; (3)
the breach of covenant of good faith and fair dealing claim;
(4) the fraud claim; (5) the negligent misrepresentation claim;
and (6) the negligence claim [D.E. 26]. On July 21, 2014,
LRP responded in opposition [D.E. 30]. On August 4, 2014,
Westfield replied [D.E. 31]. On October 31, 2014, the court
heard oral argument. As explained below, the court grants
Westfield's motion for partial summary judgment.

**I.**

In August 2011, LRP purchased a hotel in Kinston, North
Carolina. *See* Marupov Dep. [D.E. 29–2] 5 (p. 25 of
deposition). The hotel was built in 1986. *See* McClancey Dep.
[D.E. 29–4] 3 (p. 39 of deposition). Before purchasing the
hotel, LRP did not retain anyone to inspect the hotel. *See* Patel
Dep. [D.E. 29–3] 3 (p. 21 of deposition). LRP was unaware
of the age or the service life of the hotel's roof or windows.
*Id.* 12–14 (pp. 40–42 of deposition).

LRP purchased insurance from Westfield concerning the
hotel. *See* [D.E. 29–5] 1–183 (copy of insurance policy).
On August 27, 2011, Hurricane Irene hit Kinston, North
Carolina and damaged the hotel. *See* Compl. ¶ 9. LRP
made an insurance claim for damages to the hotel. *See*
*id.* ¶ 13. Within ten days of the claim, Westfield retained
an independent engineer (Rimkus Consulting Group), an
independent general contractor (Forney & WeyGant), and an
independent accountant (Sanderford & Associates, P.A.) to
inspect the hotel and analyze the damage.

Rimkus Consulting Group opined that Hurricane Irene caused
certain damage to the roof, the exterior fence in the pool area,
and the exterior storage building. See Rimkus Report [D.E.
29–6] 1–54; [D.E. 29–7] 1–5. Rimkus Consulting Group
also opined that Hurricane Irene did not cause some of the
claimed damage, including damage to some windows and
water damage in some rooms. *See* [D.E. 29–6] 5–6, 14–16.

After Westfield investigated the claim, Westfield determined
that LRP suffered covered losses of $24,958.63. After
deducting $1,000 for the deductible, Westfield paid LRP
$23,958.63. *See* [D.E. 29–8] 2–3. The covered damages that
Westfield paid for were $20,854 .36 for building repairs (less
the $1,000 deductible), $720 for sign repair, $1,441.89 for
a card reader, and $942.38 for spoiled food. *See id.* LRP
contends that covered damages to the hotel far exceed
$24,958.63. On March 6, 2013, LRP filed this suit.

 **\*2**  Summary judgment is appropriate when, after reviewing
the record taken as a whole, no genuine issue of material
fact exists and the moving party is entitled to judgment as
a matter of law. Fed.R.Civ.P. 56(a); *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). The party seeking
summary judgment bears the initial burden of demonstrating
the absence of a genuine issue of material fact. *Celotex
Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving

Add. 92

party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, *Anderson,* 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. *Anderson,* 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007).

The court has jurisdiction based on diversity, and North Carolina law governs plaintiff's claims. Thus, this court must determine how the Supreme Court of North Carolina would rule. *See, e.g., Twin City Fire Ins. Co. v. Ben Arnold–Sunbelt Beverage Co. of S.C.,* 433 F.3d 365, 369 (4th Cir.2005)."If the Supreme Court of [North] Carolina has spoken neither directly or indirectly on the particular issue before us, [this court is] called upon to predict how that court would rule if presented with the issue." *Id.* (quotation omitted). In making that prediction, the court may consider opinions of the North Carolina Court of Appeals, treatises, and the practices of other states. *Id.*

## A.

LRP contends that Westfield breached its contract with LRP by failing to pay for all covered losses under the insurance policy. *See* Compl. ¶¶ 34–37. In order to prove breach of contract under North Carolina law, a plaintiff must prove (1) the existence of a valid contract, and (2) a breach of the terms of the contract. *See, e.g., McLamb v. T.P. Inc.,* 173 N.C.App. 586, 588, 619 S.E .2d 577, 580 (2005), *disc. rev. denied,*360 N.C. 290, 627 S.E.2d 621 (2006); *Poor v. Hill,* 138 N.C.App. 19, 26, 530 S.E.2d 838, 843 (2000); *Jackson v. Carolina Hardwood Co.,* 120 N.C.App. 870, 871, 463 S.E.2d 571, 572 (1995). An insurance policy is a contract, and the policy's provisions govern the rights and duties of the contracting parties. *See Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.,* 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000); *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co., Inc.,* 326 N.C. 133, 142, 388 S.E.2d 557, 562 (1990).

In LRP's breach of contract claim, LRP contends that Westfield had a duty under the policy to investigate and pay policy benefits for covered storm damage resulting from

wind, rain, and water intrusion relating to or arising out of Hurricane Irene. *See* Compl. ¶¶ 34–37. LRP contends that Hurricane Irene caused extensive covered storm damage, including damage to: (1) the roof; (2) interior rooms; (3) the pool area; (4) a storage area; (5) trees; (6) a card reader; (7) the Hampton Inn sign; (8) food; and, (9) HVAC units. *See* ¶¶ 9–10; Marupov Dep. 43–14, 49–50, 58–59, 69; Patel Dep. 37; McClancy Expert Report [D.E. 29–9]–[D.E. 29–13]. LRP also contends that it lost revenue and incurred extra expenses for LRP employees. Patel Dep. 30. LRP contends that Westfield breached the insurance contract when it refused to pay for covered storm damage.

**\*3** Westfield responds that, other than the roof, it paid for all covered storm damages under the policy. *See* Def's Br. in Supp. of Mot. for SJ. [D.E. 29] 12. As for the roof, Westfield contends that the parties have a legitimate dispute about what damage is covered. *See id.* 6–7, 13.

At oral argument, the court concluded that the only genuine issue of material fact that remains in the case concerns damage to the roof. The other alleged damages have been paid, are not covered, or LRP has failed to raise a genuine issue of material fact.

## B.

LRP contends that Westfield committed unfair and deceptive trade practices by misrepresenting portions of the insurance coverage, failing to act reasonably in response to LRP's claim, failing to handle the claim in good faith, and failing to pay what was due under the policy. *See* Compl. ¶¶ 38–45. In order to prove a claim under North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen.Stat. §§ 75–1.1–75–43, a plaintiff must prove "(1) defendants committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that plaintiff was injured thereby."*Griffith v. Glen Wood Co.,* 184 N.C.App. 206, 217, 646 S.E.2d 550, 558 (2007) (quotation omitted); *Dalton v.. Camp,* 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001); *Walker v. Fleetwood Homes of N.C. Inc.,* 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007); *RD & J Props. v. Lauralea–Dilton Enters., LLC,* 165 N .C.App. 737, 748, 600 S.E.2d 492, 500 (2004). Under the UDTPA, a plaintiff must prove that defendants' conduct was immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *See, e.g., Gilbane Bldg. Co. v. Fed. Reserve Bank,* 80 F.3d 895, 902 (4th Cir.1996); *Branch Banking & Trust Co. v. Thompson,* 107 N.C.App. 53,

Add. 93

61, 418 S.E.2d 694, 700 (1992). Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court. *See, e.g., Tucker v. Blvd. at Piper Glen. LLC,* 150 N.C.App. 150, 153, 564 S.E.2d 248, 250 (2002); *Norman Owen Trucking. Inc. v. Morkoski,* 131 N.C.App. 168, 177, 506 S.E.2d 267, 273 (1998).

Essentially LRP argues that Westfield acted unfairly and deceptively in breaching the policy's terms. *See* Pl's Br. in Opp. [D.E. 30] 9. Specifically, LRP contends that Westfield acted unfairly in relying on the "biased inspection" of the experts that Westfield retained to evaluate LRP's claim. *See id.*

In evaluating a UDTPA claim, courts must guard against permitting a litigant to transform a breach of contract claim into a UDTPA claim. *Birtha v. Stonemor, N.C. LLC,* 727 S.E.2d 1, 10 (N.C.Ct.App.2012); *see PCS Phosphate Co. v. Norfolk S. Corp.,* 559 F.3d 212, 224 (4th Cir.2009); *Broussard v. Meineke Disc. Muffler Shops. Inc.,* 155 F.3d 331, 346–47 (4th Cir.1998)."Mere breach of contract is not sufficient to sustain" a UDTPA claim unless "the breach is surrounded by substantial aggravating circumstances."*Griffith,* 184 N.C.App. at 217, 646 S.E.2d at 558; *see Birtha,* 727 S.E.2d at 10 (noting that even an intentional breach of contract "is not sufficiently unfair or deceptive" to sustain a UDTPA action). Moreover, a fundamental disagreement between the parties about a contract's terms and coverage is not a "substantial aggravating circumstance[ ]."*Griffith,* 184 N.C.App. at 217, 646 S.E.2d at 558; *see PCS Phosphate Co.,* 559 F.3d at 224; *Broussard,* 155 F.3d at 346–47.

**\*4** Even viewing the evidence in the light most favorable to LRP, Westfield did not commit an act that was unfair or deceptive under the UDTPA. The court rejects LRP's attempt to transform its breach of contract claim into a UDTPA claim. Accordingly, the court grants summary judgment to Westfield on LRP's UDTPA claim.

### C.

LRP contends that Westfield breached a covenant of good faith and fair dealing in the insurance contract by failing to pay the amount due on the claim without any reasonable basis and by failing to conduct a reasonable investigation. *See* Compl. ¶¶ 46–51. To prevail on this claim, LRP must prove:

1) a refusal to pay after recognition of a valid claim; 2) "bad faith"; and 3) "aggravating or outrageous conduct." " 'Bad faith' means not based on a legitimate, 'honest disagreement' as to the validity of the claim. 'Aggravated conduct' is defined to include fraud, malice, gross negligence, insult ... willfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights."

*Blis Day Spa, LLC v. Hartford Ins. Grp.,* 427 F.Supp.2d 621, 631 (W.D.N.C.2006) (citations omitted).

LRP concedes that an "honest disagreement" or an "innocent mistake" is insufficient to prove a breach of covenant of good faith and fair dealing. *See* Pl.'s Br. in Opp. 10. LRP argues, however, that its breach of covenant of good faith and fair dealing claim "revolves around [Westfield's] wrongful conduct in purposefully manipulating the expert inspection reports and twisting the truth to avoid large expenses due and rightfully owed...."*Id.*

LRP cites no evidence in support of its argument. *See id.*At summary judgment, however, a party disputing a fact must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, ... admissions, interrogatory answers, or other materials."Fed.R.Civ.P. 56(c) (1)(A). In contrast to LRP, Westfield cites evidence that defeats LRP's breach of covenant of good faith and fair dealing contract claim. Specifically, LRP's owner Patel testified that he had no opinion concerning whether Westfield failed to act in good faith. *See* Patel Dep. 35. Similarly, LRP's agent Marupov testified that LRP and Westfield had an honest disagreement about the damages covered under the policy. See Marupov Dep. 46. On this record, the court grants summary judgment to Westfield on LRP's claim of breach of covenant of good faith and fair dealing. *See, e.g., Blis Day Spa, LLC,* 427 F.Supp.2d at 631–34; *Olive v. Great Am. Ins. Co.,* 76 N.C.App. 180, 185–191, 333 S.E.2d 41, 44–47 (1985).

### D.

LRP contends that Westfield committed fraud by making false representations to LRP concerning damage to the hotel, causes for the damage, and coverage under the policy. *See* Compl. ¶¶ 52–61. To prove fraud under North Carolina law, a plaintiff must prove: (1) a false representation or

Add. 94

concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) that did in fact deceive, and (5) resulted in damage to the injured party. *Forbis v. Neal,* 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007); *Ragsdale v. Kennedy,* 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974); *Ellison v. Alexander,* 700 S.E.2d 102, 107 (N.C.Ct.App.2010).

**\*5** LRP contends that Westfield committed fraud by relying on portions of the Rimkus Consulting Group report that Westfield knew to be inaccurate. *See* Pl.'s Br. in Opp. 11. However, LRP fails to specify those "false" portions of the Rimkus Consulting Group report that Westfield knew were false and relied upon to deny the claim. *Id.; cf.* Fed.R.Civ.P. 56(C)(1)(A). Thus, LRP's argument fails.

LRP also contends that Westfield misrepresented the policy to LRP. *See* Pl.'s Br. in Opp. 11. Patel's testimony and Marupov's testimony defeat this contention. *See* Patel Dep. 33; Marupov Dep. 34. Accordingly, this argument fails. Thus, the court grants summary judgment to Westfield on LRP's fraud claim.

### E.

LRP contends that Westfield made negligent misrepresentations to LRP while inspecting the hotel and adjusting the claim. *See* Compl. ¶¶ 62–68. LRP also alleges that Westfield negligently reviewed and adjusted LRP's claim. *See id.* ¶¶ 69–77.

As for LRP's negligent misrepresentation claim, LRP must prove: (1) in the course of a business or other transaction in which a party has a pecuniary interest, (2) defendant supplied false information (3) without exercising reasonable care in obtaining or communicating the information and (4) plaintiff reasonably relied on the information to its detriment. *See, e.g., Taylor v. Gore,* 161 N.C.App. 300, 303, 588 S.E.2d 51, 54 (2003); *Piedmont Inst. of Pain Mgt. v. Staton Found.,* 157 N.C.App. 577, 586, 581 S.E.2d 68, 74 (2003); *Everts v. Parkinson,* 147 N.C.App. 315, 328, 555 S.E.2d 667, 676 (2001).

Westfield dealt only with LRP's owner Rajendra Patel and LRP employee Murod Marupov. *See* Patel Dep. 31–32; Marupov Dep. 32. Each admits, however, that they are unaware of any misrepresentations that Westfield made to them. *See* Patel Dep. 32, 35; Marupov Dep. 34, 46. Thus,

the court grants summary judgment to Westfield on LRP's negligent misrepresentation claim.

Alternatively, North Carolina's economic loss rule bars plaintiffs negligent misrepresentation and negligence claims. North Carolina courts have applied the economic loss rule to prohibit recovery for purely economic loss in tort when a contract or warranty has already allocated the risk. *See, e.g., Kelly v. Georgia Pac. LLC,* 671 F.Supp.2d 785, 791 (E.D.N.C.2009); *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.,* 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), *rejected in part on other grounds by* Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc., 313 N .C. 230, 328 S.E.2d 274 (1985); *Land v. Tall House Bldg. Co.,* 165 N.C.App. 880, 882–85, 602 S.E.2d 1, 3–4 (2004); *Moore v. Coachmen Indus., Inc.,* 129 N.C.App. 389, 401–02, 499 S.E.2d 772, 780 (1998); *Warfield v. Hicks,* 91 N.C.App. 1, 9–10, 370 S.E.2d 689, 694 (1988). The economic loss rule precludes a tort action "against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract." *Spillman v. Am. Homes of Mocksville, Inc.,* 108 N.C.App. 63, 65, 422 S.E.2d 740, 741–42 (1992).

**\*6** The economic loss rule confines parties to the contract's terms when seeking redress concerning the contract's subject matter. *See Kelly,* 671 F.Supp.2d at 791–92. The economic loss rule recognizes that parties to a contract generally do not become each others fiduciaries. *See Broussard,* 155 F.3d at 347 (" 'parties to a contract do not thereby become each others' fiduciaries; [therefore,] they generally owe no special duty to one another beyond the terms of the contract.' " (quoting *Branch Banking & Trust Co.,* 107 N.C.App. at 61, 418 S.E.2d at 699)). Likewise, the rule prevents a party from seeking an extra-contractual tort remedy in an attempt to avoid a contract's allocation of risk. *See Moore,* 129 N.C.App. at 401–02, 499 S.E.2d at 780; *see also Reece v. Homette Corp.,* 10 N.C.App. 462, 466–67, 429 S.E.2d 768, 770 (1993). When injury occurs to the subject matter of a contract, "[i]t is the law of contract and not the law of negligence which defines the obligations and remedies of the parties...." *Spillman,* 108 N.C.App. at 65, 422 S.E.2d at 742. For a party to pursue a tort claim stemming from a contract, a plaintiff "must allege a duty owed him by [a] defendant separate and distinct from any duty owed under a contract." *Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc.,* 994

Add. 95

2014 WL 5581049

F.Supp. 350, 362 (W.D.N.C.1997) (quotation omitted); *see Kelly,* 671 F.Supp.2d at 791–96.

LRP's negligent misrepresentation and negligence claims are based solely on Westfield's alleged negligence in performing its duties under the insurance contract. *See* Compl. ¶¶ 62–77. LRP does not allege any duties that Westfield owed to LRP that are "separate and distinct" from the contract. *Vanwyk Textile Sys., B.V.,* 994 F.Supp. at 362. Accordingly, the economic loss rule bars LRP's negligent misrepresentation and negligence claims. *See Kelly,* 671 F.Supp.2d at 796; *accord Geico Cas. Co. v. Arce,* 333 F. App'x 396, 397–98 (11th Cir.2009) (per curiam) (unpublished); *All Erection & Crane Rental Corp. v. Acordia Nw., Inc.,* 162 F. App'x 554, 559 (6th Cir.2006) (per curiam) (unpublished); *Maynard Co-op. Co. v. Zeneca, Inc.,* 143 F.3d 1099, 1100–03 (8th Cir.1998); *Bailey Farms, Inc. v. NOR–AM Chem. Co.,* 27 F.3d 188, 190–92 (6th Cir.1994). Thus, the court grants summary judgment to Westfield on LRP's negligent misrepresentation and negligence claims.

## II.

In sum, the court GRANTS defendant's motion for partial summary judgment [D.E. 26]. The sole remaining claim is LRP's breach of contract claim concerning damage to the roof.

SO ORDERED.

---

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.



RONALD W. McMANUS, as Trustee of the Ronald W. McManus Trust, Plaintiff, v. GMRI, INC., Defendant.

CIVIL ACTION NO. 3:12-CV-009-DCK

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION

*2012 U.S. Dist. LEXIS 92094*

**July 3, 2012, Decided**
**July 3, 2012, Filed**

**COUNSEL:** [*1] For Ronald W. McManus, in his capacity as Trustee of the Ronald W. McManus Family Trust, Plaintiff: Melanie Dawn Johnson Raubach, LEAD ATTORNEY, Hamilton Stephens Steele & Martin, PLLC, Charlotte, NC; Robert C. Stephens, LEAD ATTORNEY, Hamilton, Moon, Stephens, Steele & Martin PLLC, Charlotte, NC.

For GMRI, Inc., Defendant: Charles Bailey King, Jr., LEAD ATTORNEY, Fred M. Wood, Jr., Smith Moore Leatherwood LLP, Charlotte, NC.

**JUDGES:** David C. Keesler, United States Magistrate Judge.

**OPINION BY:** David C. Keesler

**OPINION**

**ORDER**

  **THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion To Dismiss Claims Pursuant to *Rule 12(b)(6)* Or, Alternatively, For Judgment On The Pleadings Pursuant To *Rule 12(c)*." (Document No. 4). The parties have consented to Magistrate Judge jurisdiction pursuant to *28 U.S.C. § 636(c)*, and this

motion is ripe for disposition. Having carefully considered the arguments, the record, and the applicable authority, Defendant's "Motion To Dismiss ..." will be granted in part, and denied in part.

**I. BACKGROUND**

  On October 13, 2011, Plaintiff Ronald W. McManus, in his capacity as Trustee of the Ronald W. McManus Family Trust, ("Plaintiff" or "Trust") filed a "Verified Complaint" (Document No. 1-1) against Defendant [*2] General Mills Restaurants, Inc., d/b/a The Olive Garden Restaurant ("Defendant" or "GMRI") in the Superior Court of Mecklenburg County, North Carolina. On January 10, 2012, Defendant timely removed the case to this Court pursuant to the federal court's diversity jurisdiction under *28 U.S.C. § 1332*. (Document No. 1). On January 17, 2012, Defendant filed its "Motion to Dismiss ..." (Document No. 4) and "Defendant GMRI, Inc.'s Brief in Support of Motion to Dismiss ... ." (Document No. 5). "Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss ..." was filed on January 31, 2012. (Document No. 8). On February 14, 2012, Defendant responded with "Defendant GMRI, Inc.'s Reply Brief in Support of Motion to Dismiss ... ." (Document No. 13).

  Plaintiff alleges that Ramona H. McManus ("Ramona McManus") entered into a lease with Atlantic

Restaurant Ventures, Inc. ("Atlantic"), dated December 20, 1984 (the "Original Lease") for certain real property, including a restaurant building, located on Independence Boulevard in Charlotte, North Carolina (the "Premises"). (Document No. 1-1, ¶ 6). According to Plaintiff, in March 1988, the Original Lease was amended, and Atlantic assigned and [*3] transferred, and Defendant assumed, all rights, duties and liabilities of Atlantic under the Original Lease. (Id., ¶ 7). Plaintiff states that the Original Lease was further amended on May 19, 2003, and following Ramona McManus's death, Plaintiff became the owner of the Premises and the landlord under the Original Lease, as amended. (Id., ¶¶ 8-9). Plaintiff further claims that it remains the owner and landlord of the Premises, and that the parties entered into a Third Lease Amendment on June 30, 2009. (Id., ¶ 10). Finally, Plaintiff claims that the term of the Original Lease, as assigned and amended by the parties, (the "Lease") ended on June 30, 2011 (the "Termination Date"), and Defendant vacated the Premises in January 2011, but continued to pay rent through the Termination Date. (Id., ¶ 10-12).

Plaintiff alleges that "[f]ollowing the Termination Date, the Trustee inspected the Premises, which were found to be in deplorable condition." (Id., ¶ 13). Plaintiff's Complaint includes allegations that

> [w]alls, floors, doors, and ceilings were damaged. The kitchen was damaged and had not been maintained in good condition for some time. The roof leaked. Plumbing, mechanical and electrical [*4] systems required repairs. Property belonging to the Trust was wrongfully removed. Where property was removed, the damage caused by the removal was not repaired. Importantly, mold and mildew were found in the building which will require remediation.

Id. Based on these allegations, Plaintiff contends that Defendant violated various sections of the Lease and that, "[d]ue to [Defendant's] failure to maintain the Premises, failure to surrender the Premises in good condition, wrongful removal of Trust property from the Premises and failure to repair damage resulting from the removal of certain fixtures, [Plaintiff] has suffered damages in excess of $10,000." (Id., ¶ 17, 21, 24, 25-31).

Plaintiff includes in the Verified Complaint causes of action for breach of contract; negligence; unfair and deceptive trade practices; breach of covenant of good faith and fair dealing; breach of implied duty to use reasonable diligence; conversion; and unjust enrichment. (Document No. 1-1). In the pending motion to dismiss, Defendant does not seek dismissal of Plaintiff's claims for breach of contract and breach of the covenant of good faith and fair dealing (Plaintiff's "Contract Claims"), but does move to [*5] dismiss Plaintiff's "five non-contract claims," including "(1) negligence, (2) unfair and deceptive trade practices ("UDTP"), (3) breach of the implied duty to use reasonable diligence, (4) conversion, and (5) unjust enrichment." (Document No. 5, p.2). The question before the Court is whether these non-contract causes of action survive Defendant's *Rule 12(b)(6)* and *Rule 12(c)* motions to dismiss under the prevailing standard.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to *Fed.R.Civ.P. 12(b)(6)* tests the "legal sufficiency of the complaint" but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992); Eastern Shore Markets, Inc v. J.D. Assoc. Ltd. Partnership, 213 F.3d 175, 180 (4th Cir. 2000).* A complaint attacked by a *Rule 12(b)(6)* motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1960, 173 L. Ed. 2d 868 (2009),* quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007);* see also, *Robinson v. American Honda Motor Co., Inc., 551 F.3d 218, 222 (4th Cir. 2009).* "A claim [*6] has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 129 S.Ct. at 1949.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

The Supreme Court has also opined that

> *Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "'give

Appeal: 15-1063    Doc: 33    Filed: 06/10/2015    Pg: 140 of 176

Page 3
2012 U.S. Dist. LEXIS 92094, *6

the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.

*Erickson v. Pardus, 551 U.S. 89, 93-94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)*(citations omitted).

"Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986).* The court "should view the complaint in the light most favorable to the [*7] plaintiff." *Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).*

A motion for judgment on the pleadings under *Rule 12(c)* is assessed under the same standard as a motion to dismiss under *Rule 12(b)(6). Deltacom, Inc. v. Budget Telecom, Inc., 2011 U.S. Dist. LEXIS 54488, 2011 WL 2036676 at *2 (E.D.N.C. May 22, 2011)* (citing *Walker v. Kelly, 589 F.3d 127, 139 (4th Cir. 2009))*; see also, *Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002).*

### III. DISCUSSION

The crux of Defendant's argument in support of its "Motion to Dismiss..." is that "Plaintiff has not alleged any conduct on the part of [Defendant] that would rise beyond a breach of contract." (Document No. 5, p.4). Therefore, as noted above, Defendant moves to dismiss Plaintiff's five non-contract claims based on its argument that "each of the issues raised by Plaintiff is expressly addressed in the Lease and will be fully resolved in Plaintiff's Contract Claims." Id.

Plaintiff opposes the motion, arguing in general that it "has pled certain claims in contract law and, in the event the Court finds the Lease is not binding on GMRI, or certain acts fall outside the scope of the Lease, [Plaintiff] has pled certain [*8] claims in tort law." (Document No. 8, p.4). Plaintiff asserts that it "is allowed to plead such alternative and inconsistent claims pursuant to case law and the Federal Rules of Civil Procedure." Id. Moreover, Plaintiff asserts that its conversion claim should survive under one or more exceptions to the general rule that it is barred by the economic loss

doctrine, and that the unfair and deceptive trade practices claim should survive based on Defendant's "egregious" conduct. (Document No. 8, pp.4-8). Plaintiff's response in opposition to the motion to dismiss does not specifically oppose dismissal of its claims for negligence, unjust enrichment, or breach of the implied duty to use reasonable diligence. (Document No. 8).

In reply, Defendant asserts that Plaintiff failed to actually plead in the alternative, and that "Plaintiff has not alleged any facts that would support an inference that the Lease was invalid," and that Defendant concedes that the Lease "constitutes a binding agreement between [the parties]. (Document No. 13, pp.2-3). Defendant concludes that "there are no circumstances under which the Court could find that the Lease is not binding on GMRI." Id.

The Court will analyze [*9] each claim Defendant seeks to dismiss in turn. However, before considering the claims,

the Court will repeat the Fourth Circuit's observation in Broussard that it believed 'should guide [a] district court's consideration of [a party's] tort claims' in an action arising out of a contractual relationship:

"We think it unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." If [a party] has failed to fulfill its contractual obligations, the remedy is contract damages, not the blank check afforded to juries when they are authorized to return a punitive award.

*Deltacom, Inc., 2011 U.S. Dist. LEXIS 54488, 2011 WL*

2036676 at *4 (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998) (quoting *Strum v. Exxon, Co., U.S.A.*, 15 F.3d 327, 333 (4th Cir. 1994)).

## A. Negligence

Defendant first challenges Plaintiff's claim for negligence, arguing that the duties identified by Plaintiff each "arise[] from and [are] expressly addressed in the Lease ... [and] [a]ccordingly, Plaintiff's negligence claim is nothing more than a claim [*10] for negligent breach of contract." (Document No. 5, p.4). Aside from arguing that it is allowed to plead claims in the alternative, Plaintiff does not specifically challenge Defendant's "Motion to Dismiss..." as to this cause of action. (Document No. 8, pp.3-4).

As the Eastern District of North Carolina has stated, "[u]nder North Carolina law, a party may assert a negligence claim by alleging that an individual owing that party a legal duty breached that duty, proximately causing damage." *Deltacom, Inc., 2011 U.S. Dist. LEXIS 54488, 2011 WL 2036676, at *5* (citing *Camalier v. Jeffries, 340 N.C. 699, 460 S.E.2d 133, 136 (N.C. 1995)).* However, "a negligence claim is precluded where the parties' duties to one another are a matter of contract." Id. (citing *Strum v. Exxon, Co., U.S.A., 15 F.3d 327, 332-33 (4th Cir. 1994)* ("holding that a gross negligence claim is improper where the negligence 'arises out of [a party's] performance on the contract, not out of the type of distinct circumstances necessary to allege an independent tort'").

In the present case, Plaintiff contends that Defendant owed Plaintiff "a duty to exercise due care: (i) in its use of the Premises; (ii) in the inspection and repair of the Premises; and (iii) in determining [*11] which property belonged to the Trust." (Document No. 1-1, ¶ 38). In addition to alleging that these duties are specifically provided for in the Lease, Defendant notes that "[i]t is well-established ... that there is 'no cause of action for negligent breach of contract.'" (Document No. 5, p.4) (citing *Berkeley Fed. Savings & Loan Assoc. v. Terra Del Sol, Inc., 111 N.C. App. 692, 433 S.E.2d 449, 457-58 (N.C. Ct. App. 1993)* ("the trial court properly dismissed defendants' counterclaims grounded in negligence ... as a matter of law in view of the rule that there is no cause of action for negligent breach of contract.")). Defendant also argues that "under the economic loss rule, a 'tort action does not lie against a party to a contract who simply fails

to perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is the damage to the subject matter of the contract.'" (Document No. 5, p.5) (citing *Spillman v. Amer. Homes of Mocksville, Inc., 108 N.C. App. 63, 422 S.E.2d 740, 741-42 (N.C. Ct. App. 1992)).*

The Court agrees with Defendant that each of the duties enumerated in Plaintiff's negligence claim arises [*12] out of the duties owed to Plaintiff under the Lease. Specifically, Plaintiff alleges that Defendant's negligence in performing its duties owed under the parties' contract caused harm to the property that is the subject of the contract. (Document No. 1-1, ¶¶ 37-40). Accordingly, Plaintiff's negligence claim does not arise "out of the type of distinct circumstances necessary to allege an independent tort." *Broussard, 155 F.3d at 346-47* (citing *Strum, 15 F.3d at 332-33*).

Based on the foregoing, Defendant's "Motion to Dismiss..." Plaintiff's claim for negligence (Second Claim for Relief) will be granted.

## B. Unfair and Deceptive Trade Practices

Next, Defendant moves to dismiss Plaintiff's claim for UDTP based on its argument that "none of Plaintiff's allegations go beyond a mere breach of contract." (Document No. 5, p.5). Specifically, Defendant asserts that there are "simply no allegations of any substantial aggravating circumstances" that would support a claim under the Unfair and Deceptive Trade Practices Act, *N.C.Gen.Stat., 75-1.1 et seq* ("UDTPA"). (Document No. 5, pp.5-6).

In order to establish a claim for UDTP "a plaintiff must show, '(1) the defendant committed an unfair or deceptive [*13] act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff.'" *Metro. Grp, Inc. 2010 U.S. Dist. LEXIS 128795 at *17* (citing *Compton v. Kirby, 157 N.C. App. 1, 577 S.E.2d 905, 917 (N.C. Ct. App. 2003); Dalton v. Camp, 353 N.C. 647, 548 S.E.2d 704, 711 (N.C. 2001)).* A simple breach of contract does not qualify as an unfair or deceptive act; instead, a plaintiff must allege "some type of egregious or aggravating circumstances before the [UDTPA] applies." *Pan-American Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F.Supp.2d 664, 700 (M.D.N.C. 2011)* (quoting *Norman Owen Trucking, Inc. v. Morkoski,*

131 N.C. App. 168, 506 S.E.2d 267, 273 (N.C. Ct. App. 1998)). The courts have found that "[a]ggravating factors include an intentional misrepresentation for the purpose of deceiving another and which has a natural tendency to injure the other." Id. (citing *Baldine v. Furniture Comfort Co., 956 F. Supp. 580, 587-88 (M.D.N.C. 1996)*). In order for Plaintiff's claim to survive Defendant's motion to dismiss, his "complaint must allege facts stating all the elements of the claim, which here include allegations of some type of egregious or aggravating circumstances." Id. (citing *Kelley v. CitiFinancial Servs., Inc., 205 N.C. App. 426, 696 S.E.2d 775, 781-82 (N.C. Ct. App. 2010)*).

In [*14] the present case, even assuming the truth of the allegations in Plaintiff's Verified Complaint, it has failed to state a *prima facie* case for unfair or deceptive trade practices.

> A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive. The determination as to whether an act is unfair or deceptive is a question of law for the court ... . Moreover, some type of *egregious* or *aggravating* circumstances must be alleged and proved before [UDTPA's] provisions may take effect.

*Kelley, 696 S.E.2d at 781* (citing *Dalton, 353 N.C. at 656-57*). In order "[t]o prevail under the [UDTPA], one must show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." *Cameron v. Martin Marietta Corp., 729 F. Supp. 1529, 1531 (E.D.N.C. 1990)* (citing *Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 534 (4th Cir. 1989)*).

Based on this standard, the Court finds that Plaintiff has failed to allege facts sufficient to state a claim for UDTP. In response to Defendant's motion to dismiss, Plaintiff contends that "[t]he scope and magnitude of the physical damages elevate [Defendant's] conduct to the level of 'egregious' [*15] conduct required to state a claim of unfair and deceptive trade practices." (Document No. 8, p.6). The Verified Complaint alleges that Defendant's actions "were unfair and deceptive within the meaning of the [UDTPA]," "were and are affecting commerce," and "[a]s a direct and proximate result of the [UDTP] of [Defendant], [Plaintiff] has been damaged ...." (Document No. 1-1, ¶¶ 42-44).

Plaintiff's statements in support of this cause of action are conclusory and fail to state sufficient factual content to support a claim that is facially plausible. (Document No. 1-1). Similar to the circumstances that led the Kelley court to affirm a motion to dismiss for UDTP, Plaintiff fails to allege that Defendant attempted to deceive Plaintiff or that Defendant acted unethically. See *Kelley at 781-82* (finding "no indication in the complaint or supporting documents that Defendants ... attempt[ed] to deceive Plaintiff or other customers. Nor do the allegations in the complaint establish that Defendants acted unethically ..."). Moreover, as with Plaintiff's other claims, her UDTP allegations are all in the context of the alleged breach of the Lease. See (Document No. 8, p.6) (citing Document No. 1-1, [*16] ¶ 25) ("In further violation of Section 9.03 of the Original Lease, GMRI caused, or allowed, the wrongful removal of certain Trust property....").

Based on the foregoing, Defendant's "Motion to Dismiss..." Plaintiff's claim for UDTP (Third Claim for Relief) will be granted.

## C. Breach of the Implied Duty to Use Reasonable Diligence

Next, with respect to Plaintiff's claim for breach of the implied duty to use reasonable diligence, Defendant argues that the claim "fails as a matter of law because no such cause of action is recognized under North Carolina law." (Document No. 5, p.6). In its Verified Compliant, Plaintiff alleges that "[a]s a party to the Lease, [Defendant] was bound by an implied obligation to use reasonable diligence to treat the Premises in such a manner that no injury would be done to the Premises," that Defendant breached this implied obligation, and that as a result of this breach, Plaintiff "has been damaged." (Document No. 1-1, ¶¶ 51-53).

In addition to arguing that there is no such implied obligation under North Carolina law, Defendant further notes that its obligation to prevent damage to the property in question was "set forth expressly in the terms of the Lease." [*17] (Document No. 5, p.6) (citing Document No. 1-1, ¶ 15) (Section 8.01 requires [Defendant] to 'make any and all repairs required to be made ... to keep the [restaurant building] in good and presentable condition.'").

In response, Plaintiff declines to specifically oppose dismissal of this claim and fails to cite any authority

supporting its proposition that Defendant was bound by an implied duty to use reasonable diligence. (Document No. 8). To the extent Plaintiff seeks to plead such a claim "in the alternative" the undersigned does not find that Plaintiff has alleged a plausible claim. (Document No. 1-1). Rather, the Verified Complaint only asserts that Defendant was bound by this purported duty "[a]s a party to the Lease." Id.

Based on the foregoing, the Court is satisfied that Defendant's obligations in this matter are defined by the contract between the parties. Accordingly, the Court declines to find that Plaintiff has stated a plausible claim for an implied duty to use reasonable diligence (Fifth Claim for Relief) and will allow dismissal of this claim.

**D. Conversion**

Next, Defendant moves to dismiss Plaintiff's claim for conversion. (Document No. 5, pp.7-8; Document No. 13, pp.3-5). [*18] In its Verified Complaint, Plaintiff alleges that Defendant "wrongfully took the Trust's property, including but not limited to electrical equipment, light fixtures and portions of the ventilation and air-conditioning equipment. . . . exercised a right of ownership over Trust's property to the exclusion of the Trust, and . . . impermissibly and without authorization retained and refused to return the Trust's property." (Document No. 1-1, ¶¶ 55-57). Plaintiff further alleges that it is "the lawful owner of the ... property and is entitled to its immediate possession." (Document No. 1-1, ¶ 58).

"In North Carolina, conversion is generally defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *ACS Partners, LLC v. Americon Group, Inc., No. 3:09-CV-464, 2010 U.S. Dist. LEXIS 19906, 2010 WL 883663, at *11 (W.D.N.C. March 5, 2010)* (quoting *Peed v. Burleson's, Inc., 244 N.C. 437, 94 S.E.2d 351 (1956)).* The Middle District of North Carolina has further provided that "the tort of conversion involves two essential elements: ownership by the plaintiff and conversion by the defendant." *TSC Research, LLC v. Bayer Chemicals Corp., 552 F.Supp.2d 534, 542 (2007)* [*19] (citing *Lake Mary Ltd. Partnership v. Johnston, 145 N.C. App. 525, 551 S.E.2d 546, 552 (N.C. Ct. App. 2001)).* Where, a party has allegedly "received the materials in question pursuant to a contract, conversion requires more than mere

possession." Id. "[D]emand and refusal are necessary to the existence of the tort. When demand is made, an absolute, unqualified refusal to surrender, which puts the plaintiff to the necessity of force or a lawsuit to recover his own property, is of course a conversion." Id. (citing *Hoch v. Young, 63 N.C. App. 480, 305 S.E.2d 201, 203 (N.C. Ct. App. 1983)* (additional citation omitted); see also, *River's Edge Pharms, LLC v. Gorbec Pharm. Servs, LLC, 2012 U.S. Dist. LEXIS 57969, 2012 WL 1439133 at *12 (M.D.N.C. Apr. 25, 2012)).*

In the present case, Plaintiff's Verified Complaint explicitly lays out the elements establishing a claim of conversion. (Document No. 1-1, ¶¶ 54-58). Specifically, Plaintiff alleges that Defendant took Plaintiff's property "[w]ithout authorization or right," exercised a right of ownership over the property to the exclusion of the Plaintiff, and "impermissibly and without authorization retained and refused to return" the property. (Document No. 1-1, ¶¶ 55-57). Plaintiff further incorporated in its [*20] allegation that it "made demand on GMRI to recover the costs to repair the Premises and replace the property GMRI wrongfully removed, but GMRI failed and refused to comply." (Document No. 1-1, ¶¶ 54, 27).

With respect to the requirement that the property at issue must belong to Plaintiff, Defendant does not appear to contest Plaintiff's allegation that Plaintiff is the rightful owner of the property. (Document No. 5, p.7-8). However, Defendant again argues that Plaintiff's claim "sounds in contract, not tort" because "[t]he parties' rights with respect to these fixtures, including their ownership upon expiration of the Lease, are expressly governed by Section 9.03 of the Lease." (Document No. 5, p.7) (citing Document No. 1-1, ¶¶ 22, 25).

Both parties recognize the general rule that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." (Document No. 5, p.7 and Document No. 8, p.4) (quoting *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 240 S.E.2d 345, 350 (N.C. 1978))* (citations omitted); see also, *Severn Peanut Co. v. Indus. Fumigant Co., 826 F.Supp.2d 871, 873-74, (E.D.N.C. 2011).* The economic loss doctrine

> states that, ordinarily, [*21] a breach of contract does not give rise to a tort action by the promisee against the promisor. *N.C. State Ports Auth. v. Lloyd A. Fry Roofing*

Co., 294 N.C. 73, 240 S.E.2d 345, 351 (1978). The doctrine relies on the notion, derived from freedom of contract, that "the parties to the contract either contemplated or should have contemplated these dangers in allocating the risk of loss." *Palmetto Linen Serv., Inc. v. U.N.X., Inc., 205 F.3d 126, 130 (4th Cir. 2000)* (applying South Carolina law). In other words, "business entities must protect their commercial interests up front through the medium of contract." Id.

This doctrine, however, is not without limitation.

*Severn, 826 F.Supp.2d at 873-74.*

The parties here further acknowledge that the Ports Authority decision identifies exceptions to the economic loss rule; however, the parties disagree as to whether any of these exceptions are applicable to the instant case. (Document No. 5, pp.7-8; Document No. 8, pp.4-5; Document No. 13, pp.3-5). The question before the Court on this issue appears to be whether (1) "the injury, proximately caused by the promisor's negligent, or wilful act or omission in the performance of his contract, was to property [*22] of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee," or (2) "the injury so caused was a wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor." (Document No. 8, pp.4-5 and Document No. 13, p.4) (quoting *Ports Authority, 294 N.C. at 82*).

The undersigned is persuaded, applying either TSC Research or Ports Authority, that Plaintiff has made a sufficient claim of conversion to survive a motion to dismiss. Specifically, the Complaint alleges that Plaintiff demanded the recovery, replacement, and/or return of its property that was wrongfully removed, and that Defendant failed and refused. (Document No. 1-1, ¶ 27); see also *TSC Research, 552 F.Supp.2d at 542*. In addition, although this may be a factual dispute that is further developed through discovery, it appears the property that was allegedly converted was the subject of the contract. (Document No. 1-1, ¶¶ 22, 25, 55); see also *Ports Authority, 240 S.E.2d at 351*. Certainly, the specific property that Plaintiff contends was wrongfully converted was explicitly addressed in the terms of the parties'

contract. [*23] (Document No. 1-1, ¶¶ 22, 25).

Defendant also asserts that Plaintiff failed to allege a "willful injury," but Defendant declines to offer any explanation or authority supporting its position. (Document No. 5, p.8). The undersigned is unconvinced. Although Plaintiff did not use the precise term "willful" [or wilful], the Court is satisfied that the allegations describe a willful act. Courts in the Fourth Circuit have recently recognized the definition of willful as "conscious or deliberate." *Maryland v. Universal Elections, Inc., 862 F. Supp. 2d 457, 2012 U.S. Dist. LEXIS 73885, 2012 WL 1940543 at *4 n.7 (D.Md. May 29, 2012)*; see also, *Laing v. Federal Exp. Corp., 2011 U.S. Dist. LEXIS 104224, 2011 WL 6072028 at *5 (W.D.N.C. Sept. 14 , 2011)* ("Willful conduct is more than negligent and must be voluntary, deliberate, or intentional."). Here, Plaintiff's Complaint adequately describes actions in the context of the conversion claim that can be construed as conscious, voluntary, intentional, or deliberate.

Based on the foregoing, the undersigned finds dismissal of the conversion claim to be premature at this stage of the litigation. Of course, the Court may reconsider this issue on a proper motion for summary judgment. Accordingly, Defendant's "Motion to Dismiss..." Plaintiff's [*24] claim for conversion (Sixth Claim for Relief) will be denied.

**E. Unjust Enrichment**

Finally, Defendant argues that "Plaintiff's unjust enrichment claim fails as a matter of law because the parties entered into a valid and enforceable contract." (Document No. 5, p.8). Again, in response to Defendant's "Motion to Dismiss..." Plaintiff declines to specifically address this claim. (Document No. 8, pp.2-8). The Court will therefore rely on Plaintiff's Verified Complaint which contends that Defendant "has been unjustly enriched by virtue of its wrongful taking of [Plaintiff's] property ... ." (Document No. 1-1, ¶ 65).

The Court notes that under the laws of North Carolina, "a claim for unjust enrichment may not be brought in the face of an express contractual relationship between the parties." *Madison River Mgt. Co. v. Business Mgt. Software Corp., 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005)* (citing *Southeastern Shelter Corp. V. BTU, Inc., 154 N.C. App. 321, 572 S.E.2d 200, 206 (N.C. Ct. App. 2002))* (additional citation omitted). The Fourth Circuit has stated,

2012 U.S. Dist. LEXIS 92094, *24

The law of unjust enrichment in North Carolina proceeds from the general principle that "[a] person who has been unjustly enriched at the expense of another [*25] is required to make restitution to the other." *Booe v. Shadrick, 322 N.C. 567, 369 S.E.2d 554, 555-556 (1988)* (internal quotations omitted). In order to prevail on a claim for unjust enrichment, a plaintiff must prove that (1) it conferred a benefit on the defendant, (2) the benefit was not conferred officiously or gratuitously, (3) the benefit is measurable, and (4) the defendant consciously accepted the benefit. *Id. at 556.* An unjust enrichment claim is **available only in the absence of an express contract** between the parties. Id.

*Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., 72 Fed. App'x 916, 920 (4th Cir. 2003)* (emphasis added); see also, *Fireman's Fund Ins. Co. v. Safeco Ins. Co., 3:07-CV-86, 2007 U.S. Dist. LEXIS 90774, 2007 WL 4233317 (W.D.N.C. Nov. 28, 2007).*

In the present case, because all of the facts pleaded by Plaintiff allege the existence and validity of a contract between the parties, Plaintiff's claim for unjust enrichment must fail as a matter of law. (Document No. 1-1, ¶¶ 60-65). The Court notes that Plaintiff's claim for unjust enrichment expressly incorporates by reference all of the allegations of the rest of the Verified Complaint, including those alleging the existence of an [*26]

express contract. (Document No. 1-1, ¶¶ 60, 6-11, 16, 20, 23). Further, Defendant acknowledges the validity of this contract, stating "[Defendant] has admitted in its Answer that the 'Lease constitutes a binding agreement between [the parties].'" (Document No. 13, p.3).

Based on the foregoing, it is clear to the Court that a valid and enforceable contract exists between the parties. Accordingly, Plaintiff's claim for unjust enrichment must be dismissed, and Defendant's "Motion to Dismiss..." Plaintiff's claim for unjust enrichment (Seventh Claim for Relief) will be granted.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED,** that Defendant's "Motion To Dismiss Claims Pursuant to *Rule 12(b)(6)* Or, Alternatively, For Judgment On The Pleadings Pursuant To *Rule 12(c)*" (Document No. 4) is **GRANTED** in part, as to Plaintiff's claims for negligence, unfair and deceptive trade practices, breach of the implied duty to use reasonable diligence, and unjust enrichment; and **DENIED** in part, as to Plaintiff's claim for conversion.

**SO ORDERED.**

Signed: July 3, 2012

/s/ David C. Keesler

David C. Keesler

United States Magistrate Judge

551 Fed.Appx. 651
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Fourth
Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,
Fourth Circuit.

Debra Rose McMURRAY, Plaintiff–Appellant,

v.

UNITED STATES of America, Defendant–Appellee.

No. 13–1129.    |    Argued: Oct.
31, 2013.    |    Decided: Jan. 7, 2014.

**Synopsis**
**Background:** Passenger injured when vehicle being driven
by United States Marine Corps recruiter ran a red light
and collided with another car brought action under Federal
Tort Claims Act (FTCA). Government moved for summary
judgment. The United States District Court for the Eastern
District of North Carolina, James C. Dever III, Chief
District Judge, 2012 WL 6212633, granted motion. Passenger
appealed.

**Holding:** The Court of Appeals held that under North
Carolina law, public-policy exception rendered liability
release unenforceable.

Reversed and remanded.

**\*651** Appeal from the United States District Court for the
Eastern District of North Carolina, at Greenville. James C.
Dever III, Chief District Judge. (4:12–cv–00086–D).

**Attorneys and Law Firms**

**ARGUED:** Mark A. Sternlicht, Beaver, Holt, Sternlicht
& Courie, PA, Fayetteville, North Carolina, for Appellant.
Joshua Bryan Royster, Office of the United States Attorney,
Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas
G. Walker, United States Attorney, R.A. Renfer, Jr., Assistant

United States Attorney, Office of the United States Attorney,
Raleigh, North Carolina, for Appellee.

Before TRAXLER, Chief Judge, and KING and THACKER,
Circuit Judges.

**Opinion**

Vacated and remanded by unpublished PER CURIAM
opinion.

Unpublished opinions are not binding precedent in this
circuit.

PER CURIAM:

Debra Rose McMurray was a passenger in a vehicle being
driven by Michael Rumfalo, a recruiter for the United States
Marine Corps. McMurray sustained serious injuries when
Rumfalo ran a red light and collided with another car, and
she subsequently filed suit against the United States under
the Federal Tort Claims Act ("FTCA"). The district court
granted summary judgment in favor of the United States, and
McMurray appeals. We vacate the judgment of the district
court and remand for further proceedings.

**\*652 I.**

The Marine Corps occasionally conducts workshops for
teachers and other educational professionals at its facility
on Parris Island, South Carolina. The workshops give the
educators valuable information about the Corps and the
opportunity to experience first-hand some elements of basic
training.

McMurray, a guidance counselor at a high school near
Fayetteville, North Carolina, frequently counsels students
who are deciding whether to join the military or which branch
of the military would be a good fit. Interested in attending
one of the workshops, McMurray contacted Rumfalo, the
Marine Corps recruiter she knew from school. Rumfalo told
McMurray that a workshop would be held on March 29
through April 2, 2010, and he forwarded her the necessary
paperwork to be completed in order to attend. The paperwork
included a "Release and Hold Harmless Agreement" (the
"Release") that released the government from liability for any
injuries arising out of participation in the workshop, including
"riding in government-provided transportation (to include

Add. 105

transportation to and from the Educator's Workshop)." J.A. 15.

When Rumfalo came to pick up the paperwork from McMurray, she had not yet completed the Release. She asked Rumfalo if she would be allowed to participate if she did not sign the Release and was told that "everyone has to sign [the Release] to participate." J.A. 18. McMurray also asked Rumfalo if she could drive herself to Raleigh to meet the bus that would take them to Parris Island, rather than being picked up at her house and driven to Raleigh by Rumfalo. The answer to that question was also "no," an answer that "made it clear" to McMurray that she "could not negotiate the terms of [her] participation in the Workshop." J.A. 19. McMurray therefore signed the Release and attended the workshop.

After the workshop, a Marine Corps bus brought the workshop attendees back to Raleigh. Rumfalo was there, waiting to drive McMurray and an attendee from Fayetteville back to their homes. While still in Raleigh, Rumfalo ran a red light and collided with a car that had the right-of-way. McMurray suffered serious injuries, including a traumatic brain injury. McMurray missed work for the remainder of the 2010 school year and through the entire summer as well. Her medical bills and lost wages exceed $48,000.

McMurray thereafter commenced this action under the FTCA. The district court granted summary judgment in favor of the government, concluding that the Release was enforceable under North Carolina law and that it barred McMurray's claims against the government. This appeal followed.

## II.

The FTCA provides a limited waiver of sovereign immunity for torts committed by federal employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). "In other words, a claimant has an FTCA cause of action against the government only if she would also have a cause of action under state law against a private person in like circumstances. Thus, the substantive law of each state establishes the cause of action." *Anderson v. United States,* 669 F.3d 161, 164 (4th Cir.2011) (citation and internal quotation marks omitted).

The act or omission at issue here took place in North Carolina, and the substantive **\*653** law of North Carolina therefore governs McMurray's FTCA claim. The sole issue on appeal is the enforceability of the Release. If North Carolina law would enforce the Release had it been executed in favor of a private person, then we must likewise enforce the Release as barring McMurray's claim. *See id.* ("[S]ubstantive state law establishes—and circumscribes—FTCA causes of action."). When resolving that issue, this court "must rule as the North Carolina courts would, treating decisions of the Supreme Court of North Carolina as binding, and departing from an intermediate court's fully reasoned holding as to state law only if convinced that the state's highest court would not follow that holding." *Iodice v. United States,* 289 F.3d 270, 275 (4th Cir.2002) (internal quotation marks and alteration omitted).

## III.

### A.

Although contracts seeking to release a party from liability for his own negligence "are not favored by the law," such contracts are generally enforceable. *Hall v. Sinclair Refining Co.,* 242 N.C. 707, 89 S.E.2d 396, 397 (1955). Exculpatory clauses or contracts, however, "are void and unenforceable" where the "contractual provisions [are] violative of the law or contrary to some rule of public policy," or where a party to the contract has unequal bargaining power and "must either accept what is offered or forego the advantages of the contractual relation in a situation where it is necessary for him to enter into the contract to obtain something of importance to him which for all practical purposes is not obtainable elsewhere." *Id.* at 398; *see Fortson v. McClellan,* 131 N.C.App. 635, 508 S.E.2d 549, 551 (1998) ("[A]n exculpatory contract will be enforced unless it violates a statute, is gained through inequality of bargaining power, or is contrary to a substantial public interest.").

McMurray contends that each of the exceptions to the general rule of enforceability applies in this case. She argues that the release is unenforceable under the violation-of-statute exception because the Release is inconsistent with North Carolina's red-light statute. *See* N.C. Gen.Stat. § 20–158(b)(2) ("When a traffic signal is emitting a steady red circular light controlling traffic approaching an intersection, an approaching vehicle facing the red light shall come to a stop and shall not enter the intersection...."). She further argues that the Release is unenforceable under the unequal-

Add. 106

bargaining-power exception because the educator's workshop provided information and experience important to her as a guidance counselor that could not be replicated elsewhere and she lacked the ability to negotiate the terms of her attendance. As to the public-policy exception, McMurray contends that operating motor vehicles on public roads is a dangerous and heavily regulated activity. Given the significant public interests at stake, McMurray argues that it would violate public policy to permit drivers to absolve themselves of the duty to exercise reasonable care when driving. We need not consider McMurray's arguments under the violation-of-statute or unequal-bargaining-power exceptions, because we agree that the public-policy exception renders the Release unenforceable.

**B.**

As explained by the Supreme Court of North Carolina, the public-policy exception prohibits a person from contracting to protect himself from "liability for negligence in the performance of a duty of public service, or where a public duty is owed, *or public interest is involved, or where public* **\*654** *interest requires the performance of a private duty.*" *Hall,* 89 S.E.2d at 398 (emphasis added; internal quotation marks omitted). We think it clear that an important public interest is involved in this case—the public's interest in safe streets and safe driving.

There can be no dispute that driving on public roads is a dangerous activity, as North Carolina courts have repeatedly recognized. *See Williams v. Henderson,* 230 N.C. 707, 55 S.E.2d 462, 463 (1949) ("A motorist operates his vehicle on the public highways where others are apt to be.... Should he lapse into a state of carelessness or forgetfulness his machine may leave death and destruction in its wake."). Accordingly, in North Carolina, as elsewhere, numerous statutes, regulations, and cases spell out the rules of the road and the duties of a driver. And as the case law makes clear, the point of these rules and regulations is to protect not merely the driver and his passengers, but to protect the safety *of the public:*

> Our motor traffic regulations are not intended merely to protect those who are using the highways. They are designed to protect the life, limb, and property of *any and every person on or about the highway* who may suffer

injury to his person or damage to his property as a natural and proximate result of the violation thereof.

*Aldridge v. Hasty,* 240 N.C. 353, 82 S.E.2d 331, 337 (1954) (emphasis added); *see also State v. Anderson,* 3 N.C.App. 124, 164 S.E.2d 48, 50 (1968) ("Death on the highway can no longer be considered as a personal and individual tragedy alone. The mounting carnage has long since reached proportions of a public disaster."), *aff'd,* 275 N.C. 168, 166 S.E.2d 49 (1969). We therefore conclude that, under North Carolina law, there is a strong public-safety interest in careful driving and the observance of all traffic-related rules and regulations. Permitting the government to absolve itself of the duty to exercise reasonable care when driving puts members of the public at great risk and is contrary to that strong public interest.

The district court, however, held—and the Government argues on appeal—that the public-policy exception applies only to " ' entities or industries that are heavily regulated.' " J.A. 25 (quoting *Bertotti v. Charlotte Motor Speedway, Inc.,* 893 F.Supp. 565, 569 (W.D.N.C.1995)). In the district court's view, the activity of driving is not heavily regulated (at least where no common carriers are involved), such that the enforcement of the Release would not "contradict a substantial public interest." J.A. 27.

As an initial matter, we question the correctness of the district court's determination that the public-policy exception is limited to cases involving heavily regulated entities or activities. North Carolina courts have applied the public-policy exception to invalidate exculpatory contracts and clauses executed under widely varying circumstances, not all of which can be said to involve heavily regulated entities or activities. *See Fortson,* 508 S.E.2d at 551–52 (invalidating release signed as condition of participation in motorcycle-safety training program); *Alston v. Monk,* 92 N.C.App. 59, 373 S.E.2d 463, 467 (1988) (invalidating release signed by customer having hair colored by student of cosmetology school); *Brockwell v. Lake Gaston Sales & Serv.,* 105 N.C.App. 226, 412 S.E.2d 104, 106 (1992) (invalidating clause in boat-repair contract that purported to relieve mechanic of liability for negligence that led to theft of personal property contained in boat). While the practice of cosmetology may be heavily regulated, teaching motorcycle safety or repairing boats is not, yet the releases in *Fortson* and *Brockwell* **\*655** were still invalidated under the public-policy exception.

In our view, the *Hall* court's formulation of the exception, with its focus on public service, public duty, and public interest, *see Hall,* 89 S.E.2d at 398, makes it clear that the public-policy exception turns not on the level of regulation, but on the presence or absence of a *public interest* in the transaction at issue. The actual application of the exception by the North Carolina courts confirms this view—the courts enforce exculpatory clauses where no public interest is at stake, without regard to whether the entity seeking protection is regulated. *See Gibbs v. Carolina Power & Light Co.,* 265 N.C. 459, 144 S.E.2d 393, 400 (1965) ("Even a public service corporation is protected by an exculpatory clause *when the contract is casual and private and in no way connected with its public service.*" (emphasis added)); *Fortson,* 508 S.E.2d at 553 ("[W]hen [a] public utility engage[s] in non-public activity, freedom of contract principles appl[y], and the public utility's contracts [are] not limited by public policy." (internal quotation marks omitted)); *see also Blaylock Grading Co. v. Smith,* 189 N.C.App. 508, 658 S.E.2d 680, 683 (2008) (enforcing exculpatory clause in land-surveying contract despite regulation of surveying industry because "the limitation on liability in the contract at issue does not implicate the public health or safety"); *Sylva Shops Ltd. P'ship v. Hibbard,* 175 N.C.App. 423, 623 S.E.2d 785, 790, 792 (2006) (enforcing exculpatory clause in commercial lease not because relationship was not heavily regulated, but because exculpatory clause at issue "[did] not create a risk of injury to the public or the rights of third parties" and therefore "[did] not affect the public interest").

Heavy regulation of an activity or entity may well reflect the presence of an important public interest that precludes enforcement of an exculpatory clause. *See Fortson,* 508 S.E.2d at 551 ("An activity falls within the public policy exception when the activity is extensively regulated to protect the public from danger, and it would violate public policy to allow those engaged in such an activity to absolve themselves from the duty to use reasonable care." (internal quotation marks omitted)). Nonetheless, we do not read the relevant North Carolina cases as *requiring* heavy regulation of the activity or entity before the public-policy exception may be invoked. [1]

[1]     In any event, even if heavy regulation were required under North Carolina law, it is apparent that driving on public roads is a heavily regulated activity, with numerous statutes and regulations establishing the requirements for getting and keeping a license to drive

on public roads, and setting out the driver's obligations under various circumstances.

The government also contends driving is not the kind of activity that would justify application of the public-policy exception. We disagree. In our view, the public-safety interest at stake in this case is at least as important as the safety interests involved in motorcycle instruction, *see Fortson,* 508 S.E.2d at 552, or the practice of cosmetology, *see Alston,* 373 S.E.2d at 467, and significantly more important that the public interest in the safeguarding of a boat while under repair, *see Brockwell,* 412 S.E.2d at 106. Moreover, the government's argument in this regard is largely foreclosed by the North Carolina Court of Appeals' decision in *Fortson.*

In *Fortson,* the plaintiff executed a release when signing up for a two-day motorcycle safety program and was injured when the motorcycle she was assigned malfunctioned. The court found the release unenforceable under the public-policy exception. To reach its conclusion, the court focused on the risks associated with **\*656** motorcycle *use* and the public-safety interest "in minimizing the risks associated with motorcycle *use,*" an interest that is "recognized in case law and regulated by statute." *Id.* at 552 (emphasis added). [2] In the court's view, the "*same* interests in public safety" addressed by the cases and statutes involving motorcycle use "are significantly present in motorcycle safety instruction," *id.* at 554 (emphasis added), and the court therefore found the release unenforceable: "Given the hazards to the public associated with motorcycle instruction, and the extensive regulation of motorcycle use, it would violate public policy to allow instructors in a motorcycle safety instruction course, such as the one operated by defendant, to absolve themselves from the duty to use reasonable care." *Id.* at 552.

[2]     As an example of a case recognizing the public interest in minimizing the risks of motorcycle use, the *Fortson* court cited to *State v. Anderson,* 3 N.C.App. 124, 164 S.E.2d 48 (1968), a case which upheld North Carolina's helmet law as valid exercise of police powers because the law bore "a substantial relation to the promotion of *the welfare and safety of the general public* as distinguished from the welfare solely of the individual riders of motorcycles." *Id.* at 50 (emphasis added).

The *Fortson* court's analysis is thus premised on an implicit determination that the public-safety interest in the safe *use* of motorcycles is substantial enough to invalidate a release implicating that interest. If the public interest in the safe use of motorcycles is enough to invalidate a release, then the

Add. 108

public interest in the safe use and operation of cars is likewise enough.

## IV.

As the North Carolina courts have made clear, every driver owes the public the duty to exercise due care when driving on public roads; the failure to exercise due care puts people and property at great risk. *See Aldridge,* 82 S.E.2d at 337; *Williams,* 55 S.E.2d at 463. Careless driving exposes the public, not merely the driver and his passenger, to great danger, and the Release therefore cannot be viewed as a simple private contract that should be enforced according to its terms. *See Blaylock Grading Co.,* 658 S.E.2d at 683; *Sylva Shops,* 623 S.E.2d at 790.

Accordingly, we conclude that, under the circumstances of this case, it would violate public policy to permit the government to "absolve [itself] from the duty to use reasonable care" when driving. *Fortson,* 508 S.E.2d at 552; *cf. Sylva Shops,* 623 S.E.2d at 790 ("Public policy has been defined as the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good."). Because the Release is unenforceable under North Carolina law, we vacate the district court's order granting summary judgment in favor of the government, and we remand for further proceedings on McMurray's FTCA claim.

*VACATED AND REMANDED.*

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.



**ROBERT W. NUDELMAN and EMILY S. NUDELMAN, Plaintiffs, v. J.A. BOOE BUILDING CONTRACTOR, INC., JAMES A. BOOE, JR., and MILTON W. GRENFELL, A.I.A., d/b/a GRENFELL ARCHITECTURE, Defendants, and J.A. BOOE BUILDING CONTRACTOR, INC., Third-Party Plaintiff, v. VEGA INDUSTRIES, INC., d/b/a CRAFTLINE DISTRIBUTION CENTER; STO CORP., SCIULLO INTERIOR SYSTEMS COMPANY, INC.; and SCAN AM DESIGNS, INC., Third-Party Defendants.**

NO. COA02-267

COURT OF APPEALS OF NORTH CAROLINA

*2003 N.C. App. LEXIS 509*

**January 27, 2002, Heard in the Court of Appeals
March 4, 2003, Filed**

**NOTICE:**

[*1] PURSUANT TO RULE 32(b), NORTH CAROLINA RULES OF APPELLATE PROCEDURE, THIS DECISION IS NOT FINAL UNTIL EXPIRATION OF THE TWENTY-ONE DAY REHEARING PERIOD. [*1] THIS IS AN UNPUBLISHED OPINION. PLEASE REFER TO THE NORTH CAROLINA RULES OF APPELLATE PROCEDURE FOR CITATION OF UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** Guilford County. No. 00 CvS 6363.
*Nudelman v. J.A. Booe Bldg. Contr'r, 156 N.C. App. 427, 577 S.E.2d 717, 2003 N.C. App. LEXIS 165 (2003)*

**DISPOSITION:** Affirmed.

**COUNSEL:** Carruthers & Roth, P.A., by Jack B. Bayliss, Jr., for plaintiff appellants.

Dean & Gibson, L.L.P., by Christopher J. Culp, for James A. Booe, Jr., defendant appellee.

**JUDGES:** McCULLOUGH, Judge. Chief Judge

EAGLES and Judge ELMORE concur.

**OPINION BY:** McCULLOUGH

**OPINION**

*Appeal by plaintiffs from judgment entered 13 November 2001 by Judge Catherine C. Eagles in Guilford County Superior Court. Heard in the Court of Appeals 27 January 2002.*

McCULLOUGH, Judge.

This case arises out of a construction agreement between plaintiffs Robert and Emily Nudelman and defendants J.A. Booe Building Contractor, Inc., and its President, Mr. James A. Booe, Jr. The pertinent facts are as follows: In 1992, plaintiffs contracted with architect Milton Grenfell to design and oversee the construction [*2] of a custom built residence for them in Greensboro, North Carolina. J.A. Booe Building Contractor, Inc. (Booe Building) successfully bid for the construction job and entered into a construction contract with plaintiffs on 26 October 1992. Booe Building's President, Mr. James A. Booe, Jr. (Booe), executed the construction contract

on behalf of Booe Building. Throughout the construction contract, the contractor was defined as Booe Building, rather than Booe individually.

As the qualifying agent for Booe Building, Booe completed and signed a permit application for construction of the house and submitted it to the City of Greensboro. Booe Building was listed as both the applicant and the contractor, and Booe Building's contractor license number also appeared on the permit application. The City of Greensboro issued a building permit card allowing the proposed construction, and the permit card was posted on the building site. However, because the City's computers were not working when the permit was issued, the permit card was handwritten. The contractor signature line on the permit card was never signed; instead, it bore a notation from the City that read "computer down."

After the [*3] litigation commenced, Booe realized the permit card had been issued to him in his individual capacity and in his personal contractor code. Booe never signed the permit card and had no explanation for why the permit was in his name, other than the fact that the city's computers were not working and perhaps a clerical error had been made. Despite the confusion in the issuance of the permit, the construction contract itself clearly identified Booe Building as the contractor for plaintiffs' house. When deposed, Mr. Nudelman admitted he never entered into a contract with Booe individually. All payments required under the construction contract were made payable to Booe Building, rather than to Booe individually.

After construction was completed, plaintiffs discovered problems with the EIFS (exterior insulation and finishing system), a synthetic stucco product applied and installed on the outside of the house. Over time, plaintiffs learned their home had elevated moisture readings, which indicated that the synthetic stucco had not been properly installed. On 27 April 2000, plaintiffs sued both Booe Building and Booe individually, as well as their architect, Mr. Grenfell, for what they believed [*4] was a defective installation of the EIFS. Plaintiffs' complaint asserted that Booe, in his individual capacity, breached his duty to plaintiffs and was "careless and negligent . . . in conducting and supervising the construction of plaintiffs' house." On 6 June 2000, Booe Building and Booe answered plaintiffs' complaint and included a number of affirmative defenses and a

cross-claim against Mr. Grenfell alleging breach of contract and negligence.

Plaintiffs' case was set for trial at the 5 November 2001 Civil Session of Guilford County Superior Court. On 25 October 2001, defendants Booe Building and Booe filed separate motions for summary judgment. On 29 October 2001, plaintiffs filed a cross- motion for partial summary judgment on liability as to both defendants. Before calling the case for trial, the trial court heard arguments and considered the documents and discovery submitted on the motions for summary judgment. On 5 November 2001, the trial court informed the parties that it would grant summary judgment for Booe. Thereafter, on 13 November 2001, the trial court entered a written judgment granting Booe's motion for summary judgment and specifically stated that its judgment [*5] was final under N.C. Gen. Stat. § 1A-1, Rule 54(b) (2001), thus rendering it subject to appeal and review by this Court. The trial court denied Booe Building's motion for summary judgment on 21 November 2001. On the same date, plaintiffs filed a voluntary dismissal without prejudice as to Booe Building, pursuant to N.C. Gen. Stat. § 1A-1, Rule 41(a)(1) (2001). Thereafter, on 3 December 2001, plaintiffs appealed from the trial court's grant of summary judgment for defendant Booe.

On appeal, plaintiffs argue the trial court erred by (I) granting summary judgment for Booe in his individual capacity; and (II) failing to grant their motion for partial summary judgment on liability as to Booe in his individual capacity. For the reasons stated herein, we disagree with plaintiffs' arguments and affirm the judgment of the trial court.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1 [*6] , Rule 56(c) (2001). "The standard of review on appeal from summary judgment is whether there is any genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law. Further, the evidence presented by the parties must be viewed in the light most favorable to the non-movant." *Bruce-Terminix Co. v. Zurich Ins. Co., 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998)* (citation omitted).

Plaintiffs contend summary judgment for defendant

Booe was improper because he did not fulfill his duty to exercise his best efforts and comply with the North Carolina State Building Code, *N.C. Gen. Stat. § 143-138* (2001). Though they acknowledge that they entered into a contract with Booe Building (rather than defendant individually), plaintiffs nonetheless argue defendant was actively involved in the day-to-day construction of their house and was therefore responsible for the defective installation of the EIFS. They further contend the EIFS defects constituted Building Code violations and note that "the [Building] Code imposes liability on any person who constructs, supervises construction, or designs a building or [*7] alteration thereto, and violates the Code such that the violation proximately causes injury or damage." *Olympic Products Co. v. Roof Systems, Inc., 88 N.C. App. 315, 329, 363 S.E.2d 367, 375, disc. reviews denied, 321 N.C. 744, 366 S.E.2d 862, 863 (1988)*. Plaintiffs argue a duty of care arose out of the contract agreement between themselves and Booe Building (and with defendant, based upon his position with respect to Booe Building), "the theory being that accompanying every contract is a common-law duty to perform with ordinary care the thing agreed to be done, and that a negligent performance constitutes a tort as well as a breach of contract." *Pinnix v. Toomey, 242 N.C. 358, 362, 87 S.E.2d 893, 898 (1955)*. Plaintiffs seek to pierce Booe Building's corporate veil and hold defendant personally liable for the alleged defects in their home, and believe their tort claim should have proceeded to trial.

North Carolina courts "will disregard the corporate form or 'pierce the corporate veil,' and extend liability for corporate obligations beyond the confines of a corporation's separate entity, whenever necessary to prevent fraud or [*8] to achieve equity." *Glenn v. Wagner, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985)*. The "instrumentality rule" operates in the following situation:

[When a] corporation is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant shareholder and a shield for his activities in violation of declared public policy or statute of the State, the corporate entity will be disregarded and the corporation and the shareholder treated as one and the same person, it being immaterial whether the sole or dominant shareholder is an individual or another corporation.

*Henderson v. Finance Co., 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968)*.

In *Statesville Stained Glass v. T.E. Lane Construction & Supply, 110 N.C. App. 592, 430 S.E.2d 437 (1993)*, the plaintiff furnished stained glass to defendant Lane Construction Company, which used the glass in a number of structures it built. *Id. at 593, 430 S.E.2d at 438*. Upon receiving only a partial payment, the plaintiff sued Lane Construction Company, Terrence Lane, and Lane's other construction company for money it was owed and sought to hold Terrence [*9] Lane personally liable for the debt of his corporation because he was the chief executive officer, sole shareholder, and controller of the corporation. *Id. at 593-94, 430 S.E.2d at 438*. At trial, the plaintiff presented evidence that Lane Construction Company owed it over $ 15,000.00 and that while still indebted to plaintiff, defendant Terrence Lane dissolved Lane Construction Company and organized another construction company. *Id. at 594-95, 430 S.E.2d at 438-39*. The *Statesville* Court made the following observations about the propriety of piercing the corporate veil:

"In a close corporation, the principal or sole stockholder [is] permitted by law to play an active role in management, [and] may deal with third parties without incurring personal liability, as long as the separate corporate identity is maintained." *18 Am. Jur. 2d Corporations § 45* (1985). In cases arising out of contracts with a close corporation, where another party has voluntarily dealt with the corporation, corporate separateness is usually respected. 1 F. Hodge O'Neal and Robert B. Thompson, *O'Neal's Close Corporations* § 1.10, at 49 (3d ed. 1992). This is so [*10] because "if the other contracting party has agreed to look to the corporation, and thus only to the assets that have been contributed to it, courts understandably are reluctant to remake the bargain by permitting the other party to pierce the corporate veil and pursue the shareholders' noncorporate assets." *Id.*

*Id. at 597, 430 S.E.2d at 440*. In ruling that defendant Terrence Lane was not individually liable to plaintiff, the *Statesville* Court stated:

Plaintiff presented no evidence that Lane used Lane Construction to conduct personal business or for personal benefit. Furthermore, plaintiff's bare assertion that Lane used Lane Construction to defraud plaintiff, without supporting evidence, does not support the court's conclusion that "Lane exercised excessive control on

[Lane Construction], at least partially, in order to escape liability in violation of plaintiff's rights." To the contrary, the evidence presented by plaintiff shows only that Lane and the other members of the board of directors agreed to dissolve Lane Construction due to the financial condition of the corporation, and that its assets were liquidated to help pay off company debts. Our [*11] review of the evidence reveals that the trial court erred in concluding that the corporate entity of Lane Construction should be disregarded.

*Id. at 598, 430 S.E.2d at 441* (citation omitted).

In the present case, plaintiffs seek to hold defendant individually liable for the alleged construction defects in their home, even though defendant, individually, was not a party to the construction contract. The contract itself imposed no obligations on defendant Booe individually. Throughout construction, defendant served as an officer, employee, and agent of Booe Building and acted within the scope and course of his employment. The fact that defendant had an ownership interest in Booe Building and exercised control over the corporation does not, without more, subject him to personal liability for the liabilities incurred by Booe Building. Under *Statesville*, plaintiffs could maintain a negligence action against defendant in his individual capacity only if they showed (1) that defendant acted outside the course and scope of his employment; or (2) that the corporation was a sham (thereby justifying the piercing of the corporate veil). Upon review, we discern no [*12] such showing by plaintiffs.

In affirming the trial court's judgment, we also note that plaintiffs could not maintain an action against defendant in tort even if he was the contractor. Plaintiffs were the original owners of the house in question and were the promisees in the construction contract. Our Supreme Court has stated that "ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *Ports Authority v. Roofing Co., 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), rejected on other grounds by Trustees of Rowan Tech. v. Hammond Assoc., 313 N.C. 230, 328 S.E.2d 274 (1985).* Although exceptions to the general rule exist, none of the exceptions are applicable to the case before us. *See Ports Authority, 294 N.C. at 82, 240 S.E.2d at 350.*

In *Spillman v. American Homes, 108 N.C. App. 63, 422 S.E.2d 740 (1992),* this Court applied the reasoning of *Ports Authority* to construction cases. The plaintiffs in *Spillman* asserted a tort claim based upon their allegation that the defendant failed to perform the terms of their contract and improperly constructed and installed [*13] the plaintiffs' mobile home. *Id. at 64, 422 S.E.2d at 741.* In reversing the denial of the defendant's motion for a directed verdict, the *Spillman* Court stated:

Absent the existence of a public policy exception, as in the case of contracts involving a common carrier, innkeeper or other bailee, *see Ports Authority v. Roofing Co., 294 N.C. 73, 82, 240 S.E.2d 345, 350-51 (1978),* a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract. It is the law of contract and not the law of negligence which defines the obligations and remedies of the parties in such a situation.

*Id. at 65, 422 S.E.2d at 741-42. See also Mason v. Yontz, 102 N.C. App. 817, 403 S.E.2d 536 (1991)* (Plaintiffs could not recover damages based on a negligence method of recovery against the builder for the alleged improper construction of their swimming pool.).

Plaintiffs argue that defendant's work resulted [*14] in Building Code violations which constituted violations of a duty imposed as a matter of public policy and were, therefore, sufficient to impose tort liability. However, we do not believe this argument is persuasive. *See Ports Authority, 294 N.C. at 82-83, 240 S.E.2d at 350-51;* and *Warfield v. Hicks, 91 N.C. App. 1, 9-10, 370 S.E.2d 689, 694, disc. review denied, 323 N.C. 629, 374 S.E.2d 602 (1988).* Prior cases from this Court limit the remedy for original owners to contractual theories rather than tort. Finally, we note that the economic loss doctrine precludes recovery for plaintiffs on their tort claim. "North Carolina has adopted the economic loss rule, which prohibits recovery for economic loss in tort. Instead, such claims are governed by contract law[.] The courts have construed the term 'economic losses' to include damages to the product itself." *Moore v. Coachmen Industries, Inc., 129 N.C. App. 389, 401, 499 S.E.2d 772, 780 (1998). See also Ports Authority, 294 N.C. 73, 240 S.E.2d 345.* As such, plaintiffs' sole remedy, if one is deemed proper, is for breach of contract and breach of warranty [*15] against Booe Building.

2003 N.C. App. LEXIS 509, *15

In light of the foregoing, we hold that plaintiffs cannot assert a negligence claim against defendant Booe in his individual capacity, and that summary judgment in favor of Booe was therefore proper. Accordingly, plaintiffs' first assignment of error is overruled.

Plaintiffs also argue that the trial court erred by denying their motion for partial summary judgment against defendant Booe in his individual capacity. Although the trial court did not enter a written order as to plaintiffs' motion for partial summary judgment, the trial court's 13 November 2001 judgment granting summary judgment in favor of defendant rendered plaintiffs' motion moot. It is clear that the trial court did not find plaintiffs' motion persuasive, and for the same reasons it granted defendant's motion for summary judgment, the trial court implicitly denied plaintiffs' motion for partial summary judgment. Plaintiffs' second assignment of error is meritless and is therefore overruled.

Upon careful review of the record and the arguments presented by the parties, we conclude the trial court acted properly in all respects. The trial court's judgment in favor of defendant Booe is hereby

Affirmed.

[*16]  Chief Judge EAGLES and Judge ELMORE concur.

Report per Rule 30(e).

Riggs v. Orkin, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 2417016

2011 WL 2417016
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina,
Southern Division.

David C. RIGGS, Plaintiff,
v.
ORKIN, INC., Defendant.

No. 7:11–CV–5–D.    |    June 13, 2011.

**Attorneys and Law Firms**

George L. Collins, Collins & Maready, PA, Jacksonville, NC, for Plaintiff.

Steven B. Epstein, Poyner Spruill LLP, Raleigh, NC, for Defendant.

**ORDER**

JAMES C. DEVER, III, District Judge.

*1 On December 2, 2010, David C. Riggs ("Riggs" or "plaintiff") filed suit against Orkin, Inc. ("Orkin" or "defendant") in Onslow County Superior Court [D.E. 1–1]. Riggs alleges that Orkin breached a termite protection contract covering his real property in Maysville, North Carolina. Compl. 1–2.Riggs claims breach of contract, negligence, unfair and deceptive trade practices, and fraud, and requests punitive damages. *Id.* at 2–5.On January 5, 2011, Orkin removed the action to this court [D.E. 1]. On January 12, 2011, Orkin filed a motion to dismiss Riggs's claims for negligence, unfair and deceptive trade practices, fraud, and punitive damages, and Riggs's request for damages for severe emotional distress due to the breach of contract [D.E. 3]. On February 1, 2011, Riggs responded in opposition [D.E. 7]. On February 16, 2011, Orkin replied [D.E. 9]. For the reasons stated below, the court grants the motion to dismiss.

**I.**

Riggs alleges that at some time before 1990, he entered into a termite protection contract with Orkin. CompL ¶ 3. Orkin agreed to inspect his home in Maysville, North Carolina, provide termite treatment of that home, and notify Riggs should conditions at the home be conducive to

termite activity. *Id.* ¶¶ 3–4.Orkin inspected Riggs's residence annually until 2009. *Id.* ¶ 5. These inspections resulted in Orkin representatives "reporting in writing that all was well and that no problems existed."*Id.* ¶ 6. Riggs alleges that despite these inspections, his house became infested with termites, and that Orkin representatives "repeatedly reported that there was nothing which required attention under [Riggs's] house."*Id.* ¶ 7. The termite infestation caused damage to Riggs's home requiring significant repairs and derivative expenses.*Id.* ¶¶ 10–11.Riggs also claims he "has suffered severe emotional distress." *Id.* ¶ 11.

In analyzing a motion to dismiss for failure to state a claim upon which relief can be granted, a court must determine whether the complaint is legally and factually sufficient. *See*Fed.R.Civ.P. 12(b)(6); *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949–50 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 563 (2007); *Coleman v. Md. Ct. of Appeals,* 626 F.3d 187, 190 (4th Cir.2010); *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir.2008); *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir.2007) (en banc); *Kloth v. Microsoft Corp.,* 444 F.3d 312, 319 (4th Cir.2006); *accord Erickson v. Pardus,* 551 U.S. 89, 93–94 (2007) (per curiam). In considering a motion to dismiss, a court need not accept a complaint's legal conclusions drawn from the facts. *Iqbal,* 129 S.Ct. at 1949–50; *Coleman,* 626 F.3d at 190; *Nemet Chevrolet Ltd. v. Consumeraffairs.com. Inc.,* 591 F.3d 250, 253 (4th Cir.2009). Similarly, a court need not accept as true "unwarranted inferences, unreasonable conclusions or arguments."*Giarratano,* 521 F.3d at 302 (quotation omitted): *see Iqbal,* 129 S.Ct. at 1949–50.

*2 The court has jurisdiction based on diversity, and North Carolina law governs Riggs's claims. Thus, this court must determine how the Supreme Court of North Carolina would rule. *See Twin City Fire Ins. Co. v. Ben Arnold–Sunbelt Beverage Co.,* 433 F.3d 365, 369 (4th Cir.2005)."If the Supreme Court of [North] Carolina has spoken neither directly nor indirectly on the particular issue before us, we are called upon to predict how that court would rule if presented with the issue."*Id.* (quotation omitted). In making that prediction, the court may consider lower court opinions in North Carolina, treatises, and the practices of other states. *See id.*

As for Riggs's request for damages for severe emotional distress due to the breach of contract, the claim requires a plaintiff to show that the contract "was not one concerned with trade and commerce with concomitant elements of profit

Add. 115

involved," that "pecuniary interests were not the dominant motivating factor in the decision to contract," and that "the benefits contracted for relate directly to matters of dignity, mental concern or solicitude, or the sensibilities of the party to whom the duty is owed, and which directly involves interests and emotions recognized by all as involving great probability of resulting mental anguish if not respected."*Reis v. Hoots,* 131 N.C.App. 721, 731, 509 S.E.2d 198, 205 (1998) (quoting *Johnson v. Ruark Obstetrics,* 327 N.C. 283, 301, 395 S.E.2d 85, 96 (1990)). Here, the termite service contract Orkin allegedly breached fails to meet these requirements. Thus, Riggs's claim for damages for severe emotional distress in count one is dismissed for failure to state a claim upon which relief can be granted.

As for Riggs's negligence claim, "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor."*N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co .,* 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), *rejected in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.,* 313 N.C. 230, 328 S.E.2d 274 (1985)."To pursue a tort claim and a breach of contract claim concerning the same conduct, a plaintiff must allege a duty owed him by the defendant separate and distinct from any duty owed under a contract."*Kelly v.Georgia-Pacific LLC,* 671 F.Supp.2d 785, 791 (E.D.N.C.2009) (quotation omitted); *Broussard v. Meineke Disc. Muffler Shops, Inc .,* 155 F.3d 331, 346 (4th Cir.1998). This independent tort "must have an aggravating element such as malice or recklessness...."*Strum v. Exxon Co., USA,* 15 F.3d 327, 331 (4th Cir.1994). Here, Riggs's negligence claim fails to allege a separate and distinct duty from Orkin's contractual duty. Thus, Riggs's claim for negligence in count two is dismissed for failure to state a claim upon which relief can be granted.

As for Riggs's unfair and deceptive trade practices claim, under the Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen.Stat. §§ 75–1.1–75–16.2, a plaintiff must show (1) an unfair or deceptive act or practice (2) in or affecting commerce (3) which proximately caused actual injury to the plaintiff or to his business. *See, e.g.,*N.C. Gen.Stat. § 75–1.1; *Walker v. Fleetwood Homes of N.C. Inc.,* 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007); *Dalton v. Camp,* 353 N.C. 647, 656–57, 548 S.E.2d 704, 710–11 (2001); *RD & J Props. v. Lauralea–Dilton Enters., LLC,* 165 N.C.App. 737, 748, 600 S.E.2d 492, 500 (2004). The conduct must be immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *See, e.g., Gilbane Bldg. Co. v. Fed. Reserve Bank,* 80 F.3d 895, 902 (4th Cir.1996);

*Branch Banking & Trust Co. v. Thompson,* 107N.C.App. 53, 61, 418 S.E.2d 694, 700 (1992). Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court. *See, e.g., Walker,* 362 N.C. at 71, 653 S.E.2d at 399; *Harty v. Underhill,* No. COA10–583, 2011 WL 1648099, at *5 (N.C.Ct.App. May 3, 2011).

**\*3** "[A] breach of contract claim cannot, standing alone, form the basis of an [UDTPA] claim."*Harty,* 2011 WL 1648099, at *6."The plaintiff must show substantial aggravating circumstances attending the breach to recover under the [UDTPA]...."*Eastover Ridge, L.L.C. v. Metric Constructors, Inc.,* 139 N.C.App. 360, 367–68, 533 S.E.2d 827, 832–33 (2000) (quotation omitted)."North Carolina courts are extremely hesitant to allow plaintiffs to attempt to manufacture a tort action and allege [UDTPA claims] out of facts that are properly alleged as a breach of contract claim ."*Jones v. Harrelson & Smith Contractors, LLC,* 194 N.C.App. 203, 229, 670 S.E.2d 242, 259 (2008)."It is unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations."*Eastover Ridge, L.L.C.,* 139 N.C.App. at 368, 533 S.E.2d at 833 (quotation omitted); *PCS Phosphate Co. v.. Norfolk S. Corp.,* 559 F.3d 212, 224 (4th Cir.2009). Here, Riggs's claim fails to allege any aggravating circumstance. Thus, Riggs's claim for unfair and deceptive trade practices in count three is dismissed for failure to state a claim upon which relief can be granted.

As for Riggs's fraud claim, Riggs alleges that Orkin, through its employees and agents, made representations it knew to be false regarding the condition of Riggs's home, thus fraudulently inducing Riggs to contract with Orkin for additional services. Although fraud that induces contractual relations may be claimed in addition to a breach of contract, *see, e.g., Food Lion, LLC v. Schuster Mktg. Corp.,* 382 F.Supp.2d 793, 800–01 (E.D.N.C.2005) (collecting cases), both the Federal Rules of Civil Procedure and the North Carolina Rules of Civil Procedure require that fraud be pled with particularity.Fed.R.Civ.P. 9(b); N.C. Gen.Stat. § 1A–1, Rule 9(b). A plaintiff must plead "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby ."*Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999) (quotation omitted); *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC,* 189 N.C.App. 601, 610, 659 S.E.2d 442, 449 (2008).

Dismissal is appropriate for failure to plead fraud with particularity, unless the court believes that the pleading alerts the defendant sufficiently to prepare a defense at trial and that the plaintiff possesses substantial prediscovery evidence of facts supporting the alleged fraud. *Harrison,* 176 F.3d at 783–84 & n. 5. Here, Riggs fails to allege with particularity the time or contents of the false representations. Although Riggs alleges Orkin inspected his residence at least annually over a 19–year period and that Orkin generally informed him that "conditions under his house were good," Riggs fails to allege when those inspections occurred and which inspections involved the alleged fraudulent misrepresentations. Riggs's "mere generalities and conclusory allegations of fraud [do] not suffice to sustain a fraud claim." *Strum,* 15 F.3d at 331 (quotation omitted). Furthermore, nothing suggests that Riggs possesses evidence of the alleged fraud. "The crux of this matter is ... a contract dispute." *Broussard,* 155 F.3d at 346. Thus, Riggs's claim for fraud in count four is dismissed for failure to state a claim upon which relief can be granted.

**\*4** Finally, Riggs requests punitive damages. Punitive damages may only be awarded in cases involving fraud, malice, or willful or wanton conduct. N.C. Gen.Stat. § 1D–15(a). However, punitive damages may not be awarded solely for breach of contract. *Id.,* § 1D–15(d). Therefore, when the sole surviving claim is for breach of contract, a trial court should dismiss any claim for punitive damages. *Carcano v. JBSS, LLC,* 200 N.C.App. 162, 180–81, 684 S . E.2d 41, 54 (2009). Because Riggs's claim for breach of contract is the sole surviving claim, his claim for punitive damages in count five is dismissed.

## II.

Orkin's motion to dismiss [D.E. 3] is GRANTED. Counts two, three, four, and five are DISMISSED. Riggs's request for damages for severe emotional distress in count one is also DISMISSED. The sole surviving claim is Riggs's breach of contract claim in count one.

SO ORDERED.

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 1433237

2005 WL 1433237
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Ansonia-Milford.

SMITH CRAFT REAL ESTATE CORP.

v.

HANDEX OF CONNECTICUT, INC.

No. CV03082188S.    |    May 19, 2005.

**Attorneys and Law Firms**

Harlow Adams & Friedman PC, Milford, for Smith Craft Real
Estate Corporation.

Brenner Saltzman & Wallman, New Haven, for Handex of
Connecticut Inc.

PHV John H. Perten, Framingham, MA, pro se.

**Opinion**

RONAN, J.T.R.

**\*1** Before the court is a motion for partial summary
judgment filed by the defendant, Handex of Connecticut, Inc.,
pursuant to Practice Book §§ 17-44 et seq. The motion seeks
judgment with respect to: (1) those claims by the plaintiff,
Smith Craft Real Estate Corp., for consequential, indirect
or incidental damages; and (2) those claims for damages
suffered by a third-party purchaser of the subject property.
This matter was heard on May 2, 2005.

**I.**

On March 9, 2004, the plaintiff filed a second revised four-
count complaint against the defendant. This action arises out
of monetary damages allegedly sustained by the plaintiff as
a result of the alleged breach of contract (counts one and
three) and negligence (counts two and four) on the part of the
defendant.

The operative facts in the complaint are as follows. The
plaintiff acquired a piece of property through a wholly-
owned limited liability company as evidenced by a written
purchase and sale agreement. As agreed, the plaintiff was
given a period of time to inspect the physical, environmental
and financial conditions of the property. The plaintiff
thereafter entered into a written agreement with the defendant
regarding a Phase I Environmental Site Assessment (Phase I
Assessment) and a Phase II Subsurface Assessment (Phase II
Assessment) of the property. The defendant was aware that
the plaintiff was seeking its advice and services in connection
with the investigation of the property, and that the plaintiff
would rely upon the defendant's findings in deciding whether
to terminate the real estate contract within the prescribed
time. The plaintiff relied on the defendant's acts, advice and
opinions in connection with the environmental conditions of
the property and its suitability to be used by the plaintiff for
its intended purpose.

As part of the Phase I and Phase II Assessments, the
defendant agreed and warranted to perform the necessary
services in a manner consistent with that level of care
and skill ordinarily exercised by members of its industry
engaged in similar work. After both assessments were
completed, the defendant prepared and issued a written
report to the plaintiff that incorrectly concluded that the
property in question did not qualify as an "establishment"
as that term is known and used in the Connecticut Transfer
Act and the Connecticut Department of Environmental
Protection Remediation Standard Regulations. Further, the
complaint alleges the defendant failed to identify existing
contamination, which significantly and adversely impacted
the property. Relying upon the defendant's erroneous
conclusions, the plaintiff did not terminate the purchase
and sale agreement and, as a result, became obligated
to purchase the property. The plaintiff claims that the
defective work on the part of the defendant amount to a
breach of contract (counts one and three) and negligence
(counts two and four), thereby entitling the plaintiff to
damages for costs associated with: (1) further environmental
testing and monitoring; (2) compliance with applicable law
and regulations associated with the acquisition of property
classified as an "establishment"; (3) remediation and clean-up
of the property; and (4) the devaluation of the property due to
the stigma associated with property which is contaminated. [1]

---

[1]    Counts one and two pertain to the Phase I Assessment,
while counts three and four pertain to the Phase II
Assessment.

Add. 118

## II.

**\*2** On February 7, 2005, the defendant filed this motion for partial summary judgment, supported by a memorandum of law and the following documentary evidence: (1) a signed and notarized affidavit of Wayne Thomas; (2) a certified copy of the "Agreement to Perform a Phase I Environmental Site Assessment between Handex of Connecticut, Inc. and Smith Craft Real Estate"; (3) a certified copy of the "Agreement to Perform Environmental Services between Handex of Connecticut, Inc. and Smith Craft Real Estate"; and (4) a copy of the plaintiff's response to interrogatory number 21. The plaintiff, in support of its memorandum in opposition, has submitted a signed and notarized affidavit of Philip Craft, the secretary of Smith Craft Real Estate Corp. The parties submitted supplemental memoranda of law and, subsequently, the plaintiff submitted an additional affidavit of Philip Craft.

Practice Book § 17-49"provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ... In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party ... The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law ... and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact."(Citations omitted; internal quotation marks omitted.) *Barrett v. Montesano,* 269 Conn. 787, 791-92, 849 A.2d 839 (2004).

"[S]ummary judgment is appropriate only if a fair and reasonable person could conclude only one way ... To succeed on a motion for summary judgment, [t]he movant must show that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact."(Citations omitted; internal quotation marks omitted.) *Dugan v. Mobile Medical Testing Services, Inc.,* 265 Conn. 791, 815, 830 A.2d 752 (2003).

The defendant moves for partial summary judgment of the plaintiff's complaint on the ground that pursuant to the Phase I and Phase II agreements, the plaintiff expressly waived its

right to any consequential, indirect or incidental damages arising from the defendant's services. Since the limitation of liability provision in the agreements use the word "any" with respect to the waiver of damages, the defendant maintains that such language also applies to negligent performance claims. Additionally, the defendant claims that because the plaintiff does not object to the application of the limitation of liability provisions to its contract claims, the motion for summary judgment should be granted in that respect.

**\*3** The plaintiff counters that the limitation of damages clause does not disclaim liability for the defendant's negligence because the parties neither discussed nor agreed to such a limitation. Moreover, relying on *Hyson v. White Water Mountain Resorts of CT,* 265 Conn. 636, 829 A.2d 827 (2003), the plaintiff argues that the clause is unenforceable because express language is required in order to release a party from its own negligence. Additionally, the plaintiff maintains that the enforcement of a liquidated damages clause raises issues of fact that cannot be established on a motion for summary judgment and that the waiver of consequential and indirect damages in the Phase II agreement applies only to contractual indemnity claims which the plaintiff is not asserting here. Finally, it argues that both agreements contain conflicting provisions regarding damages that create an ambiguity relative to the parties' intent and resolvable only by a trier of fact.

In support of its argument, the defendant argues that the following clauses are relevant. Pursuant to Article 7, entitled "Report Use and Liability Limitation," of the Phase I agreement, "[the plaintiff] expressly waives its right to any consequential or indirect damages against [the defendant] and agrees that the [the defendant's] aggregate liability hereunder is limited to fifty thousand dollars ($50,000.00)." Pursuant to Article 8(a), entitled "Indemnity," of the Phase II agreement, "[t]he parties agree that neither will be liable to the other for any consequential or incidental damages arising from or in connection with the performance of the work."

Proper analyzation of the argument requires examination of the application, of the limitation of liability/damages clause as it relates to breach of contract claims. Under Connecticut law, "[a] provision which allows liquidated damages for breach of contract is enforceable if certain conditions are satisfied ... The requisite three conditions are that: (1) the damage which was to be expected as a result of a breach of contract was uncertain in amount or difficult to prove; (2) there was an intent on the part of

Add. 119

Smith Craft Real Estate Corp. v. Handex of Connecticut, Inc., Not Reported in A.2d (2005)
2005 WL 1433237

the parties to liquidate damages in advance; and (3) the amount stipulated was reasonable."(Internal quotation marks omitted.) *Mattegat v. Klopfenstein,* 50 Conn.App. 97, 102, 717 A.2d 276 (1998), cert. denied, 247 Conn. 922, 722 A.2d 810; *CMG Realty of Connecticut, Inc. v. Colonnade One Ltd. Partnership,* 36 Conn.App. 653, 667, 653 A.2d 207 (1995). The third condition requires that "the amount stipulated was reasonable in the sense that it was not greatly disproportionate to the amount of the damage, which, as the parties looked forward, seemed to be the presumable loss which would be sustained by the contractee in the event of a breach of the contract."(Internal quotation marks omitted.) *Norwalk Door Closer Co. v. Eagle Lock & Screw Co.,* 153 Conn. 681, 686, 220 A.2d 263 (1966)."Reasonableness is a question of fact for the trier to determine based on all of the circumstances."*Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 580, 657 A.2d 212 (1995).

**\*4** With respect to the breach of contract claims, the defendant notes that the plaintiff did not object to the motion for summary judgment as to these claims and did not initially brief the issue. While it is true that the plaintiff did not initially object, the plaintiff did provide this court with a supplemental brief examining this issue. Moreover, the burden is on the defendant "to show that it is quite clear what the truth is." (Internal quotation marks omitted.) *Dugan v. Mobile Medical Testing Services, Inc., supra,* 265 Conn. 815. Here, the defendant offers no evidence of the following: (1) that the damages are uncertain in amount or difficult to prove; (2) an intent on behalf of the parties to liquidate damages in advance; and (3) that the amount stipulated was reasonable. Thus, genuine issues of material fact exist as to whether the liquidated damages/limitation of liability clauses are enforceable for a breach of contract claim.

The court now turns to the issue of whether the clause is an enforceable disclaimer of liability for negligence. "A disclaimer is a refusal to recognize the existence of an obligation."(Internal quotation marks omitted.) *Mattegat v. Klopfenstein, supra,* 50 Conn.App. 103. "The law does not favor contract provisions which relieve a person from his own negligence."*Griffin v. Nationwide Moving & Storage Co.,* 187 Conn. 405, 413, 446 A.2d 799 (1982)."[T]he law's reluctance to enforce exculpatory provisions of this nature has resulted in the development of an exacting standard by which

courts measure their validity. So ... unless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability for his own negligent acts."(Internal quotation marks omitted.) *B & D Associates, Inc. v. Russell,* 73 Conn.App. 66, 72, 807 A.2d 1001 (2002). Even as applied to contracts between sophisticated business entities, the clause "must evince the unmistakable intent of the parties."(Internal quotation marks omitted.) *Id.,* 73.

The defendant analogizes the language of the clause in this case to that found in a lease in *B & D Associates, Inc. v. Russell, supra,* 73 Conn.App. 66. The analogy, however, is not persuasive because the clause found in the subject agreements are not as broadly worded as the clause analyzed in that case. See *B & D Associates, Inc. v. Russell, supra,* 73 Conn.App. 73 ("there shall be no liability on the part of LANDLORD to said TENANT ... for any damage or loss to any of the foregoing from any cause or for any reason whatsoever"). In the present case, the language may be accurately viewed as somewhat ambiguous. Consequently, there is a need to look beyond the language of the clauses to discern the parties' intent. The defendant has failed to demonstrate an intent by both parties to disclaim the defendant's liability for negligence. As such, there still exist genuine issues of material fact that cannot be resolved on a summary judgment motion.

**\*5** The defendant also moves for partial summary judgment on certain claimed damages on the ground that the plaintiff lacks standing to sue for damages that it did not suffer. This argument harkens back to a prior argument made by the defendant on another pretrial motion which this court has already addressed and resolved in favor of the plaintiff. Furthermore, the defendant has offered no evidence to support its contention that the plaintiff was not the party that suffered the damages. While the defendant repeatedly attempts to place the evidentiary burden on the plaintiff, the law is clear that the initial burden to show the absence of any genuine issue of material facts is on the moving party. The defendant has failed to meet its burden.

The defendant's motion for partial summary judgment is denied in its entirety.

---

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Add. 120



**IAN VIGUS and LEAH MOORE VIGUS, Plaintiffs, v. MILTON A. LATTA & SONS DAIRY FARMS, INC., a North Carolina Corporation; WILLIAM LATTA, in his official capacity as President, and in his individual capacity; TATE LATTA, in his official and individual capacity; JOLLY BUILDERS, INC., d/b/a AMERICA'S HOME CHECKERS; HAROLD JOLLY, in his capacity as owner-agent for America's Home Checkers, and in his individual capacity; KELLER WILLIAMS REALTY, A North Carolina Corporation; ROBYN MARSHALL, agent for Keller Williams Realty, and in her individual capacity; THE FORD PERRY TEAM; ORANGE REALTY, a North Carolina Corporation; BONNIE GATES, agent for Orange Realty, and in her individual capacity; JOE PHELPS, as agent for Orange Realty and Broker in Charge, and in his individual capacity, Defendants.**

NO. COA08-700

COURT OF APPEALS OF NORTH CAROLINA

*2009 N.C. App. LEXIS 830*

**January 27, 2009, Heard in the Court of Appeals**
**May 19, 2009, Filed**

**NOTICE:**

PURSUANT TO RULE 32(b), NORTH CAROLINA RULES OF APPELLATE PROCEDURE, THIS DECISION IS NOT FINAL UNTIL EXPIRATION OF THE TWENTY-ONE DAY REHEARING PERIOD. THIS IS AN UNPUBLISHED OPINION. PLEASE REFER TO THE NORTH CAROLINA RULES OF APPELLATE PROCEDURE FOR CITATION OF UNPUBLISHED OPINIONS.

**SUBSEQUENT HISTORY:** Reported at *Vigus v. Milton A. Latta & Sons, 676 S.E.2d 669, 2009 N.C. App. LEXIS 1826 (N.C. Ct. App., May 19, 2009)*

**PRIOR HISTORY:** [*1]
Durham County. No. 06 CVS 59.

**DISPOSITION:** Affirmed.

**COUNSEL:** Hairston Lane Brannon, PA, by Anthony M. Brannon, for plaintiff-appellants.

Cheshire & Parker, by D. Michael Parker, for defendant-appellees Milton A. Latta & Sons Dairy Farms, Inc., William Latta, and Tate Latta.

Cranfill Sumner & Hartzog LLP, by Daniel G. Katzenbach and Andrew D. Hathaway, for defendant-appellees Jolly Builders, Inc., d/b/a America's Home Checkers, Harold Holly, and Kelly Jolly.

Teague, Campbell, Dennis & Gorham, L.L.P., by Christopher G. Lewis, for defendant-appellees Keller Williams Realty and Robyn Marshall.

Manning Fulton & Skinner P.A., by William C. Smith, Jr., for defendant-appellees Orange Realty, Bonnie Gates, and Joe Phelps.

**JUDGES:** HUNTER, ROBERT C., Judge. Judges WYNN and ERVIN concur.

**OPINION BY:** HUNTER, ROBERT C.

**OPINION**

Appeal by plaintiffs from an order entered 13 December 2006 by Judge Michael R. Morgan, and from judgments entered 26 March 2007, 30 March 2007, and an order entered 30 April 2007 by Judge Orlando F. Hudson, Jr. in Durham County Superior Court. Heard in the Court of Appeals 27 January 2009.

HUNTER, ROBERT C., Judge.

This case arises out of the sale of a house in Hillsborough, North Carolina, which Ian and Leah Vigus ("Mr. Vigus," "Mrs. [*2] Vigus," or collectively "plaintiffs") purchased unseen. After discovering extensive structural damage resulting from termite infestation, plaintiffs filed suit against, *inter alia,* their real estate agent and her employer, the listing real estate agent and his employer, the sellers of the house, and the home inspector. Summary judgment was granted in favor of the home inspector. The case proceeded to trial against the remaining defendants. After the close of plaintiffs' evidence, the trial court granted motions for directed verdict as to all claims against the multiple defendants.

Plaintiffs now appeal from: 1) the grant of defendants' Motions for Directed Verdict; 2) the denial of plaintiffs' Motion to Reconsider and Motion for New Trial; and 3) the grant of summary judgment for defendant Jolly Builders, Inc., d/b/a America's Home Checkers, and Harold and Kelly Jolly. After careful review, we affirm.

Background

On 22 April 2004, plaintiffs entered into an "Exclusive Right to Represent Buyer-Buyer Agency Agreement" ("Buyers Agreement") with Ms. Robyn Marshall ("Marshall"), a real estate agent employed by Keller Williams Realty ("Keller Williams"). Plaintiffs specifically contracted with [*3] Marshall because she was a buyer's agent who would solely represent their interests in any real estate transaction.

Plaintiffs were residing in England at the time, but wished to purchase a home in or around Hillsborough, North Carolina. Mrs. Vigus was pregnant and restricted from traveling by her doctor and Mr. Vigus was not permitted to travel to the United States as he was awaiting approval of his immigration visa. Plaintiffs communicated with Marshall via telephone, facsimile, or mail courier.

Plaintiffs became interested in a house located at 2012 Phelps Road, Hillsborough, North Carolina. The house was listed on the Triangle Multiple Listing Service ("TMLS") by defendant Joe Phelps ("Phelps"), an employee of defendant Orange Realty. Defendants Milton A. Latta & Sons Dairy Farms Inc., William Latta and Tate Latta (collectively "the Lattas") owned the listed property. [1] According to the TMLS data, the house was listed for $ 225,000 and described as an "[o]ld [f]armhouse," with vinyl siding, built in 1940 and remodeled in the early 1980's. Several of plaintiffs' friends visited the house and took photographs of the exterior, but did not go inside, and reported to plaintiffs that the [*4] house "'looked great'".

> 1 William Latta was sued in his official capacity as president of Milton A. Latta & Sons Dairy Farms, Inc. and in his individual capacity. Tate Latta was sued in his official capacity as an officer of the corporation and in his individual capacity.

Upon expressing further interest in the property, plaintiffs received a "State of North Carolina Residential Property Disclosure Statement" in which the Lattas made no representations with regard to each query, except when asked if there had been any room additions or structural changes. The Lattas acknowledged that the "[h]ouse was remodeled [sic] in 1981 or 1982." Mr. Latta testified that he asked Marshall why no representations were made, and Marshall explained that because the house had been used as a rental property, the sellers may not know the "history of the property." According to the text of the Disclosure Statement, the seller is informed, "[i]f you check 'No Representation,' you have no duty to disclose the conditions or characteristics of the property, even if you should have known of them."

On 22 April 2004, plaintiffs signed an Offer to Purchase and Contract for the Property in the amount of $ 220,000. The [*5] Offer to Purchase contained the following language:

> Wood-Destroying Insects: Unless otherwise stated herein, Buyer shall have the option of obtaining, at Buyer's expense, a report from a licensed pest control operator . . . . The Buyer is advised that the inspection report described in this

paragraph may not always reveal either structural damage or damage caused by agents or organisms other than wood-destroying insects.

(Alteration in original.)

On 23 April 2004, the contract was accepted by the Lattas. On 30 April 2004, an Additional Provisions Addendum was attached to the contract, which included a "Cost of Repair Contingency" that allowed plaintiffs to terminate the contract if a reasonable estimate of repairs to the property exceeded $ 1,500.

On 12 May 2004, defendant America's Home Checkers ("Home Checkers") performed an official inspection of the property at plaintiffs' request and issued a report. The report stated that Home Checkers was unable to enter the crawl space under the house, but noted that there were uneven floors throughout the house, as well as other needed repairs. The report indicated that there was "[e]vidence of past pest infestation in attic. Evaluation needed [*6] by qualified pest inspector." Mr. Vigus testified that Marshall said "'[e]verything looks fine'" and did not recommend an additional home inspection.

A termite inspection was ordered by Marshall, on behalf of plaintiffs, and the inspector noted in his report that there were "visible signs of termites in front porch, on pillars and whole house." [2] The Official North Carolina Wood-Destroying Insect Information Report admittedly reviewed by plaintiffs stated:

If there is evidence of a previous or an active infestation of subterranean termites and/or other wood-destroying insects in the wooden members, it must be assumed that there is some damage to the wooden members caused by this infestation, no matter how slight. If this is the case, the structural integrity of this property should be evaluated by a qualified building expert.

[2] This report is not dated; however, an invoice was submitted to Keller Williams on 28 May 2004.

Mr. Vigus asserted that he and his wife read every report that was sent to them by Marshall, though not always the "small print," and spoke with her often. Mr. Vigus claimed that their telephone bill was approximately $ 2,000 a month due to his frequent conversations with [*7] Marshall. Plaintiffs testified that they individually had conversations with Marshall regarding the termite report and that she told them a termite treatment was needed, but that once the termites were eliminated, there would be no further problems. Marshall then ordered the termite treatment, but according to plaintiffs, Marshall did not advise them to have a qualified building expert assess any resulting damage from the termite infestation. Plaintiffs did not have any other inspections performed prior to purchase.

Plaintiffs were not present for the real estate closing on 21 June 2004 as they were still not able to travel to the United States. Mrs. Vigus moved to the United States on or about 14 July 2004 with her two-month-old son. Soon thereafter, as she was moving her belongings into the house, Mrs. Vigus began to notice "soft spots" and unevenness in the flooring. Mr. Vigus obtained his visa and moved to the United States on or about 22 October 2004. Mr. Vigus then began to uncover the massive extent of the termite damage, which had significantly undermined the structural integrity of the home. Mr. Vigus testified that the dirty carpet attached to a tack strip was the only thing [*8] preventing someone from falling through the floor. Mr. Vigus stated that the vinyl siding was covering extensive damage to the wood underneath. In many places the "wooden siding, the original siding of the house was becoming disconnected from the decomposed and rotten studs."

David Jones ("Jones"), a home inspector who testified for the plaintiffs, stated that there was severe damage to the floor joists, that the floors were artificially propped up by wood and cinder block, and that the house was likely built "between the mid-1800's and 1920[,]" not 1940 as the TMLS sheet indicated. Jones further testified that the house "had the worst termite damage that [he had] ever seen in 23 years of inspecting houses."

Jeff Nielson, owner of Nielson Construction, testified as to various repair estimates he provided plaintiffs. "The first one, to demo the house and replace the structure, was 250,000. The estimate to complete the renovation from the point of what Ian had already finished was 112,220, and the estimate to complete it plus

put a price on what Ian had already done was 159,480." Mr. [*9] Vigus testified at trial that, thus far, he had spent approximately $ 30,000 to $ 40,000 on materials alone.

On 5 January 2006, plaintiffs filed a complaint against: 1) the Lattas for intentional misrepresentation and intentional concealment, negligent misrepresentation in the alternative, breach of the implied warranty of habitability, and punitive damages; 2) Phelps, Orange Realty, and Bonnie Gates for intentional misrepresentation and intentional concealment, negligent misrepresentation in the alternative, negligence, unfair and deceptive trade practices, and punitive damages; 3) Marshall, Keller Williams Realty, and the Ford Perry Team for intentional misrepresentation, negligent misrepresentation in the alternative, negligence, breach of contract, unfair and deceptive trade practices, and punitive damages; and 4) Home Checkers for negligence, breach of contract, unfair and deceptive trade practices, and punitive damages.

After discovery was complete, all defendants moved for summary judgment. A hearing was held on 16 October 2006. By stipulation, the claims against the Ford Perry Team were dismissed as was the claim for breach of implied warranty of habitability against the Lattas. [*10] On 13 December 2006, in two separate orders, the trial court granted summary judgment as to all claims in favor of defendants Home Checkers, Harold Jolly and Kelly Jolly, Orange Realty, and Bonnie Gates. On 10 January 2007, the trial court granted partial summary judgment for Robyn Marshall and Keller Williams.

At trial, plaintiffs' remaining claims included those against: 1) the Lattas for intentional misrepresentation and intentional concealment, negligent misrepresentation in the alternative, and punitive damages; 2) Phelps for intentional misrepresentation and intentional concealment, negligent misrepresentation in the alternative, unfair and deceptive trade practices, and punitive damages; and 3) Marshall and Keller Williams Realty for negligent misrepresentation.

Trial began on 12 March 2007. Plaintiffs presented six witnesses and thirty-six exhibits. Plaintiffs did not call any of the defendants to testify. After the close of plaintiffs' case in chief, defendants moved for a directed verdict on all claims. On 16 March 2007, in open court, the trial judge granted all of defendants' motions for directed verdict. On 26 March 2007, judgment was entered dismissing all claims against [*11] Joe Phelps. On 30 March 2007, two judgments were entered dismissing all claims against: 1) Milton A. Latta & Sons Dairy Farms, Inc., William and Tate Latta in their official and individual capacities; and 2) Robyn Marshall and Keller Williams. Plaintiffs filed a Motion to Reconsider and Motion for a New Trial on 17 April 2007, which was denied without a hearing on 1 May 2007. Plaintiffs filed a notice of appeal on 29 May 2007.

Analysis

## I. Home Checkers, Harold and Kelly Jolly

Plaintiffs argue that the trial court erred by granting summary judgment for defendant Home Checkers because there were genuine issues of material fact in dispute with regard to two claims.

First, plaintiffs argue that the trial court erred in granting summary judgment for Home Checkers with regard to the claim of negligence. Plaintiffs allege that Home Checkers was negligent in performing its contractual duty to inspect the home as evidenced by the extensive damage that was not discovered upon inspection. There are two key components to this claim: 1) that Home Checkers was negligent because it failed to uncover the extent of the damage to the house; and 2) that Home Checkers did not inspect the crawl space, an area [*12] where there was a significant amount of termite damage.

Secondly, plaintiffs contend that the trial court erred in dismissing its breach of contract claim against Home Checkers. As plaintiffs only address negligence and breach of contract in their brief, all other claims are abandoned. N.C.R. App. P. 28(a), (b)(6).

### A. Standard of Review-Summary Judgment

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *N.C. Gen. Stat. § 1A-1, Rule 56(c)* (2007). A grant of summary judgment is reviewed *de novo* by this Court. *Falk Integrated Tech., Inc. v. Stack, 132 N.C. App. 807, 809, 513 S.E.2d 572, 574 (1999).* On appeal, this Court must determine: "'(1) whether there is a genuine issue of material fact and (2) whether the movant is entitled to

judgment as a matter of law.'" *McCoy v. Coker, 174 N.C. App. 311, 313, 620 S.E.2d 691, 693 (2005)* (quoting *NationsBank of N.C. v. Parker, 140 N.C. App. 106, 109, 535 S.E.2d 597, 599 (2000))*.

A genuine issue of material fact depends [*13] on whether the claim is supported by substantial evidence. *Eason v. Union Cty., 160 N.C. App. 388, 391, 585 S.E.2d 452, 455 (2003)* "'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Thompson v. Wake County Bd. of Educ., 292 N.C. 406, 414, 233 S.E.2d 538, 544 (1977))*. All inferences of fact are made in favor of the nonmoving party. *McCoy, 174 N.C. App. at 313, 620 S.E.2d at 693.*

B. Negligence

Robyn Marshall, on behalf of plaintiffs, signed a contract with Home Checkers on 12 May 2004 for inspection services. Plaintiffs claim that Home Checkers negligently performed this contract. It has been recognized in this State that when a plaintiff seeks only economic damages arising out of a contractual relationship with a defendant, only the law of contracts governs the claim, not the law of torts. *Ports Authority v. Roofing Co., 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), rejected on other grounds by Trustees of Rowan Tech. v. Hammond Assoc., 313 N.C. 230, 328 S.E.2d 274 (1985).* Our Supreme Court in *Ports Authority* recognized exceptions to that general rule, but further stated: "our research has brought to our [*14] attention no case in which this Court has held a tort action lies against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill." *Id. at 83, 240 S.E.2d at 351.* None of the four enumerated exceptions found in *Ports Authority* apply to this case, and while *Ports Authority* indicated that the exceptions listed may not be exclusive, our Courts have not found further exceptions subsequent to the economic loss doctrine that was promulgated in that case.

Accordingly, the trial court did not err in granting summary judgment for Home Checkers with regard to this negligence claim as plaintiffs were seeking economic damages arising out of a breach of contract. [3]

    3  Plaintiffs' claims against other defendants in tort, discussed *infra*, are not barred by the economic loss doctrine even though there was a contractual relationship between the parties,

because the fraud and negligent misrepresentations alleged by plaintiffs fall outside the scope of the contracts involved.

C. Breach of Contract

"A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law." *Dysart v. Cummings, 181 N.C. App. 641, 647, 640 S.E.2d 832, 836 (2007).*

Plaintiffs [*15] did not allege in their complaint that a particular provision in the contract between plaintiffs and Home Checkers was breached. [4] Indeed, the crux of plaintiffs' argument is that Home Checkers inspected the property but did not uncover the extent of the termite damage; therefore, Home Checkers breached its duty to thoroughly inspect the property.

    4  Plaintiffs did not file a response to Home Checkers' motion for summary judgment.

Upon review, the contract clearly states that plaintiffs requested a "limited visual inspection" of the structure. In signing the contract, plaintiffs "agree[d] to assume all risk for all conditions which are concealed from view at the time of the inspection." Furthermore, "[t]ermites, pests, or other wood destroying organisms" were outside the scope of the inspection according to the contract.

In reviewing the record as presented to the trial court at the time of the hearing on the summary judgment motion, we find that plaintiffs did not forecast sufficient evidence to support their breach of contract claim. Home Checkers noted multiple problems with the property in the inspection report, including the sagging floors, and stated that the issues warranted additional [*16] attention/repair or that they should be evaluated by a licensed contractor. Based on a "limited visual inspection," Home Checkers was not required to lift up the carpeting, pull off the vinyl siding, or cut out portions of the sheet rock to view behind the walls. In fact, the contract excludes inspection for pests, but Home Checkers still noted evidence of pest infestation in the attic, putting plaintiffs on notice of a potential pest problem.

With regard to the crawl space, Kelly Jolly stated the following in a sworn affidavit:

7. During the inspection I viewed the crawlspace from the opening and saw large amounts of hanging insulation throughout the crawlspace area that was visible from the crawlspace opening. As a result, I did not feel that it was safe for me to enter and inspect the crawlspace because of the possibility of electrical wiring which could be loose or hanging but obscured from view by the hanging insulation. I have seen dangerous electrical conditions in crawlspaces on previous inspections, and unless I can clearly see if there are any such conditions in a crawlspace I do not believe it is safe enough for me to enter a crawlspace.

. . . .

9. On page 6 of our inspection [*17] report I marked the box indicating that the crawlspace was viewed from the access opening only, and I wrote under the "Comments" section that the inspection of the crawlspace was limited to an external view only and that no inspection could be made of framing, plumbing, electrical or HVAC components. Additionally, next to the box indicating that the crawlspace was viewed from the access opening only, there is a *, which corresponds to a key at the top of the page. The key states that a * "Signifies items that warrant attention/repair."

In its motion for summary judgment, Home Checkers provided the trial court with Section .1100 of the North Carolina Home Inspector Standards of Practice and Code of Ethics, which contains a provision stating that a home inspector is not required to enter an area that may be dangerous to him or her. Plaintiffs point to the inspection report of David Jones, issued on 8 November 2004 after plaintiffs had moved in, as evidence that the crawl space was accessible. Jones stated in his report:

Most of the crawl space below the first floor of the house was accessible, but areas below the right rear corner of the living room, the rear third of the center

hall and [*18] stairwell, and the rear of the left room could not be accessed because rigid metal ductwork blocked access. Some other areas were difficult to access because of fallen insulation, but were accessible.

The fact that Jones was able to enter the crawl space on 8 November 2004 does not provide evidence that Home Checkers breached any provision of its contract when it claimed that it could not safely access that area of the house on 12 May 2004. [5]

5  On 30 November 2004, plaintiffs filed a complaint against Kelly Jolly with the N.C. Home Inspector Licensure Board. At the time of summary judgment, the Board had not completed its investigation.

In sum, plaintiffs are unable to point to a provision of the contract that was breached and rely solely on the fact that there was damage to the property not discovered by Home Checkers. Because plaintiffs failed to provide a sufficient forecast of evidence in support of their breach of contract claim, the trial court did not err in granting summary judgment for Home Checkers.

**II. The Lattas**

A. Standard of Review - Directed Verdict

"This Court reviews a trial court's grant of a motion for directed verdict *de novo*." *Herring v. Food Lion, LLC, 175 N.C. App. 22, 26, 623 S.E.2d 281, 284 (2005).* [*19] "The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." *Davis v. Dennis Lilly Co., 330 N.C. 314, 322, 411 S.E.2d 133, 138 (1991).* "If there is more than a scintilla of evidence supporting each element of the nonmovant's case, the motion for directed verdict should be denied." *Snead v. Holloman, 101 N.C. App. 462, 464, 400 S.E.2d 91, 92 (1991).* "The reviewing court does not weigh the evidence or assess credibility, but takes petitioners' evidence as true, resolving any doubt in their favor." *Jones v. Robbins, 190 N.C. App. 405, 408, 660 S.E.2d 118, 120, disc. review denied, 362 N.C. 472, 666 S.E.2d 120, 2008 N.C. LEXIS 1208 (2008).*

Plaintiffs argue that the trial court erred in granting

the Lattas' motion for directed verdict with regard to the claims against them for intentional misrepresentation, intentional concealment, negligent misrepresentation as pled in the alternative, and punitive damages because plaintiffs presented sufficient evidence at trial as to these claims. We will now review the grant of directed verdict as to each claim presented at trial.

B. Fraud Based [*20] on Intentional Misrepresentation

Plaintiffs claimed at trial that the Lattas fraudulently misrepresented the extensive termite damage. Our Supreme Court has defined fraud as:

> (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.

*Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974).* "Additionally, plaintiff's reliance on any misrepresentations must be reasonable." *RD&J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 744, 600 S.E.2d 492, 498 (2004).* Plaintiffs must establish evidence of each element of the claim in order to survive a motion for directed verdict. *Snead, 101 N.C. App. at 464, 400 S.E.2d at 92.*

Pertaining to the claim for intentional misrepresentation in this case, the two threshold questions to consider are whether plaintiffs' evidence was sufficient to show that the Lattas in fact made an intentional misrepresentation, and if so, whether plaintiffs reasonably relied on the misrepresentation.

i. Evidence of Intentional Misrepresentation

To qualify as an intentional misrepresentation for purposes of [*21] a fraud claim, the misrepresentation must be "definite and specific." *Libby Hill Seafood Restaurants, Inc. v. Owens, 62 N.C. App. 695, 698, 303 S.E.2d 565, 568, disc. review denied, 309 N.C. 321, 307 S.E.2d 164 (1983).* Plaintiffs allege that the Lattas 1) placed vinyl siding over rotten wood; 2) propped up the floor with wooden devices and cinder blocks to disguise the true condition of the sagging floors; and 3) the TMLS data sheet misrepresented the age of the home and renovations supposedly made in the 1980's. Plaintiffs claim that these actions amounted to intentional

misrepresentations. However, plaintiffs failed to present sufficient evidence at trial as to these claims.

The testimony and exhibits presented at trial tended to show that the Lattas answered "no representation" to [*22] almost every query on the Residential Property Disclosure Form, including whether there was a present infestation of termites or damage due to a past infestation, and they made no verbal assertions to the plaintiffs, either personally or through their agent, regarding termites in the home. Plaintiffs did not ask the Lattas if they were aware of any current infestation or any damage to the house due to termites.

The fact that the Lattas chose to place vinyl siding on the house and prop up the floors is not a definite and specific assertion that there were no termites in the home or resulting damage from an infestation. Even if the Lattas were attempting to conceal damage through use of the vinyl siding, plaintiffs presented no evidence of such scienter at trial. With regard to the crawl space, the Lattas did not bar entrance to that area and the props were clearly visible upon inspection, as testified to by plaintiffs' expert, David Jones.

Finally, plaintiffs assert that the Lattas misrepresented the age of the home on the TMLS sheet and that they were mislead by the claim that the house had been renovated in the 1980's, as this statement indicated that the house was habitable and cared [*23] for. In fact, the TMLS sheet clearly stated that the "Information deemed RELIABLE but not GUARANTEED." Moreover, the Lattas checked "no representation" with regard to the age of the structure on the Residential Property Disclosure Statement. Mr. Vigus testified that he sought clarification of what the remodel entailed and was informed by Marshall that "the old log cabin or structure on the back of the house had been taken down at that time and a kitchen and dining room added and that's when the total remodel of the house took place." There was no evidence presented that this "remodel" did not actually occur. Most importantly, the age of the house and the remodel does not relate to plaintiffs' damages, which resulted from termite infestation.

Absent some evidence that the Lattas intentionally misrepresented material facts, specifically regarding termites or termite damage, an action for fraud cannot be supported.

ii. Reasonable Reliance by Plaintiffs

Assuming, *arguendo,* that the Lattas misrepresented the condition of the house, "when the seller of property makes affirmative misrepresentations, the failure of the purchaser to make diligent inquiries when he has notice of a problem precludes [*24] a recovery for fraud." *Robertson v. Boyd, 88 N.C. App. 437, 443, 363 S.E.2d 672, 676 (1988).* Therefore, even if the Lattas made misrepresentations, reasonable reliance on the misrepresentations must still exist to bring an action in fraud.

> "With respect to the purchase of property, '[r]eliance is not reasonable if a plaintiff fails to make any independent investigation' unless the plaintiff can demonstrate: (1) 'it was denied the opportunity to investigate the property,' (2) it 'could not discover the truth about the property's condition by exercise of reasonable diligence,' or (3) 'it was induced to forego additional investigation by the defendant's misrepresentations.'"

*MacFadden v. Louf, 182 N.C. App. 745, 747-48, 643 S.E.2d 432, 434 (2007)* (quoting *RD&J Props., 165 N.C. App. at 746, 600 S.E.2d at 499*). "'The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion.'" *Willen v. Hewson, 174 N.C. App. 714, 718, 622 S.E.2d 187, 191 (2005)* (quoting *State Properties, LLC v. Ray, 155 N.C. App. 65, 73, 574 S.E.2d 180, 186 (2002)), disc. review denied, 360 N.C. 491, 631 S.E.2d 520 (2006).* This requirement that plaintiff [*25] undergo independent investigation comports with the policy of the courts in this State, which is, "'on the one hand, to suppress fraud and, on the other, not to encourage negligence and inattention to one's own interest.'" *Libby Hill Seafood, 62 N.C. App. at 700, 303 S.E.2d at 569* (quoting *Calloway v. Wyatt, 246 N.C. 129, 134-35, 97 S.E.2d 881, 886 (1957)).* Because plaintiffs in this case failed to make any independent inquiry into the structural integrity of the property after receiving notice of potential problems, we must find that any reliance upon purported misrepresentations by the Lattas was not reasonable.

In the case at bar, the following facts support defendants' contention that plaintiff failed to show reasonable reliance on any alleged misrepresentations by the Lattas: 1) the termite inspector found termites throughout the house; 2) the crawl space had not been examined; 3) the home inspector noted the existence of a "pest" infestation in the attic [6]; 4) the home inspector found uneven floors throughout the house; 5) no representations had been made as to termite damage on the disclosure form; 6) the Official North Carolina Wood-Destroying Insect Information Report placed [*26] plaintiffs on notice that potential structural defects may exist due to termite infestation; and 7) had plaintiffs sought the advice of a qualified building expert, it is likely that he/she would have discovered the extensive damage to the house. All of these facts were revealed through plaintiffs' own evidence at trial and demonstrate unreasonable reliance on the part of plaintiffs.

> 6    While it is not clear from the evidence in this case if the "pests" referred to were indeed termites, plaintiffs made no further inquiry into this finding by the home inspector.

In addition, neither the Lattas nor Phelps made any assurances as to the condition of the property, and plaintiffs were not discouraged from further investigation by the Lattas, who acquiesced to every request to inspect made by plaintiffs. Upon her first visit to the home, Mrs. Vigus realized that the floors were unstable. Though plaintiffs repeatedly assert that they were in England during the entire process, the fact that plaintiffs could not observe or supervise the inspections, or even view the property, does not excuse any lack of due diligence upon receiving notice that there were potential structural defects, as intimated [*27] by the termite inspection report and the general home inspection report.

The case of *Robertson v. Boyd* is analogous in many respects to the present case. There, the plaintiffs claimed that the defendant sellers, the defendant listing agent, and the defendant termite inspector knew of termite damage under the home and "'collectively and/or individually engaged in an effort to keep the Plaintiffs from discovering [the termite damage].'" *Robertson, 88 N.C. App. at 442, 363 S.E.2d at 675-76.* The Court granted defendants' 12(b)(6) motions to dismiss in part because the "plaintiffs' complaint allege[d] facts which show[ed] that they had notice of possible termite damage and failed to investigate." *Id., 363 S.E.2d at 676.* The *Boyd* Court noted that the termite report received by the plaintiffs stated that parts of the house were inaccessible, that there was some termite damage seen in the front of the house,

and that the observed damage should be "evaluated by a qualified building expert." *Id.* Because the plaintiffs in *Boyd* had notice of potential termite damage, they could not reasonably rely on affirmative misrepresentations by the defendants. *Id.* The Court held:

> In an action with respect [*28] to realty . . . the purchaser can recover only if he has been fraudulently induced to forego inquiries which he otherwise would have made. An action in fraud will not lie where the purchaser has full opportunity to make inquiries but neglects to do so through no artifice or inducement of the seller.

*Id.,* 363 S.E.2d at 675 (citing *Libby Hill Seafood, 62 N.C. App. at 698, 303 S.E.2d at 568*). In this case, plaintiffs were on notice that there were termites present in the "whole house" but failed to inquire further through no artifice of the Lattas.

In sum, we find that plaintiffs failed to provide a scintilla of evidence that the Lattas intentionally misrepresented the condition of the house or the extent of the termite infestation, and plaintiffs' failure to further inspect upon notice of potential defects signifies an absence of reasonable reliance on any purported misrepresentations. Accordingly, the intentional misrepresentation claim should not have been presented to the jury and we find no error in the trial court's grant of directed verdict as to this claim.

C. Fraud Based on Intentional Concealment

Plaintiffs further claim that they provided sufficient evidence that the Lattas failed [*29] to disclose the extent of the termite damage, and in fact attempted to conceal it with vinyl siding and floor props. This fraud claim is based upon a breach of the duty to disclose a material fact, as opposed to an affirmative misrepresentation.

> This State has long recognized that "[w]here a material defect is known to the seller, and he knows that the buyer is unaware of the defect and that it is not discoverable in the exercise of the buyer's diligent attention or observation, the seller has a duty to disclose the existence of the

defect to the buyer." In such cases, *suppressio veri* (a failure to disclose the truth) is as much fraud as *suggestio falsi* (an affirmative false representation).

*Everts v. Parkinson, 147 N.C. App. 315, 321, 555 S.E.2d 667, 672 (2001)* (quoting *Carver v. Roberts, 78 N.C. App. 511, 512-13, 337 S.E.2d 126, 128 (1985)*).

The facts of this case indicate that the Lattas did not disclose the extensive damage to the house, which was a material defect that they *may* have been aware of and thus had a duty to disclose *if* the defects were unknown to the buyer and were not "'discoverable in the exercise of the buyer[s'] diligent attention or observation.'" *Id.* (quoting *Carver, 78 N.C. App. at 512-13, 337 S.E.2d at 128*).

While [*30] there is no requirement of reasonable reliance in an action for fraud based on the breach of a duty to disclose, the party bringing the claim must still show that he or she exercised due diligence in attempting to discover defects.

> This requirement serves the same purpose as the reasonable reliance requirement in other fraud claims: it precludes a claim of fraud where a plaintiff has been negligent or inattentive to his own interests. This is because, if a defect *is* discoverable in the exercise of a buyer's diligent attention or observation, and the buyer fails to employ diligent attention or observation (and thus fails to discover the defect), a claim for fraud will not stand because in such a situation there is no duty on the part of the seller to disclose the defect.

*Id. at 325-26, 555 S.E.2d at 674*.

The primary question with regard to this claim is whether plaintiffs could have discovered the defects in the property through due diligence. If plaintiffs failed "to employ diligent attention or observation," then there was "no duty on the part of [the Lattas] to disclose the defect," if in fact they were aware of it. *Id. at 326, 555 S.E.2d at 674*. For the same reasons that plaintiffs [*31] failed to show reasonable reliance at trial, as detailed *supra,* they also failed to show due diligence in discovering the extent of the damage to the house when they were on

notice of the termite infestation.

Plaintiffs contend that *Everts* supports their claim that the Lattas were liable for failing to disclose a material fact. There, the buyers of a house brought a claim of fraud against the defendant seller for failure to disclose the fact that there was significant water intrusion into the house that resulted from a defective synthetic stucco exterior. *Id. at 318, 555 S.E.2d at 670.* The Court reversed the trial court's grant of summary judgment for the defendant because it found an intent to deceive on the part of the defendant as evidenced by his attempts to repair rotting brick mold, replace other rotten portions of windows, and apply a "decorative" stucco band around the windows that would not solve the leakage problem. *Id. at 321-25, 555 S.E.2d at 672-74.* The defendant admitted that he did not disclose any of the damage or repair work completed. *Id. at 324, 555 S.E.2d at 674.* Plaintiffs obtained a home inspection in which no rot or water infiltration was discovered. *Id. at 327, 555 S.E.2d at 675.* [*32] The inspector filed an affidavit which stated, "the 'decorative bands,' which had been installed around the windows before his inspection, 'concealed the joint where the synthetic stucco met the window brick molding,' and that, as a result, he 'was not able to visually observe the perimeter joints of the exterior windows.'" *Id.* As a result of finding that defendant may have attempted to deceive the buyers, and that the inspector did not find any indication of the underlying problem potentially due to the defendant's "repairs," the Court held, "[v]iewing the evidence in the light most favorable to plaintiffs, we believe there are genuine issues of material fact as to whether the alleged defects were discoverable in the exercise of plaintiffs' diligent attention or observation and, therefore, whether [the defendant] had a duty to disclose the defects." *Id.*

Unlike in *Everts,* plaintiffs' own evidence in the case *sub judice* established that they were aware of the potential defects in the house - that the entire house they were buying unseen was infested with termites, that an additional inspection by a qualified building expert was recommended, that there were uneven floors, and that the [*33] crawl space had not been inspected where floor props were readily observable. It is arguable that the vinyl siding covered up a "red flag," but that does not excuse plaintiffs from using due diligence in conducting further inspections in this case, when many other red flags had been discovered.

Accordingly, the trial court did not err in granting the Lattas' motion for directed verdict as to fraud based on intentional concealment.

D. Negligent Misrepresentation

"The tort of negligent misrepresentation occurs when in the course of a business or other transaction in which an individual has a pecuniary interest, he or she supplies false information for the guidance of others in a business transaction, without exercising reasonable care in obtaining or communicating the information.'" *Id. at 328, 555 S.E.2d at 676* (quoting *Fulton v. Vickery, 73 N.C. App. 382, 388, 326 S.E.2d 354, 358, disc. review denied, 313 N.C. 599, 332 S.E.2d 178 (1985)).* "Justifiable reliance is an essential element of both fraud and negligent misrepresentation." *Helms v. Holland, 124 N.C. App. 629, 635, 478 S.E.2d 513, 517 (1996).*

Furthermore, a "directed verdict [is] . . . proper if plaintiffs' evidence establishes [*34] their own contributory negligence . . . ." *Stanford v. Owens, 76 N.C. App. 284, 287, 332 S.E.2d 730, 732 (1985).*

> Where a "person having the capacity to exercise ordinary care . . . fails to exercise such care, and such failure, concurring and cooperating with the actionable negligence of defendant contributes to the injury complained of, he is guilty of contributory negligence. Ordinary care is such care as an ordinarily prudent person would exercise under . . . similar circumstances to avoid injury." In North Carolina, a finding of contributory negligence poses a complete bar to a plaintiff's negligence claim.

*Swain v. Preston Falls E., L.L.C., 156 N.C. App. 357, 361, 576 S.E.2d 699, 702 (2003)* (quoting *Clark v. Roberts, 263 N.C. 336, 343, 139 S.E.2d 593, 597 (1965)).* Thus, justifiable reliance (an element of negligent misrepresentation) and contributory negligence (a defense to negligent misrepresentation) are closely associated bars to recovery. If a plaintiff's own evidence tends to show that he/she was not justified in relying upon the misrepresentations of a defendant, then he/she is in effect contributorily negligent. *See Stanford, 76 N.C. App. at 287, 332 S.E.2d at 732.*

Here, [*35] there was no evidence presented at trial

that the Lattas supplied false information as guidance in a business transaction. As found *supra,* the data on the TMLS sheet regarding the age of the farm house and the remodeling was not material with regard to termite infestation and damage. The Lattas never represented that there were no termites present in the house or that there was no damage as a result of an infestation.

Assuming, *arguendo,* that false information was supplied, the element of justifiable reliance bars plaintiffs' claim for negligent misrepresentation. Plaintiffs were made aware by Home Checkers that there were pests in the attic and uneven floors. The termite inspector informed plaintiffs that there were termites in the whole house and that a qualified building expert should evaluate the premises. Plaintiffs failed to further investigate. Thus, the trial court was correct in granting the motion for directed verdict as to this claim.

E. Punitive Damages

The trial court did not err in granting the motion for directed verdict as to punitive damages as there were no remaining claims upon which punitive damages could be awarded against the Lattas.

**III. Joe Phelps**

At trial, plaintiffs [*36] claimed that Phelps, the Lattas' listing agent, committed intentional misrepresentation, intentional concealment, negligent misrepresentation in the alternative, unfair and deceptive trade practices, and that plaintiffs were entitled to punitive damages.

A. Fraud Based on Intentional Misrepresentation

As previously stated, to establish a claim for intentional misrepresentation, plaintiffs were required to provide sufficient evidence at trial that Phelps made an affirmative, knowing or reckless, misrepresentation to plaintiffs regarding a material fact on which plaintiffs justifiably relied to their detriment. *Libby Hill Seafood, 62 N.C. App. at 695, 303 S.E.2d at 568.* Plaintiffs' claim is without merit.

Plaintiffs never spoke to Phelps, and he never made any affirmative claims to Marshall that the house was structurally sound or free of termites. Plaintiffs cannot show that they ever relied on any affirmative statements by Phelps. He never discouraged any inspections from

taking place or disputed the findings of the reports that indicated a termite infestation and possible structural instability.

As with the intentional misrepresentation claim against the Lattas, plaintiffs' reliance on [*37] any purported misrepresentations would be unreasonable under the circumstances of this case as they had notice of the problem and failed to further investigate. *Goff v. Realty & Insurance Co., 21 N.C. App. 25, 30, 203 S.E.2d 65, 68* (directed verdicts were proper in favor of the defendants' listing agent and seller where listing agent incorrectly informed the plaintiff buyers that there was not a septic tank or drainage problem on the property because the "[d]efendants resorted to no artifice which was calculated to induce plaintiffs to forego investigation"), *cert. denied, 285 N.C. 373, 205 S.E.2d 97 (1974).* Hence, a directed verdict was properly granted in favor of Phelps with regard to intentional misrepresentation.

B. Fraud Based on Intentional Concealment

The primary question with regard to this claim is whether plaintiffs provided sufficient evidence at trial that Phelps failed to disclose a material fact that he was aware of, which plaintiffs could not discover through the use of due diligence. *Everts, 147 N.C. App. at 321, 555 S.E.2d at 672.* Since plaintiffs allege that Phelps failed to disclose the same material facts as the Lattas, and we previously concluded that plaintiffs' [*38] did not utilize due diligence in the discovery of these facts, it follows that an action for failure to disclose against Phelps cannot lie. Therefore, the trial court properly granted the motion for directed verdict as to this claim.

C. Negligent Misrepresentation

The motion to dismiss with regard to the claim of negligent misrepresentation should not have been granted if plaintiffs provided sufficient evidence that Phelps "'supplie[d] false information for the guidance of others in a business transaction, without exercising reasonable care in obtaining or communicating the information.'" *Id. at 328, 555 S.E.2d at 676* (quoting *Fulton, 73 N.C. App. at 388, 326 S.E.2d at 358*). Plaintiffs must also have shown that they justifiably relied on the false information. *Helms, 124 N.C. App. at 635, 478 S.E.2d at 517.*

As we previously found, Phelps did not make any

affirmative statements as to a material issue in this case. Since he did not supply false information, we must conclude that the directed verdict was properly granted. Assuming, *arguendo,* that he did supply false information, as we previously determined with regard to the same claim against the Lattas, plaintiffs have not shown justifiable [*39] reliance on any such statements by Phelps.

D. Unfair and Deceptive Practices

In North Carolina, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." *N.C. Gen. Stat. § 75-1.1(a)* (2007).

> In order to prevail under this statute plaintiffs must prove: (1) defendant committed an unfair or deceptive act or practice, (2) that the action in question was in or affecting commerce, (3) that said act proximately caused actual injury to plaintiff. Plaintiffs do not have to prove fraud, bad faith, or intentional deception, but proof of fraud necessarily constitutes a violation of the statute. In determining whether a representation is deceptive, its effect on the average consumer is considered. Conduct is unfair or deceptive if it has the capacity or tendency to deceive.

*Canady v. Mann, 107 N.C. App. 252, 260, 419 S.E.2d 597, 602 (1992)* (citations omitted).

There was no evidence presented at trial that Phelps engaged in unfair or deceptive acts or practices that proximately caused actual injury to plaintiff. Plaintiffs failed to show that Phelps deceived them in any way. He made no affirmative statements [*40] regarding the structural integrity of the house, and he never attempted to thwart any further investigation by plaintiffs, who were on notice of a potentially serious defect in the house. Accordingly, the trial court was correct in granting the motion for directed verdict as to this claim.

E. Punitive Damages

The trial court did not err in granting the motion for directed verdict as to punitive damages as there was no remaining claim upon which punitive damages could be

awarded against Phelps.

**IV. Robyn Marshall and Keller Williams Realty**

Negligent Misrepresentation

The only claim against Marshall and Keller Williams Realty at trial was negligent misrepresentation. In support of this allegation, plaintiffs claim that Marshall told them that the house was "fine" and that everything would be okay once the termites were treated. She further stated that her mother had termites and that once they were treated, there were no further problems. Plaintiffs contend that Marshall never advised them to obtain any additional inspections upon reviewing the termite report and general home inspection report. Plaintiffs also take issue with the fact that Marshall had never sold a house in Hillsborough before [*41] and that she asked Phelps to refer inspectors.

Ms. Vicki Ferneyhough ("Ferneyhough"), plaintiffs' real estate expert, testified that these actions by Marshall were improper. Ferneyhough further stated that, in her opinion, Marshall offered a negligent misrepresentation with regard to the two inspection reports "[b]ecause she basically was told on the inspection report that the inspector did not have the opportunity to look at the crawlspace and look under the house, she was told on a second inspection report that there was visible infestation of termites, and at that point nothing else got done." Ferneyhough testified that Marshall had a "higher duty" because her clients were in England and unable to view the house.

However, plaintiffs presented no evidence that Marshall made any affirmative statements about the structural integrity of the house, most of which was not readily visible to her. While Marshall did not advise plaintiffs to seek further inspections, there was no evidence presented at trial that she attempted to dissuade plaintiffs from further investigation. Marshall may have assured plaintiffs that everything would be "fine" once the termites were treated, but that is not [*42] the same as saying there is no structural damage and you should not further investigate. In fact, the Exclusive Right to Represent Buyer signed by the parties contains the following clause:

> In addition to the services rendered to Buyer by the Agent under the terms of this Agreement, Buyer is advised to seek other

2009 N.C. App. LEXIS 830, *42

professional advice in matters of law, taxation, financing, surveying, *wood-destroying insect infestation, structural soundness,* engineering, and other matters pertaining to any proposed transaction.

(Emphasis added.)

While Marshall may have failed to represent her clients in accord with the standards of her profession, her actions do not amount to negligent misrepresentation, the only claim against her at trial.

Because plaintiffs cannot show that false information was negligently given by Marshall, the trial court was correct in granting the motion for directed verdict in favor of Marshall and her employer Keller Williams.

**V. Motion for Reconsideration and Motion for a New Trial**

Plaintiffs submitted a Motion for Reconsideration and Motion for a New Trial pursuant to *N.C. Gen. Stat. § 1A-1, Rule 59* (2007), which was denied. "The trial court's discretionary ruling under *Rule 59* [*43] in either granting or denying a motion for a new trial may be reversed on appeal 'only in those exceptional cases where an abuse of discretion is clearly shown.'" *Hughes v. Rivera-Ortiz, 187 N.C. App. 214, 217, 653 S.E.2d 165,*

*168 (2007)* (quoting *Anderson v. Hollifield, 345 N.C. 480, 483, 480 S.E.2d 661, 663 (1997)), affirmed in part, 362 N.C. 501, 666 S.E.2d 751 (2008).* "Our review of the trial court's decision to enter an order on [plaintiffs'] motion under *Rules 59* and *60* without notice or a hearing is limited to whether the trial judge abused his discretion." *Ollo v. Mills, 136 N.C. App. 618, 625, 525 S.E.2d 213, 217 (2000).* The trial judge determined that no claims were appropriate for jury determination. It was in his sound discretion to decide whether a new trial was warranted. Based on our discussion *supra,* we find there was no abuse of discretion in his decision to deny a new trial without a hearing.

Conclusion

We conclude that, based upon the evidence presented, the trial court did not err in granting summary judgment for Home Checkers, Harold and Kelly Jolly. We further conclude that the trial court properly granted defendants' motions for directed verdict as to all claims, [*44] and that no error occurred in the trial court's denial of plaintiffs' motion for reconsideration and motion for a new trial.

Affirmed.

Judges WYNN and ERVIN concur.

Report per Rule 30(e).

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*6,995*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: June 10, 2015                    /s/ James L. Warren, III
                                        *Counsel for Appellants*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 10th day of June, 2015, I caused this Reply Brief of Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Steven B. Epstein
Andrew H. Erteschik
POYNER SPRUILL LLP
P.O. Box 1801
Raleigh, North Carolina  27602-1801
(919) 783-6400

*Counsel for Appellees*

William J. Conroy
CAMPBELL TRIAL LAWYERS
1205 Westlakes Drive, Suite 330
Berwyn, Pennsylvania  19312
(610) 964-6380

*Counsel for Appellees*

I further certify that on this 10th day of June, 2015, I caused the required copies of the Reply Brief of Appellants to be hand filed with the Clerk of the Court.

/s/ James L. Warren, III
*Counsel for Appellants*